IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AWAD HAMED AL-BANDAR
Civilian Detained in
US Military Custody
In, or near, Baghdad, Iraq

Petitioner,

v.

GEORGE WALKER BUSH,
President of the United States
The White House
1600 Pennsylvania Ave., N.W.
Washington, D.C. 20500

ROBERT M. GATES
Secretary of Defense
United States Department of Defense
The Pentagon
Arlington, Virginia

General George CASEY
Commander of US Forces in Iraq, US Army
United States Department of Defense
The Pentagon
Arlington, Virginia

General John ABIZAID,
Commander of CENTCOM, US Army
United States Department of Defense
The Pentagon
Arlington, Virginia

Vice-Admiral David C. NICHOLS Jr.,
Deputy Commander of CENTCOM, US Army
Commander of CENTCOM, US Army
United States Department of Defense
The Pentagon
Arlington, Virginia

1

Major General Lloyd J. AUSTIN III
Chief of Staff of Command of CENTCOM, US Army
Commander of CENTCOM, US Army
United States Department of Defense
The Pentagon
Arlington, Virginia

Respondents,

All Respondents are sued in their official capacities.

## PETITION FOR WRIT OF HABEAS CORPUS

1.  Petitioner seeks a Writ of Habeas Corpus.

2.  Petitioner is in the actual and exclusive physical custody of United States military

personnel, or other officers, personnel or contractors of the U.S. government. See, Exhibit 2,

Declaration of Ramsey Clark with attachments; Exhibit 3, Declaration of Dr. Curtis F.J.

Doebbler.

3.  Although petitioner is at this time and has been at all times during more than the past

two years in the actual physical custody of U.S. military personnel, or other officers, personnel,

or contractors of the U.S. government, he faces the imminent threat that he will be surrendered,

or turned over to the custody of personnel of the government of Iraq, its paramilitary forces, or

other groups, or persons allied with an official, or agency of the Iraqi government in which event

he will be in immediate jeopardy of execution, whether, summary, extra judicial, or pursuant to

the illegal trial by the  Iraqi Special Tribunal, also called the Iraqi High Criminal Court, herein

IST/IHCC, which was illegally created by the U.S., that is neither independent nor impartial and

which subjected him to a seven month trial which was consistently unfair and violated due

2

process of law.   If surrendered to the IST/IHCC petitioner will immediately face torture, cruel, inhuman and degrading treatment and cruel and unusual punishment and death.

4.   Petitioner, a civilian and Chief Justice of a court of national jurisdiction in Iraq at the time of the U.S. war of aggression, invasion and occupation of Iraq beginning in March 2003, has not been determined by the U.S. to have been properly detained as enemy combatant, and is not now awaiting such determination for purposes of trial before a U.S. Military Commission, to his knowledge.

## I. JURISDICTION

6.   Petitioners invoke this Court's jurisdiction under 28 U.S.C. §§1331, 1350, 1651, 2201, 2202, 2241(a), (c)(1) and (c)(3), 2242, and 2243; 5 U.S.C. §702; the U.S. Constitution, Article I, §9, cl. 2, Article III, the Due Process Clause of the Fifth Amendment, the Sixth Amendment, and the Eighth Amendment; the International Covenant on Civil and Political Rights ("ICCPR"); the American Declaration on the Rights and Duties of Man ("ADRDM"); the American Convention on Human Rights, (ACHR); the Third Geneva Convention Relative to the Treatment of Prisoners of War; the Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War and Customary International Law. For declaratory relief, Petitioners also rely on Fed. R. Civ. P. 57.

7.   The U.S. Supreme Court has held that federal habeas corpus jurisdiction "requires nothing more" than a claim that a petitioner is "being held in federal custody in violation of the laws of the United States" once personal jurisdiction over a custodian is established. *Rasul v. Bush*, 542 U.S. 466, 483, 124 S. Ct. 2688, 2698 (2004).

8.  Petitioner is in the complete and exclusive "jurisdiction or dominion exercised in fact" over him by officials of the U.S., the Respondents, who are within the jurisdiction of this Court. This Court has jurisdiction over petitioners claims. *Rasul v. Bush*, 542 U.S. 466, 482, 124 S. Ct. 2688, 2697 (2004).

9.  This Court is empowered under 28 U.S.C. §2241 to grant the Writ of Habeas Corpus. This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. §2201, and to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. §2202, as this case involves an actual controversy within the Court's jurisdiction.

10.  This Court has personal jurisdiction over Respondents because they are officers or agents of the U.S. performing their duties in the District of Columbia, having substantial contacts in the District, and being physically located within this Court's territorial jurisdiction. The U.S. Supreme Court has held that a court's jurisdiction over a habeas corpus petition rests on its jurisdiction over the petitioner's custodian. *Rasul v. Bush*, 542 U.S. 466, 478-479, 124 S.Ct. 2686, 159 L.Ed. 2nd. 548 (2004) and *Rumsfeld v. Padilla*, 542 U.S. 426, 442, 124 S.Ct. 2711, 159 L.Ed. 2d 513 (2004).

## II. VENUE

11.  Venue is proper in the U.S. District Court for the District of Columbia, for this writ of habeas corpus because one or more of Respondents resides within the jurisdiction of this Court, a substantial part of the acts or omissions giving rise to the claim occurred in the district, where at least one Respondent may be found, and all Respondents are officers and employees of

4

the U.S., acting in their official capacities on all matters related to petitioner and are amenable to service of process in the district. 28 U.S.C. §§1391(b) and 1391(e).

## III. PARTIES

12. Petitioner Awad Hamed Al-Bandar is a citizen of Iraq who is in the exclusive, unlawful physical custody of the U.S. military in Iraq. He has been convicted and sentenced to death in an illegal and unfair trial by the IST/IHCC. The conviction and sentence are on appeal in an Iraqi court. If he is surrendered, or released to personnel of the government of Iraq, its paramilitary forces, or other groups, or persons in Iraq allied with an official, or agency of the Iraqi government – he will be placed in jeopardy of summary, or illegal execution, torture, cruel, inhuman and degrading treatment and cruel and unusual punishment.

13. Respondent Bush is the President of the U.S. and Commander-in-Chief of the U.S. Military. He ordered the war of aggression, invasion and continuing illegal use of force in Iraq. He authorized the arrest and detention of Petitioner and he must authorize his surrender, or release to the government of Iraq, or others and is responsible for his unlawful detention and any violation of his rights if he is surrendered, or released to the government of Iraq, or others. Respondent Bush is sued in his official capacity.

14. Respondent Gates is the Secretary of the U.S. Department of Defense and has his principal office in Arlington, Virginia. Respondent Gates has been charged with overall responsibility for the conduct of hostilities against Iraq and the maintenance of the occupation of Iraq by U.S. armed forces, including the custody and control of the detained petitioners. Respondent Gates is sued in his official capacity.

5

15. Respondent General George Casey is the Commander of Central Command of U.S. military forces in Iraq for the U.S. Miliary. He is sued in his official capacity.

16. Respondent General John Abizaid is Commander of CENTCOM, U.S. Army. He is sued in his official capacity.

17. Respondent Vice-Admiral David C. Nichols Jr. Is Deputy Commander of CENTCOM, U.S. Army. He is sued in his official capacity.

18. Respondent Major General Lloyd J. Austin III is Chief of Staff of Command of CENTCOM, U.S. Army. He is sued in his official capacity.

## IV. STATEMENT OF FACTS

### A.   Background to Arrest of Petitioner

19. Petitioner, Awad Hamed Al-Bandar, age 66, was the civilian Chief Justice of an Iraqi court of nationwide jurisdiction at the time of the U.S. invasion and occupation of Iraq in March 2003. He was living in Iraq throughout 2003 with his large family until it was dispersed during the occupation. His home was looted and property destroyed during the occupation. He has been at all times a civilian, a non combatant and has not participated in authorizing, planning or participating in any act of violence, or other unlawful acts or acts against U.S. forces, or other, or aiding others to such activity. He was not listed among the more than fifty former officials of the government of Iraq whose photos and identity were placed on cards in 2002, widely distributed and the subject of intense search, most of whom have been captured.

20. The former government of Iraq was driven from power by the U.S. war of aggression and occupation of Iraq in violation of international law, as the overwhelming consensus of

6

international legal opinion confirms. Exhibit 1, (attached) documenting inter alia, the illegality of the U.S. attack at pp. 16-21, *especially* nn. 16.

21.    On information and belief, Petitioner surrendered or was seized by the U.S. military in early 2004, and placed under arrest. Undersigned counsel have not been able to discuss this, or other issues with petitioner.

22.    The precise circumstances of his surrender, or seizure and arrest are within the knowledge of the Respondents.

23.    The U.S. government has consistently acknowledged that it is holding Petitioner from the time of his surrender, or seizure by the U.S. military to date.

**B.    Petitioner's Detention By the United States**

24.    Judge Bandar has remained in the exclusive and illegal custody of the United States at all times since first placed under arrest by U.S. military forces in early 2004, from that moment to this date, including the days in which he has been brought by the U.S. before the IST/IHCC in court in Baghdad.

25.    Judge Bandar's exact location at any given time since his arrest is uncertain, because the U.S. keeps his location secret, except when he is in the presence of his defense counsel, or in the court building of the IST/IHCC in the International Zone in Baghdad, but it is known that he is held in the area of the International Airport near Baghdad in a large area under the exclusive control of the U.S. military forces, somewhere in a part called Camp Cropper, because he is met there in an unidentifiable building by his present defense counsel and son Bader al Bandar.

26.    Judge Bandar has been at all times and is now in the exclusive custody of U.S. military personnel, but personnel of the U.S. Department of Justice, other U.S. personnel and

contractors of the U.S. may on occasion be present. Several unarmed Iraqi's in T-shirts act as bailiffs within the courtroom which is under the physical control of the U.S. military and to which all access is guarded by U.S. military personnel. All visits by defense counsel and communications between counsel and petitioner outside the courtroom are arranged and controlled by U.S. military personnel.

27. Petitioner was interrogated by U.S. military personnel and other U.S. personnel after his detention for months before he was allowed counsel and since without notice to, or the presence of his counsel. All meetings with his defense counsel during his custody have been monitored audibly and visually, by U.S. military personnel, or other U.S. personnel.

28. While petitioner and later his defense counsel have protested his arrest and detention by the U.S., he has never been advised of his rights under U.S. and international law and his rights under the Constitution and laws of the United States, the Geneva Convention, the International Covenant on Civil and Political Rights, other international treaties of the United States, and international law have been regularly disregarded and violated by U.S. personnel.

29. After Judge Bandar was seized by U.S. military forces, or surrendered to them in early 2004 and while remaining in the exclusive custody of the U.S. he was tried, convicted and on November 5, 2006 sentenced to death by the IST/IHCC. The conviction and sentence are on appeal in an Iraqi court.

30. The Respondents authorized, directed and supervised the seizure, detention and arrest of Petitioner. They directed and supervised Petitioner's detention and the conduct of U.S. personnel in whose custody Petitioner is placed, and the conditions under which he is detained. They authorized the violations of his rights.

31.   The Respondents authorized, directed and participated in creating the illegal IST/IHCC and financing, selecting, training its Judges and other personnel and authorized, directed and approved its control by U.S. personnel and its lack of independence and impartiality.

U.S. military personnel control all communication by defense counsel with Petitioner and with the Court outside the courtroom.  They control physical protection of the judges and their families and maintain large staffs including military and civilian lawyers from the U.S. Department of Justice and others retained by it to advise, consult and direct the Judges of the IST/IHCC and who work both the Court in its immediate proximity.

32.   Respondents have directed, facilitated and approved the violations of due process of law and the many acts of unfairness in the trial of Petitioner.

33.   Respondents plan to deliver and release Petitioner to personnel of the government of Iraq, its Minister of Interior, paramilitary organizations, or persons acting under the direction of Prime Minister Maliki if, and as soon as, the Iraqi appellate court reviewing the conviction and sentence of the IST/IHCC affirms in whole, or part, his sentence and conviction despite the illegality of the Court, its lack of independence and impartiality and its denial of due process of law and the fundamental unfairness of the trial knowing the immediate consequence will be summary, or illegal execution, torture, cruel, inhuman and degrading treatment and cruel and unusual punishment.

## C.    Petitioner's Illegal and Unfair Trial

34.   Petitioner was tried, convicted and sentenced to death by an illegal court.  Defense counsel tried repeatedly to present the law and facts which demonstrate the illegality of the IST/IHCC to the Court from October 19, 2005 the day the trial began, but were prevented by the

court from addressing the issue, though various briefs on the subject were filed during the trial. A major brief was prepared and submitted to the Trial Panel in September 2006 and an updated copy of the same memo was submitted to the appellate court in November 2006 with additional and new facts presented. These additions were placed at the end of the September brief. It presents all the major deficiencies and failures of the Court and trial including the issue of the legality of the IST/IHCC. The updated brief is attached as Exhibit 1. The principal arguments on legality which arise from the illegal invasion and occupation of Iraq by the U.S. were presented to both Courts at pages 14-30, Ex. 1, hereto.

35.  The IST/IHCC lacks independence from outside influences that have directly affected its personnel, conduct and decisions which prejudiced Petitioner. The Iraqi Study Group described outside influences on Iraqi courts as "ruthless."  The direct influence of Respondents and their subordinates is greatest. In late January of 2006, after hearing more than 30 witnesses since commencement of the trial on October 19, 2005, the President of the IST/IHCC, Chief Judge Amin was forced to resign by political pressure, his successor as Chief Judge Saeed al-Hammash, publicly announced by the Court, was removed from the court several days later on grounds first raised and pressed by the U.S., that he was a former member of the Baathest party, among millions of others, though he had sat on the trial panel from the beginning of the proceeding.  Judge Abdel Rahman, who replaced Judge al-Hammash, had not been on the Court theretofore, was then made Chief Judge of the Court. The Chief Judge conducts the entire trial proceedings and has been the only judge on the trial panel identified to defendants, including Petitioner, or named publicly or shown in the courtroom video tapes with rare exceptions.

The U.S. has funded the IST/IHCC at a cost of hundreds of millions of dollars, including judicial salaries. The U.S. protects the judges from violence with U.S. personnel. Further examples and details of the Courts lack of independence are found in Ex. 1 primarily at pages 56-60. The requirement that the Judiciary be independent of external influences in hearing and deciding cases is essential to the judicial function and rule of law. It is universally recognized. See, Ex. 1 Endnotes, 153-158 at pp. 126.

36,   The IST/IHCC lacked impartiality in the trial. As a single illustration of the fact and appearance of bias, the final Chief Judge of the Court, Judge Abdel Rahman, a Kurd, placed on the Court and in charge of the trial after it was more than 1/3 complete, is from Halabja, a Kurdish town where it is claimed 5,000 people were killed by nerve gas used by Iraqi forces in 1988. Relatives and friends of Judge Abdel Rahman were killed. It was alleged in a motion for his recusal that before his appointment to the Court, he had said, of this trial, "a trial is not necessary, only a hanging". Judge Abdel Rahman refused to withdraw from the Court, but never denied any of the many allegations that he was bitterly prejudiced. For more examples of judicial bias see Ex. 1, pp. 61-64. Near the end of the defense case in May 2006, Judge Abdel Rahman addressed the defendants in anger and in an extreme expression of prejudice, said "You have had blood on your hands since childhood". Speaking to Judge Bandar, and directly alluding to the major fact in dispute in the case, Judge Abdel Rahman said "I won't issue a sentence on 148 defendants within one hour. I am not this type." The evidence showed Judge Bandar's Court after a two year investigative proceeding by the Court, reviewed confessions and guilty pleas of 148 persons over a period of 18 days before entering judgments of guilt and mandatory death sentence. See, Exhibit 5, International Center for Transitional Justice: Briefing Paper on Dujail,

11

Trial and Error, Nov. 2006, www.ictj.org., for its criticism of Judge Abdel Rahman's conduct of the trials. At another time, Judge Abdel Rahman called Judge Bandar "stupid" and ordered him to resume his seat. See, Exhibit 4, Human Rights Watch, Judging Dujail: The First Trial before the Iraqi High Tribunal, Vol. 18, No.9(E) November 2006, pp. 65-69 criticizing Judge Abdel Rahman's many displays of prejudice. Judge Abdel Rahman, who was the only member of the Court active in conducting the trial speaking in the Courtroom to counsel, the accused, including Petitioner, and courtroom personnel manifested, prejudice against Petitioner and all the accused every day of the trial.

37.    The IST/IHCC and the United States failed to provide adequate protection for the Court and trial participants to function without an overwhelming sense of fear. The general prevalence of violence in Iraq and its concentration in Baghdad caused a constant awareness of the risk of violence by all participants in the trial and made fairness improbable. In the nature of things the U.S. military and its contractors were the only reliable source of protection for the court, its personnel and families, and defense counsel and their families. Despite pleas by defense counsel for U.S. protection, which included a formal request from Chief Judge Amin for such protection in December 2005. Meaningful protection was never provided defense counsel and their families. Most removed their immediate families from Iraq. As a direct consequence three defense lawyers were assassinated during the trial. The first lawyer to be kidnapped, by a large group of men in business suits arriving in new SUV's and proclaiming themselves to be from the Ministry of Interior, was Judge Bandar's first counsel of choice, a distinguished lawyer, and friend Saloon al Janabi. He was seen on television on October 19, 2006, acting as a defense counsel on the first day of the trial. Late the next evening, October 20, 2006, he was taken from

12

his office and brutally murdered. Badir al Bandar, a young son of the Judge, appeared as his father's counsel in the next Court session.

A second defense lawyer was murdered on the street by gunman appearing to be from the Interior Ministry on November 8, 2005 and a third was later kidnapped from his home early in the morning by men claiming to be from the Interior Ministry of Iraq, and murdered on June 21, 2006.

38. The Dujail Trial, as it is called, can only be understood as the trial of a trial. The trial that was on trial was a case before Judge Bandar. The case involved an assassination attempt on the life of President Saddam Hussein on July 8, 1982 on a main highway running through a town called Dujail. It was one of several assassination attempts against officials of the Iraqi government by members of the Dawa party, a Shia party funded by Iran, and committed to overthrow the government of Iraq. The case was under investigation and processing by investigative judges from 1982 to 1984. The files of the investigative judge which contained confessions to capital offenses by 148 males were then submitted to Judge Bandars court which reviewed them and the confessions which included guilty plea's by each of the 148 men, and entered judgments of guilt and mandatory death sentences for treason, or taking up arms against Iraq in support of Iran during the Iran-Iraq war. The convictions and sentences were reviewed by a large national panel and were confirmed and 148 orders of execution signed by President Saddam Hussein in mid 1985, three years after the assassination attempt. The 148 death sentences were the only basis for charges against Judge Bandar. His conviction was necessary if President Saddam Hussein was to be convicted for signing the warrants which was the major evidence against them. The very theory of the Dujail case is extreme. In the midst of a very

13

deadly and dangerous war with Iran after assassination attempts on Minister Tariz Aziz, and other officials including the President of the country, that Iraq would delay three years, fabricating a trial and a review by eminent national figures, before imposing death sentences.

During his trial Judge Bandar pleaded from the first day for the trial records of his Court of that trial from 1982 to 1984. He never got them. Typical of his conduct, Judge Abdel Rahman taunted Judge Bandar "Asking for dossiers (the records of the earlier trial) is the work of the defense, but don't ask us to do it." Judge Bandar replied "The Americans have seized all the documents of the Iraqi government, and the Court can ask them to bring it, but if you want to try me without knowing the truth..." to which Judge Abdel Rahman famously replied, "I don't do that ... I won't issue a sentence on 148 within one hour, I am not this type!" U.S. military and civilian lawyers working closely with the IST/IHCC and observed the entire trial were aware of Judge Bandars pleas.

39.    The Dujail case was brought solely because of political pressure from members of the Dawa Party, in Iraq's present government, including former Prime Minister Jaffari, and present Prime Minister Maliki, and the dominant role of the Dawa Party in the present Parliament of Iraq. The Dawa Party was founded in Iran primarily by Iraqi's in exile. From its creation, the Dawa Party was committed to the overthrow of the government of Iraq. Before, during the Iran-Iraq war and thereafter, members of the Dawa Party committed acts of violence and sabotage against the people and government of Iraq. During the period of 1980-82 members of the Dawa Party planned and conducted attempts to assassinate leaders of the government of Iraq including President Saddam Hussein and Foreign Minister Tariq Aziz. These planned assassinations were supported by current members of the Dawa Party in the government of Iraq including the office

14

of the Prime Minister. The Dawa Party had significant secret membership and supporters in Dujail who conducted and supported the assassination attempt on President Saddam Hussein in July 1982 and conspired with and supported Iran in the Iran-Iraq war which was raging a the time. Saddam Hussein testified in the trial that the announcement of the assassination attempt on his life was first made in Tehran and participants in its planning and execution fled to Iran.

The Dujail trials came during an extremely dangerous time for Iraq, 1982 when Iran drove Iraqi troops from most of southern Iran and invaded parts of Iran along their common border . Over a million people were killed during the Iran-Iraq war, largely forgotten even by Iraqis except by the Dawa Party and former Iraqi government officials directly threatened by them. That such a case was brought surprised anyone familiar with the history of Iraq from 1970 through 2003. It was brought because of the insistence of the Dawa Party to show its power and exact revenge making the Dujal incident in 1982 and its prosecution over a three year period the first case against former regime.

40. Before the trial began Judge Dara Nureddin withdraw his name after having been nominated to the Dujail trial panel because he had allegedly been convicted and sentenced to prison by the courts functioning under the government of Iraqi President Saddam Hussein. Another Judge withdrew from the Dujail trial panel in late November 2005, because it was alleged his brother had been killed by the government of President Saddam Hussein. Judge Abdel Rahman lost more than one relative at Habalja and was twice sentenced to death by Iraqi courts, the second time during President Saddam Hussein's administration.

41. Shortly after joining the IST, new Chief Judge Raouf Rasheed Abdel-Rahman was challenged to recuse himself because of prejudice. He failed to provide a reasoned decision on

the motion seeking his disqualification for bias. He first ignored, then refused to decide the motion, but later stated that the Court of Appeal of the IST has decided the motion. No written decision was provided at that time however. When a decision was finally provided it rejected the defense motion for recusal on the sole basis that under Iraqi law it should have been submitted before the proceedings on the merits started in October 2005, more than three months before Judge Abdel-Rahman, whose disqualification was sought, had joined the IST and was known to Petitioner. It was impossible for defense counsel to have challenged his impartiality at that time.

42. Violence has continued to plague defense counsel. Just a few days after the second trial before the IST/IHCC began and while the verdict and judgment in the Dujail trial were under consideration, in September 2006, a fourth defense lawyer, Abdel-Moneim Hussein Yassin, was murdered.

43. The Dujail trial proceedings include the following additional acts and failures by U.S. authorities, the IST/IHCC, and persons acting under their authority.

a. Failure to provide Petitioner basic due process rights during interrogations and investigations by denying him legal counsel and the right to see the evidence against him; Ex. 1, pp. 52-53, 69-70;

b. Failure to ensure a trial before a competent tribunal and instead holding a trial before an exceptional court that was created in violation of Iraqi and international law; id pp.5-7, 33-35;

c. Failure to ensure a trial before an independent tribunal and instead holding a trial before an exceptional court that is subject to interference by the political authorities in Iraq and outside Iraq that has prejudiced Petitioner; id pp. 8-9, 39, 55-59;

16

d.  Failure to ensure a trial before a impartial tribunal and instead holding a trial before an exceptional court where the judges have repeatedly acted and made statements that reveal deep prejudice against Petitioner and constitute fundamental unfairness; id pp. 60-63;

e.  Failure to provide Petitioner timely statements of the charges against him by first presenting the charges against him in June 2006 more than two years after he was detained, eight months into his trial, and one month after Judge Abdel Rahman cut off all further defense testimony with the statement "If you cannot prove your innocence with 34 witnesses, 100 will not help; and forced him to proceed at times during the trial and close his defense in the absence of his lawyers of choice; p. 64;

f.  Failure to allow Petitioner adequate time and facilities to prepare his defense by confiscating his resources, failing to provide resources for a defense, withholding and refusing to compel the production of vital exculpatory evidence, withholding all transcripts of the proceedings, and rushing the defense unreasonably; Id pp. 45, 65-67;

g.  Failure to provide a public trial by denying the general public access to the trial, frequently closing the trial to the attending press, and public by drawing curtains after the glass through which they viewed the trial and cutting off all video-audio transmissions which cut off the media and public elsewhere, and by later showing only edited versions of the trial that present Petitioner in the worst light possible; Id p. 67;

h.  Failure to allow Petitioner time to choose replacement counsel after the murder of his first lawyer, and to meet adequately with counsel of his own choosing and by assigning counsel to which Petitioner objected when his chosen defense counsel was prevented from participating; Id 48-51, 68-70;

17

i.  Allowing the intimidation of witnesses in which even the judges of the court participated by sending court officials to coach witnesses and by threatening witnesses with repercussion if they provide testimony that is not what the Prosecution wishes; Id pp. 70-72

j.  Relying on *ex post facto* laws by applying domestic laws of Iraq which did not exist until decades after the acts which are the basis of the charges against Petitioner; Id 72-73, see also 79;

k.  Violating the presumption of innocence by Judge Abdel Rhaman stating defendants must prove their innocence and making biased statements and the withholding of relevant exculpatory evidence; Id p. 74;and

l.  Failure to ensure equality of arms between the parties by allowing the prosecution more than eight months to present its case with massive funding and constant threat assistance of officers and attorneys of the Prosecution.  The U.S. provide the Court, its Judges and Prosecution to prepare, present and judge the case while no compulsory process, refusing exculpatory evidence, denying any resources to defense counsel for protecting the investigation and present their defense, and only five weeks to present the entire defense case; Id pp. 74-76.

Fuller descriptions of the factual basis and support for the allegations in paragraph 45 are in Exhibit 1.

**D.  Threat of the Unlawful Surrender, or Release of Judge Bandar to Representatives of the Government of Iraq, or Its Designee.**

44.  Unless restrained, the Respondents will surrender, or release Judge Bandar who is in the exclusive custody of the U.S. to the government of Iraqi, its Interior Ministry, or another

designee of the government of Iraq, the IST/IHCC, or others in Iraq when the Iraqi appeals court acts on his conviction, as may happen at any time, or shortly thereafter.

45.  Respondents will violate U.S. and international law if they surrender or releases Judge Bandar to the government of Iraq, its designee, or others at any time under present conditions because Judge Bandar would be immediately threatened with and exposed to summary, extra judicial or illegal execution, torture, cruel inhuman and degrading treatment and cruel and unusual punishment, as is well known to Respondents.

## V.    Reasons for Granting the Writ of Habeas Corpus

46.  If Judge Bandar is surrendered, or released by Respondents to any person, or persons designated in, or in any way associated with the government of Iraq, or the IST/IHCC, or to any other organization or person in Iraq, he will be immediately threatened with extra judicial, or summary execution, or illegal execution, torture, cruel and unusual punishment and cruel inhuman and degrading treatment in violation of his rights and the laws set forth below.

47.  The Respondents will violate the Constitution and laws of the United States and International law as set forth below if it surrenders or release Judge Bandar to any person, or persons designated, or in any way associated with the government of Iraq, or the IST/IHCC, or any other organization, or person in Iraq, or exposes him to seizure by anyone.

48.  Accompanying this petition are the supporting sworn declarations of Ramsey Clark (Exhibit 2) and Dr. Curtis F. J. Doebbler (Exhibit 3).

First, Respondents know (1) that the government of Iraq intends to execute Petitioner and will do so if Petitioner is placed in the hands of anyone the government of Iraq designates, (2) from the conduct of the government of Iraq which Respondents have observed toward prisoners

19

in its custody it is assured that Petitioner will be tortured and subjected to cruel inhuman and degrading treatment, and cruel and unusual punishment before execution (3) the U.S. waged a war of aggression against Iraq continuing to occupy it in the midst of great violence and the U.S. created, financed, protects, monitors and guides the daily workings of the IST/IHCC which is neither legal, nor independent and repeatedly violated Petitioner rights to due process of law and fundamental fairness all caused, or condoned by Respondents, (4) that they hold Petitioner in their exclusive custody and have subjected him to an illegal and unfair trial by the IST/IHCC as a result of which he is threatened as aforesaid; that for these reason Respondents surrender, or release Petitioner and he is executed, tortured or subjected to cruel, unusual, inhuman and degrading punishment.  Respondents will be charged as principals with murder, torture, assault, or as accomplices, accessories, or for aiding and abetting such crimes.

Second, Respondents have held Petitioner in their exclusive custody and subjected him to a trial before the IST/IHCC in which Respondents have participated in the violation of Petitioner rights under the Fifth, Sixth and Eight Amendments of the Constitution of the United States in which he was deprived of life and liberty without due process of law, a public trial by an impartial trier of fact, the rights to be informed of the nature and source of the accusation against him, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, to be provided exculpatory evidence for his defense, to have law assistance of counsel of his choice for his defense, among other rights.

Third, Respondents have held Petitioner in their exclusive custody and subjected him to a trial before the IST/IHCC in which Respondents have participated in the violation of Petitioners rights protected by treaties made under the authority of the United States and customary

20

international law which are part of the supreme Law of the Land as provided in Article VI of the Constitution of the United States, including Article 6, 7, 10, 14, 15 and 19 of the International Covenant on Civil and Political Rights, 999 UNTS 171; Article 3 of the International Covenant Against Torture and other Cruel, Inhuman and Degrading Treatment, or Punishment, 1465 UNTS 85, enacted into the laws of the U.S. at 18 USC §2340, et seq, and related provisions stated in Pub.L. 105-277, §224(a); Articles 10, 84, 87, 99, 104 and 105 of the Third Geneva Convention Relating to the Treatment of Prisoners of War; the Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Article I, et seq, of the American Declaration on the Rights and Duties of Man and Article 4.4 of the American Convention on Human Rights which prohibits capital punishment for political crimes or common crimes related threats, both reflecting customary international law.

Fourth The United States will deprive Judge Bandar of rights guaranteed persons seized by the U.S. military in times of armed conflict as set forth in the Uniform Code of Military Justice, U.S. Army Regulation 190-8, and The Law of Land Warfare, U.S. Army Field Manual 27-10 (1956).

Fifth, the aforestated provisions of international law prohibit every state, including the United States, and Respondents from surrendering, or releasing a person to another state, or person when the transfer of custody will result in violation of their provisions. See, the United Nations Human Rights Committee, Ng. v Canada (1993) 98 1 LR 479; the European Court of Human Rights, Soering v. United Kingdon, Series A, No. 161 (7 July 1989).

The Court has habeas corpus jurisdiction over petitioner's case, and is bound, in the exercise of this jurisdiction, to take cognizance of the violations of law, identified and described

in this petition, to which Petitioner has been subjected and which place him in jeopardy of torture and death, and grant appropriate relief.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner for relief prays that the Court:

1.  Order Respondents to retain exclusive custody of Petitioner until this Court has considered and decided the merits of this Petition,

2.  Order Respondents to prohibit the surrender, or release of Petitioner or to allow him to be turned over to the government of Iraq, or any of its Ministries, agents, the IST/IHCC or designees or any other entity, or person without the prior approval of this Court,

3.  Order Respondents to allow his attorneys to meet and confer with Petitioners, in private and unmonitored attorney-client conversations at all reasonable times;

4.  Order Respondents to cease all interrogations of Petitioner, without the presence or consent of counsel;

5.  Order Respondents to bring Petitioner before this Court;

6.  Issue a Writ of *Habeas Corpus* requiring Respondents not to release Petitioner to anyone in Iraq or outside Iraq until his physical safety is assured.

7.  Order an evidentiary hearing and order Respondents to produce Petitioner for the hearing,

8.  Order such other relief as the Court may deem necessary and proper to protect Petitioner's rights under the U.S. Constitution and International Law.

22

Dated:   December 26, 2006

Respectfully submitted,

Ramsey Clark    [# 73833]
Counsel of Record
Lawrence W. Schilling
37 West 12the Street 2B
New York, New York 10011
(212) 989-6613
(212) 979-1583 (FAX)

Mara Verheyden-Hilliard    [#450031]
Carl Messineo    [#460033]
10 G St, NE   suite 650
Washington, D.C. 20002
(202) 789-4330
(202) 789-4333 (FAX)

Curtis F.J. Doebbler    [# 481243]
1003 K Street, NW, #640
Washington, D.C. 20001
(202) 248-1411
(206) 984-4734 (FAX)

## Verification

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.  Signed on December 26, 2006.

Ramsey Clark

## NOTICE TO RESPONDENTS

The general allegations of this petition apply equally to all seven of the men convicted in the Dujail case whose identities are well known to Respondents.  To avoid subjecting any one of them to extra judicial, summary or illegal execution, torture, cruel, inhumane and degrading treatment, or cruel and unusual punishment, the United States should retain each of these men in its exclusive custody until a final decision is made in this case because substantial doubt exists as to the legality of their surrender, or release to the government of Iraq, or any entity or persons it may designate, including the IST/IHCC.

Ramsey Clark

**THE IRAQI SPECIAL TRIBUNAL: A CORRUPTION OF JUSTICE**

Prepared 8 July 2006
Revised 1 September 2006
Revised  5 December 2006

Prepared by
Ramsey Clark
Curtis F.J Doebbler

TABLE OF CONTENTS

## INTRODUCTION

### Introduction — 5 —

*The IST is Illegal* — 6 —

*The IST is Incapable of Providing a Fair Trial* — 8 —

*Action That Needs to be Taken* — 13 —

## PART I

### ILLEGALITY — 15 —

*Background to the United States Illegal War of Aggression* — 16 —

*The IST is Illegal Because It is Based on an Illegal War of Aggression* — 18 —

*The IST is Illegal Because It Is Created in Violation of the Law of Occupation* — 24 —

*Illegal Because It Is Created in Violation of Iraqi Law* — 27 —

## PART II

### VIOLATIONS OF HUMAN RIGHTS — 31 —

*The Applicable Law* — 32 —

*The IST is Dysfunctional and Unable to Ensure Respect for Human Rights* — 32 —

*The Flawed Creation of the IST* — 33 —

*The Flawed Functioning of the IST* — 35 —

*Lack of Security and Murders of Defense Participants* — 48 —

*Lack of Respect for Due Process During Investigations* — 52 —

*Incompetence of the IST* — 53 —

*The Lack of Independence*                                        - 55 -

*The Lack of Impartiality*                                        - 60 -

*Other Issues of Impartiality*                                    - 63 -

*Failure to Provide Timely Charges*                              - 64 -

*No Adequate Facilities or Time to Prepare a Defense*           - 65 -

*Failure to Provide Public Trial*                                - 67 -

*Lack of Privacy Between Lawyer and Client*                     - 68 -

*Lack of Effective Defense Counsel*                             - 68 -

*Intimidation of Defence Witnesses*                            - 70 -

*Nulla Poena Sine Lege and Nullum Crimen Sine Lege*           - 72 -

*No Presumption of Innocence*                                   - 74 -

*No Equality of Arms*                                           - 74 -

*No Security of the Person*                                     - 76 -


**PART III**

**ILLEGAL APPLICATION OF DEATH PENALTY**           - 78 -

*No Ex Post Facto Application of the Death Penalty*    - 79 -

*No Death Penalty after an Unfair Trial*              - 80 -


**CONCLUSION**                                        - 81 -

**ANNEXES**                                           - 85 -

**ENDNOTES**                                         - 120 -

# Introduction

## INTRODUCTION[i]

The appellate division of the Iraqi Special Tribunal (IST) should find that proceedings in the trial court below did not provide a fair trial as required by Iraqi and international law and void the trial and judgment of 5 November 2006.

The defects of legality, due process/fair trial, and of proof of facts are articulated in some detail in this submission.

The overwhelming majority of the defects of legality, due process/fair trial, and of proof of facts were submitted to the IST, but the IST refused to provide a reasoned ruling on them. Moreover, the defects of legality and due process/fair trial have been recognized by numerous international bodies, including the United Nations Working Group on Arbitrary Detention. The opinion of the Working Group dated 1 September 2006 states that the trial is unfair and violates article 14 of the International Covenant of Civil and Political Rights. This opinion should be respected by the appellate division of the IST because the government of Iraq has voluntarily agreed to be bound by this treaty and has recognized the authority of the Working Group to interpret this treaty.

The views of the Working Group are shared by the United Nations Special Rapporteur on the independence of judges and lawyers, the international non-governmental organization Human Rights Watch, and every independent expert who has reviewed the trial.

The trial was unfair and included many violations of international human rights law.

The defense arguments on illegality and unfairness should have been considered at the start of the trial when they were submitted by the defense lawyers, they must consider now by the appellate division and the trial chamber must be reversed. Instead the IST repeatedly refused to consider them from the start of the trial to the very end of it. Even on the day that the IST issued its verdict the chief judge Raouf Rasheed Abdel-Rahman refused to consider arguments about the illegality and unfairness of the court. Instead judge Abdel Rahman criticized the defense lawyers for making these legal arguments and without warning ordered Mr. Ramsey Clark, a lawyer for President Saddam Hussein and a former Attorney-General of the United States, removed from the courtroom by force when the defense lawyers tried

---

[i] The arguments made in this introduction are elaborated and substantiated with extensive citations in the following text and annexes. This introduction is merely intended to lay out the subsequent arguments in summary form.

to submit arguments concerning the illegality and unfairness of the IST. Mr. Clark was not provided an opportunity to reply or reasons for his removal.

The repeated corruption of justice by the trial chamber of the IST require that the appellate court declare the proceedings void and reverse the 5 November 2006 judgment.

The proceedings before the Iraqi Special Tribunal (IST) are an attempt to impose victors' injustice on the Iraqi people and another example of the United States' unfortunate disregard for international law. The clearly perceived unfairness of the proceedings and the illegality of the IST insult the Iraqi people and contribute substantially to the increasing violence in Iraq.

The carefully edited pictures of the trial released after American censorship show few Americans in the Courtroom, but behind every door and more disturbingly behind almost every action there are Americans pulling the strings.

This American puppet show of disrespect for the rule of law—a patently unfair trial—insults the basic principles upon which the United Nations is based. Harrowingly it will continue to its irreversible conclusion unless the member states of the United Nations act quickly to stop it.

*The IST is Illegal*

The IST is illegal in its origin primarily because the invasion and occupation of Iraq are illegal.

The international community has overwhelmingly condemned the United States' aggression against the Iraqi people. Not only have scores of leading international lawyers condemned the invasion as illegal, but so have the majority of governments. Examples of the widespread condemnation of the United States aggression against the Iraqi people include the statements of the majority of the permanent members of UN Security Council. Additionally, Germany, a non-permanent member of the Security Council in 2003, unambiguously declared that a United States-led invasion of Iraq without further Security Council authorization would violate international law. Even United Nations Secretary-General Kofi Annan has reiterated what is obvious to almost every international lawyer: the invasion and occupation of Iraq is illegal.

This is a textbook case of illegal aggression in violation of the prohibition of the use of force by one country against another found in article 2(4) of the Charter of the United Nations and under customary international law.

The Nüremberg Tribunal described such aggression as

> essentially an evil thing. Its consequences are not confined to the belligerent states alone, but affect the whole world. To initiate a war of aggression, therefore, is not only an international crime; it is the supreme international crime differing only from other war crimes in that it contains within itself the accumulated evil of the whole.[1]

It is not the person on trial in Iraq who committed this crime, but the American President George W. Bush and his allies. Rather than being brought to justice for their crimes, the Bush administration and it allies have resorted to trying their victims in a manner that insults longstanding concepts of justice and fair trial. These values have long been central to Iraqi law, Islamic values, and are international human rights. To the members of the Bush administration this action justifies or distracts attention away from its own illegal actions.

One of the ends of the illegal act of aggression was to capture, detain, try, and execute the President of Iraq, President Saddam Hussein, who had dared to stand up to the United States violations of international law. The IST, sometimes known as the Iraqi Higher Criminal Court, was created to fulfill this goal. The IST is a directly intended consequence of the United States illegal use of force.

Under international law, when illegal acts have consequences, all states are obliged not to recognize them. The United Nations International Law Commission's Draft Articles on State Responsibility, which in relevant part reflects customary international law, states this principle explicitly: states are prohibited from benefiting from their own illegal acts.

In this case, the IST and its proceedings against Iraqi President Saddam Hussein and his colleagues are intended consequences of the United States illegal aggression against the Iraqi people. These consequences must not be recognized by any state under international law because of their illegal origins.

International humanitarian law applying to occupying powers irrespective of the illegality of the use of force also prohibits the creation of new or special courts or tribunals and the political manipulation of an existing judiciary. The longstanding and almost universally ratified provisions of the Fourth Geneva Convention forbid changes to the laws or judicial system of a country under occupation.

As if the inherent illegality of the IST were not enough, the United States has constantly taunted the international community by orchestrating a trial that is as widely criticized as unfair and even farcical.

*The IST is Incapable of Providing a Fair Trial*

In the proceedings to date the IST has violated almost every provision of the right to fair trial in article 14 of the International Covenant on Civil and Political Rights that could be violated that at juncture of the proceedings.

The security of all participants in the IST proceedings is constantly threatened; the competence, independence, and impartiality of the IST is constantly undermined; and the ability of the IST to conduct a fair trial is irreparably compromised. These deficiencies are highlighted by the fact that four of the five originally selected judges of the IST have been either replaced or killed and almost half the defense lawyers representing the Iraqi President have been killed.

The Security concerns alone are reasons that a fair trial cannot be held before the IST in Iraq.

Already before the proceedings began, in March 2005, the Associated Press reported that a judge on the tribunal had been killed.

In late November 2005, another judge recused himself after the trial had started, according to the Associated Press, "... because one of the co-defendants may have been involved in the execution of his brother."

In January 2006, two judges resigned in a matter of weeks. First, IST Chief Judge Rizgar Amin was pressured into resigning by, among other individuals, Ali al-Adeeb, a senior Shiite official in Prime Minister Ibrahim al-Jaafari's party and a member of the Interim legislature, who declared to the Associated Press that "[t]he Chief Judge should be changed and replaced by someone who is strict and courageous." Shortly thereafter Judge Rizgar Amin was pressured to rescind his resignation.

In January after Judge Amin refused to rescind his resignation, the new Chief Judge of the IST was announced as Saeed al-Hammash. Within days he too was removed because of pressure from Ali Faisal, the head of the de-Ba'athification Commission, which is a creation of the U.S.-led occupying powers.

On 24 January 2006, *The Jordan Times* reported that a new judge, Raouf Rasheed Abdel-Rahman, was brought in by the powers controlling the IST. This judge is from Halabja, one of the cities in which it is claimed that the defendants committed crimes against multiple victims. It can be assumed that he is a relative or friend of some of the alleged victims. He is also alleged to have called for the President's execution without trial before joining the IST.

On 10 February 2006, Kurdish Media reported that 60-year-old Judge Ali Hussein al-Shimmiri had died. This judge had allegedly had an altercation with the new Chief Judge at a prior meeting of the IST and had fallen ill afterwards.

Finally, even before the trial began Judge Dara Nureddin refused to join the IST after having been nominated because he had allegedly been convicted and sentenced to prison by the courts functioning under the government of Iraqi President Saddam Hussein.

Shortly after joining the IST, new Chief Judge Raouf Rasheed Abdel-Rahman refused to provide a reasoned decision on a motion seeking his disqualification for bias. Despite his refusal to decide the motion in first instance, he has alleged that the Court of Appeal of the IST has decided the motion, but again no written decision has been provided. When a decision was finally provided it rejected the defense motion claiming that it should have been submitted before the proceedings on the merits started in October 2005, almost five months before Judge Abdel-Rahman whose disqualification was sought, had joined the IST. It was thus impossible for defense counsel to have challenged his impartiality at that time.

On 20 October 2005, just one day after the first hearing, defense lawyer Mr. Sadoon al-Janabi was gunned down by individuals claiming to be from the Iraqi Interim Ministry of Interior.

On 8 November 2005, another defense lawyer, Mr. Adil Mohammad Abbas al-Zubeidi, was killed and a colleague seriously injured, again with alleged involvement of the Iraqi interim government and the occupying United States forces, according to independent news reports.

On 21 June 2006, a third defense lawyer, Mr. Khamis al-Obedi, was killed, again under circumstances in which both Iraqi and United States authorities appeared to be involved.

Already after just a few days of the second trial before the IST and while the verdict from the Dujail proceedings is being awaited in the early days of September 2006, a fourth defense lawyer, Abdel-Moneim Hussein Yassin, was murdered.

Among the other striking violations of the human right to a fair trial are the lack of equality of arms between the parties and the lack of an independent and impartial tribunal.

The inequality of arms can be illustrated simply in dollar values. The United States has spent hundreds of millions of dollars supporting the prosecution of the Iraqi President. This stands in stark contrast to the defense lawyers who have been volunteering their services as *pro bono* lawyers with no adequate resources.

The inequality of arms can also be illustrated in terms of the amount of time that each side has been allowed to prepare their case. The prosecution alleges to have been collecting evidence since at least 1991—which, of course, could only be true if it were the United States government doing the collecting—and has at least been doing so since April 2003 when dozens of American lawyers and Iraqis who had not lived in Iraq for years were shuttled in to build a case. In contrast, the defense lawyers, despite requesting visits with their client since December 2003 when he was detained, have never been allowed the confidential visits that are necessary to begin to prepare a defense. No visits were allowed with the most senior lawyers until after the trial had started and at each visit American officials exercise the authority to read any materials brought into the visiting room despite the fact that all meetings remain under close audio and visual surveillance. Moreover, the defense was provided just a matter of minutes to begin presenting its defense, including calling defense witnesses, after the charges were made known on 15 May 2006. And within weeks, as compared to the months allowed the prosecution, the defense was forced to end its defense after being told it could not call any more defense witnesses.

As if this were not enough, evidence was also withheld from defense counsel. The defense lawyers were denied access to investigative hearings, were denied prior notice of witnesses, and were prevented from even visiting the site of the alleged crime.

Frequently trial sessions have been announced without advance notice and without any consultation with the defense lawyers. This makes it impossible for the most experienced lawyers to attend the hearings and they have thus missed their only opportunities for meetings with the President.

All of these rights are part of the right to a fair trial under both Iraqi law and international law. This law, however, is violated with impunity. The extent of this impunity was evidenced on 24 January of this year when the judicial clerk Mr. Riza Hasan attempted to return the more than fifty page brief that had been submitted to IST claiming that "the judges did not want it." Perhaps he was explaining why none of the motions that have been submitted to the IST, including motions on illegality of the IST and disqualification of specific judges, have never received a reasoned reply and most have received not reply at all.

The interference with the independence of the tribunal has permeated all its aspects. Four out of five judges who started the cases have been removed through publicly acknowledged interference that can be attributed to the United States' interference. The judges have been continuously harassed by Iraqi and American politicians. Even American President George W. Bush has declared that the trial is on track and that the Iraqi President *will be* executed.

And as an apparent attempt to prevent the disclosure of the serious violations of human rights, the IST has repeatedly refused to provide defense lawyers a transcript of the proceedings.

In September 2005, four prominent statesmen wrote the UN Secretary-General advising him of the threat to participants in the trial in Iraq. These warnings were ignored. Several weeks later, two defense lawyers were murdered in a manner evidencing the involvement of the United States authorities and the Iraqi authorities who are cooperating with them. In May 2006, a defense witness was killed after his whereabouts were disclosed to US authorities.

The judges' lack of impartiality has also been repeatedly made apparent. In a film shown in France in 2005 and produced by Jean-Pierre Krief for Arte France and KS Visions, a judge of the IST states that the Iraqi President who at the time was about to go on trial before the IST had "persecuted the Kurds. He killed them, wiped many of them out. He also used chemical weapons with the aim of committing genocide against this race, against this people, to eradicate them as a nation. He also went after the Shiites due to their religious beliefs." In the same film, another judge states that the President is "one of the worst tyrants in history." These are not the statements of impartial judges, who in the inquisitorial system of justice such as that of the IST, is both the evaluator of law and fact. These are instead the statements of persons who have been put in place by an illegal occupying power to serve its ends and not to achieve justice.

On 12 of June, 2006, further evidence of the bias of IST was provided. In public, in the presence of all participants in the proceedings in the courtroom, a judge of the IST proceeded to read out loud a series of allegations of unethical conduct by defense counsels. The judge accused the defense counsel for the President of bribing their own witnesses. The allegations were claimed to have been based on statements made by the defense witnesses who had in the interim been beaten, arrested and held without access to counsel of their choosing by the Iraqi government with the cooperation of the United States authorities. These allegations were read in front of the lawyers' clients and in a public session of the IST panel that is trying the clients of these lawyers. The IST did not bring the defense witnesses into the courtroom, although it had had them in custody for almost two weeks before this statement was made. The IST did not provide defense counsel copies of the allegations nor the right

to respond to them. And the IST subsequently—through a person who claimed to be an officer of the IST—threatened the defense lawyers with arrest if they challenged the IST's actions.

These numerous incidents are irrefutable evidence that the IST is biased, the trial is unfair, and that a mistrial must be declared.

In March 2006 the European Court of Human Rights avoided deciding whether the trial violated international human rights law by claiming that it had no jurisdiction. The European Court supported its ruling by holding that it had not been proven that any of the European members of the American-led coalition were involved in the trial. The European Court did implicitly seem to agree that it was the United States—and not Iraq—that was responsible for the trial. The UN Working Group on Arbitrary Detention on 30 November 2005 and the UN Special Rapporteur on the Independence of Judges and Lawyers on 31 August 2005 and again on March 2006 explicitly confirmed that the United States shared responsibility with the Iraqi authorities. Annex's A, B, and C.

These international human rights experts have also condemned the trial as unfair. In his March 2006 report to the newly created Council on Human Rights, the Special Rapporteur on the independence of judges and lawyers, Leandro Despouy stated that after "analysis and special concern of the Special Rapporteur since 10 December 2003 when the Statute of the Iraqi Special Tribunal (IST) was adopted and throughout its development ... [the Special Rapporteur] express[es] his reservations regarding the legitimacy of the tribunal, its limited competence in terms of people and time and the breach of international human rights principles and standards to which it gives rise." Annex C.

On 1 September 2006, in a decision sent to defense lawyers on 25 October 2006, the UN Working Group on Arbitrary Detention handed down a final opinion stating unequivocally that

> The deprivation of liberty of Mr. Saddam Hussein is arbitrary, being in contravention of article 14 of the International Covenant on Civil and Political rights to which Iraq and the United States are parties, and falls within category III of the categories applicable to the consideration of the cases submitted to the Working Group.

This decision constitutes an authoritative decision concerning the legally binding obligations in article 14 of the International Covenant on Civil and Political Rights.

The first chief judge Amin Rizgar also expressed his opinion that the trial was unfair on 5-7 November 2006 in the television interview broadcast in Iraq.

No unbiased observer has considered the IST to be both legal and acting with respect for the human right to a fair trial. Many observers have had the courage to condemn the IST it for its illegality or violations of human rights.

*Action That Needs to be Taken*

Both, Professor M. Cherif Bassiouni of DePaul University, a leading expert in international criminal law and the IST original architect, as well as Professor Leandro Despouy, the United Nations' expert on fair trial, have called for the trial to be held before a truly international court under UN auspices. Both these eminent experts have pointed to the several recent examples of tribunals or courts under United Nations auspices that can ensure justice and a fair trial.

Only removing the trial to a forum that can ensure a fair trial will restore respect for the rule of law. The solutions proffered by the United States to date merely emulate and emphasize already serious violations of international law. Furthermore, the path currently being followed before the IST indicates a significant disregard for international law.

Although there is a widespread perception that the trial is illegal and unfair, the Security Council, has to date refused to act to ensure respect for the rule of law.

The UN Security Council has acknowledged in its Resolution 1483(2003) that the Secretary-General's Special Representative for Iraq is responsible for "promoting the protection of human rights" in Iraq, but little successful action has resulted from this acknowledgment.[2]

The situation has deteriorated to such a state that in early 2006 the outgoing UN human rights chief in Iraq, Mr. John Pace, described the situation of human rights in Iraq as the worst it has ever been and deteriorating daily.

The UN should take a stand on the issue of unfair trial as part of its explicit mandate to promote human rights in UN Security Council Resolution 1483(2003). The fairness of these proceedings, which are closely followed by Iraqis and throughout the Arab world, is a crucial test of the international community's commitment to the rule of law.

The international community failed to stop the United States' illegal aggression against the Iraqi people and the United States illegal—foreign and oppressive—occupation of the Iraqi people. Now insufficient action is being

taken to stop an unfair and illegal trial with the consequence that this abuse of law is substantially contributing to the increasing violence in Iraq.

Imposition of the judgment will be illegal and is likely to contribute substantially to increased violence in Iraq.

As a first step towards ensuring respect for the rule of law in Iraq the appellate division of the IST should annul the 5 November 2006 judgment of the trial chamber and declare a mistrial.

# Part I

# Illegality

*Background to the United States Illegal War of Aggression*

In the 1980's, the United States had sought out and established the relationship of an ally with Iraq according to official United States documents.[3] This relationship was strengthened when current United States Secretary of Defense Donald Rumsfeld, as a special envoy of the United States government, traveled to Iraq for a highly publicized visit to Iraqi President Saddam Hussein to assure him of America's friendship and support.[4]

It was only after Iraq refused to follow the United States' agenda, starting in 1988, that the United States began it campaign against the Iraqi people in earnest.

The first manifestation of this campaign was the use of force against Iraq in 1991 followed by years of deadly sanctions.[5] The sanctions started after the conclusion of the first Gulf War on 3 March 1991 and remained in effect through the most recent war. The sanctions killed hundreds of thousands of Iraqi children.[6] The sanctions were maintained by the United States despite the clear objection of the overwhelming majority of states in the international community and resignation of several senior international officials who cited the humanitarian tragedy being caused to the Iraqi people by the sanctions.[7] At the time, the United States Ambassador to the United Nations, Ms Madeline Albright, coldly accepting that a half million Iraqi children with the inhuman retort that in America "we think the price is worth it."[8]

At the same time, and despite the fact that a ceasefire had been agreed on 3 March 1991, the United States and its allies continued to enforce a no-fly zone over much of Iraq by carrying out regular bombing raids against the Iraqi people.

Finally, at approximately 02:30 GMT on 20 March 2003, the United States elevated its aggression against Iraq to an international armed conflict by leading an all out attack against the Iraqi people.

The United States acknowledged responsibility for this attack at the highest levels of its government.[9] Senior legal advisors of the United States government justified the attack as a "preemption of Iraq's possession and use of weapons of mass destruction."[10]

Emerging from a meeting with American CIA director George Tenet in 2002, the United Kingdom's intelligence chief Sir Richard Dearlove stated that "Bush wanted to remove [Iraqi President] Saddam [Hussein], through military action, justified by the conjunction of terrorism and WMD [weapons of mass destruction]. But the intelligence and facts were being fixed around the policy."[11]

No evidence of links to terrorism or weapons of mass destruction was ever found to have existed. The United States and its allies had lied to the world or even worse had attacked another country out of pure ignorance. None of the justifications given by the United States and its allies, even if they had been true, however, could have justified the use of force against another country. The use of force by one country against another, unless required as an act of self-defense or in furtherance of a unambiguous Security Council decision under Chapter VII of the Charter of the United Nations is absolutely prohibited as norm of *jus cogens*.[12]

The United States' attack against the Iraqi people that began on 20 March 2003 pitted the world's most advanced and most expensive military against a country that had been subjected to more than a decade of deadly sanctions.

Under the rule of Iraqi President Saddam Hussein, Iraq was transformed into a country with a high literacy rate, good medical care, and an effective social welfare system. The Iraqi people were transformed from a developing country to a developed country with health and social development indicators improving spectacularly.[13]

The imposition of sanctions on Iraqi in 1990 seriously obstructed the development of Iraq. Despite the sanctions the state health care, education, the economy, and the judiciary are widely considered to be of a far higher quality than those currently functioning are under occupation. A reputable 1991 study by noted international development economists indicated that the distribution of rations by the government of Iraq was equitable even shortly after the country had been ravished by the war in early 1991.[14] This study also reliably estimated that infant mortality had tripled as a result of the war.

The United States' 2003 attack on the Iraqi people has been reliably estimated to have caused at least 150,000 additional civilian deaths in the first year alone, according to a study by reputed scientists published in the highly respected British medical journal *The Lancet*. This figure excluded the casualties in what was reported as a 'massacre' in Fallujah.[15]

The use of force against Iraq that began on 20 March 2003 threatened international peace and security and interfered with the territorial integrity and political independence of Iraq. The international peace and security is threatened by the deployment of hundreds of thousands of soldiers under United States control and in a manner that threatens the right to life of every one of the estimated 26 million Iraqis. Today there are still over a 100,000 of the invading soldiers occupying Iraq.

The territorial integrity and political independence of Iraq has been violated by the aggression that is still continuing today with parts of Iraq under occupation and administered by a government that is publicly colluding with the occupying powers that mounted the original aggression against the people of Iraq.

The overwhelming majority of international legal scholars and government leaders consider this use of force a violation of the most fundamental provisions of international law in the Charter of the United Nations.[16] No unbiased observer has considered the IST to be both legal and acting with respect to human rights.[17]

*The IST is Illegal because it is based on an Illegal War of Aggression*

The attack against Iraq by the United States and its allies is a violation of international law and the IST created to carry out the objectives and purposes of the unlawful use of force is illegal.

The illegal attack by the United States and its allies against Iraq is undisputedly attributable to these states. As indicated below, these parties themselves have claimed that they carried out the attack. The attack is also a violation of the *jus cogens* principle international law that one state must not use force against another.

In Part I, which follows, it is shown that the United States action is a violation of an international obligation found in both treaties and customary international law that incurs it responsibility and special obligations for other states in the international community.

On 20 March 2003, the United States began to use illegal force against Iraq. That this illegal use of force is attributable to the United States and its allies is not in dispute. First, the United States Congress passed a Joint Resolution authorizing the use of force against Iraq in the law.[18] Second, the United States government stated to the world that it was attacking Iraq when at 03:15 UTC on 20 March 2003 (22:15 EST on 19 March 2003) United States President George W. Bush announced that he had ordered an "attack of opportunity" against Iraq.[19] Finally, the United States government admitted to the Member states of the United Nations that it was attacking Iraq.[20]

An act of aggression by a state constitutes one of the most serious violations of international law against the entire community of nations. The aggression against Iraq is one of the most serious acts in the international community in recent years. The individuals involved in it as well as those who provide indirect support committed the international crime of aggression that the Nuremberg Tribunal described in the following language:

> War is essentially an evil thing. Its consequences are not confined to
> the belligerent states alone, but affect the whole world. To initiate a
> war of aggression, therefore, is not only an international crime; it is the
> supreme international crime differing only from other war crimes in
> that it contains within itself the accumulated evil of the whole.[21]

A war of aggression is a violation of the international obligations of the states
involved, particularly the United States. The legal obligations of the United
States and its allies are contain in treaties and customary international law.

The prohibition on the use of force is enshrined in article 2, paragraph 4, of the
Charter of the United Nations. This article prohibits "the threat or use of force
against the territorial integrity or political independence of any state." The
United States, its allies in the invasion, as well as the Iraqi government, have
all ratified this treaty. The prohibition on the use of force is one of the most
fundamental principles of the Charter and a basic principle of international
law. In its statements before the International Court of Justice, the United
States government has itself recognized that it is "generally considered by
publicists that Article 2, paragraph 4, of the United Nations Charter is an
embodiment of the existing general principles of international law," and that it
is "inconceivable that this Court could consider the lawfulness of an alleged
use of armed force without referring to the principal source of the relevant
international law—Article 2(4) of the United Nations Charter."[22]

The International Law Commission has long held that "the great majority of
international lawyers today unhesitatingly hold that Article 2, paragraph 4,
together with other provisions of the Charter, authoritatively declares the
modern customary law regarding the threat or use of force."[23]

By using force against Iraq, the United States violates its legal obligation
under article 2, paragraph 4 of the Charter of the United Nations.

The obligation to refrain from the use of force in international relations is also
found in articles I and II of the General Treaty for the Renunciation of War.[24]
This treaty has been ratified by the United States government and remains in
force today. Article I of this treaty states that "[t]he High Contracting Parties
solemnly declare in the names of their respective peoples that they condemn
recourse to war for the solution of international controversies, and renounce it
as an instrument of national policy in their relations with one another."

In considering states' obligations under this treaty, the prestigious
International Law Association has declared that a "state which threatens to
resort to armed force for the solution of an international dispute of a conflict is
guilty of a violation of the Pact."[25]

Lacking a justification for its use of force against Iraq, the United States and its allies have violated their legal obligations under the General Treaty for the Renunciation of War by using force against Iraq.

The rule prohibiting the use of force is also well-established under customary international law. The International Court of Justice referred to the rule as a "fundamental principle outlawing the use of force in international relations."[26] When discussing the law of treaties, the International Law Commission declared that "… the law of the Charter concerning the prohibition of the use of force in itself constitutes a conspicuous example of a rule in international law having the character of *jus cogens*."[27] A *jus cogens* rule of international law is non-derogable under any circumstance. That the prohibition of the use of force constitutes a rule in international law having the character of *jus cogens* cannot be in doubt today given the overwhelming body of opinions supporting this position. This is supported by the uncontested statements of both parties before the International Court of Justice;[28] statements of the International Law Commission;[29] uncontradicted statements by numerous Governments at the Vienna Conference on the Law of Treaties;[30] and United Nations General Assembly's Declaration on Principles of International Law concerning Friendly Relations and Cooperation among States in accordance with the Charter of the United Nations.[31]

As this rule prohibits the use of force in relations between states, it is clearly violated when one or more states use armed force against another state. The United States and its allies violated this rule of law when they used force against Iraq starting in March 2003.

The prohibition of the use of force is violated whenever one or more states use force against another state without lawful justification.

Under modern international law, only two justifications exist for the use of force by one state against another: self-defense or express UN Security Council authorization.

The justification of self-defense is established in article 51 of the Charter. This provision allows states to respond to an armed attack by using force until the United Nations Security Council intervenes to assert jurisdiction over the dispute. Self-defense is only a legal justification for the use of force when a state has directly suffered an armed attack. In reviewing the facts of this case, there is no indication that the United States or any of its allies were ever subjected to an attack by the government of Iraq. Such threat has been considered not to exist by the United States' own Central Intelligence Agency and Naval War College.[32]

The second justification for the use of force exists if the United Nations Security Council has expressly authorized it. The United States has claimed that UN Security Council Resolution 1441 represents such an authorization. This argument is premised on the assumption that Resolution 678(1991), authorizing the use of force and imposing a lengthy list of obligations on Iraq, has been breached, and that in order to remedy such a breach, Resolution 1441(2002) implicitly authorizes the use of force by re-activating Resolution 678.

Such argument contradicts the position taken by the United States when Resolution 1441 was adopted. On the day of the vote on Resolution 1441, the then-U.S. Ambassador to the UN John Negroponte, reaffirming that this had consistently been the position of the United States government on this matter, stated that in the event of a 'further breach' by Iraq, "this Resolution contains no 'hidden triggers' and no 'automaticity' with respect to the use of force," adding that "[i]f there is a further Iraqi breach reported to the Council by UNMOVIC, the IAEA, or a member state, the matter *will return to the* Council for discussions."[33] This argument regarding the automaticity of SC 1441 was also rejected by three permanent members of the Security Council,[34] the majority of states on the Security Council,[35] and the overwhelming majority of legal commentators.[36] Even former staunch United States' ally, the former Prime Minister of the United Kingdom Baroness Margaret Thatcher, criticized the invasion as illegal.[37] And opinion polls showed that a significant majority of the people of nearly all countries or the world opposed the war without an UN mandate, and that many people viewed the United States as a danger to world peace.[38]

In any event, the use of force authorized in UNSC Resolution 678 explicitly ended on 3 April 1991 when the Security Council adopted Resolution 687. This resolution ended all authority for using force against Iraq.[39]

As the United States' justification for the use of force is fatally flawed, its attack against Iraq was not justified and therefore violated international law.

A longstanding principle of international law is that the consequences of an unlawful use of force must not be recognized as lawful, especially if the consequences are carrying out the objectives and purposes for which the unlawful use of force has been undertaken.[40]

Reflecting a rule of customary international law, article 41(2) of the International Law Commission's (ILC) articles on State responsibility unequivocally states that "[n]o State shall recognize as lawful a situation *created by a serious breach ...*" [emphasis added].[41]

This principle was expressly agreed to by the United States in article 11 of the Montevideo Convention on the Rights and Duties of States[42] and by the United States' support of the resolution of the Sixth International Conference of American States condemning aggression on 18 February 1928.

This principle is also supported by highly qualified legal publicists. For example, Professor Bin Cheng, one of the leading experts on general principles of international law, surveying the practice of international and national tribunals, wrote almost two decades ago that "[t]he judicial essence of responsibility is that it imposes an obligation upon every subject of law who commits an unlawful act to wipe out all the consequences of that act and to re-establish the situation which would, in all probability, have existed if that act had not been committed. It is a logical consequence flowing from the very nature of law and is an integral part of every legal order."[43]

In this case, this well-established principle of law requires at least that consequences that perpetuate, and are a direct aim of the original illegal act of use of force, must be reversed and must not be recognized as legal by any state. The creation and functioning of the IST is one of these consequences. The IST must therefore not be recognized as legitimate by any state in the international community.

The IST was created by the Coalition Provisional Authority (CPA).[44] The CPA, itself an entity that was created by the countries that are occupying Iraq, is a consequence of the illegal use of force against Iraq. The occupying powers have "all executive, legislative and judicial authority" according to their own proclamation in Section 1 of CPA Regulation No. 1.[45] The United States is the country primarily responsible for the creation of the CPA and therefore, the IST.

The United States President has stated that its use of force against Iraq was done with the intention of removing the lawful government of Iraq, specifically the President of Iraq.[46] The creation and functioning of the IST is an integral part of the use of force against Iraq and the occupation of Iraq, which share the primary goal of removal of the lawful President of Iraq.

Furthermore, the Statute creating the IST is a direct consequence of the illegal invasion and occupation of Iraq. The IST was formed not by a sovereign act of the Iraqi people, but by the fiat of the occupying powers which issued CPA Order No. 48.[47] The exercise of jurisdiction by the IST despite such inherent illegality must not be recognized as legal by any state—including a subsequent state of Iraq government—as to do so would violate a general principle of the international law of state responsibility that the consequences of illegal actions must not be recognized.

The attempt by the US-led occupying powers operating through the Iraqi Interim authorities to shift the responsibility for the IST to the Iraqi Interim authorities by urging them to re-adopting the Statute that had in effect already been adopted by CPA Order No. 48, with new legislation that makes only cosmetic changes of the on an unspecified date in August 2005, is merely an attempt by the US-led occupying powers to derogate from its obligations under the law of occupation that is stated in articles 54 and 64 of the Geneva Convention Relative to the Protection of Civilian Persons in the Time of War, 12 August 1949.[48]

This attempt was carried out by the Governing Council, which is itself a body created by the US-led occupying powers who are represented by the CPA. This is made clear by CPA Regulation No. 6 that unequivocally states that the

> The CPA *recognized* the formation of the Governing Council as the principal body of the Iraqi interim administration, pending the establishment of an internationally recognized, representative government by the people of Iraq, consistent with Resolution 1483 (emphasis added).

As is the case of all CPA regulations, CPA Regulation No. 6 has been adopted by the US-led occupying powers through the CPA, which they control, not a sovereign Iraqi government. Since the occupation of Iraq began in March 2003 no elections meeting the standards of UN Security Council Resolution 1483 have taken place.

The subsequent attempts to legitimize the IST are based on faulty foundations emanating from the CPA, the Iraqi Governing Council, or an Iraqi government that was named only after elections that were orchestrated by the United States. All persons supporting the previous government were banned from the elections, coercion was used to ensure voters turned out and voted as the occupiers wished, and funds were even provided to the campaigns of person supporting the occupying regime. As a result the elections were little more than an attempt to justify the occupation and the victors depended on the occupiers to survive in power.

Further evidence of the fact that the IST was created by the occupying powers is the fact that all the trial judges, appellate judges, investigating judges and prosecutors had to be formally approved by the United States. This practice apparently continues to date as in early 2006 a judge, nominated by his peer to be the Chief Judge, prevented from sitting on a case by a United States established vetting agency.

It is also clear that subsequent action cannot transform an entity that is illegal into one that is legal when the foundation of legality at issue are the initial illegal acts of invading Iraq and the subsequent attempt to reorder its courts.

The non-recognition of illegal actions is a responsibility of states that has been recognized by the International Court of Justice as being part of customary international law.[49] This elementary principle is binding on every sovereign state including Iraq. If the Iraqi authorities were to recognize the consequences of the United States' illegal act, this would make the current government of Iraq jointly responsible for the violation of international law that occurred on its own soil when armed force was first used against the Iraqi people in March 2003. Such a situation would not only incur the current government of Iraq's responsibility for the violence against its own people under international law, but would also indicate to the Iraqi people how politically unfortunate a position its own government is willing to adopt as pertains to the slaughter of hundreds of thousands of its own citizens in violation of international law.

### The IST is Illegal Because
### It Is Created in Violation of the Law of Occupation

Iraqi is occupied by the United States and its allies according to international law.[50] Article 42 of the Hague Regulations provides that "[t]territory is considered occupied when it is actually placed under the authority of the hostile army." As such, from the day United States forces gained control over Iraq's territory, the country was deemed occupied. By 1 May 2003, when the United States President and Commander-in-Chief of its military announced that major military operations had ended, Iraq had become occupied land.

Articles 54 and 64 of the Fourth Geneva Convention Relative to the Protection of Civilian Persons in the Time of War[51] (hereinafter "Fourth Geneva Convention"), provide respectively that an occupying power may not "alter the status of public officials or judges in the occupied territories", that "the penal laws of the occupied territories shall remain in force", and that "no new penal laws may be issued."

Article 54 of the Fourth Geneva Convention states in relevant part that "[t]he Occupying Power may not alter the status of public officials or judges in the occupied territories..." and article 64 states in relevant part that "[t]he penal laws of the occupied territory shall remain in force ... the tribunals of the occupied territory shall continue to function..." These provisions state the general rule, in accordance with the general object and purpose of this treaty and international humanitarian law, which is that an occupation is not permanent and the occupying powers must not change the laws of institutions of an occupied country.[52]

The rationale behind article 54 of the Fourth Geneva Convention is explained in the International Committee of the Red Cross' *Commentary* as:

> [j]udges and other members of the judiciary, for their part, are the natural guardians and protectors of the inhabitants of the country in their relations with the Occupying Power and their resignation might well paralyse the whole administrative and judicial machinery, in which case protected persons would be the first to suffer.[53]

Indeed subsequent to the United States-led invasion and occupation of Iraqi, this grim prediction has been proven valid in cases such as Abu Ghraib, Tal Afar, and Fallujah, among many others examples. In these cases, Iraqi civilians have been brutalized while being prevented from having any meaningful recourse to the courts to protect their rights. This is largely because the existing Iraqi courts were not allowed to function or because these courts were prevented from functioning by the state of insecurity that is the result of the illegal aggression against, and occupation of, Iraq.

Similarly the rationale behind article 64 of the Fourth Geneva Convention is explained in the International Committee of the Red Cross' *Commentary* as being the "fundamental notion" that "the penal legislation in force must be respected by the Occupying Power."[54] Furthermore, the only two exceptions for which the occupying power might change any penal law—substantive or procedural—are "two exceptions ... of a strictly limitative nature" and not derogating from the general rule that "[t]he occupation authorities cannot abrogate or suspend the penal laws for any other reason -- and not, in particular, merely to make it accord with their own legal conceptions."[55]

Neither of the permitted exceptions—the security of the occupying forces or making the law more humane for the occupied population—apply in this instance. The creation of the IST has had an effect of contributing to the deterioration of security of the occupying forces as it is widely viewed as an example of the occupiers' oppression. Furthermore, as indicated by the long catalogue of human rights violations documented here the IST is not able to secure the basic due process rights of the individuals who are before it and it thus treats the occupied population inhumanely.

Both articles 54 and 64 were violated when the US-led occupying power created the IST.

In addition to their obligations under articles 54 and 64 the occupying powers must not:

-change the administration of an occupied territory according to articles 51, 54 and 64 of the Fourth Geneva Convention and articles 43 and 48 of the Hague Regulations;

-change the legal system according to article 43 of the Hague Regulations;

-prosecute inhabitants of occupied territories for acts committed before the occupation began, according to article 70 of the Fourth Geneva Convention; and,

-enact retroactive penal provisions according to article 65 of the Fourth Geneva Convention.

Moreover, according to article 7 of the Fourth Geneva Convention, the occupying power must not enter into agreements with any authority in the occupied territories that "shall adversely affect the situation of the protected persons, as defined by the present Convention, or the rights which it confers upon them."

The manner in which the IST was created and the provisions of its enabling Statute violate each and every of these provisions.

As already shown, the IST was created by the occupying powers while they occupied Iraq. The enabling Statute of the IST was drafted by the CPA and enacted by a decree of the CPA before any attempt was made to transfer authority back to the Iraqi people. The Iraqi authorities attempt to re-adopted the Statute in August 2005 was nothing less than a ratification of the CPA action by a body created by the CPA and not representative of the Iraqi people.[56]

That the occupying power, through the CPA, created the IST is established by the fact that Order No. 48, containing the Statute of the Iraqi IST, had to be signed by CPA Administrator L. Paul Bremer before it could enter into force.

The Statute of the IST also contains provisions which modify the penal provisions of Iraqi law in an *ad hoc* manner. For example, some provisions of existing Iraqi law are incorporated into the document in article 14 of the Statute of the IST; while others are left out, apparently because they would be favorable to defendants coming before the IST, for example, article 40 for example of the Constitution of Iraqi from 1970 provides for head of state immunity.

Furthermore, Section 2 of CPA Order No. 15 of 23 June 2003 sought to suspend provisions of the Iraqi Law on Judicial Organization,[57] which violates articles 54 and 64 of the Fourth Geneva Convention.

The creation of the IST in 2003 and its re-creation in 2005 were unmitigated attempts by the US-led occupying powers to alter the penal laws of the occupied territories.

By attempting to add an 'extraordinary', 'exceptional' or 'special' tribunal to the existing Iraqi judiciary, the creation of the IST constitutes an attempt to change the legal and administrative system of the occupied territories.

Furthermore, by vetting and naming judges based on their political opinions the occupying powers impermissibly altered the status of judges in the occupied territories.

These attempts violate international humanitarian law and make the IST an illegal body.

### Illegal Because It Is Created in Violation of Iraqi Law

The IST was created by the United States despite the existence of courts, judges, and a process for both creating courts and naming judges. These processes are set forth in section IV, articles 60 and 61 of the Iraqi Constitution of 16 July 1970 and the Iraqi Law on Judicial Organization.[58] These laws were in force when Iraqi was subjected to a war of aggression in 20 March 2005. The Iraqi laws intentionally created a judiciary that was different from that of the United States and Europe. Nevertheless, these existing laws were ignored and a judicial model based upon foreign traditions and written by American lawyers was imposed on Iraq.

The United States promulgated CPA Order No. 15 on 23 June 2003 in English. It was not until 126 days later that an Arabic copy was produced and available to the Arabic language Iraqi population. Section 2 of Order No. 15 sought to suspend provisions of the Iraqi Law on Judicial Organization,[59] but did not specify which provisions were suspended.

Section 1 of this CPA Order established a Judicial Review Committee that was expressly made subordinate to the CPA. According to Section 6 of Order No. 15 the Judicial Review Committee is "bound by and operating in accordance with its Terms of Reference and any Regulations, Orders or Memoranda issued by the [CPA] Administrator."

Among those Order sand Memoranda issues by the CPA are De-Ba'athification Order No. 1[60] and Coalition Provisional Authority Memorandum Number 1 on the Implementation of De-Ba'athification Order No. 1. The essence of these CPA promulgated instruments, which the Judicial Review Council is bound to implement, is that no Iraqi who is a member of

the Ba'ath party may be a judge and those who are already judges may be removed. Indeed, more than a hundred Iraqi judges have been removed because of their affiliation with the Ba'ath party.

In additional CPA Order No. 17 entitled "Status of the Coalition Provisional Authority, Certain Missions and Personnel in Iraq" and issued on 27 June 2004 declares that all United States personnel are immune for the jurisdiction of the IST. Thus despite the fact that the IST attempts to apply penal law retroactively to Iraqis who would otherwise be immune under the law existing a the time of their alleged offenses, it both retroactively and proactively makes immune the United States soldiers who have participated in war crimes, crimes against humanity, and the crime of aggression against Iraqis. Iraqi Prime Minister Nuri al-Maliki recognized the hypocritical nature of this situation when he was forced by the Iraqi public to call upon the UN Security Council "to lift the immunity" of American soldiers.[61]

Furthermore, the members of the Judicial Review Committee are three Iraqis and three internationals who serve at the discretion of the CPA, according to Section 3 of Order No. 15. This allows the United States to effectively control the Iraqi courts.

Although vaguely defined in Order No. 15—apparently to obscure a conflict with international law concerning the independence of the judiciary—the responsibility and task of the Judicial Review Committee, which it exercises in practice, is to screen judges for their political affiliations. This ensures the elimination of judges who are hostile to the illegal occupation of Iraq or partial to former government of Iraq or the Ba'ath party. This function is made clear by reading CPA Order No. 15 in conjunction with CPA Order No. 1. In the case IST, it members were subject to the same screening process. The panel of IST judges hearing this case, to the best of defense counsels' knowledge, was subjected to a screening process that eliminated all Sunni candidates; thus ensuring that judges retained to serve would be drawn from a panel of Kurd and Shia judges.

The IST itself was created by Order No. 48. The latter contained the Statute of the IST and was signed by CPA Administrator L. Paul Bremer on 10 December 2003. At that time, the Iraqi Law of Judicial Organization[62] was already the basis of the judiciary and *de jure* remained so in accordance with article 64 of the Third Geneva Convention, which unequivocally states that "… the tribunals of the occupied territory shall continue to function..."

The IST was created outside of, and is in direct conflict with, the established Iraqi legal system. Although approved by a special provision of the TAL adopted on 8 March 2004, the IST is nothing more than a United States proxy as the Iraqi Governing Council itself and the TAL had been created by the

United States controlled CPA. Both the TAL and the Iraqi Governing Council were created and adopted while Iraq was under illegal occupation. United Nations' Security Council Resolution 1511[63] this fact by recognizing both the TAL and the fact that Iraq is an occupied country.

The exceptional nature of the IST is recognized by the manner in which it was referred to in the authoritative text at the time it was adopted—the English language text which calls the body the "Iraqi Special Tribunal." The language of article 48 that refers to the IST as a 'special tribunal' is in complete contradiction with articles 3, 12, 15(1) and 43 of the same instrument.

Article 15(I) of the TAL unequivocally states that "special or exceptional courts may not be established." This provision is expressly violated by the establishment and continued functioning of the IST. This violation cannot be remedied by reference to article 48, as to do so would be to undermine the very essence of the rule of law in Iraq.

Additionally, the IST is inconsistent with Iraqi law because it violates basic principles of international human rights law which are binding on the Iraqi government authorities according to article 44 of the Iraqi Constitution.

The competence of a court anywhere in the world is based first and foremost on the fact that it has been created in accordance with pre-existing law. This has been stated unambiguously by the state parties to the International Covenant of Civil and Political Rights (ICCPR) describing the requirement of a "competent" court in accordance with article 14 of this treaty.[64] Iraq and the United States are parties to the ICCPR.

Article 14 of the ICCPR requires that courts be established under preexisting law. This provision is intended to ensure that courts are not established to adjudicate specific cases based on political or other biases. This article is further explained by Principle 5 of the Basic Principles on the Independence of the Judiciary, which states that:

> [e]veryone shall have the right to be tried by ordinary courts or tribunals using established legal procedures. Tribunals that do not use the duly established procedures of the legal process shall not be created to displace the jurisdiction belonging to the ordinary courts or judicial tribunals.[65]

Principle 5 has, as such, been interpreted as expressly prohibiting the use of special courts. The United Nations Working Group has stated that "one of the most serious causes of arbitrary detention is the existence of special courts."[66] Annex A.

A court specially created to try only specific individuals for specific offences constitutes a form of vindictive injustice that undermines the rule of law and can cause irreconcilable divisions in Iraqi society. The IST is prohibited from prosecuting persons who are committing serious breaches of international law, such as the United States' soldiers and politicians who authorized and carried out acts of illegal aggression against the Iraqi people.

The IST violates general international law prohibiting a state from benefiting from its own illegal use of force. The IST also violates international humanitarian law and Iraqi law because it was created by the occupying powers in manner that is inconsistent pre-existing Iraqi law and in violation of international humanitarian law.

# Part II

# Violations of Human Rights

*The Applicable Law*

This evaluation takes into account the following treaty obligations or obligations under customary international law to which Iraq and all or some of the occupying powers are legally bound: the Charter of the United Nations (1945); the International Covenant of Civil and Political Rights (ICCPR);[67] the International Covenant of Civil and Political Rights (ICESCR);[68] the Convention on the Rights of Children;[69] the Convention on the Elimination of All Forms of Discrimination Against Women;[70] the Convention on the Elimination of All Forms of Racial Discrimination;[71] the Regulations annexed to the Fourth Hague Convention Respecting the Laws and Customs of War on Land, (hereinafter "Hague Regulations");[72] the Third Geneva Convention Relative to the Treatment of Prisoners of War, 12 August 1949 (Third Geneva Convention);[73] the Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention).[74] All of the provisions of all of these instruments remain in force today and are part of Iraqi law either as treaties or as reflections of customary international law.

The United States is additionally bound by the rules of customary international law reflected in the American Declaration on the Rights and Duties of Man.[75]

The right to a fair trial is well established in Islamic,[76] Iraqi[77] and international law.[78] Highly qualified legal publicists have written that the "importance of this right in the protection of human rights is underscored by the fact that the implementation of all other rights depends upon the proper administration of justice."[79] Article 20 of the original Statute of the IST, article 19 of the new Statute of the IST, article 14 of the International Covenant of Civil and Political Rights, as well as numerous other international human rights instruments, all provide for the right to a fair trial.

The right to a fair trial is fundamental to every society and very person. The United States government has criticized other states who have taken similar actions as violating the human right to fair trial under international human rights law.[80]

*The IST is Dysfunctional and Unable to Ensure Respect for Human Rights*

Since its inception the IST has been plagued by its inability to function and its inability to ensure respect for human rights. During the whole of the Dujail trial President Saddam Hussein has still not been able to have a single confidential meeting with his legal counsel that provides him the opportunity to prepare his defense.

During the proceedings there has also been no written and reasoned decision by the IST on any of the motions submitted by defense counsel, namely:

a. 19 October 2005: A motion indicating that notice of evidence and witnesses was not provided to defense counsel in a timely manner.
b. 19 October 2005: A motion calling for the proceedings to be suspended due to insecurity.
c. 8 December 2005: A preliminary motion challenging the legality of the IST and its failure to ensure respect for human rights.
d. 21 December 2005: A supplementary motion challenging the legality of the IST.
e. 1 February 2006: A preliminary motion requesting the disqualification of Chief Judge Abdel-Rahman on grounds of bias.[81]
f. 20 February 2006: A supplementary motion requesting the disqualification of Chief Judge Abdel-Rahman on grounds of bias.[82]
g. 15 March 2006: the seventeen point request, including respect for some basic human rights of fair trial.

Moreover, the IST has shown itself unwilling and/or unable to ensure the safety of defense counsel in spite of repeated requests to take action. Former Chief Judge Amin Rizgar had even agreed to take the matter into consideration by referring it to the President of the Tribunal. Nevertheless, no adequate action was taken despite the killing of three defense counsel.

*The Flawed Creation of the IST*

On 15 June 2003, the United States created the CPA as an organization under the control of the United States Department of Defense. The CPA was headed by Mr. L. Paul Bremer; an American who held all ultimate sovereign (legislative and appointment) authority according to CPA Regulation No. 1.[83] Between 15 June 2003 and 28 June 2004, the CPA promulgated twelve regulations, one hundred orders, and seventeen memoranda that allegedly "established a comprehensive legal system and answered most [legal] questions"[84] despite a being an occupying power with an obligation not to substantially change Iraqi law.

On 13 July 2003 the CPA appointed twenty-five persons to an Iraq Governing Council (IGC) in accordance with CPA Regulation No. 6.[85] While Mr. Ahmed Chalabi was presiding over the IGC in September 2003, he named his nephew Mr. Salem Chalabi, who was neither an expert in international criminal law nor Iraqi criminal law, to prepare a draft Statute for the Iraqi Special Tribunal.

Between September and December 2003, a Statute for the IST was drafted based on a March 2003 draft by DePaul University Law Professor Cherif Bassiouni. Professor Bassiouni had prepared a draft Statute for an international tribunal with provision for adequately qualified judges,

prosecutors, and IST staff. All were to have experience and expertise in international criminal law.

The draft was instead used to create the IST as an Iraqi tribunal of the occupying powers. The United States choose the judges from among persons whose identities have never been officially made known and based on unknown criteria as to qualification. It does appear that these persons included a mix of United States and some Iraqi lawyers, who had been living abroad and who had advocated he overthrow of the government of President Saddam Hussein by violence as well as in some cases the execution of the President.

One of these individuals was Mr. Salem Chalabi, an avowed enemy of the President, who had for years advocated the violent overthrow of the government of Iraq. He bragged that he was personally selecting the staff of the IST.[86] At the same time he refused to provide details either as to how the IST had been constituted or what were to be the qualifications of the prospective judges. As a consequence, very little is known about the qualifications of the judges. Even their names and identities have not been disclosed. What is known about the background and qualifications of the judges is based on speculation.

The comments and concerns of leading non-governmental organizations working in the field of human rights and international law were ignored. Human Rights Watch has described the process by which the IST was created as one whereby the United States

> without establishing a transparent process to consult Iraqis or assess Iraqi attitudes towards issues of justice and accountability … [instead proffered a] … proposal for an "Iraqi Special Tribunal" emanated from individuals close to the CPA and the CPA-appointed Interim Governing Council (IGC). The process of drafting and revising the founding document of the Iraqi Special Tribunal lacked transparency. Numerous requests by Human Rights Watch and other human rights organizations and international experts to see and comment upon the draft law were rejected.[87]

Eighteen months after the Statute's public release by the US government, Amnesty International concluded after an extensive analysis that the "Statute of the Iraqi Special Tribunal currently in place is not consistent with international law."[88]

On 9 December 2003 the occupying powers led by the United States-controlled CPA issued CPA Order No. 48,[89] which is the Tribunal's enabling statute. The same day, CPA Administrator Mr. L. Paul Bremer temporarily ceded his exclusive legislative authority to the IGC in order to claim that

Iraqis had adopted the Statute. The IGC, however, had been installed by the United States government when it occupied Iraq. Mr. Bremer then signed the Statute into law the next day as is stated in CPA Regulation No. 6.[90] On 10 December 2003 the signed order was published in the CPA's Official Gazette.[91]

At the time of its promulgation, the controlling language of the Statute of the Iraqi IST was English—not Arabic. This is evidenced by CPA Regulation No. 1 that was first promulgated in English and signed by the American Administrator Paul L. Bremer, who does not understand Arabic.[92] The official languages of Iraq, however, are Arabic and Kurdish, according to article 9 of the Law of Administration for the State of Iraq for the Transitional Period that was promulgated by the CPA on 8 March 2004. With this action, as Professor Cherif Bassouni points out, the IST now "became an official institution of the "occupying powers"."[93]

The IST was created while Iraq had no functioning government and was under foreign occupation. Moreover, as if to emphasize that the creation of the IST was the will of the occupier, the United States occupying power also promulgated CPA Order 17 giving complete immunity to American soldiers for their international crimes committed in Iraq just weeks later.[94]

As an occupying power in Iraq the United States government "issued orders in the same way as it did during the post-World War II occupation of Germany and Japan. In Germany, these orders were issued by the Allied Control Council, while in Japan they were issued by the Supreme Allied Commander."[95] In Iraq these orders are called 'CPA orders'.

*The Flawed Functioning of the IST*

The official language used by the IST is Arabic according to article 34 of its Statute, even though the Statute was first drafted in English.

The Statute of the IST provides for the punishment of the crimes of genocide (art. 11), crimes against humanity (art. 12), war crimes (art.13) and selected Iraqi criminal laws (art. 14) which have been adapted to prevent the prosecution of soldiers from the occupying powers.

Articles 1 and 2 of CPA Order No. 48 also declared that drafting of the Elements of Crimes and Rules of Procedures had to be approved by the CPA. Consequently different drafts of the Revised Rules of Procedure and Evidence have been circulated on the internet and it is not clear whether or not this instrument has entered into force even after the conclusion of the Dujail trial. It is also not clear which version is authoritative. Likewise, the draft 'Elements of Crimes' have not been officially circulated and it is not clear which version

is operative. The resulting confusion makes it impossible for defense lawyers to prepare a defense or even challenge many of the actions or arguments of the prosecution or the IST that may be inconsistent with the rules or elements of crimes.

Since the beginning of the American-led invasion, Iraqis have fought against the occupying powers. On or around 13 December 2003, one of those Iraqis fighting the occupation, President Saddam Hussein, was captured in the vicinity of Tikrit, Iraq, under circumstances largely unknown. In any event, President Saddam Hussein was quickly transferred to the custody of the United States, in whose *de facto* custody he remains today.

The United States repeatedly stated that it is detaining the President as a prisoner of war.[96] At the same time, it has failed to respect his human rights under international humanitarian law. These rights include those under the Third Geneva Convention that provides for the human rights to security of person, privacy, respect, humane treatment, and fair trial.

The United States violated these rights by several times permitting the release of embarrassing information, including pictures, to the media.[97] This information has aimed at humiliating the President. The IST did nothing to respond to these actions.

According to article 3, the TAL is "the Supreme Law of the land and shall be binding in all parts of Iraq without exception" while "[a]ny legal provision that conflicts with this Law is null and void." According to paragraph C of article 3, the TAL is to remain in effect until the "formation of an elected government pursuant to a permanent constitution" has taken place. Article 13 of the Permanent Constitution of the Republic of Iraq that was adopted on 15 October 2005 states that the Constitution is the "supreme law in Iraq and shall be binding in all parts of Iraq without exception" and that "[n]o law shall be enacted that contradicts this Constitution" and text "that contradicts is deemed void."

On 30 June 2004, the occupying powers attempted to transfer authority to the IGC for acts that had been committed under the exclusive authority of the CPA. On 30 January 2005, the Iraqi elections were held as another attempt to transfer authority exercised by the CPA to the Iraqi Interim Government which was to serve until an Iraqi government could be elected under a permanent constitution. The elections where held with inadequate security and with candidates who were not to the liking of the United States government being prevented from standing for office.

At the hearing of 19 October 2005, President had still not consulted with counsel retained by his family, in spite of the latter's numerous written

requests for access. Defense counsel also complained at the opening of hearings that they had been denied the right to meet their client together with numerous other violations of their client's human rights. They also complained about the legality of the IST and the lack of basic security for witnesses and lawyers.

At the hearing on 19 October 2005 defense counsel filed a motion indicating that notice of evidence and witnesses had not been provided to defense counsel in a timely manner. The defense also filed a motion calling for the proceedings to be suspended due to insecurity. Before this date defense counsel were not able to communicate with the IST despite numerous attempts.

On 26 November 2005, followers of Shiite cleric Muqtada al-Sadr, who controls a faction of at least thirty members of the Iraqi Parliament, called for the summary execution of President Saddam Hussein. On that same day, the Associated Press reported that "the leader of the biggest Shiite party, Abdul-Aziz al-Hakim, accused the IST of "weakness" for not having sentenced Hussein to death already" and that an attempt had been made on the life of another IST judge.[98]

In contrast to the defense lawyers, the judges and the prosecutors are provided around the clock security, secure living and working quarters, and residence outside of Iraq. The defense lawyers are sometimes provided security when they travel in the Green Zone and sometime denied any security; they were promised money for three guards that was never paid; and they were repeatedly told that no adequate security would be provided with replies that incorrectly claim that security is being provided.

Nevertheless, despite the insecurity, the IST hearings continued on 27 and 28 November 2005 without the IST addressing the security concerns of the lawyers.

Around the same time, a judge of the IST reportedly "recused himself in late November because one of the co-defendants may have been involved in the execution of his brother. That judge was replaced."[99]

At the hearings on 7 and 8 December 2005 a preliminary motion challenging the legality of the IST and its failure to ensure respect for the defendants' human rights was submitted to the IST by defense counsel.

At the hearing on 21 December 2005, the IST refused defense counsel the opportunity to make arguments challenging its legality.

Also on 21 December 2005 a supplementary motion again challenging the legality of the IST was submitted by defense counsel to the IST.

The same day, 21 December 2005, Dr. Curtis F.J. Doebbler, who possesses written powers of representation from the Iraqi President Saddam Hussein, again requested access to his client by presenting the documentation requested by the IST in both Arabic and English.

Captain Philip Lynch asked Dr. Doebbler to wait outside the courtroom and to speak to Judge Amin Rizgar when he arrived. When Amin Rizgar appeared, Dr. Doebbler greeted him and was immediately attacked by United States Marshall Bartlett, who physically assaulted Dr. Doebbler and threatened to "permanently remove him" if he came close again.

A few minutes later, United States military Captain Philip Lynch told Dr. Doebbler that the IST had approved his request, but that the decision had been "reversed by a Canadian judge named Howard Davidson," an individual apparently acting as an advisor to the IST.

Dr. Doebbler was then told to return to a 'safe-house' were he was forced to remain under house arrest guarded by two Bulgarian guards who claimed to be working for the United States government.

On 22 December 2005, before the IST session began the IST provided defense counsel a two-page letter summarily asserting its own competence to try the defendants without providing a reasoned legal analysis on the issue and after denying defense counsel the right to make oral arguments on this issue. This statement did not address the violations of human rights or provide any substantive reasoning to support its decision.

Later, also on 22 December 2005 and in the courtroom, defense counsel again requested time to make oral argument on the question of legality and requested that the IST consider this issue as a preliminary issue. The IST refused this request without giving any reasons. The Chief Judge said the question had been decided. To date no reasoned decision has been provided to this or any of the other requests to the IST.

On 17 January 2006, defense counsel requested the permission of the United States authorities to visit their client. The United States officials stated that only five of the nine defense counsel requested by the President, were allowed to visit.

Other lawyers were told they first had to be admitted to by the IST, although some, such as Dr. Doebbler, could not be admitted because he was not allowed into the courtroom. At the same time Dr. Doebbler was told by United States'

- 38 -

and Canadian officials, who clamed to act on behalf of the IST, that only if he proffered his original papers to the IST in the courtroom could he be admitted.

On 18 January 2006, it was publicly reported that Special Tribunal Chief Judge Rizgar Amin had been pressured into resigning. This pressure had been exerted by Mr. Ali al-Adeeb, a senior Shiite official in Prime Minister Ibrahim al-Jaafari's party and member of the Interim legislature, who publicly declared that "[t]he Chief Judge should be changed and replaced by someone who is strict and courageous."[100]

After Judge Rizgar Amin resigned he was then pressured to rescind his resignation, according to "sources close to the Chief Judge" who told Reuters that the Chief Judge "…tendered his resignation to the court a few days ago, but the court rejected it … talks are under way to convince him to go back on his decision … He's under a lot of pressure, the whole court is under political pressure."[101]

The new Chief Judge of the IST was announced as Saeed al-Hammash,[102] but he too was forced to step down because of pressure from Ali Faisal, the head of the de-Baathification Commission, a creation of the U.S.-led occupying powers meant to prevent individuals who supported the former government of Iraq from participating in public affairs in occupied Iraq.[103] Judge Saeed al-Hammash stepped down sometime between 24 and 29 January 2006.

On 23 January 2006, while the lawyers were in Baghdad they were informed by United States military Captain Mr. Philip Lynch that there had been two car bombs were reported to have gone off very in the near vicinity of their lodgings and that numerous people had been killed. For this reason, one of the lawyers who required emergency medical care was forced to wait several hours before he could go to the hospital.

The same day, 24 January 2006, it was reported that a new judge, Raouf Rasheed Abdel-Rahman, was brought in by the occupying powers controlling the IST.[104] This judge is from Halabja. This is one of the cities in which it is alleged that the President committed crimes against multiple victims. It can reasonably be assumed he is a relative or friend of some of the alleged victims. Moreover, as submitted below, this judge has displayed clear prejudice against the accused before he began his involvement in the trial.

While the lawyers were waiting for the hearing to begin on 24 January 2006, a clerk of the IST who identified himself as Mr. Riza Hasan attempted to return to the defense lawyers a lengthy written submission that had been made to the IST on 21 December 2005. He stated that the IST did "not want the arguments" and was refusing to rule on them.

At the courthouse, on 24 January 2006, defense counsel who had traveled from Sudan, Qatar, Bahrain, Jordan, Syria, and the United States were forced to wait in a room at the courthouse from which they neither could exit on their own free will nor communicate with the outside world. The defense lawyers were cut off from all outside contact despite the fact that this jeopardized the lives and well-being of their other clients who could not contact them. The IST did not communicate with the defense lawyers until 14:00 when a Captain in the United States military informed them that the hearing was cancelled in the wake of a declaration by Investigative Judge *and* Tribunal Spokesman, Raed Juhi, to the effect that "some of the witnesses had not yet returned from the HAJ. It should be noted that as of 24 January, 2006, the HAJ had ended *ten full days earlier*" (emphasis added).

On 26 January 2006, it was announced that Saeed al-Hammash was reinstalled as Chief Judge of the IST after the intervention of outside powers. In an interview with the Associated Press, one judge speaking for the IST declared that "[m]atters are not in our hands."[105]

The same day, 26 January 2006, it was also announced that Judge Rauf Rasheed Abdel-Rahman would indeed be the new Chief Judge despite the fact that he was born in Halabja and had allegedly been himself arrested and convicted under the regime of President Saddam Hussein for criminal offenses under the government headed by President Saddam Hussein.[106]

Without consultation with the defense lawyers, the IST set the next hearing date for 29 January 2006. Several lawyers, including the most senior defense lawyer, had prior obligations before courts in their own countries on 29 January 2006.

On 29 January 2006, only four defense lawyers were thus able to travel to Iraq. The most senior lawyer could not attend the IST session. Other defense lawyers were deterred by the deteriorating security situation.

At this session Dr. Curtis Doebbler and Mr. Sahal Armouty were admitted to appear before the IST after their original papers, which they had submitted in open court, were reviewed. A written request for a transcript of the prior proceedings was also made, but received no response.

On 1 February 2006, defense counsel submitted challenges to the impartiality of the Chief Judge and the prosecutor by arguing that they were biased. Both had made comments indicating that the guilt of the President was a foregone conclusion. This preliminary motion specifically requested the disqualification of Chief Judge Abdel-Rahman based on information that was widely reported and in the public domain.

On 19 February 2006, these submissions were supplemented by additional representations that were drafted on 8 February 2006, but could not be submitted to the IST until 19 February 2006 because of the inability to communication with the IST. These supplemental submissions again requested the disqualification of Chief Judge Abdel-Rahman on grounds of bias citing his pre-trial statement that the President should be summarily executed. This submission is supported by the affidavit of a Jordanian lawyer, Mr. Ziyad al-Nasjdawi who had witnessed the statement.

On 28 February and 1 March 2006, the IST refused to deal with the submissions regarding the lack of impartiality and the bias of Judge Abdel-Rahman, stating that it would not decide them. The IST did not disclose that the request for the disqualification of Chief Judge Abdel-Rahman had already been decided by the IST on 20 February 2006 in a decision whereby the IST's appellate body found that the motion should have been submitted before 19 October 2005, *almost four months before Chief Judge Abdel-Rahman and thus a practical impossibility*.

At the hearings on 12 and 13 March 2006, the IST stated that it had decided and rejected the motion for disqualification of Chief Judge Abdel-Rahman, but the IST refused to provide its decision in writing to the defense lawyers despite repeated requests.

The defense lawyers then requested a decision on their prior submissions concerning security, the illegality of the IST, and the conditions for a fair trial. Chief Judge Abdel-Rahman refused to consider this request or allow arguments to be presented. Instead he ordered one of the colleagues of the President and one defense lawyer from the courtroom for insisting that the IST at least implement previous oral decisions.

On 7 February 2006, chief Prosecutor Jaafar Al Mussawi told AFP and the Middle East Times that the lawyers of President Saddam Hussein "have no right to see the defendants."[107]

On 10 February 2006, Kurdish Media reported that another judge of the IST, 60-year-old Ali Hussein al-Shimmiri had died on 9 February 2006.[108] With this death four out of the five judges who were on the original IST panel were now removed.

On February 13 and 14, Chief Judge Abdel-Rahman presided over hearings of the IST where defendants had no counsel of their own choosing present to assist on their behalf. Moreover, evidence was read into the record on the basis of affidavits and without notice to defense counsel allowing them a reasonable opportunity to challenge the evidence.

On 28 February 2006, Judge Abdel-Rahman refused to respond to defense counsel's motions for his disqualification for bias and his inability to ensure basic human rights for defendants. Instead, further evidence was read into the record on the basis of affidavits of which defense counsel had no adequate prior notice, and therefore no opportunity to meaningfully question the witnesses allegedly making claims against their integrity and of criminal wrongdoing.

Between 29 January and 26 February defense counsel were denied access to their client despite repeated requests.

Only on 26 February 2006 was Mr. Kaleel al-Dolami allowed to meet with President Saddam Hussein after an oral assurance that such meeting could take place which was communicated from the United States authorities by United States military Captain Michael McCoy in an email dated 22 March 2006.

No other defense lawyer traveled to this meeting because of the short notice and uncertainty about whether the IST would allow the lawyers to meet with their client. In his email of 20 February 2006, Captain Michael McCoy had informed defense counsel that meetings had to be arranged solely through the IST. The IST finally issued a reply on 8 March 2006, well after the meeting was scheduled to take place.

On 28 February 2006, Chief Judge Abdel-Rahman held another session of the IST. Again defense counsel insisted on a written decision on the motion for disqualification. The IST refused to give a decision thereby forcing defense counsel to withdraw out of fear of prejudicing their client's rights. The Chief Judge continued the proceedings without defense counsel present after appointing new lawyers.

On 1 March 2006 only Mr. Khamis el-Obedi appeared for the defense. Nevertheless the IST denied all motions requesting a short delay. At the end of proceedings the trial was adjourned until 12 March 2006.

On 7 March 2006 the IST wrote to defense counsel informing them that five lawyers were entitled to meet with the President and enter the courtroom. Dr. Doebbler and Mr. Armouty were not among the five, although they had been previously admitted by the IST and allowed to attend meeting with President Saddam Hussein. Both Dr. Doebbler and Mr. Armouty possessed powers of attorney from the President and had previously been approved by the IST. No reason was give for the apparent decision to exclude them.

On 8 March 2006, subsequent to an enquiry from the defense lawyers, the IST stated in an email to Dr. Doebbler, in apparent contradiction with the event of 29 January 2006, that Dr. Doebbler was "not admitted to practice before the

IHT. The IST never accepted any paperwork from you on January 29, 2006 and has not recognized your right to represent Saddam Hussein or any other defendant." Dr. Doebbler is expert on international human rights law expert on the legal team.

On Monday and Tuesday, 12 and 13 March 2006, additional hearings were held in which some defense counsel were prevented from attending the hearings.

On 15 March 2006, the defense lawyers submitted to the IST in writing a 17-point request. The first point requested equality of arms between the parties. Among other points, the motion also requested the IST's prompt attention to the following: the defense request for a written response to their earlier submissions (points 2, 4 and 5); the defense request for timely notice and copies of all evidence submitted to the IST and all exculpating evidence in the possession of the prosecution (points 8, 11, 12, and 13); the defense request for timely notice of hearings (point 9); for transcripts (points 10 and 12); the defense request for private and confidential meetings with President (point 15); and the defense request for adequate time and facilities to prepare a defense (points 16 and 17). The IST accepted the filing but once again refused to rule on them to date despite the fact that some of them clearly go the very legitimacy of the proceedings.

On 3 April 2006, defense lawyers were granted another meeting with their clients. Like all previous meetings this one was not confidential. This time, Iraqi translators joined American soldiers in interfering with the meeting's confidentiality. Moreover, before some lawyers were allowed to enter the meeting, their private papers were searched and read despite their objections that such searches violated their lawyer-client privilege. Additionally, even legal papers already submitted to the IST had to be read by United States authorities before they could be provided to President Saddam Hussein.

On 4 April 2006, although a request had been made 24 hours in advance as required by the US occupying powers in charge of monitoring the movements of the lawyers in Iraq and without prior notice, cancelled meetings that defense counsel had indicated were extremely important to their defense. These meetings were with a potential witness and senior United Nations personnel. One of the witnesses with whom a meeting was to take place was killed shortly thereafter. This witness would have been exposed to both American and Iraqi officials who are frequently at the meeting site, the Al-Rasheed Hotel, and the checkpoints that were required to pass to get to the meeting site.

On 5 April 2006 a meeting took place with IST officials who announced that the review of the authenticity of documents and signatures would be

conducted by a person who worked for the Ministry of Interior. Objections by defense counsel claiming that the review should be done by an impartial expert were ignored.

At the hearing, defense counsel again repeated in writing their requests for written responses from the IST to their motions and they again asked for adequate time and facilities to prepare a defense. Defense counsel also asked to see some original defense documents together with their clients. While the IST apparently granted the last request in part, the Americans indicated to defense counsel that only the lawyers and not their clients could view the documents. In addition at the hearing at which only President Saddam Hussein was present, Judge Abdel-Rahman admitted receiving at least six motions, but he again refused to rule on them claming that he had no time to do so.

Also at the hearing on 5 April 2006, Judge Abdel-Rahman also ordered the only female defense counsel, Mrs. Bushra al-Kalili, forcibly removed from the courtroom by four male guards. The removal was the result of Mrs. Bushra al-Kalili's failing to respond to the judge's order to "sit down and shut up." Defense lawyer Mrs. Bushra al-Kalili had argued that prejudicial evidence presented by the prosecution without prior notice to defense should be ruled inadmissible. The prosecution had introduced a video tape without a date and where several sources had been combined in a collage from Al-Arabya, a television station created by the US occupying forces with a publicly acknowledged goal of providing propaganda against supporters of the former Iraqi government. As defense lawyer Mrs. Bushra Kalili demonstrated the harmful consequence of allowing any evidence into the trial, Judge Abdel-Rahman became extremely irate and ordered bailiffs to remove her using force. Such treatment of a respected female lawyer is not only prejudicial to the President's rights, but such action is also far removed from Arab and Islamic the values.

On 12 April 2006, the IST again reconvened without any defendants present. In addition because the defense lawyers had been given only four days notice of the session, the most experienced defense lawyers were prevented from attending. The hearing was ultimately adjourned after ten minutes with the Chief Judge claiming that the IST was not ready to hold the hearing because handwriting experts had failed to appear.

At the 15 April 2006 hearing the President claimed that Ministry of Interior officials were killing and torturing Iraqis. The President attempted to illustrate how such summary killings created a 'chilling effect' for all other witnesses. The IST not only failed to call for an investigation into the allegations of obstruction of justice, it also told the President that such allegations should not be raised before the IST.

On 17 April 2006, amid increasing violence, the hearings resumed.[109] At the hearing the Prosecution introduced a report by alleged experts who worked in the Iraqi Ministry of Interior. The report claimed that all the signatures and documents presented by the Prosecution were authentic.

In April 2006, it was also confirmed that Mr. William Wiley, who had worked for the United Nations from approximately mid-2005 to early 2006, had gone to work for the United States government's Regime Crimes Liaison Office, which is the office that defense counsel and observers have accused of controlling the IST. For months, Mr. Wiley had used his United Nations position to gain confidential information from defense counsel and had represented to defense counsel that they could trust him with their confidential information.

On 12 June 2006, the IST read out allegations against the defense lawyers that had been made by defense witnesses who had been beaten, arrested and held without access to counsel of their choice. These allegations were read in front of the lawyers' clients and in a public session of the IST trying these clients. The statements alleged that the defense witnesses had been bribed by the defense lawyers. The IST did not bring the defense witnesses into courtroom, although they had been in custody during the last IST session. The IST did not provide defense counsel printed copies of the allegations or the right to respond to them. And later—through a person who claimed to be an officer of the IST—defense lawyers were threatened with arrest if they challenged the allegations before the IST the next day.

On 13 June 2006, when the defense lawyers raised arguments concerning international human rights law, Chief Judge Abdel-Rahman repeatedly interrupted them with irrelevant criticisms, such as concerns their choice of attire,[110] and then cut off their arguments. When the defense lawyers raised the issue of serious and widespread human rights violations of the right to fair trial, the Chief Judge said these arguments "are irrelevant" and that "the court should not be lectured to about these rights."[111]

At the hearing, despite having agreed to hear more defense witnesses and after receiving a written note passed to him from American officials outside the courtroom, Chief Judge Abdel-Rahman suddenly the defense case closed and ordered both parties to make their closing statements. The Chief Judge stated that "You've presented twenty-six witnesses. If that is not enough to present your case, then 100 won't work." In fact, the defense had presented less than 20 witnesses, while the prosecution had presented more fifty.

The Chief Judge then set down 19 June 2006 for the prosecution's closing statement—eight months after the prosecution began its case—and 10 July 2006 for the defense—less than two months after the defense lawyers had

received the formal charges and were forced to start presenting a defense without any time to prepare it.

After the hearing on 13 June 2006 an American escorting the lawyers to the Al-Rasheed hotel for meetings told the lawyers that the courthouse had been hit by rockets and was on fire.

On 19 June 2006, the Prosecutor made a final argument restating the allegations against the defendants, but failing to consider with the alleged perjury by prosecution witnesses, the allegation that persons who had been claimed killed were still alive, and the allegations that attempts were made to bribe defense witnesses. The judge ordered the defense counsel to present their closing argument on 10 July 2006.

Two days later, on 21 June 2006, a third defense lawyer, Mr. Khamis Obedi, was killed. The defense lawyers again pointed out that they lacked adequate security and that the killing of three defense lawyers proves this. The United States officials responded stating that they were already providing adequate security and could not improve upon it. Consequently the defense lawyers stated that they could not appear before the IST until better security was provided.

On 10, 11, 24, 26 and 27 July 2006, the IST convened despite the defense lawyers' objections and no further action to improve security. The IST appointed defense lawyers over the express objections of the defendants and their chosen defense lawyers. The IST also required some defendants to attend some of the hearings by force.

These hearing were mainly devoted to the statements of the IST-appointed lawyers. The IST-appointed lawyers read out statements that were prepared, according to one of the lawyers, by an advisor to the IST named Mr. William Wiley. The defense counsel chosen by defendants had earlier complained to the IST about Mr. Wiley's interference in the case and had asked the IST to issue an injunction against his contacting defense witnesses or any person connected to the defense. All the defense counsel had signed this submission that was made to the IST on 13 July 2006. In keeping with the practice that had been consistent through out the proceedings, no transcript or copy of the statements made by the IST-appointed lawyers was ever provide to the defense counsel or their clients.

At the final session of the trial court on 5 November 2006, Judge Abdel criticized the defense lawyers for making these legal arguments. Even on the day that the IST issued its verdict the chief judge Raouf Rasheed Abdel-Rahman refused to consider arguments about the illegality and unfairness of the court. Instead judge Abdel Rahman criticized the defense lawyers for

making these legal arguments and without ordered Mr. Ramsey Clark, a lawyer for President Saddam Hussein and a former Attorney-General of the United States, removed from the courtroom by force when the defense lawyers tried to submit arguments concerning the illegality and unfairness of the IST.

After public condemning the President to death on 5 November 2006, the IST failed to provide a written and reasoned judgment to defendants until 23 November 2006, severely curtailing the opportunity for appeal by defense counsel. Moreover, defense lawyers have never been provided a record of the proceedings upon which they can base their appeal. The written judgment that was provided to the defense lawyers on 23 November 2006 merely stated that the court would not consider arguments concerning it illegality and it lack of fairness. Annex L: 23 November 2006 Judgment of the IST.

Instead, of correcting the litany of mistakes that it has made, the IST continues to perpetuate and compound its mistakes.

### The Failure to Fix the Problems

More than two years after his initial detention and after legal proceedings have begun and the prosecution has presented its case, President Saddam Hussein was still not able to have a single private and confidential meeting with his legal counsel that provides him the opportunity to begin to be able to prepare his defense.

There has also been no written and reasoned decision by the IST on any of the motions submitted by defense counsel, namely:

h.  19 October 2005: A motion indicating that notice of evidence and witnesses was not provided to defense counsel in a timely manner.
i.  19 October 2005: A motion calling for the proceedings to be suspended due to insecurity.
j.  8 December 2005: A preliminary motion challenging the legality of the IST and its failure to ensure respect for human rights.
k.  21 December 2005: A supplementary motion challenging the legality of the IST.
l.  1 February 2006: A preliminary motion requesting the disqualification of Chief Judge Abdel-Rahman on grounds of bias.[112]
m.  20 February 2006: A supplementary motion requesting the disqualification of Chief Judge Abdel-Rahman on grounds of bias.[113]
n.  15 March 2006: the seventeen point request, including respect for some basic human rights of fair trial.
o.  13 June 2006: a request to prevent Mr. William Wiley who alleged to work for the IST from interfering with defense witnesses and from contact with defense lawyers who he was threatening.

Moreover, the IST has shown that it cannot even ensure the safety of defense counsel by failing to address numerous requests for security, despite one of its own Judge's commitment to remedying the problems.

Instead, the IST continues to make matters worse for itself. It continues to desecrate the rule of law and the Arab and Islamic principles of Iraq by pushing forward with a clearly unfair and unjust trial. This unfair trial has already caused further divisiveness in Iraq contributing to the instability created by the state of war.

*Lack of Security and Murders of Defense Participants*

Even before the trial began in October 2005, defense counsel and other prominent observers warned about the lack of security for such a trial.

For example, on 19 September 2005, in a letter to the United Nations Secretary-General, Mr. Kofi Annan, Mr. Ahmed Ben Bella, former President of Algeria; Tun Dr. Mohammed Mahathir, former Prime Minister of Malaysia, Mr. Roland Dumas, former Minister of Foreign Affairs of France, and Mr. Ramsey Clark, former Attorney-General of the United States, publicly expressed their concern for the safety of all participants in the trial. Annex E. In this letter these four prominent statesmen drew attention to the atmosphere of violence in which the United States and Iraqi authorities were considering conducting a trial.

The lawyers themselves also provide the IST with detailed requests for security. For example, on 28 November 2005, Mr. Ramsey Clark presented these requests both in writing and in oral argument to the judges of the IST. Annex D. And on 26 January 2006 Mr. Kaleel al-Dolami repeated these requests in writing, but was denied the opportunity to make oral argument to the judges of the IST. Annex F. These requests for adequate security were always either denied or ignored.

Unfortunately, the fears of these prominent statesmen were proven well-founded when on 20 October 2005, just one day after the first hearing, defense lawyer Mr. Sadoon al-Janabi was gunned down by individuals claiming to be from the Iraqi Interim Ministry of Interior. The next day, 21 October 2005, eyewitnesses told Al Arabiya TV that "Mr. Janabi's abductors, dressed in suits and ties, identified themselves as officials of the Interior Ministry" and on 22 October the *New York Times* reported that eyewitnesses identified the men abducting the victim as claiming to be from the Iraqi interim administration's Ministry of Interior.[114] This killing was never been investigated by the Iraqi or United States authorities, and, despite renewed request for the security by

defense counsel, no adequate security was put in place for the remaining lawyers.

No adequate security measures were put in place after this killing and the IST deferred any response to requests made by the defense lawyers for adequate security arrangements to be made.

On 8 November 2005, another defense lawyer, Mr. Adil Mohammad Abbas al-Zubeidi, was killed and a colleague seriously injured, again with alleged involvement of the Iraqi interim government and the occupying United States forces, according to independent news reports.[115] These allegations of Iraqi government involvement in the assassination of private individuals have been repeatedly reported by the media in Iraq.[116]

The defense lawyers again pleaded for adequate security to be provided. In addition the United Nations Secretary-General Mr. Kofi Annan issued a public statement condemning the killings and stating that "it is vitally important that the security of all involved with the Tribunal should be equally assured to ensure a trial free from intimidation and coercion … [and that the Secretary-General] … hopes that the Tribunal will uphold the international standards of justice necessary to ensure its legitimacy, fairness and independence."[117] No adequate action was taken by either the Iraqi or United States authorities.

On 28 November 2005, when proceedings resumed despite not adequate security arrangements having been made, another request for security was submitted to the IST and the United States authorities. This time Mr. Ramsey Clark, on behalf of the defense counsel, made an oral plea in the courtroom and submitted a written request seeking specific measures of security for defense counsel. (See annex D) The Chief Judge asked that oral argument be held "later".

On Monday, 5 December 2005, the IST proceeded without the defense counsel present because no steps had been taken to provide adequate security. The IST had also refused to allow the defense counsel to address the preliminary issues of lack of security and the illegality of the IST. Chief Judge Rizgar Amin appointed defense lawyers who had been waiting outside the courtroom and without any preparation and over the express protests of President Saddam Hussein the lawyers entered the courtroom. The IST-appointed lawyers made no challenges to any prosecution witness.

On Tuesday, 6 December 2005, the IST proceeded with more witnesses and again denied defense lawyers request to make preliminary arguments on issue of security and legality.

On Wednesday, 7 December 2005, the IST proceeded with more witnesses and again denied defense lawyers request to make preliminary arguments on issue of security and legality. Protesting the unfairness of the IST he defendants refused to be present. After the public hearing was adjourned defense lawyer Mr. Ramsey Clark was allowed to make a 10 minute oral argument in which he reiterated the call for security to be provided to all participants in the trial. He also provided this request in writing in Arabic and English to the IST. Defense lawyer Mr. Najeeb al-Nuaimi was also allowed to make a 15 minute oral argument on the issue of legality.

On 8 December 2005, Chief Judge Rizgar Amin orally indicated to the defense lawyers that he agreed with their security concerns and had referred the request to the President of the IST for action. No adequate action was ever taken.

During the early December 2005 hearings the prosecution's lead witness testified that no attack had taken place against President Saddam Hussein in Dujail in 1982. This statement is later proven to have contradicted an earlier statement by the same witness and to have shown that this witnesses' testimony is not credible. Furthermore, none of the witnesses directly implicated President Saddam Hussein in any alleged criminal acts, but instead described vaguely treatment they had received at the hands of individual security agents. And in addition most of the witnesses were anonymous and nothing was known about their identity or background by the defense lawyers.

In a letter dated 20 December 2005, the same Chief Judge of the IST indicated that "[t]he Court agrees with the defense point of view about the importance of providing security" (IST Doc. Ref. 1/2005). Again no adequate action was ever taken.

The United States and the Iraqi authorities failed to take any adequate security measure to protect the defense lawyers, especially the Iraqi lawyers. Instead, of providing the security measures requested by defense counsel, the United States authorities agreed to pay for two guards for each defense lawyer. This money was never paid to defense lawyers, as was admitted by Mr. William Wiley in a meeting with defense counsel on behalf of the IST in Amman, Jordan on 7 May 2006. In this meeting Mr. Wiley admitted that the money was not paid and said he would look into the matter. Even if this *de minimus* security arrangement had been provided it would not have been adequate to protect the lawyers from attacks that were carried out by heavily armed perpetrators who claimed to be government authorities and who acted with impunity and perhaps in concert with both Iraqi and United States authorities.

On 21 June 2006, a third defense lawyer, Mr. Khamis al-Obedi, was killed, again under circumstances in which both Iraqi and United States authorities appeared to be involved.[118] The attackers, who abducted the defense attorney, identified themselves as being form the Iraqi Ministry of Interior, and they both arrived at the lawyer's home as well as fled without being pursued by United States authorities that were in the nearby vicinity.

A United States government spokesperson said that they noted that "the Iraqi Government and the international community offer every form of protection and assistance to those involved in the trial … [and that] … unfortunately in this case and this individual, he refused those protections and refused those offers."[119] This is statement was untrue and the United States government knew it to be untrue. Indeed, the *New York Times* had already reported months earlier that the defense lawyers had repeatedly sought adequate security and that "Mr. Obeidi had been one of the most vocal members of Mr. Hussein's team in calling for better security or for the boycotting of the trial after the assassinations of two other defense lawyers in October and November last year."[120]

On 27 June 2006, Mr. Ramsey Clark and Dr. Curtis Doebbler, two of the surviving lawyers on the defense team provided public documentary evidence of the requests made by Mr. Obeidi and the other defense lawyers for adequate security dating back to November 2005 at a press conference at the National Press Club in Washington D.C. in the United States. These two lawyers also indicated that despite the IST's agreement with these requests, these requests had never been honored.

Even as the defense lawyers are trying to prepare final arguments after the defense case was stopped by the chief judge, threats continue against the lawyers. The Iraqi government has threatened the lawyers by claiming to pursue family members of the President for arrest.[121] The timing of this unfounded action by the Iraqi authorities was clearly intended as further attempt to intimidate the lawyers and prevent the defense from being able to proceed.

Furthermore, in public on 27 July 2006, Chief Judge Abdel-Rahman falsely accused the defense lawyers of taking large sums of money from their clients and of not representing their clients.[122] He did this despite knowing that the defense lawyers have worked *pro bono* and have constantly complained that they have no money or other resources available to them to enable them to adequately prepare a defense.[123]

*Lack of Respect for Due Process during Investigations*

There has been constant and extensive interference in the investigative process by members of the Iraqi executive branch of government and by the foreign occupying powers.

The United States has interfered by providing the prosecuting office more than two hundred thousand dollars of support, plus logistic support and constant encouragement to push the trial forward as fast as possible without due respect for the human rights of the accused to a fair trial. There are also countless American lawyers working for the prosecution, but not identified to the defense lawyers.

No exculpatory evidence was shared with defense counsel before or during the proceedings before the IST. Even the proceedings concerning Dujail court in 1982, which were central to the alleged charges relating to events in Dujail, were never provided the defense lawyers despite the admissions that they existed.[124]

United States President George W. Bush, Iraqi President Jalal Talabani, the Chief Prosecutor of the IST, and, allegedly, the Chief Judge before the trial have all said that the death penalty will or should be implemented. Other officials spoke out stating their desired out in favor of their desired outcome of a guilty verdict and/or an execution. Examples of the numerous public statements are recounted in the next section on the lack of independence of the IST.

On 20 June 2004, Mr. Salem Chalabi, the first director of the IST, sum up the proceedings before the IST as nothing more than a "show trial" which would end in the execution of the President.[125]

Notwithstanding these public statements, the President was not formally charged for almost two years while he remained in detention without allowed legal representation of their own choosing, not allowed or able to approach a court of law to determine the legality of their arrest, and not allowed adequate facilities to prepare a defense.

During this time he was repeatedly interrogated without a lawyers present and in a manner which he constituted torture. Allegations of torture were made in the courtroom before the IST, but never investigated.

On 1 July 2004, the President was forced to appear before an investigative judge in a spectacle that was televised around the world. The President had not seen his lawyers and had no lawyer with him. He was not provided detailed charges but subjected to vague allegations by a junior judge. The process was

clearly intended as an attempt to humiliate him. Nevertheless, the President maintained his composure and objected the hearing and the IST as illegal. He also asked to see his lawyers, as request that was not granted for almost another six months.

Between 1 July 2004 and 19 October 2005, the President repeatedly appeared before investigative judges with no prior notice and without a lawyer. Some of these judges even bragged falsely that the President had confessed.[126]

*Incompetence of the IST*

Every court or tribunal must be created in accordance with pre-existing law.[127] The violations of this obligation have been established above in the section on the illegality of the IST. Nevertheless, it is relevant to reiterate that when a court is not created in accordance with pre-existing law it is incompetent and illegal.

The IST was not created in accordance with law. It was created in violation of international law and Iraqi law to serve the interests of the occupying powers.

When the United States invaded and occupied Iraq in March 2003 is dissolved the regular courts and created new courts including special courts such as the IST. The IST was created by Order No. 48 which contained its Statute. Order No. 48 was signed into law by CPA Administrator L. Paul Bremer acting for the occupying power on 10 December 2003.

Iraq already had courts existing under Iraqi law. Iraqi Law No. 160 on Judicial Organization established the basis for the creation and functioning of the courts. This law must have remained in force throughout the occupation as this is required by article 64 of the Fourth Geneva Convention, which unequivocally states that "penal laws of the occupied territory shall remain in force ... [and] ... the tribunals of the occupied territory shall continue to function in respect of all offenses covered by the said laws." The existing laws were ignored when the IST was established in late 2003

The IST was thus created outside the established Iraqi legal system. Although an attempt was made to ratify it *ex post facto* by the TAL adopted on 8 March 2004, this instrument was created and adopted while Iraq was under occupation. This is recognized by U.N. Security Council Resolution 1511 that recognizes both the TAL *and* the fact that Iraq is an occupied country.[128]

Another attempt was made to re-create the IST with minor adaptations in August 2005 by Iraqi Law No. 10, which was promulgated by the United States chosen Iraqi Council in October 2005 just a week before the start of the proceedings concerning Dujail. At the time that the proceedings began the

defense could not even obtain a copy of the new version of the Statue of the IST.

The exceptional nature of the IST is also recognized in the manner in which it was referred to in the originally authoritative English language text; as the "Iraqi Special Tribunal" (see article 1 of the old Statute). The new statute also refers to the "Iraqi Higher Criminal Court" as a "specialized" court (see article 1 of the new Statute). Both the Transitional Law of 8 March 2004 and the later adopted Constitution recognize the exceptional nature of the IST by attempting to make special provisions for its existence despite articles in both instruments that prohibit special courts.

Article 48 of the TAL—which in contradiction to articles 3, 12, 15(I) and 43 of the same law—states that the IST is a 'special' tribunal. Article 15(I) of the TAL unequivocally states that "special or exceptional courts may not be established." This provision is expressly violated by the establishment and continued functioning of the IST. The more recently adopted Constitution article 130 also contradicts article 92 in the same way just described.

The violation of the prohibition of special courts cannot be remedied by reference to an exceptional article authorizing the special courts that is promulgated after the courts have been created. The violation of this prohibition, which exists under general customary international law, has already occurred.

In Iraqi law, this has been expressed as the principle of legality[129] and in international human rights law as the principle of due process, which is well-established in human rights treaties including article 14(1) of the International Covenant of Civil and Political Rights as well as article XXVI of the American Declaration of the Rights and Duties of Man, article 7 of the European Convention on Human Rights,[130] article 9 of the American Convention on Human Rights,[131] and article 7 of the African Convention on Human Rights.[132]

Article 14 of the International Covenant of Civil and Political Rights requires that courts be established by preexisting law. This provision is intended to ensure that courts are not established to adjudicate specific cases based on political or other biases.

This article is further explained by Principle 5 of the Basic Principles on the Independence of the Judiciary which states that:

> [e]veryone shall have the right to be tried by ordinary courts or tribunals using established legal procedures. Tribunals that do not use the duly established procedures of the legal process shall not be created

to displace the jurisdiction belonging to the ordinary courts or judicial tribunals.[133]

Principle 5 has, as such, been interpreted as expressly prohibiting the use of special tribunals. The United Nations Working Group has stated that "one of the most serious causes of arbitrary detention is the existence of special tribunals."[134] Annex A. The Inter-American Court has stated that it is violation of human rights when states use "[t]ribunals that do not use the duly established procedures of the legal process [...] to displace the jurisdiction belonging to the ordinary courts or judicial tribunals."[135]

In this case there can be no doubt the IST was created in violation of international law and Iraqi law. It flawed creation also contributes to its lack of independence.

### *The Lack of Independence*

The independence of the judiciary is essential to any democratic state respecting the rule of law.

In 2004, the American-appointed Ahmed Chalabi appointed his relative Salem Chalabi as the first Chief Administrative judge. Salem Chalabi is a United States educated nephew of Ahmad Chalabi, a long time exile from Iraq, an individual who has proudly acknowledged close ties to the U.S. government, its Defense Department, other agencies and individual leaders, and an avowed enemy of President Saddam Hussein.

A few months later, Salem Chalabi was removed from the IST by Iyad Allawi, a "favorite of the CIA," after his appointment by the United States as an interim Prime Minister, and the selection of Amir Bakri, a member of Allawi's own party.

Amir Bakri then dismissed Judge Naim al-Egaili, the President of the IST, in what was branded as a wrestling of 'political control' from Chalabi's faction to that headed by Allawi.

A further attempt to change the IST was forced through the Iraqi assembly in August 2005. This attempt was to revise the whole statute, not by improving its substance, but by repeating its mistakes and shortcomings with the stamp of the Iraqi Governing Council (IGC). The IGC, however, was a creation of the occupying powers and merely acting on their behalf. It was certainly not an independent body. In any event, the new IST Statute was not published until 11 October 2005, just eight days before the first hearings began.

Despite the binding nature of the universal requirement of fair trial there have been repeated acknowledgments by persons involved in this trial—from person in the Iraqi government as well as in the United States government that is occupying Iraq—indicating that the IST is not independent.

Statements made by officials of the IST, officials of the executive branch installed by the occupying power, as well as the occupying powers, indicate that the IST is subject to the control of both the occupying power as well as the executive branch it has installed. Members of Iraq's executive and legislative branches have repeatedly exerted pressure on the IST.

In January 2006, IST Chief Judge Rizgar Amin was forced to resign by external pressure from those such Ali al-Adeeb, a senior Shiite official in Prime Minister Ibrahim al-Jaafari's party and member of the Interim legislature, who declared that "[t]he Chief Judge should be changed and replaced by someone who is strict and courageous."[136] After Judge Rizgar Amin resigned he was then pressured to rescind his resignation, according to "sources close to the Chief Judge" who told Reuters that the Chief Judge "...tendered his resignation to the court a few days ago, but the court rejected it. Now talks are under way to convince him to go back on his decision ... He's under a lot of pressure, the whole court is under political pressure."[137]

Immediately after the new after Judge Saeed Al-Hameesh was publicly nominated to replace Judge Amin Rizgar,[138] pressure was asserted by Mr. Ali Faisal, the head of the United States-created de-Baathification Commission, to force his resignation.[139] These overt public acts of interference in the make-up of the IST on overtly political grounds and by political actors are strong evidence of both the apparent and *de facto* lack of independence of the IST.

The above actions are all executive interferences in the functioning of the IST.

This pressure has ranged from statements assuming guilt even before a trial begins to conclusions about what sentences should be passed.

Iraqi Interim President Jalal Talibani stated on 5 October 2005, before any trial had commenced, to Radio Free Europe that the President "is a war criminal. He committed crimes against the Iraqi people, against our neighbours, against Iranians, against Kuwaitis. For that I think he will deserve to be presented to the court as a war criminal" and that the President should be executed twenty times.[140]

On 19 January 2006, United States George W. Bush was quoted as saying that the trial was on track and that he was sure that the President would be executed at the end.[141]

More recently on 6 July 2006 the Arab Times reported Iraqi Prime Minister Nouri Al-Maliki said that "[t]he trial of the deposed Iraqi President Saddam Hussein would not take long and his execution for crimes against humanity would come soon after the court's verdict ... if President Jalal Talabani refused to sign the death sentence, a presidential council would carry out the mission."[142]

Also before any trial commenced, American television outlet CNN reported that President Talabani "had spoken to one of the Iraqi Special Tribunal judges involved in the investigation who had said that "he was able to take important confessions from Saddam Hussein and he has signed these confessions and there is video and audio for these confessions."[143]

The leader of Iraq's most powerful Shiite political party, Abdul Aziz Hakim, also declared that the Iraqi Interim government "wants to see Saddam dead, it wants him to face the death penalty, because that is the will of the people"[144] just days after the trial began.

On 26 November 2005, followers of Shiite cleric Muqtada al-Sadr, who controls a fraction of at least thirty members of the Iraqi Parliament that had been created under the United States-led occupation, demonstrated in Baghdad calling for the summary execution of President Saddam Hussein. And he has said that "I call for the execution of Saddam ... [he] should not [even] be tried."[145] On that same day, the Associated Press reported that "the leader of the biggest Shiite party, Abdul-Aziz al-Hakim, accused the IST of "weakness" for not having sentenced Hussein to death already" and that an attempt had been made on the life of one of the judges.[146]

Ali Dabagh, a Shi'ite member of the Transitional National Assembly appeared to acknowledge interference with the functioning of the IST when he declared that "[t]he judge is giving too much leeway to Saddam. He should respect the Iraqis and the victims' feelings."[147]

And Hoshyar Zebari, the Iraqi Foreign Minister, pressured the IST to act more quickly declaring derogatorily that "[t]here are Baathist thugs in the country who still believe Saddam is coming back. I believe that if he had been tried before we would have better control of security now."[148]

Statements indicating interference have also been directed towards possible penalties that the IST could impose before any judgment has even been pronounced.

Iraqi Interim Prime Minister, Ibrahim Al-Jafari pressured the IST to impose the death penalty when he surmised that finding persons twilling to carry out the execution was "not a problem, many people already volunteered. Many

people would love to do the job. This is a man who does not deserve any mercy."[149]

Political leaders have made repeated statements interfering with the independence of the IST.

In October 2005, a senior American advisor to the IST who has worked for the United States Department in the past has stated that "[t]he United States will be involved in the trial but from behind the scenes, more like a puppet master role. In fact, the tribunal statute requires that both the judges and the prosecutors receive assistance from U.S. authorities."[150]

This was confirmed by the statement of Ridha Jwad Taqi, head of the political office of SCIRI, another Shi'ite party in the government who declared that "[t]he Americans have attempted to Americanize the IST so it appeals to their public..."[151]

The investigative judges, sitting judges, and prosecutors of the IST are named by the Iraqi Governing Council (IGC), a temporary executive authority that itself is created by the occupying powers.[152]

Although a Judicial Council has been established, it does not have power to remove the judges. The judicial appointments were instead made by the Iraqi Prime Minister a member of the executive branch of government. The IGC no longer exists. It has been disbanded in January 2005. As a consequence, no legitimate entity which existed under Iraqi law remains in order to name judges to the Iraqi IST.

Moreover, during the existence of the IGC, judges were named by the Prime Minister in consultation with unknown individuals. The secretiveness of the process under a military occupation that is being unyieldingly resisted by patriotic Iraqis, alone raises serious doubts about the appointment of independent judges.

The process by which the IST judges are selected is in direct contradiction with the United Nations' Principles on the Independence of the Judiciary. The Principles unequivocally advise against the nomination of judicial authorities by political authorities.[153] Article 6(b) of the old Statute of the IST also requires the President of the IST "to appoint non-Iraqi nationals to act in advisory capacities or as observers to the Trial Chambers."

The article further states that the role of these observers is to "provide assistance to the judges" and to "monitor" the functioning of the IST. Other articles also call for observation of the IST's functioning by foreign observers.[154] Such functions are *prima facie violation* of judicial independence

in that they impinge upon the independent decision making prerogatives of the IST by subjecting the latter's internal deliberations to the scrutiny of observers beholden to the occupying power.

The independent functioning of the IST is further impugned by the fact that no standards of professional qualification are established for prosecutors, although such standards are required by Iraqi law.[155] These actions severally and jointly violate the requirement of judicial independence and deprive the IST of its legality.

Evidence of the lack of independence in practice has been provided by the manner in which the IST makes decisions. At the hearing on 28 November 2005, the IST agreed that defense counsel should be given at least three months to meet with their clients and begin to prepare their defense cases. After consultations in which American military personal and other foreigners who were apparently advisors to the IST met with IST officials the decision was reversed and the time significantly limited. Again on 13 June 2006 after having agreed to allow more defense witnesses, the Chief Judge suddenly changed his mind in the courtroom after receiving a note passed to him by Americans outside the courtroom. Finally, an another example of the United States control of the proceedings was the 21 December 2005, denial of the right to enter the courtroom to Dr. Curtis F.J. Doebbler, who possess three powers of representation from the Iraqi President Saddam Hussein. According to US military Captain Philip Lynch this documentation was accepted by the IST, but the decision was reversed by Canadian judge Howard Davidson, who apparently acts as an advisor to the IST. These clear examples of United States control of the proceedings call into serious question the independent functioning of the IST.

The requirement of independence of the judiciary is has been confirmed by numerous states in their domestic constitutions[156] as well as in numerous international instruments,[157] particularly article 14 of the International Covenant of Civil and Political Rights and article 10 of the Universal Declaration of Human Rights, which reflects a rule of customary international law. It is also found in articles 8(1) and 27(2) of the American Convention on Human Rights, article XXVI of the American Declaration on the Rights and Duties of Man that reflects customary international law, article 6(1) of the European Convention on Human Rights, and articles 7(1) and 26 of the African Charter of Human and Peoples' Rights. It "is an absolute right that may suffer no exception."[158]

This right is violated when the independence of judges are repeatedly interfered with by Iraqi and foreign authorities as has been the case with the judges of the IST.

*The Lack of Impartiality*

Impartiality is an essential condition of the right to fair trial that requires that judges carry their judicial duties free from any bias. Judges must be impartial in fact as well as appear to be impartial.[159]

An example of the requirements of impartiality is illustrated by Judge Dara Nureddin an Iraqi who was nominated to sit on the appellate division of the IST, but who recused the nomination because "he had previously been imprisoned by the Saddam regime."[160]

Anonymous judges—those whose identity and qualification are not known— are *prima facie* violations of impartiality as has been recognized by the United States government itself. When commenting on the practice of "anonymous judges in Colombia, it recognized that "[h]uman rights groups continued to charge that this system violated basic legal norms and procedural rights."[161]

Furthermore, although the qualifications and names of the judge have not been made known, it is known that the judges have been vetted for their political opinions. Vetting judges on the basis of their political opinions is a *prima facie* violation of the principle of impartiality.

The occupying powers are violating this principle by selecting only judges who have been vetted for their political opinion for the IST.

In addition to preventing the existing judiciary from continuing to function or selecting new judges on the basis of their legal competence, the occupying power announced a program of de-Ba'athification.[162] This process sought to vet judges based on their support for an occupation regime that had been installed by an unlawful use of force.

Judges who were allowed to remain on the bench were implicitly those who supported the illegal use of force against their own country and opposed, in violation of their own domestic law, the legitimate government of the country. As avowed enemies of the previous government, these judges cannot be expected to adjudicate in a fair and unbiased manner. Moreover, the government has announced that the judges' names will be kept secret in order to ensure their personal safety; this procedure is an additional *prima facie* showing of the lack of impartiality.

Judges of the tribunal stated that the Iraqi President who was then about to go on trial before them had "persecuted the Kurds. He killed them, wiped many of them out. He also used chemical weapons with the aim of committing genocide against this race, against this people, to eradicate them as a nation.

He also went after the Shiites due to their religious beliefs."[163] Another judge stated that the President is "one of the worst tyrants in history."[164]

The lack of impartiality of the judges, which must be assumed because the majority are 'faceless'/anonymous and neither their identity nor their credentials have been disclosed to defense counsel, must result in the disqualification of all the judges of the IST.

One judge, whose identity is known, is Chief Judge Abdel-Rahman, who as indicated above became Chief Judge only after significant interference in the functioning of the IST by both United States and Iraqi political officials. Moreover, Judge Abdel-Rahman was a Kurdish judge of junior level who did not even received the two weeks training that other judges on the IST had allegedly received. His statements in the courtroom irrationally lashing out at defense counsel are strong evidence that he was seriously biased against Iraqi President Saddam Hussein.

Despite strict secrecy surrounding information about Judge Abdel-Rahman and the inability of defense counsel to investigate his background through sources in Iraq because of the insecurity, there is ample information in the public domain to indicate that he is biased or must reasonably be perceived as biased.

This information included the following:

   a. The media has widely reported that Judge "Raouf Abdul Rahman, the judge who has taken over at the trial of former Iraqi leader Saddam Hussein, was born in the Iraqi Kurdish town of Halabja."[165]

   b. The British Broadcasting Company (BBC) has also stated that "Judge Rahman lost some of his relatives in the attack, although not immediate family members." [166] The American media has furthermore stated that "[s]ome relatives of Abdel-Rahman were among the dead, according to his family."[167]

   c. It has also been reported that Judge "Abdel Rahman set up organisations to help his hometown of Halabja recover from a gas attack attributed to Saddam's forces in 1988, which killed 5,000 people, including his relatives."[168] And that Judge "Abdel Rahman has taken a personal interest in helping Halabja heal, forming committees to help its distraught residents recover. Some observers wonder if a Kurdish judge can show impartiality."[169]

   d. It has furthermore been reported that "[t]he Chief Judge [Abdel Rahman] was imprisoned and allegedly tortured for membership in a

Kurdish nationalist movement in the early 1970s, when Iraq was already ruled by the Baath Party regime"[170] and that Judge Abdel Rahman "was also reportedly tried *in abstentia* in 1977 and sentenced to life in prison."[171]

Each of these media reports are corroborated and consistent with the defense lawyers' own very limited knowledge of judge Abdel-Rahman's background. None of the allegations have been substantively challenged, even in the final judgment of the IST on 5 November 2006. Moreover, judge Abdel-Rahman has frequently expressed his hatred for the defendants saying before the trial that for Saddam Hussein "a trial is not necessary, just a hanging" and during the trial, of the defendants, that they "had blood on their hands since childhood."[172]

None of these allegations been denied when they were alleged in formal motions made to the IST. These motions called for the disqualification of judge Abdel-Rahman because of his perceived bias which is evidenced by his statements. These statements indicate that he is unable to ensure the presumption of innocence to which every defendant is entitled.

The IST has refused to provide a reasoned reply to the motion challenging Judge Abdel Rahman's lack of impartiality. Instead the Appellate division of the IST held that it could not consider the motion because it should have been presented before the proceedings on the merits commenced. This was, of course, impossible as pointed out above, Judge Abdel Rahman was not a member of the IST when proceedings commenced in October 2005, nor was he even known to the defense lawyers. The IST's failure to provide a reasoned opinion on motion challenging Judge Abdel-Rahman's lack of impartiality is itself a violation of the obligation of impartiality.

Both for reasons related to obscuring of the judges' identities as well as to the strong evidence suggesting overt displayed bias by the Chief Judge the IST violates the obligation of impartiality.

The manipulation of the IST already described in the previous section on lack of independence also indicates that the IST lacks impartiality. This is both because its judges have failed to defend the IST from attempts to politically control it and because the judges have created an appearance of colluding with political authorities.

The judges' lack of impartiality has also been repeatedly made apparent. In a film by Jean-Pierre Krief for Arte France and KS Visions that was shown in France in 2005 a judge of the tribunal states that the Iraqi President who was then about to go on trial before them had "persecuted the Kurds. He killed them, wiped many of them out. He also used chemical weapons with the aim

of committing genocide against this race, against this people, to eradicate them as a nation. He also went after the Shiites due to their religious beliefs." Another judge states that the President is "one of the worst tyrants in history."[173] (See Annex J "Arte France and KS Visions DVD"). These are not the statements of impartial judges, who in the inquisitorial system of justice such as that of the IST, is both the evaluator of law and fact. These are the statements of persons who have been put in place by an illegal occupying power to serve its ends and not those of justice.

On 12 June 2006, the IST evidence its bias when the Chief Judge allowed a judge to read out allegations against the defense lawyers that had been made by defense witnesses who had been beaten, arrested, and held without access to counsel of their choice. These allegations read in front of their clients and in a public session of the IST that is trying these clients, alleged that the defense witnesses had been bribed by the defense lawyers. The IST did not bring the defense witnesses into IST, although it had had them in custody during the last session; it did not provide defense counsel copies of the allegations or the right to respond to them; and it later—through a person who claimed to be an officer of the IST—threatened the defense lawyers with arrest. This act alone is irrefutable evidence that the IST is biased, the trial is unfair, and that a mistrial must be declared.

This right is found in article 20(d)(1) of the original Statute of the IST, article 19(Fourth)(A) of the new Statute, article 14(1) of the International Covenant of Civil and Political Rights as well as under customary international law as reflected in article 10 of the Universal Declaration of Human Rights, article 6(1) of the European Convention on Human Rights, article 8(1) of the American Convention of Human Rights, and article 7(1) of the African Charter on Human and Peoples' Rights.

The Human Rights Committee has stated that impartiality "implies that judges must not harbour preconceptions about the matter put before them, and that they must not act in ways that promote the interests of one of the parties."[174]

The requirement of impartiality is violated because the judges have expressly shown bias by their statements and actions and have created an appearance of bias through their actions and inactions.

*Other Issues of Impartiality*

In April 2006 it was confirmed that Mr. William Wiley, who had worked from the United Nations from approximately mid-2005 to early 2006, had gone to work for the United States government's Regime Crimes Liaison Office, which is the office that defense counsel and observers have accused of controlling the IST. For months Mr. Wiley used his United Nations position to

gain confidential information from defense counsel and had represented to defense counsel that they could trust him with confidential information.

This conflict of interest represents not only a serious breach of integrity of the United Nations human rights operation in Iraq and undermines public confidence in this work, but it also constitutes a serious breach of legal ethics that undermines the impartiality of the IST.

Furthermore, Mr. Wiley also approached defense witnesses in an attempt to influence their testimony after he had been asked not to do so by the defense lawyers and he approached defense lawyers, prompting them to petition the IST on 13 June 2006 to have him prohibited from contacting either witnesses or the defense lawyers, according to Mr. Kaleel al-Dolami.[175] Immediately after this motion was made, the Chief Judge of the IST prematurely ended the defense and disallowed the defense from calling anymore of the many witnesses it wished to call.

*Failure to Provide Timely Charges*

The right to be informed of charges in a timely manner has been violated by the fact that the President was not informed in any detail about the charges leveled against him in a timely or adequate manner.

The specific charges against the President were not provided to the defense until 15 May 2006, approximately two and half years after the President had been arrested, and approximately seven months into the trial and after the prosecution had presented its case, including all its witnesses and evidence. The extraordinary delay in providing the President the charges against him precluded him from preparing a defense or even questioning the witnesses or evidence against him.

This is especially egregious because the Statute of the Tribunal contains numerous charges that overlap or are very similar and contains new offenses which did not exist under neither Iraqi or international law at the time they are alleged to have been committed.

This right to a prompt hearing is enshrined in article 20(d)(1) of the original Statute of the IST and article 19(Fourth)(A) of the new Statute that entered to force on 11 October 2005 as well as under customary international law that is reflected in article 14(3)(a) of the International Covenant of Civil and Political Rights and is reiterated article 67(1)(a) of the Statute of the International Criminal Court, article 8(2)(b) of the American Convention on Human Rights, and article 6(3)(a) of the European Convention on Human Rights.

Interpreting the meaning of 'promptness' the Inter-American Court of Human Rights has held that it is violated when the accused was found to have been held incommunicado for 36 days without charges. The Court noted that "the principle of *"reasonable time"* is to prevent accused persons from remaining in that situation for a protracted period and to ensure that the charge is promptly disposed of."[176]

### No Adequate Facilities or Time to Prepare a Defense

The right to adequate facilities and time to prepare one's own defense requires that the President and his legal counsel be allowed to freely and confidentially consult with each other in advance of a trial and during a trial. This right has been seriously violated in numerous ways.

The only meetings that took place between the President and his IST-appointed lawyers were not private and took place with constant surveillance from several United States soldiers.

There were no meetings between the President and his lawyer for more than a year including no face-to-face meeting during the whole of the defense case during May and June 2006.

When the President was able to meet a lawyer, he was only able to meet one who had been agreed to by the IST. This lawyer Mr. Kaleel al-Dolami, although extremely courageous, has no experience in prominent criminal cases, no experience or training in international criminal law, and had never met the President in person in his life. He was appointed by the IST from a list of several lawyers prepared by the IST from which the President was forced to choose. The ACHRP held that the assignment of lawyers to accused persons "is capable of exposing the victims to a situation of not being able to communicate, in confidence, with counsel of their choice."[177] In this case, the President's Iraqi lawyers were all either IST-appointed or IST approved before they could meet the President. In addition lawyers none of them have significant expertise in international criminal law from which all the charges against the President are drawn. Such expertise is central to the proceedings according to the Statute of the IST. At the same time, lawyers with expertise in international law were consistently prevented from participating in the defense either by the IST-appointed lawyers, the United States government officials or those acting on their behalf, or Iraqi officials.

Repeated requests by the President himself to consult experts in international law were ignored by both the IST and the occupying powers. The ECHR reaffirmed that "art 6(1) might sometimes compel the state to provide for the assistance of a lawyer when such assistance proved indispensable for effective

access to a court, either because legal representation was rendered compulsory, or by reason of the complexity of the procedure or of the case."[178]

Moreover, all the meetings that took place between the President and his IST-appointed lawyers were not private and took place with constant surveillance of several soldiers from the occupying powers.

The IST did not allow the President to know the charges against him until 15 May 2006, almost two and half years after he was detained and had been held with very limited access to legal counsel. After he was provided the charges the defense was given a matter of minutes to begin to present its case, no time was allowed to prepare a defense or to evaluate the prosecution's case.

Moreover, because the charges were provided only after the prosecution had presented its case there was not even the possibility for the defense lawyers to cross examine witnesses or review documentary evidence after knowing the charges.

Furthermore, only part of the evidence—and not all of the most important evidence—was handed over to the defense mere days before the proceedings were to begin in October 2005. By comparison, in *Ocalan*, the European Court of Human Rights frowned at the delay in providing legal counsel access to information, the likes of which it deemed the result of "the sheer number and volume of documents and the restriction imposed on the number and length of their (legal counsel) visits."[179]

Furthermore, the prosecution did not provide the defense lawyers any exculpatory evidence. This was the case even though the defense lawyers repeatedly asked for evidence such as the transcripts and papers form the Dujail investigation and trial that took place in 1982. While first denying and then admitting they had these papers, the prosecution never provided them to the defense lawyers. This state of affairs in Mr. Hussein's case stands in stark contrast with the ICTY Tribunal's decision to grant defense counsel access to confidential transcripts and documents from another legal proceeding.[180]

In *Avocats Sans Frontieres v. Burundi*, the African Commission on Human and Peoples' Rights found that

> the right to equal treatment by a jurisdiction, especially in criminal matters, means, in the first place, that both the defense and the public prosecutor shall have equal opportunity to prepare and present their pleas and indictment during the trial. Simply put, they should argue their cases before the jurisdiction on an equal footing. Secondly it entails the equal treatment of all accused persons by jurisdictions charged with trying them. This does not mean that identical treatment should be meted

> to all accused. The idea here is the principle that when objective facts are alike, the response of the judiciary should also be similar. There is a breach of the principle of equality if judicial or administrative decisions are applied in a discriminatory manner. In the case under consideration, it is expected of the Commission to attend to the first aspect, that is, observation of the rule of equality of the means utilized by the defense and the prosecution.[181]

The right to adequate facilities and time to prepare one's own defense has been violated by the failure to provide the President adequate access to his lawyers.

The right to adequate time and facilities to prepare a defense is stated in article 20(d)(2) of the original Statute of the IST and article 19(Fourth)(B) of the new Statute that entered to force on 11 October 2005 as well as in article 14(3)(b) of the International Covenant of Civil and Political Rights and is reiterated in article 67(1)(d) of the Statute of the International Criminal Court, article 8(2)(c) of the American Convention on Human Rights, and article 6(3)(b) of the European Convention on Human Rights.

### *Failure to Provide Public Trial*

The trial has not been public. Instead the United States government controls what parts of trial are allowed to be broadcast to the public and deletes whatever parts it does not wish to be broadcast.

The BBC's John Simpson has commented that "[t]he American company in charge of broadcasting the proceedings frequently blanks out the sound of what Saddam and the others say, and sometimes cuts the vision as well." He continues to the frustrating conclusion that "[t]he impression of control and censorship is very strong - and yet the things which cannot be broadcast are often trivial enough."

In addition, the Chief Judge has sometimes shut the courtroom from the public because he did not like what was being said by a witness or other participant in the trial without either providing an explanation or refer to a rational nexus as that latter may pertain with regards to the protection of other persons present in the courtroom or listening to the trial.

On 13 June 2006, for example, the Chief Judge suddenly ordered the IST closed to the press for several hours for no apparent reasons.

The right to public trial is stated in article 20(c) of the original Statute of the IST and article 19(Third) of the new Statute that entered to force on 11 October 2005 as well as in article 14(1) of the International Covenant of Civil and Political Rights.

- 67 -

*Lack of Privacy between Lawyer and Client*

The right to a lawyer of one's own choosing and to communicate with a lawyer of one's own choosing requires that a defendant be able to choose his own lawyer or lawyers after consultations.

In this case, the President had requested meetings with senior lawyers, including former United States Attorney General Mr. Ramsey Clark. These lawyers also themselves sought meetings with the President. No meeting with such senior lawyers was ever allowed to take place before the proceedings started in October 2005.

This right is violated whenever a defendant is refused the right to meet with a lawyer who wishes to meet with the defendant.

This right is enshrined in article 20(d)(2) of the original Statute of the IST and article 19(Fourth)(B) of the new Statute that entered to force on 11 October 2005 as well as in article 14(3)(d) of the International Covenant of Civil and Political Rights and in article 11(1) the Universal Declaration of Human Right, which reflects customary international law as is evidenced by the restatement of the rule in article 67(1)(d) of the Statute of the International Criminal Court, article 8(2)(d) of the American Convention on Human Rights, article 6(3)(c) of the European Convention on Human Rights, article 7(1)(c) of the African Charter of Human and Peoples' Rights.

This right is violated whenever a defendant is refused the right to meet with a lawyer who wishes to meet with the defendant. In *Ocalan,* the court noted that

> on the day after his arrest, his lawyer in Turkey, Mr Feridun Celik (who already possessed a valid authority), sought permission to visit him . . . but was prevented from traveling by members of the security forces. In addition, on 22 February 1999 sixteen lawyers who had been retained by the applicant's family sought permission from the State Security Court to visit the applicant, but their requests were turned down by the authorities."

The Court held that "to deny access to a lawyer for such a long period and in a situation where the rights of the defense might well be irretrievably prejudiced is detrimental to the rights of the defense to which the accused is entitled by virtue of art 6 . . ." [182]

*Lack of Effective Defense Counsel*

Every defendant has the right to be adequately represented by lawyer of his own choosing. This right was significantly violated by the requirement that defence counsel had to be approved by the IST and the occupying power, experience defense counsel were denied the right to meet with the President before the start of the trial, defense counsel have been continuously obstructed from being able to prepare a defense and participate in the trial, and several times—including for closing arguments—defence counsel were appointed who had previously declared the defendant guilty in front of other defense counsel.

From the time that the President was detained in late 2003 until August 2004, no defense counsel was allowed to meet the President despite requests that were made by experienced defense counsel who knew the President, such a Mr. Ramsey Clark on the time of his detention. These request received no response from the American or Iraqi authorities.

Only in December 2004 was one lawyer with no experience in international criminal law allowed to meet the President after being approved by the IST and the American occupying powers. This lawyer, Mr. Kaleel al-Dolami, had submitted his name with other Iraqi lawyers in early 2004 for approval. This lawyer was not know to the President, had not been requested by the President at the time, and admits that he is not an expert in international criminal law and has no experience in high profile trials.

Not until after the first trial started on 19 October 2005, was experienced counsel allowed to meet the President. This was almost two years after he had been detained and repeatedly investigated, interviewed and allegedly tortured. Even at that time and despite a specific authorization for foreign lawyers in the Statute of the IST,[183] the foreign lawyers with experience in prominent criminal cases and international law were not allowed to meet with the President.

Continuously during the trial experience defense counsel were harassed and denied access to their client. This was done through several different actions. Defence counsel were told they could not meet with their client because of security concerns, defense counsel were told it was not safe to come to Iraq or not provided security in Iraq, defense counsel were told that they would have to pay exorbitant fees for security, defense counsel were not allowed private meetings with the President, defense counsel were not allowed to pass legal documents to the President without their first being reviewed by the occupying authorities—often important legal documents were not authorized, hearing where scheduled with inadequate notice and without taking into account prior legal obligations of counsel—especially the most experienced lawyers, defense counsel were told they had to repeatedly submit documents concerning their standing as lawyers to the IST—often the IST did not respond

or claimed not to have received documents that had been provided to the IST in open court, documents were not provided on time and were often unreadable and never translated to English so that the experienced foreign defence counsel could read them.

Finally, in several hearing before the IST, including for the closing argument delivered on 10 July 2006, the IST appointed lawyers against the will of the defendants. On these occasions defense counsel chosen by the President did not appear because of threats to their personal security or because of the serious due process violations by the IST, for example, denying defense counsel the right to speak before the IST. On 10 July 2006, the President objected to the IST appointed lawyers who presented the closing argument in his defense. Lawyer Mr. Mazin Abdul Hammed Jabbar told a Jordanian lawyer at the courthouse that "the defendants in this case do not deserve being tried ... [and] they should be left in the streets for people to directly take their revenge on them. This is because the death penalty is a rather mild sentence when compared to the crimes they committed against the Iraqi people." Annex I from 26 March 2006 entitled "Affidavit by Jordanian Lawyer of Statements of Bias Against President Made By IST-Appointed Lawyer Who Made Closing Statement for Defense."

The right to be represented by competent lawyers of one's choosing is an indispensable part of a fair trial. This right is enshrined in article 20(d)(2) of the original Statute of the IST and article 19(Fourth)(B) of the new Statute that entered to force on 11 October 2005 as well as in article 14(3)(d) of the International Covenant of Civil and Political Rights. This right is further explained in principle 5 of the UN Basic Principles on the Role of Lawyers as the right of every defendant "to be assisted by a lawyer if their own choice upon arrest or detention" and to requiring that all defendants for lawyers are appointed by a court "be entitled to a lawyer of experience and competence commensurate with the nature of the offence assigned to them in order to provide effective legal assistance,"[184] which reflects customary international law as is evidenced by the restatement of the rule in article 67(1)(d) of the Statute of the International Criminal Court, article 8(2)(d) of the American Convention on Human Rights, article 6(3)(c) of the European Convention on Human Rights, and article 7(1)(c) of the African Charter on Human and Peoples' Rights.

*Intimidation of Defence Witnesses*

The right to call and examine witnesses is fundamental to the opportunity to a defense. Without this right a defendant and defense counsel are not able to conduct a defense. This right requires that witnesses must be protected by the court in which they appear and that the defense must have the ability to question witnesses.

In the current proceeding, witnesses—especially defense witnesses—cannot testify because they cannot be protected from the violence that is widespread Iraq by the authorities and defense lawyers cannot find witnesses because they are subjected to same violence without adequate protection. Defense lawyers are also impeded in compiling a list of its own witnesses, as they are constantly threatened and/or intimidated when they are attending the IST sessions. On 13 June 2006, the IST also expressly prevented the defense from calling more witnesses stating merely that it did not wish to hear anymore defense witnesses after agreeing to do the day before.

Moreover, during these proceedings, defense has not been provided the copies of the statements of prosecution witnesses in violation of Rule 40(A) of the Rules of Procedure and Evidence of the IST. It also violates the human right of the defense to call and examine witnesses. Without the transcripts of the proceedings defense lawyers are not able to adequate participate in the questioning of either defense or prosecution witnesses.

Moreover, defense witness have been killed and intimidated, sometimes even by IST officials or with the apparent participation of the occupying powers.

In April 2006 after the United States authorities cancelled a meeting between a defense lawyer and a defense witness, the witness turned up dead. The United States officials had refused to allow the defense lawyer to travel to the meeting alone and had insisted they be told the time and place of the meeting in order to provide security. After being provided the exact time and place of the meeting the American cancelled it without prior notice and without the defense lawyer being able to contact the person he was to meet. A few days later this defense witness was killed.

On Wednesday 31 May 2006, after having testified that several prosecution witnesses were lying, three defense witnesses were beaten, arrested, and held without access to lawyers of their own choosing. The IST had issued the order for their arrest according to the police and United States force that came to arrest them. The IST later alleged that the defense witnesses were arrested because they had been lying when in their testimony they accused prosecution witnesses of lying and the prosecutor of bribing them. No effort was made to investigate the truth of these statements, but instead the arrests appear based merely on the prosecution's or United States government's allegation. During their detention, while being held with access legal representation of their own choosing, the IST alleged on 12 June 2006 that the defense witnesses had signed statements saying they had been bribed by defense lawyers. The IST gave no details of motive and read the charges into the record in the courtroom, but refused to allow defense lawyers to have a copy of the statements or to question the defense witnesses.

Furthermore, on 12 and 13 June 2006, Mr. William Wiley, who claimed to working for the IST, questioned and instructed defense witnesses what to say over the objection of the defense lawyers. He also indirectly—through his colleague—threatened one of the defense lawyers with arrest if they objected to his actions in open court.

These examples are evidence of interference with witnesses that was so intense as to violate the human right to call and examine witnesses of the defense.

This right to be able to confront witnesses is found in article 20(d)(5) of the original Statute of the IST and article 19(Fourth)(E) of the new Statute that entered to force on 11 October 2005 as well as in article 14(3) of the International Covenant of Civil and Political Rights and in customary international law as is evidenced by the restatement of the rule in article 67(1)(e) of the Statute of the International Criminal Court, article 8(2)(f) of the American Convention on Human Rights, article 6(3)(d) of the European Convention on Human Rights.

### *Nulla Poena Sine Lege and Nullum Crimen Sine Lege*

The right reflected in the maxims *nulla poena sine lege* and *nullum crimen sine lege* prohibits the punishment or prosecution of an individual for acts that were not deemed crimes under the laws of the country concerned at time of their commission. It also precludes the prosecution of individuals before special courts that were created to prosecute specific individuals for acts made crimes long after the acts constituting the alleged crimes were committed.

The IST did not exist under Iraqi law. It was created by the IST Statute attached to CPA Decree No. 1 on 10 December 2003. Not only was the IST created illegally as has been shown above, but it was created only to try the President and his colleagues for specific crimes. The creation of the IST long after the alleged crimes have been committed and when courts already existed in Iraq means that the President and his colleagues could not have reasonably believed that they would be subjected to the jurisdiction of such an extraordinary court when they alleged took action.

This IST Statute also contains crimes that that did not exist at the time that they were allegedly committed or there are serious questions as to their existence. For example, the Iraqi Penal Code[185] in force since 1969 does not include crimes against humanity in civilian armed conflicts. Although crimes against humanity were created by after World War II, it was not until very recently, with the development of the jurisprudence of the two ad hoc

tribunals, that war crimes and crimes against humanity became recognized as offenses in non-international armed conflicts.[186]

In the Dujail case the President is charged with crimes against humanity. Such crimes did not exist either under Iraq law or under international law at the time that the alleged events took place in July 1982. Iraqi law had not incorporated any concept of crimes against humanity and the concept that did exist under international law as applying to non-international armed conflicts as was made clear at the Nuremberg trials.[187]

The principles of maxims *nullum crimen nulla poena* or *nullum crimen sine lege* are enshrined in article 15(1) of the International Covenant of Civil and Political Rights and article 11(2) the Universal Declaration of Human Right, which reflects customary international law as is evidenced by the restatement of the rule in article 22 of the Statute of the International Criminal Court, article 9 of the American Convention on Human Rights, article 7 of the European Convention on Human Rights, and article 7(2) of the African Charter of Human and Peoples' Rights.

The ECHR has held that

> [a]ccording to the Court's case-law, Article 7 of the Convention is not confined to prohibiting the retrospective application of the criminal law to an accused's disadvantage: it also embodies, more generally, the principle that only the law can define a crime and prescribe a penalty (*nullum crimen, nulla poena sine lege*) and the principle that the criminal law must not be extensively construed to an accused's detriment. From these principles it follows that an offence must be clearly defined in the law. This requirement is satisfied where the individual can know from the wording of the relevant provision and, if need be, with the assistance of the courts' interpretation of it, what acts and omissions will make him criminally liable. [notes omitted][188]

These rights are non-derogable, according to article 4 of the International Covenant of Civil and Political Rights, and have been referred to by leading international legal experts as "cornerstone principles of criminal law" that "have become known in almost all of the world's legal systems."[189] Article 70 of the Fourth Geneva Convention also prohibits prosecutions based on retroactively applicable laws.

In this case, the principles of *nullum crimen nulla poena* and *nullum crimen sine lege* have been knowingly and intentionally violated by the United States and Iraqi authorities as part of their effort to conduct an unfair trial to ensure an execution that serves their political ends.

*No Presumption of Innocence*

The right to presumption of innocence requires that an individual not be prejudged.

This right requires that all public officials of the state prosecuting an individual must not make statements expressly stating or implying that guilt of a person who has not yet been convicted.[190] This principle has been interpreted as a fundamental principle, which protects everybody against being treated by public officials as if they were guilty of an offence even before such guilt is established by a competent court.[191]

The repeated statements by officials of the government of Iraq and the United States government violate this right. These statements have sometimes come from the judges of the IST as well.

A judge of the tribunal states that the Iraqi President who was then about to go on trial before them had "persecuted the Kurds. He killed them, wiped many of them out. He also used chemical weapons with the aim of committing genocide against this race, against this people, to eradicate them as a nation. He also went after the Shiites due to their religious beliefs"[192] In the same film another judge states that the President is "one of the worst tyrants in history."[193] Such statements are evidence of the bias of the judges of the IST and consequently the lack of impartially of the proceedings before the IST.

This right is well-established in article 20(b) of the original Statute of the IST and article 19(First) of the new Statute that entered to force on 11 October 2005 as well as article 14(2) of the International Covenant of Civil and Political Rights and in article 11 of the Universal Declaration of Human Right, which reflects customary international law as is evidenced by the restatement of the rule in principle 36(1) of the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment.[194]

*No Equality of Arms*

The principle of equality of arms is violated when the prosecuting party is able to spend millions of dollars on the prosecution of an offense while confiscating all assets of the President and forbidding him to gain access to lawyers willing to represent him.

In the present case, the United States, as one of the occupying powers, has stated that it has spent at least hundreds of millions of dollars while preparing the alleged case against the President[195] and provided at least "$138 million to build, over the course of a year, the state-of-the-art courthouse that sits at the heart of the fortified Green Zone" for the judges and prosecutors.[196] The

United States is also alleged to have sent teams of prosecutors, investigators and advisors to gather evidence and train prosecutors.[197] Even before the trial started it was reported that he United States was paying the IST's annual budget of $75 million for 2004-05"[198] and that "teams of Iraqi lawyers and judges are backed up by more than 75 foreign experts, many from the United States and Britain, and have been helping to prepare the evidence and organize the cases."[199]

At the same time, the occupying powers confiscated all monies and property belonging to the President, including an estimated US$700,000 taken from the President's person at the beginning of his detention. Such a taking is not only a violation of international humanitarian law,[200] but it also deprives the President of resources he could have used to prepare his defense.

As a consequence, defense counsel are working as volunteers and have no resources to investigate the scenes of the alleged crime, to search for witnesses, to review evidence—most of which they have not been given, or to even do the complex legal research that is required for such a trial.

Defense counsel are denied regular and meaningful visits with their client as request for meeting are routinely ignored and receive with such short notice as to make it often impossible to organize travel to the Iraqi capital at the specified day and time.

In an email of 1 December 2005, United States military Captain Michael McCoy attempted to extort between "between $2,000 and $3,000" for each trip to or from the airport from defense counsel, saying that "we will forward that bill onto the Saddam International Attorneys when we receive it" and threatening not to provide security if this sum was not paid.[201]

While the United States government has taken some steps towards meeting their responsibilities to provide security to the lawyers, these steps have been grossly inadequate—as the killing of two defense counsel, which have to date not been investigated, have indicated—and often the steps taken have done more to interfere with ability of the lawyers to do their work then to provide security.

For example, on 4 April 2006, claming security required he be prevented from leaving the housing compound, one of the lawyers was forced to miss meetings with potential witnesses. These meetings had been pre-arranged and the American officials had been notified more than 24-hours in advance with the exact time, length, and location of the meetings. Nevertheless, with no prior warning—indeed after assurances were made that these meetings would be held—and while the lawyers were prevented from having access to communications equipment such a their mobile telephones so the persons they

were meeting could not be contacted in time, the United States prevented any lawyer from attending the meetings. Not only does this show the degree of American control over whole process before the IST, but also how prerogatives of security are exercised in such a way to prevent defense counsel from being able to prepare a defense and this significantly disadvantaging them in relation to the prosecution.

Equality of arms requires both procedural and substantive equality between the President and the prosecution. established in article 20(a) of the original Statute of the IST and article 19(First) of the new Statute that entered to force on 11 October 2005 as well as the Statute of the ICTY (article 20), the Statute of the ICTR (article 20) and the Statute of the ICC (article 67)

*No Security of the Person*

Additionally, the right to security of person has been violated by the arbitrary arrest of the President as a consequence of an illegal use of force against his country and the denying him of the right to challenge his arrest before a court that can fully review its legality. The African Commission on Human and Peoples' Rights has held that "even where it cannot be proved that violations were committed by government agents, the government had a responsibility to secure the safety and the liberty of its citizens. . ."[202]

In this case, the arrest is *prima facie* illegal because such arrest took place in furtherance of a violation of international law, and as a result of an illegal action. An illegal arrest is a violation of the human right to security of person.

Furthermore, after arresting the President his human right to security of person was violated by: (a) the detaining powers' failure to inform him in a timely manner of the reasons for his arrest and any of the charges against him; (b) the detaining powers' failure to bring him promptly before a court so as to allow him the opportunity to challenge the legality of his arrest and denied him legal representation; and (c) the detaining powers' failure to provide him a means of seeking compensation for the violation of his rights, which included the theft of money allegedly found on the President's person at the onset of his illegal detention.

The President was not informed of the charges against him for more than a year and half of detention. The President was only formally charged on 15 May 2006 the same day he was forced to start to present his defense and only a months before the Judge interfered with the defense denying it the right to continue and forcing it to make closing arguments. The President and his lawyers had not time to prepare a defense.

The President was held incommunicado from 13 December 2005 to 1 July 2004 before he was brought before an investigative judge. During this time and until December 2004 the President was denied any access to a lawyer. As such, he was denied the right to appear before a court of law to challenge the legality of his defense. All attempts by lawyers to whom the President has explicitly requested access have been denied or have received no response.

Moreover, the trial chamber of the IST has failed to provide the President a meaningful process by which he might be compensated for the violation of his rights. When a preliminary petition was submitted challenging the legality of the IST, this submission was rejected. The IST did not even consider defense counsel's submissions as was indicated by the fact that the clerk of the IST asked the defense lawyers to "take it back" because the judges "did not want to respond to it."[203]

The right to security of person is found most notably in article 10 of the International Covenant of Civil and Political Rights as well as article 3 of the Universal Declaration of Human Rights, article 7 of the American Convention on Human Rights, article XXV of the American Declaration of the Rights and Duties of Man, article 5 of the European Convention on Human Rights, and article 6 of the African Charter of Human and Peoples' Rights.

The European Court, while interpreting the right to the security of persons listed in article 5 of the European Convention on Human Rights, a right which is stated in similar language in article 10 of the International Covenant of Civil and Political Rights, stated that "an arrest made by the authorities of one State on the territory of another State, without the consent of the latter, affects the person's individual rights to security under Article 5 §1."[204] To show that his rights have been violated, the Applicant must establish "that the authorities of the State to which the applicant has been transferred have acted extra-territorially in a manner that is inconsistent with the sovereignty of the host State and therefore contrary to international law."[205]

# Part III

# Illegal Application of Death Penalty

On 5 November 2006 the trial chamber of the IST decided that President Saddam Hussein should be sentenced to death. The application of the death penalty will be a violation of international and Iraqi law.

Not only has the Prosecutor of the IST expressly called for the death penalty,[206] but United States President George W. Bush,[207] Iraqi President Jalal Talabani,[208] Iraqi Prime Minister Nouri Al-Maliki,[209] and, allegedly, the Chief Judge even before the trial started,[210] have all said that the death penalty should be implemented.

To implement the death penalty in this case will violate the prohibition of the *ex post facto* application of the death penalty under international law and result in the application of the death penalty after a clearly unfair trial.

### No Ex Post Facto Application of the Death Penalty

Iraq did not have the death penalty for the crimes that may be tried before the IST prior to the United States' aggression against the Iraqi people because those crimes did not even exist under Iraqi law. Immediately after the invasion the United States established CPA suspended the death penalty completely as of June 2003.

Moreover, in 1982, when the acts complained of allegedly took place, there was no death penalty for the alleged crimes because the alleged crimes did not exist at that time under Iraqi law. Even when the President and his colleagues were detained there was no death penalty. The crimes with which the President and his colleagues have been charged were only created by the American occupying powers in Iraq subsequent to their illegal aggression against the people of Iraq.

The majority of states in the international community do not have the death penalty and the death penalty has been rejected by every judicial body applying international criminal law without exception. It is excluded as a penalty from the Statutes of the International Criminal Court, the International Criminal Tribunals for the former Yugoslavia and for Rwanda, the Special Court for Sierra Leone, the Special Panels for East Timor, the special panels in Kosovo, and the Extraordinary Chambers in Cambodia.

In addition, despite the United States suspension of the death penalty by section 3(1) of CPA Order No. 7 of 9 June 2003, the Statute of the IST attempts to reinstate it with retroactive effect. Section 2(2) of the Iraqi Penal Code, to which sections 17(a) (ii) and 24 of the Statute of the IST refers, clearly says that if there are changes in the law after a certain offence then the

most favorable, not the latest law, must be applied. This requires that once the death penalty has been abolished as was done it cannot be re-instated with retroactive effect, but that the most favorable law in the intervening period of time must be given effect.

Nevertheless, on 8 August 2004 the death penalty was reinstated in Iraq for for the crimes in the Statute of the Iraqi Special Tribunal. Under article 24(a) of the Statute, penalties for offenses 'shall be those prescribed by Iraqi law [...].' And under article 24(e) of the Statute, penalties that 'do not have a counterpart under Iraqi law shall be determined by the Trial Chambers taking into account such factors as the gravity of the crime, the individual circumstances of the convicted person and relevant international precedents.'

The retroactive application of the death penalty violates the Iraqi Penal Code, which states in Article 1 that "no act or omission shall be penalized except in accordance with a legislative provision under which the said act or omission is regarded as a criminal offense at the time of its occurrence." It also violates article 6, paragraph 2, of the International Covenant of Civil and Political Rights that prohibits imposition of the death penalty when it does not apply "in accordance with the law in force at the time of the commission of the crime." Consequently, this arbitrary application of the death penalty is also a violation of the right to life in article 6 of the International Covenant of Civil and Political Rights.

*No Death Penalty after an Unfair Trial*

The death penalty may not be applied after an unfair trial. The death penalty may only be applied "pursuant to a final judgment rendered by a competent court after legal process which gives all possible safeguards to ensure a fair trial, at least equal to those contained in article 14 of the International Covenant on Civil and Political Rights, including the right of anyone suspected of or charged with a crime for which capital punishment may be imposed to adequate legal assistance at all stages of the proceedings," according to Safeguard 4 of the authoritative UN Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty.

As indicated above by the extensive examples of unfairness, the proceedings before the IST are extremely unfair and unjust. Many of the above examples include interferences urging that the death penalty by applied.

Execution after an unfair trial will violate the non-derogable right not to be arbitrarily deprived of life, guaranteed by Article 6 of the International Covenant of Civil and Political Rights.

# CONCLUSION

*Conclusion*

The trial is widely perceived to be illegal and unable to ensure fundamental human rights. This observation has been made by numerous human rights bodies including non-governmental organizations and intergovernmental organizations.

Having observed the IST since its inception the United Nations expert on fair trial, Professor Leandro Despouy, has stated that[211]

> 56. This [IST] has been the subject of analysis and special concern for the Special Rapporteur since 10 December 2003 when the Statute of the Iraqi Special Tribunal (IST) was adopted and throughout its development. Already in his reports to the Commission and the General Assembly in 2005, he had the opportunity to express his reservations regarding the legitimacy of the tribunal, its limited competence in terms of people and time [footnote omitted] and the breach of international human rights principles and standards to which it gives rise. But beyond these serious objections of a legal nature, to which should be added the possibility that the death penalty might be applied, the Special Rapporteur has observed the terrible conditions in which the trial has been taking place and in particular the climate of insecurity in the country, which in turn has affected its development.

> 57. The level of violence is such that one of the judges and another five candidates for the post have been assassinated. The same fate was met by one of the defence lawyers of Saddam Hussein on the day after the trial began; on 8 November 2005 another defence lawyer was murdered and in the course of the same attack a third one was wounded. Pressure has grown for the trial to be removed from Iraq. The protests of non-Iraqi lawyers have increased, and they maintain they are not allowed enough time to put forward their pleas. All this led at E/CN.4/2006/52 page 18 the beginning of December 2005 to the temporary suspension of the trial, to the withdrawal and return of the defence team, to the absence of the main person accused and to the possibility that the trial might be continued behind closed doors.

> 58. Although it is generally agreed that Saddam Hussein should be tried for the atrocities committed, what is needed is an institution which has the material capacity to do so, which respects international human rights standards and which offers the necessary security guarantees, and this is obviously not the case at present. The experience of the various international tribunals established by the United Nations shows that there are alternatives to the IST, even within the Organization, since the trial of the former dictator and his

- 82 -

collaborators can offer a valuable model for combating impunity, provided that the rules of due process are respected and that the community at large understands that it is a real act of justice and not the verdict of the victors over the vanquished.

This statement reflected widely held concerns by the Commission, but it does not state the consequences of these concerns. International law requires certain consequences.

First and foremost among these consequences is that all violations of international human rights law should be brought to an end.

This can only be done if the current proceedings are stopped, a mistrial declared, and all the current judges of the IST are disqualified.

In addition, all the defendants should be immediately compensated for the violations of their human rights and provided the resources equivalent to those provided to the prosecution in order to prepare their defense.

The irreparable violations of human rights make continuation of the trial before the IST impossible and allowing the trial to continue will send a message to the world that force can be used to launch assaults on the rule of law with impunity as the United States government has done.

An even more immediate consequence will be continued violence in Iraq. The unfairness of the trial has already heightened tensions between section of the population that opposed the President and supported the aggression against their country, and the increasing number of people whose security was better ensured under their own government rather than under a government put in place by a foreign and oppressive occupier.

Stability, peace, and reconciliation must be prompted. These goals cannot be achieved by victors' injustice imposed by those whose *de facto* authority is based on their illegal aggression against the Iraqi people. Far too many people have already died. If these proceedings continue, they will contribute to the death of many more.

Urgent action is needed by the international community if it is to preserve the rule of law.

Having regards for the international condemnation of the proceedings before the IST and the serious violations of Iraqi and international law, the appellate division of the IST is requested to annul the judgment of the trial chamber of the IST handed down on 5 November 2006.

To carry out an execution after an unfair trial is a serious violation of international. The death penalty decreed on 5 November 2006 should be immediately and irrevocably annulled.

# Annexes

Annex A
30 November 2005
Decision of the United Nations Working Group on Arbitrary Detention

OPINION No. 46/2005 (Iraq and United States of America)
Communication addressed to the Governments on 9 March 2005,
Concerning: Mr. Saddam Hussein Al-Tikriti
Both States are Parties to the International Covenant on Civil and Political
Rights

1. The Working Group on Arbitrary Detention was established by resolution
1991/42 of the Commission on Human Rights. The mandate of the Working
Group was clarified and extended by resolution *1997/50* and confirmed by
resolution 2003/31. Acting in accordance with its methods of work, the
Working Group forwarded the above-mentioned communication to the
Governments of Iraq and the United States of America.

2. The Working Group conveys its appreciation to both Governments for
having submitted information with regard to this communication.

3. The Working Group regards deprivation of liberty as arbitrary in the
following cases:

I. When it manifestly cannot be justified on any legal basis (such as continued
detention after the sentence has been served or despite an applicable amnesty
act) (Category I);

II. When the deprivation of liberty is the result of a judgement or sentence for
the exercise of the rights and freedoms proclaimed in articles 7, 13, 14, 18,
19,20 and 21 of the Universal Declaration of Human Rights and also, in
respect of States parties, by articles 12. 18, 19, 21, 22, *25,* 26 and 27 of the
International Covenant on Civil and Political Rights (Category II);

III. When the complete or partial non-observance of the relevant international
standards set forth in the Universal Declaration of Human Rights and in the
relevant international instruments accepted by the States concerned relating to
the right to a fair trial is of such gravity as to confer on the deprivation of
liberty, of whatever kind, an arbitrary character (Category III);

4. In the light of the allegations made the Working Group welcomes the
cooperation of the Governments of Iraq and of the United States of America.

The Working Group transmitted the replies provided by the two Governments to the source and received its comments.

5. According to the information received from the source, Mr. Saddam Hussein Al-Tikriti, born on 28 April 1937, of Iraqi nationality, is the former President of Iraq.

6, According to information publicly available, on 20 March 2003 military forces belonging primarily to the United States of America ("US") and the United Kingdom of Great Britain and Northern Ireland ("UK") began the invasion of Iraq. On 9 April 2003, Baghdad was formally secured by US forces and the Iraqi regime headed by President Saddam Hussein was declared to have ended, On 1 May 2003 the President of the United States announced the end of major combat operations in the Iraq war, As recognized in UN Security Council resolution 1483 (2003), [page 1] around this date the US and the UK "assumed the specific authorities, responsibilities, and obligations under applicable international law .as occupying powers under unified command". The Coalition forces established a Coalition Provisional Authority (CPA) under an Administrator named by the US. The CPA named an Interim Iraqi Governing Council. On 30 June 2004, the occupation of Iraq ended and the CPA ceased to exist. As of that date, Iraq reasserted its full sovereignty and an Interim Government of Iraq assumed full responsibility for governing Iraq (see paragraphs 1 and 2 of UN Security Council resolution 1546 (2004)). In accordance with Security Council resolution 1546, however, a multinational force, composed primarily of US and UK military forces, remains in Iraq at the request of the Iraqi Government.

7. On 13 December 2003, Mr. Saddam Hussein was captured in Tikrit by military forces of the United States, then the occupying power in Iraq, and was taken into custody at an undisclosed location. From that date until the time of submission of the communication, his only contact with his defence team was on 16 December 2004 with one of his attorneys, under supervision of at least two United States military guards who were present during this interview. The source states that despite repeated requests before and after this interview, the lawyers of the defence committee were denied the possibility to hold other meetings with their client.

8. The source alleges that Mr. Saddam Hussein was initially detained as a prisoner of war wider the terms of the Third Geneva Convention Relative to the Protection of Prisoners of War. However, the United States Government has since then claimed that he is no longer a prisoner of war but a prisoner of the Iraqi Government. The source adds that, despite this claim by the United States Government, Saddam Hussein remains under the complete control of the United States Government.

9. On 10 December 2003, the Iraqi Governing Council established the Iraqi Special Tribunal. According to Article 1 (b) of its Statute, "[t]he Tribunal shall have jurisdiction over any Iraqi national or resident of Iraq accused of the crimes listed in Articles 11 to 14 below, committed since July 17, 1968 and up until and including May 1, 2003, in the territory of the Republic of Iraq or elsewhere, including crimes committed in connection with Iraq's wars against the Islamic Republic of Iran and the State of Kuwait." The crimes listed in Articles 11 to 14 of the Statute are genocide, crimes against humanity, war crimes, and violations of certain Iraqi laws listed in Article 14. On 11 October 2005, the President of Iraq signed a new statute and new rules of procedure of the court, which rename it Supreme Iraqi Criminal Tribunal (which is the term used hereinafter).

10. According to information publicly available, Mr. Saddam Hussein appeared before the Supreme Iraqi Criminal Tribunal for his first hearing (arraignment) on 1 July 2004. The hearing took place in a Secret location and the defendant was not assisted by counsel, the investigating judge confined himself to ascertaining the identity of the accused. In addition, Mr. Saddam Hussein was informed of seven charges brought against him. Because he was not assisted by legal counsel, he refused to sign the record of proceedings.

11. The source further submits that Mr. Saddam Hussein's status should be covered by the Third Geneva Convention Relative to the Protection of Prisoners of War, since he was captured because of his participation in an armed conflict. However, he is being denied such protection by the United States Government as occupying power and custodian authority, and the Iraqi authorities have brought charges against him before the Supreme Iraqi Criminal Tribunal, [page 2] Therefore, the source is of the opinion that legal responsibility for Ms arbitrary detention attaches to both Iraq and the United States of America.

12. The source alleges that the detention of Mr. Saddam Hussein is arbitrary because he has not been charged in a timely manner, has not been granted the full privileges of a prisoner of war (for example, to be allowed to communicate with his family without undue delays or to receive documents pertaining to his legal representation), has been forced to prepare his trial in conditions of complete isolation from the outside world, detained at a secret location, severely restricted in the contact with legal counsel (although the charges raised against him must be of the most serious nature to fall within the mandate of the Supreme Iraqi Criminal Tribunal). The source concludes that the non-observance of international norms relating to fair trial is so serious as to render his pre-trial detention, as well as any detention upon conviction, arbitrary. Furthermore, the source alleges that Mr. Saddam Hussein has been denied the right to challenge the legality of his detention. Finally, the source expresses doubts as to whether a fair trial can at all take place under the

current security situation in Iraq, before a special tribunal that lacks the independence and impartiality needed.

13. In its reply to the communication, dated 2 May 2005, the Government of Iraq states that Saddam Hussein is awaiting trial, and that it is premature to discuss matters relating to his right to prepare his defence and to a fair hearing. As to his place of detention, it is kept secret in order to protect him. The Government further reports that Saddam Hussein was allowed to meet one of his lawyers on 27 April 2005, that this meeting had lasted six hours, and that the lawyer was able to freely interview Saddam Hussein in the presence of an officer.

14. In its reply to the communication, the Government of the United States underlines that, as also noted by the source, Saddam Hussein is in physical custody of the Multinational Forces in Iraq (MNF-I) pursuant to arrangements between MNF-I and the Iraqi Ministry of Justice, but is being held under the legal authority of an Iraqi court. The Government of the United States therefore considers that the Government of Iraq is best placed to clarify the legal basis of the detention of Saddam Hussein.

15. In replying to the statement by the Government of the United States, the source argues that as the State actually detaining Saddam Hussein, the United States is responsible for respect of his right to security of person, a responsibility it cannot disclaim on the basis of the argument that Saddam Hussein is kept in custody on behalf of the Government of Iraq or of the argument that he is not detained on US territory.

16. As to the reply of the Iraqi Government, the source asserts that the Iraqi Government confirms the accuracy of all its allegations. The source argues that Saddam Hussein's rights to counsel, to prepare his defence, and to a fair hearing have been violated (as of mid-August 2005) for more than 20 months, It adds that a single meeting between counsel and defendant in the presence of a United States military officer clearly does not fulfill the requirements of the right to be assisted by counsel, Finally, the source argues that the violation of Saddam Hussein's rights is exacerbated by the repeated attacks against the house of his defence counsel, as well as by his humiliation through the circulation of pictures showing him in partial undress, and by the Government allowing physical attacks against him while in custody. [page 3]

17. To be able to spell out the law applicable to the *different* issues raised by the source and *identify* the Government(s) responsible under international law for the legality of the detention and the eventual violation of the rights of Mr. Saddam Hussein, if any, the Working Group considers necessary to highlight the particularity of the circumstances of the case before it.

18. The Working Group would like to stress that Mr. Saddam Hussein was the President of the Republic when armed forces of the United States and the United Kingdom of Great Britain and Northern Ireland invaded Iraq on 20 March. On 1 May 2003, the Security Council in its resolution 1483 admitted that the United States and the United Kingdom of Great Britain had assumed the authority, responsibility and applicable obligations under international law in the territory of Iraq. On 13 December 2003, Saddam Hussein was captured in Tikrit by US military forces. Later, the occupying forces constituted the CPA as the Coalition Provisional Authority under the control of an envoy named by the Government of the United States. On 30 June 2004, the occupation ended and the full sovereignty of Iraq was restored through the Interim Government of Iraq. In accordance with Security Council resolution 1546 of 8 June 2004, however, a multinational force (MNF-I), composed primarily of United States of America and United Kingdom military forces, remained in Iraq at the request of the Iraqi Government. At some point before the restoration of sovereignty to Iraq, Mr. Saddam Hussein and other members of the former Iraqi' regime were "formally" or *"de jure"* transferred by the CPA to Iraqi custody.

19. According to some developments publicly reported in the case under consideration, on 1 July 2005, Saddam Hussein and 11 other members of the former Baathist leadership appeared before the Supreme Iraqi Criminal Tribunal's chief investigating judge. The defendants were reportedly informed of the charges against them and questioned by the investigating judge. The defendants did not have legal counsel present, and no full public transcript of the proceedings exists.

20. On 19 October 2005, the trial before the Supreme Iraqi Criminal Tribunal against Saddam Hussein and seven co-defendants in the *Dujail* case opened. At the hearing, defense counsel and some of the defendants raised three challenges: the lack of adequate time given to the defense to study the final dossier and prepare its case; the lack of sufficient access to the accused by defense counsel; and concerns regarding the court's legitimacy and competence. The court granted an adjournment of the trial until 28 November 2005. At the time of drafting this Opinion (30 November 2005) another adjournment had been granted to 5 December 2005.

21. On 20 October 2005, the day following the opening hearing, Mr. Sadoum al-Janabi, counsel of one of Saddam Hussein's co-defendants, was abducted from his office by armed men. He was subsequently found dead with two bullet wounds to the head. On 8 November 2005, in a drive-by shooting in Baghdad, gunmen killed Mr. Adel Muhammad al-Zubaidi, who represented another defendant in the *Dujail* trial, and injured a further defense lawyer, Mr. Thamer al-Khuzaie.

22. The source alleges that Mr. Saddam Hussein was initially detained as a prisoner of war, but has not been granted the full privileges of a prisoner of war under the terms of the Third Geneva Convention Relative to the Protection of Prisoners of War of 12 August 1949, In their replies, neither the US Government nor the Iraqi Government provided information on this allegation. It is however well known that from the early days of the conflict in Iraq, the US [page 4] Government recognized that the Geneva Conventions applied comprehensively to individuals captured in the *conflict* in Iraq. The US Government also gave assurances that it intended to comply with article 5 of the Third Geneva Convention by treating all belligerents captured in Iraq as prisoners of war unless and until a competent tribunal determines that they were not entitled to POW status.[1]

23. The position of the Working Group is that although the invading coalition stated that the major combat operations finished on 1 May 2003, the total occupation still continued until 30 June 2004. Therefore as Saddam Hussein's detention took place in the context of an international armed conflict resulting in the invasion of Iraq by the American Government's forces and the armed coalition, his status is protected by the Third Geneva Convention at least until 30 June 2004.

24. consequently, and in accordance with paragraph 16 of its methods of work and 14 of its revised methods of work,[2] the Working Group will not assess the lawfulness of Mr. Saddam's detention for the period taking place between 13 December 2003 and 30 June 2004, as it occurred during an ongoing international armed conflict and the United States Government recognized that the Geneva conventions applied to individuals captured in the conflict in Iraq.

*25.* According to the fifth paragraph of Article 119 of the Third Geneva Convention it is permissible that prisoners of war against whom penal proceedings are pending may be detained until the close of such proceedings. The Working Group is also not in a position to assess the conformity to the applicable provisions of international humanitarian law (Arts. 12, 1 18 and 1 19 of the Third Geneva Convention to which the US and Iraq are parties) of the procedure under which Mr. Saddam Hussein was transferred by the CPA to the Interim Government of Iraq. It is, however, not disputed that, while *de jute* transferred, Mr. Saddam remains *de facto* in US custody. The United States Government, in its reply to the Working Group, recognises that *"the detainee is under the custody of the "Multinational Force Iraq" according to an agreement reached with the Minister of Iraqi Justice although he is under the authority of an Iraqi court"*.

26. The Working Group concludes that until 1 July 2004 Saddam 1-lussein was detained under the sole responsibility of the Coalition members as occupying powers or, to be more precise, under the responsibility of the US

Government. Since then, and as the Iraqi criminal Tribunal is a court of the sovereign State of Iraq, the pre-trial detention of a person charged before the Tribunal is within the responsibility of Iraq. In light of the fact that Saddam Hussein is in the physical custody of the US authorities, any possible conclusion as to the arbitrary nature of his deprivation of liberty may involve the international responsibility of the US Government.

27. As of the period of detention subsequent to 30 June 2004, Saddam Hussein appeared before the Supreme Iraqi Criminal Tribunal for his first hearing on 1 July 2004. The hearing took place in a secret location and the defendant was not assisted by counsel, In addition, Mr. Saddam Hussein was informed of the charges brought against him. Because he was not assisted by legal [page 5] counsel, he refused to sign the record of proceedings. Therefore, whatever the status under which he was detained prior to the 1 July 2004, he subsequently became a defendant in a criminal procedure, entitled to the protection of the International Covenant on Civil and Political Rights. Both the US and Iraq have ratified the ICCPR and therefore articles 9(3) and 14 ICCPR are applicable to his detention.

28. Although neither the Iraqi Government nor the US Government have provided detailed answers to the allegations concerning the characteristics of the process and the violations affecting the right of the defence, as invoked by the source, the Working Group had access to, and gathered information regarding the Supreme Iraqi Criminal Tribunal and its rules of procedure.

29. This tribunal was established by the Iraqi Governing Council on 10 December 2003, and in the first days of August 2004 the Interim Iraqi Assembly modified the statute that was regulating it. The Working Group does not know the criteria under which the Iraqi Government has nominated the judges who form this tribunal. However, the alleged withdrawal or substitution of several judges is a matter of concern. The atmosphere surrounding the preparation of the trial, which can negatively affect the independence and impartiality of the Tribunal — or at least give the impression that the tribunal lacks the requisite independence and impartiality—, is also a matter of concern to the Working Group. The murder of defence lawyers, the threatening behaviour of the crowd against some of the accused, motivated by past wrongs suffered in the previous regime, might exert an undue pressure on the tribunal. More specifically, the fact that capital punishment was recently re-established and that no appeal is allowed against conviction and sentence, which is in complete disregard of Article 14 paragraph 5 of the International Covenant on Civil and Political Rights, may cast a shadow over the requisite fairness of the process.

30. In his annual report (2005) to the UN General Assembly, Leandro Despouy, the Special Rapporteur on the independence of judges and lawyers,

raised his own concerns about the judicial proceedings taking place before the "Iraqi Special Tribunal". He stated that: *"Despite the commitment and personal efforts of the judges and the cooperation provided by several countries in setting up the tribunal, he is concerned that the pressure weighing on the judges and the prevailing insecurity in Iraq may undermine its independence. Moreover, the tribunal itself has its deficiencies, some of which can be traced back to the manner in which it was set up, and in particular to the restriction of its jurisdiction to specific people and a specific time frame; i.e., the tribunal may only try Iraqi citizens for acts committed prior to F' May 2003, when the occupation began. The tribunal 's power to impose the death penalty demonstrates the extent to which it contravenes international human rights standards, Because it was established during an occupation and was financed primarily by the United States, its legitimacy has been widely questioned, with the result that its credibility has been tarnished. The Special Rapporteur urges the Iraqi authorities to follow the example set by other countries with deficient judicial systems by asking the United Nations to set up an independent tribunal which complies with international human rights standards3. "*

31. The Working Group shares these concerns. It is also concerned about the criminal proceedings in Saddam Hussein's case, notably the right to counsel. Apparently Saddam can only See (*150/321) page *15.* [page 6] meet his defence counsel in the presence of US officials; it is not clear whether he can meet them often enough to have the significant exchange necessary for such a complicated case, On 19 October 2005, at the hearing, defense counsel and some of the defendants raised three challenges: the lack of adequate time given to the defense to study the final dossier and prepare its case; the lack of sufficient access to the accused by defense counsel; and concerns regarding the court's legitimacy and competence. The Working Group was also made aware that there are discrepancies between the old Iraqi criminal procedure code and the rules of procedure of the SICT on important points, and it is not clear which law prevails.

32. Since procedural flaws amounting to the violation of the right to a fair trial may, in principle, be redressed during the subsequent stages of the criminal proceedings, the Working Group would find premature to take a position now on this point. The Working Group is fully aware that the ongoing judicial procedure in Iraq is aimed to bringing to justice the highest- ranking leaders of the past Iraqi regime of Saddam Hussein, including himself, for the most serious crimes they allegedly committed against the Iraqi people and some neighboring nations. The crimes for which they are prosecuted comprise, but are not limited to genocide, crimes against humanity and war crimes.

33. As one of the mechanisms of the United Nations Commission on Human Rights, the Working Group is deeply committed to the principle that any

violation of human rights, whether committed by politicians or others, must be inquired into and redressed, if necessary by putting the perpetrators to justice. Yet, any procedure aiming to put right gross human rights violation ,as such welcomed by the Working Group, shall scrupulously respect the rules and standards elaborated and accepted by the international community to respect the rights of any person charged of a criminal offence. The violation of the rights of the person charged may easily backfire. This is particularly true in the instant case; any lack of respect for the rights of the leaders of the former regime in the criminal proceedings against them may undermine the credibility of the Justice system of the newly emerging democratic Iraq.

34. The Working Group believes that under the circumstances the proper way to ensure that the detention of Saddam Hussein does not amount to arbitrary deprivation of liberty would be to ensure that his trial is conducted by an independent and impartial tribunal in strict conformity with international human rights standards.

35. On the basis of what precedes, the Opinion of the Working Group is that

a) It will not take a position on the alleged arbitrariness of the deprivation of liberty of Mr. Saddam Hussein during the period of international armed conflict;

b) The Working Group will follow the development of the process and will request more information from both concerned Governments and from the source. In the meantime and referring to paragraph 17(c) of its methods of work, it decides to keep the case pending until further information is received.

Adopted on 30 November 2005.


Notes:

1. Statement made in April 2003 see e g. "Briefing on Geneva Convention, EPW and war crimes." 7 April 2003, available at: <www.defenselink.mil/transcripts/2003t04072003_t407genv.html>.

2. "The Working Group will not deal with situations of international armed conflict in so far as they are covered by the Geneva Conventions of 12 August 1949 and their Additional Protocols, particularly when the International Committee of the Red Cross (ICRC) has competence".

Annex B
Excerpt from the 2005 Report of the UN Special Rapporteur on the
Independence of Judges and Lawyers

United Nations Doc. No. A/60/321
General Assembly
Distr.: General
31 August 2005
English
Original: Spanish
Sixtieth session
Item 73 (b) of the provisional agenda*
Human rights questions: human rights questions including alternative
approaches for improving the effective enjoyment of human rights and
fundamental freedoms Civil and political rights, including the questions of
independence of the judiciary, administration of justice, impunity
Note by the Secretary-General

The Secretary-General has the honour to transmit to the members of the
General Assembly the report of the Special Rapporteur of the Commission on
Human Rights on the independence of judges and lawyers, Leandro Despouy,
submitted in accordance with Commission resolution 2005/33 of 19 April
2005.

... [Page 15] ...

VII. The Iraqi Special Tribunal

42. At the time of writing (August 2005), the Special Rapporteur is concerned about the judicial proceedings taking place before the Iraqi Special Tribunal. Despite the commitment and personal efforts of the judges and the cooperation provided by several countries in setting up the Tribunal, he is concerned that the pressure weighing on the judges and the prevailing insecurity in Iraq may undermine its independence. Moreover, the Tribunal itself has certain deficiencies, some of which can be traced back to the manner in which it was set up and, in particular, to the restriction of its jurisdiction to specific people and a specific time frame; i.e., the Tribunal may only try Iraqi citizens for acts committed prior to 1 May 2003, when the occupation began. The Tribunal's power to impose the death penalty demonstrates the extent to which it contravenes international human rights standards. Because it was established during an occupation and was financed primarily by the United States, its legitimacy has been widely questioned, with the result that its credibility has been tarnished.

43. The Special Rapporteur urges the Iraqi authorities to follow the example set by their countries with deficient judicial systems by asking the United Nations to set up an independent tribunal which complies with international human rights standards.

...

IX. Conclusions and recommendations

... [page 17]

51. The Special Rapporteur points out that the Iraqi Special Tribunal has certain deficiencies and that its legitimacy has been rightfully criticized, with the result that its credibility has been called into question. He is alarmed that it is empowered to impose the death penalty, that its jurisdiction is restricted to specific persons and a specific time frame, and that it otherwise violates international human rights standards. He hopes that the Iraqi authorities will adopt relevant measures to ensure that the barbaric crimes committed in Iraq will be prosecuted by independent and impartial tribunals, in strict compliance with international human rights standards, as other countries in similar circumstances, such as Sierra Leone, have done with the active cooperation of the international community. As mentioned earlier, mankind has admirably demonstrated that it is possible to overcome legal or material constraints at the national level, combat impunity and dispense justice, on the basis of different international precedents.

Annex C
Excerpt from the 2006 Report of the UN Special Rapporteur on the
Independence of Judges and Lawyers

UNITED NATIONS
Economic and Social Council
Distr.: GENERAL
UN Doc. No. E/CN.4/2006/52
23 January 2006
ENGLISH
Original: SPANISH
COMMISSION ON HUMAN RIGHTS
Sixty-second session
Item 11 (d) of the provisional agenda
CIVIL AND POLITICAL RIGHTS, INCLUDING THE QUESTIONS
OF INDEPENDENCE OF THE JUDICIARY, ADMINISTRATION,
OF JUSTICE, IMPUNITY
Report of the Special Rapporteur on the independence of judges and lawyers,
Leandro Despouy

... [Page 17] ....

V. IRAQI SPECIAL TRIBUNAL

56. This has been the subject of analysis and special concern for the Special Rapporteur since 10 December 2003 when the Statute of the Iraqi Special Tribunal (IST) was adopted and throughout its development. Already in his reports to the Commission and the General Assembly in 2005, he had the opportunity to express his reservations regarding the legitimacy of the tribunal, its limited competence in terms of people and time25 and the breach of international human rights principles and standards to which it gives rise. But beyond these serious objections of a legal nature, to which should be added the possibility that the death penalty might be applied, the Special Rapporteur has observed the terrible conditions in which the trial has been taking place and in particular the climate of insecurity in the country, which in turn has affected its development.

57. The level of violence is such that one of the judges and another five candidates for the post have been assassinated. The same fate was met by one of the defence lawyers of Saddam Hussein on the day after the trial began; on 8 November 2005 another defence lawyer was murdered and in the course of the same attack a third one was wounded. Pressure has grown for the trial to be removed from Iraq. The protests of non-Iraqi lawyers have increased, and they maintain they are not allowed enough time to put forward their pleas. All this led at [page 18] the beginning of December 2005 to the temporary suspension of the trial, to the withdrawal and return of the defence team, to the absence of the main person accused and to the possibility that the trial might be continued behind closed doors.

58. Although it is generally agreed that Saddam Hussein should be tried for the atrocities committed, what is needed is an institution which has the material capacity to do so, which respects international human rights standards and which offers the necessary security guarantees, and this is obviously not the case at present. The experience of the various international tribunals established by the United Nations shows that there are alternatives to the IST, even within the Organization, since the trial of the former dictator and his collaborators can offer a valuable model for combating impunity, provided that the rules of due process are respected and that the community at large understands that it is a real act of justice and not the verdict of the victors over the vanquished.

… [page 21] …

77. The notorious shortcomings apparent in the trial of Saddam Hussein and his main collaborators and the climate of insecurity in which the trial is being conducted make it advisable to transfer the trial to an international tribunal with United Nations cooperation.

Annex D
28 November 2005
Submission Requesting Security Arrangements be put in Place

### SECURITY REQUIREMENTS FOR IRAQI DEFENSE COUNSEL

Iraqi defense counsel and their families are living in great danger. They have no protection. They receive death threats frequently. Two of those who appeared in Court on October 18, 2005 have been executed, courageous colleagues Sadoun al-Janabi and Adel al-Zubadi. Several Iraqi T.V. stations regularly broadcast that defense counsel are criminals for representing the accused, fanning the flames of hatred. The identities of some of the defense counsel are known to forces that seek to execute them. The identities of all will become known as the trial proceeds.

By serving as defense counsel they and their families are placed in grave danger. Levels of violence in Iraq continue to grow. Attacks, kidnappings and executions of Sunni men by armed forces, some apparently controlled by the Interior Ministry and other parts of the government, are committing summary executions. Defense counsel are prime targets.

It does not appear that the risk of assassination for defense counsel will decrease anytime soon and will linger for years even after peace and reconciliation among Iraqi people, for which defense counsel work and pray is achieved.

As a consequence, all defense counsel have decided that their families will be safe only if they leave Iraq for the foreseeable future. This decision is reached with great sorrow because they love their country, and their children and grand children will grow up strangers to Iraq.

But defense counsel will not desert their clients. The security requirements they require are as follows:

1. Family Relocation: The immediate relocation of their entire families to include parents, wives, children, grand children and minor, elderly, or handicapped relatives for whom they presently provide care. They seek relocation in an Arab State. All believe Qatar would provide the best security. Arrangements should be made immediately. Dwellings for each family acceptable to them should be found and the families relocated as soon as possible. All persons relocated should be granted political asylum in the state where they relocate and their rights and the rights of offspring born to them to remain in the country to which they are relocated must be equal to citizens of that country.

Funds for the transportation and support of the families should be provided. These must be agreed upon and adjusted periodically to changes in

the cost of living where they reside, and right to such funds must be inviolable, unless and until they become self sufficient from their own labors.

Any property the families own in Iraq and must leave behind must be protected until sold.

Defense counsel must be provided funds to travel to visit their families wherever there is time to do so until they are able to safely join them after the conclusion of all trials in which they participate.

Funds for family living expenses in Iraq until families are relocated shall be provided.

2. Immediate Protection for all defense counsel: Defense counsel shall be immediately provided funds for the full time employment of ten trained guards for himself and his family until the family has been safely relocated outside Iraq. Guards shall be authorized to possess machine guns, automatic rifles, and pistols and such other weapons as are needed to defend the family and counsel. Top quality body armor shall be provided. All passes necessary for travel by counsel and family, from both Iraqi and United States authorities, shall be provided, including passes to use roads including single lane roads exclusively for U.S. military and VIPs wherever such roads are available to the Airport, Court, between office, home, court, the international zone, and elsewhere, and passes for expedited passage through all checkpoints. Family members and defense counsel shall receive personal I.D. passes for checkpoints and military assistance.

3. Emergency Telephone Access for U.S. Military Protection: Defense counsel and senior family members shall be provided emergency telephone equipment and access to the U.S. military to call for military protection whenever threatened, attacked, traveling in dangerous zones, or otherwise necessary.

4. Funding for Defense Counsel Expenses of Living and Working: Defense counsel shall be provided funds for his living expenses paid regularly, during the continuation of the trial sufficient to cover all expenses related to his presence in Iraq to serve as defense counsel.

5. Witness Protection and Relocation: Funds for locating, interviewing, transporting, protecting, living expenses and relocating and providing new identities to witnesses for the defense shall be provided by the U.S. in a timely manner.

6. Protection, and funds for Investigators and Experts: Protection and funding for defense investigators and experts to meet the all efforts in preparing and presenting the defense shall be provided by the U.S. in a timely basis.

Annex E
19 September 2005
Letter to the UN Secretary-General

The Honorable Kofi Annan
Secretary General of the United Nations

Re:     **Urgent Request for the Immediate Investigation
        by the United Nations of the Kidnapping and**

**Murder**

        **of Sadoum al-Janabi**

Dear Mr. Secretary-General,

A United Nations investigation of the kidnapping and murder in
Baghdad on October 20, 2005 of Sadoun al-Janabi, defense attorney for Awad
Hamed al-Bander, the day after the televised exposure of defense attorneys for
eight leaders of the former government of Iraq, including President Saddam
Hussein, is an urgent necessity.

Investigations by the interim government of Iraq and the United States
will have no credibility. Leaders of both governments have repeatedly
expressed hostility toward the accused persons and both governments have
resorted to criminal violence against supporters of the former government of
Iraq.

The New York Times reported Saturday, October 22, 2005 in a first
page story:

> "Eyewitnesses quoted on Friday on the television station Al
> Arabiya said that Mr. Janabi's abductors, dressed in suits and ties,
> identified themselves as officials of the Interior Ministry, which has
> faced accusations in recent months that it has harbored Shiite death
> squads that hunt down members of the Sunni Arab community with
> links to Mr. Hussein's years in power." N.Y. Times, October 22, 2005,
> at p. 10.

Mr. Janabi, a Sunni, was reported to be a personal friend of President
Hussein. He spoke out repeatedly during the hearing on October 19, once
accusing the prosecutor of making a "political speech."

President Bush failed to answer a letter from our committee dated June
15, 2005 in which we addressed the necessity of "...immediate, full and secure

access to President Saddam Hussein for defense counsel and their assistants and investigators" and security measures to enable them "to perform their work safely" without interference in preparing and presenting the defense case.

Previously President Bush, Secretary Rumsfeld and the Commanding Generals of U.S. Forces in Iraq had consistently rejected all requests to consult with prisoners, including former Deputy Prime Minister Tariq Aziz beginning in May 2003, and later with President Saddam Hussein beginning in December 2004, keeping Saddam Hussein in complete isolation for more than a year with only one limited contact thereafter with individuals who were chosen or approved by the U.S.

As the first day of proceedings began, President Bush announced that he is "confident" that President Saddam Hussein will get a fair trial. See London Herald Sun, October 19, 2005.
He earlier described Saddam Hussein as "the guy who tried to kill my dad."

The truth about the kidnapping and murder of Mr. Janabi is critically important to the future of Iraq, peace in the Middle East and beyond and "to reaffirm faith in fundamental human rights, in the dignity and worth of the human person, in the equal rights of men and women and of nations large and small."

The failure of the U.S. and Iraq to provide protection to the defense and access to the defendants requires the transfer of any trials to a legal international forum if there is to be fairness in appearance and fact.

Respectfully submitted,

Ahmed Ben Bella, former President of Algeria
Tun Dr. Mahathir Mohamad, former Prime Minister of Malaysia
Roland Dumas, former Foreign Minister of France
Ramsey Clark, former Attorney General of the United States

Annex F
29 January 2006
Repeated Request for Security

Att. The Presiding Judge of the Tribunal which we do not recognize its legality.

Submitted by Mr. Kaleel al-Dolami

On behalf of the Defense Committee, we would like to state before this
Tribunal and for the world the following arguments of our challenge:

We are committed to defend our clients and we will never abandon them.

We cannot continue the proceedings before this tribunal until security for the
lawyers and their families is provided in an affirmative manner. Also all the
essential conditions for a fair trial should be provided.

Since it's creation, this tribunal could not meet the standards of an independent,
impartial and legal court of law:

Mr. Rizgar Amin has resigned and he declared that interference of the political
authority and other parties in the work of the tribunal has led him to resign.
Although Judge Saeed Hammashi has been a part of this illegal court since it
was established, he was recently removed under the pretext of Debaathification.
Judge Raouf Rasheed Abdul-Rahman has been appointed as a presiding judge
and a session on Jan. 24th 2006 was determined. After days of traveling from
many Arab and foreign states, we had to wait for more than seven hours. A
clerk of the tribunal came to us with two packs of paper in his hand, they were
the submissions that we have submitted to the tribunal on Dec.21, 2005. The
documents were divided into two parts. The clerk handed the first part to us
saying that we can publish it in any of the political papers, or that we may read
it before a political conference. He kept the second part with him saying that
they will respond to it. We were astonished at such an act, and asked the clerk
repeatedly whether he was sure that the presiding judge had said this and he
said:" Yes". We said to him:" you can either review them as they were
presented or reject them totally by a reasoned decision issued by your court".
Could the court be dysfunctional, feeble and unable to deal with the case before
it? We are not astonished for this state of affairs because the tribunal is a
creation of the occupying power and not the Iraqi people.

Is it reasonable for the president of the U.S.A. to interfere in the proceedings of
the court by proclaiming, "That the court is on the track and that the butcher
will have the punishment he deserves". Bush violated one of the principles of
justice, which is provided for in the constitution of the U.S. and all
constitutions of the states of the world, i.e.the presumption of innocence. The

question is: "how does Bush know that H. E. President Saddam has been found guilty of the false allegations attributed to him?" We hope that Bush will refrain in the future from forcing his electoral problems and political purposes and aims on this illegal trial. Besides, is there any law that permits this unjustified interference?

Mr. Rizgar Amin, the former president of the trial panel, was accused of being too slow and too lenient with the defendants. Later, Raed Juhi, the investigative judge, stated that the trial would end within two months. Everyone knows that an investigation judge is not entitled to make any public statements or to act as a spokesperson for the tribunal. Such statements violate his responsibilities. By doing so, he has deprived our clients from their right to defend themselves as provided for in local and international laws.

The tribunal is indecisive in making decisions in important issues such as the legality of the tribunal, the protection of the defense lawyers and their families and making decisions on the various submissions that were submitted before it, including the legal request to establish an investigation in torturing our clients. The detainees and the prisoners of war were tortured physically. While physical torture discontinued, psychological torture continued. Investigations were conducted based on avowed enmity of some judges against our clients. Such investigations are defected so we demand that all previous investigations be deemed as null and void, and that judges who have a vowed enmity with our clients should not conduct such investigations in the future. We have demanded also, that all the letters and information that were exchanged between the American investigators, the FBI and other elated parties should be revealed. The tribunal has not responded to our requests about torturing our clients. That we, and the Iraqi people should be informed about the details of the investigation that the appointed government and its establishments have promised to conduct about the terrorist criminals and killers who have executed our colleagues: martyr Saadoun Al-Janabi and martyr Adel Al-Zubaidi. The reasons for the delay in revealing the results of such investigations should also be made public.

The tribunal continues to refuse to respond to the Defense' requests to enable the defense team to meet their clients according to time schedules that suit the defense rather than the detaining power. This serves the right of the defense lawyers to meet their clients in any time. This right should not be subject to the unpredictable mood of the detaining power or any other party.

The Defense Committee for the Iraqi President
Saddam Hussein

Annex G
19 February 2006
Decision of President of the IST
[English translation of Arabic original]

Decision of 19 February 2006 Concerning Judge Abdel Rahman

Applicant/lawyer Kaleel Dolami, President of the Defense Committee in the Dujail Case.

Lawyer Kaleel Dolami has submitted argument to disqualify the Presiding Judge of the First Trial Panel on 15 February 2006.

The Presiding Judge Raouf Rasheed Abdel Rahman replied that he has no bias against the defendant Saddam Hussein or against any other defendant in the Dujail case, and that impartiality and justice are his guiding principles

Upon review and consideration, it has been found that article 95/1 of the Code of Civil Procedure, law no. 83 of 1969, provides that a disqualification request must be made before entering onto the merits of the case, otherwise it shall be dismissed...

As the applicant has made his request after the merits stage of the case has been reached, it is decided that his request shall be dismissed and the applicant should be fined an amount of one thousand Iraqi Dinars in accordance with article 96/4 of the said law.

This decision has been made in agreement as for the subject and by majority on 19 February 2006.

The President of the Court
[Signed]

Annex H
6 April 2006
Decision of Appeals body of the IST
[English translation of Arabic original]

Decision of 3 April 2006 Concerning Presiding Judge of the First Trial Panel

The Appellate Chamber of the Iraqi High Criminal Court on 3 April 2006. The session was presided over by the President and two other judges in the name of the people and makes the following decision:

Applicant/lawyer Kaleel Dolami, President of the Defense Committee for the defendant Saddam Hussein al-Majeed.

Lawyer Kaleel Dolami submitted a request to disqualify the Presiding Judge of the First Trial Panel Judge Raouf Rasheed Abdel Rahman pursuant to article 96/2 of the Code of Civil Procedure and Rules number 7 and 8 of the Rules of Procedure on the grounds hat the Presiding Judge, during the session of 15 March 2006 addressed his client by saying that he is accused of killing innocent persons in the Dujail case and that he was the cause of the injustice inflicted upon the Iraqi people because of the oil coupons. The judge also threatened to have any defense lawyer who breached the law handcuffed.

Judge Raouf Rasheed Abdul Rahman replied that the statements attributed to him do not constitute a biased opinion.

Upon review and consideration it has been found that the statements included in the disqualification request do not reflect a pre-mature opinion in accordance with article 3/93 of the Code of Civil Procedure. This request is dismissed and the applicant shall be fined two thousand Iraqi Dinar in accordance with article 96(4) of the Code of Civil Procedure. The decision is made by agreement on 3 April 2006.

The President of the Court
[Signed]

Annex I
26 March 2006
Affidavit by Jordanian Lawyer of Statements of Bias Against President
Made By IST-Appointed Lawyer Who Made Closing Statement for Defense
[English translation of Arabic original]


## An AFFIDAVIT


**Subject**: Statement of Lawyer Mazin Abdul Hameed Jabbar,
one of the lawyer's appointed by the Iraqi Higher Criminal Court


I, the undersigned, testify that the information given in this
affidavit is correct and was given under oath.
During repeated meetings with the above mentioned lawyer, he
stated without equivocation that the "defendants in this case do
not deserve being tried, and that they should be left in the streets
for people to directly take their revenge on them. This because
death penalty is a rather mild sentence when compared to the
crimes they committed against the Iraqi people".
Showing his contempt for the President (i.e.H.E.Saddam
Hussein) and the other co-defendants, the said lawyer added that
he feels ashamed because those people have governed his
country for more than thirty years. He accused them of
committing crimes, of ignorance an absurdity.
He deplored the existence of Defense lawyers of our choice for
the defendants saying that the reason behind the lawyers
decision to defend those people is "that you had earned
millions". He said also that "the amounts that have been paid
for the Court, to prepare for the trials and to train the judges,
should have been spent on the people who suffered injustice and
on the victims of the regime. The trials during the days of the
past regime were artificial and very quick. Now, they should be
treated equally".
I informed Captain Mike McCoy of the (RCLO) about the
statements of the said appointed lawyer during the session of

March 15th 2006. I told Captain McCoy that such a person
should no longer remain in the Defense Office of the Court.
Captain McCoy supported my view and asked the appointed
lawyer whether I have said the truth. He replied:" yes, but I did
not speak about my client".
I give this affidavit to the best of my knowledge and memory.

Lawyer
Issam Ghazzawi

On this day the 26th of March 2006

Annex J
2005
Arte France and KS Visions DVD
[English language]

Available as a separate item.

Annex K
Final Decision of the UN Working Group on Arbitrary Detention

OPINION No. 46/2005 (Iraq and United States of America)

Communication addressed to the Governments on 9 March 2005,

Concerning: Mr. Saddam Hussein Al-Tikriti

Both States are Parties to the International Covenant on Civil and Political
Rights

1. The Working Group on Arbitrary Detention was established by resolution
1991/42 of the Commission on Human Rights. The mandate of the Working
Group was clarified and extended by resolution *1997/50* and confirmed by
resolution 2003/31. Acting in accordance with its methods of work, the
Working Group forwarded the above-mentioned communication to the
Governments of Iraq and the United States of America.

2. The Working Group conveys its appreciation to both Governments for
having submitted information with regard to this communication.

3. The Working Group regards deprivation of liberty as arbitrary in the
following cases:

I. When it manifestly cannot be justified on any legal basis (such as continued
detention after the sentence has been served or despite an applicable amnesty
act) (Category I);

II. When the deprivation of liberty is the result of a judgement or sentence for
the exercise of the rights and freedoms proclaimed in articles 7, 13, 14, 18,
19,20 and 21 of the Universal Declaration of Human Rights and also, in
respect of States parties, by articles 12. 18, 19, 21, 22, *25*, 26 and 27 of the
International Covenant on Civil and Political Rights (Category II);

III. When the complete or partial non-observance of the relevant international
standards set forth in the Universal Declaration of Human Rights and in the
relevant international instruments accepted by the States concerned relating to
the right to a fair trial is of such gravity as to confer on the deprivation of
liberty, of whatever kind, an arbitrary character (Category III);

4. In the light of the allegations made the Working Group welcomes the cooperation of the Governments of Iraq and of the United States of America. The Working Group transmitted the replies provided by the two Governments to the source and received its comments.

5. According to the information received from the source, Mr. Saddam Hussein Al-Tikriti, born on 28 April 1937, of Iraqi nationality, is the former President of Iraq.

6, According to information publicly available, on 20 March 2003 military forces belonging primarily to the United States of America ("US") and the United Kingdom of Great Britain and Northern Ireland ("UK") began the invasion of Iraq. On 9 April 2003, Baghdad was formally secured by US forces and the Iraqi regime headed by President Saddam Hussein was declared to have ended, On 1 May 2003 the President of the United States announced the end of major combat operations in the Iraq war, As recognized in UN Security Council resolution 1483 (2003),  around this date the US and the UK "assumed the specific authorities, responsibilities, and obligations under applicable international law _as occupying powers under unified command". The Coalition forces established a Coalition Provisional Authority (CPA) under an Administrator named by the US. The CPA named an Interim Iraqi Governing Council. On 30 June 2004. the occupation of Iraq ended and the *CPA* ceased to exist. As of that date, Iraq reasserted its full sovereignty and an Interim Government of Iraq assumed full responsibility for governing Iraq (see paragraphs 1 and 2 of UN Security Council resolution 1546 (2004)). In accordance with Security Council resolution 1546. however, a multinational force, composed primarily ofUS and UK military forces, remains in Iraq at the request of the Iraqi Government.

7. On 13 December 2003, Mr. Saddam Hussein was captured in Tikrit by military forces of the United States, then th occupying power in Iraq, and was taken into custody at an undisclosed location. From that date until the time of submission of the communication, his only contact with his defence team was on 16 December 2004 with one of his attorneys, under supervision of at least two United States military guards who Were present during this interview. The source states that despite repeated requests before and after this interview, the lawyers of the defence committee Were denied the possibility to hold other meetings with their client.

8. The source alleges that Mr. Saddam Hussein was initially detained as a prisoner of war wider the terms of the Third Geneva Convention Relative to the Protection of Prisoners of War. However, the United States Government has Since then claimed that he is no longer a prisoner of war but a prisoner of the Iraqi Government. The source adds that, despite this claim by the United

States Government, Saddam Hussein remains under the complete control of the United States Government.

9. On 10 December 2003, the Iraqi Governing Council established the Iraqi Special Tribunal. According to Article 1 (b) of its Statute, "[t]he Tribunal shall have jurisdiction over any Iraqi national or resident of Iraq accused of the crimes listed in Articles 1 1 to 14 below, committed since July 17, 1968 and up until and including May 1, 2003, in the territory of the Republic of Iraq or elsewhere, including crimes committed in connection with Iraq's wars against the Islamic Republic of Iran and the State of Kuwait." The crimes listed in Articles 11 to 14 of the Statute are genocide, crimes against humanity, war crimes, and violations of certain Iraqi laws listed in Article 14, On 11 October 2005, the President of Iraq signed a new statute and new rules of procedure of the court, which rename it Supreme Iraqi Criminal Tribunal (Which is the term used hereinafter).

10. According to information publicly available, Mr. Saddam Hussein appeared before the Supreme Iraqi Criminal Tribunal for his first hearing (arraignment) on 1 July 2004. The hearing took place in a Secret location and the defendant was not assisted by counsel, the investigating judge confined himself to ascertaining the identity of the accused. In addition, Mr. Saddam Hussein was informed of seven charges brought against him. Because he was not assisted by legal counsel, he refused to sign the record of proceedings.

11. The source further submits that Mr. Saddens Hussein's status should be covered by the Third Geneva Convention Relative to the Protection of Prisoners of War, Since he was captured because Of his participation in an armed conflict. However, he is being denied such protection by the United States Government as occupying power and custodian authority, and the Iraqi authorities have brought charges against him before the Supreme Iraqi Criminal Tribunal,

Therefore, the source is of the opinion that legal responsibility for Ms arbitrary detention attaches to both Iraq and the United States of America.

12. The source alleges that the detention of Mr. Saddam Hussein is arbitrary because he has not been charged in a timely manner, has not been granted the full privileges of a prisoner of war *(for* example, to be allowed to communicate with his family without undue delays or to receive documents pertaining to his legal representation), has been forced to prepare his trIal in conditions of complete isolation from the outside world, detained at a secret location, severely restricted in the contact with legal counsel (although the charges raised against him must be of the most serious nature to fall within the mandate of the Supreme Iraqi Criminal Tribunal). The source concludes that the non-observance of international norms relating to fair trial is so serious as

to render his pre-trial detention, as well as any detention upon conviction, arbitrary. Furthermore, the source alleges that Mr. Saddam Hussein has been denied the right to challenge the legality of his detention. Finally, the source expresses doubts as to whether a fair trial can at all take place under the current security situation in Iraq, before a special tribunal that lacks the independence and impartiality needed.

13. In its reply to the communication, dated 2 May 2005, the Government of Iraq states that Saddam Hussein is awaiting trial, and that it is premature to discuss matters relating to his right to prepare his defence and to a fair hearing. As to his place of detention, it is kept secret in order to protect him. The Government further reports that Saddam Hussein was allowed to meet one of his lawyers on 27 April 2005, that this meeting had lasted six hours, and that the lawyer was able to freely interview Saddam Hussein in the presence of an officer.

14. In its reply to the communication, the Government of the United States underlines that, as also noted by the source, Saddam Hussein is in physical custody of the Multinational Forces – Iraq (MNF-I) pursuant to arrangements between MNF-I and the Iraqi Ministry of Justice, but is being held under the legal authority of an Iraqi court. The Government of the United States therefore considers that the Government of Iraq is best placed to clarify the legal basis of the detention of Saddam Hussein.

15. In replying to the statement by the Government of the United States, the source argues that as the State actually detaining Saddam Hussein, the United States is responsible for respect of his right to security of person, a responsibility it cannot disclaim on the basis of the argument that Saddam Hussein is kept in custody on behalf of the Government of Iraq or of the argument that he is not detained on US territory.

16, As to the reply of the Iraqi Government, the source asserts that the Iraqi Government confirms the accuracy of all its allegations. The source argues that Saddam Hussein's rights to counsel, to prepare his defence, and to a fair hearing have been violated (as of mid-August 2005) for more than 20 months, It adds that a single meeting between counsel and defendant in the presence of a United States military officer clearly does not fulfil the requirements of the right to be assisted by counsel, Finally, the source argues that the violation of Saddam Hussein's rights is exacerbated by the repeated attacks against the house of his defence counsel, as well as by his humiliation through the circulation of pictures showing him in partial undress, and by the Government allowing physical attacks against him while in custody.

17. To be able to spell out the law applicable to the *different* issues raised by the source and *identify* the Government(s) responsible under international law for the legality of the detention and the eventual violation of the rights of Mr. Saddam Hussein, if any, the Working Group considers necessary to highlight the particularity of the circumstances of the case before it.

18. The Working Group would like to stress that Mr. Saddam Hussein was the President of the Republic when armed forces of the United States and the United Kingdom of Great Britain and Northern Ireland invaded Iraq on 20 March. On 1 May 2003, the Security Council in its resolution 1483 admitted that the United States and the United Kingdom of Great Britain had assumed the authority, responsibility and applicable obligations under international law in the territory of Iraq. On 13 December 2003, Saddam Hussein was captured in Tikrit by US military forces, Later, the occupying forces constituted the *CPA* as the Coalition Provisional Authority under the control of an envoy named by the Government of the United States. On 30 June 2004, the occupation ended and the full sovereignty of Iraq was restored through the Interim Government of Iraq. In accordance with Security Council resolution *1546* of 8 June 2004, however, a multinational force (MNF-I), composed primarily of United States of America and United Kingdom military forces, remained in Iraq at the request of the Iraqi Government. At some point before the restoration of sovereignty to Iraq, Mr. Saddam Hussein and other members of the former Iraqi' regime were "formally" or *"de jure"* transferred by the *CPA* to Iraqi custody.

19. According to some developments publicly reported in the case under consideration, on 1 July 2005, Saddam Hussein and 11 other members of the former Baathist leadership appeared before the Supreme Iraqi Criminal Tribunal's chief investigating judge. The defendants were reportedly informed of the charges against them and questioned by the investigating judge. The defendants did not have legal counsel present, and no full public transcript of the proceedings exists.

20. On 19 October 2005, the trial before the Supreme Iraqi Criminal Tribunal against Saddam Hussein and seven co-defendants in the *Dujail* case opened. At the hearing, defense counsel and some of the defendants raised three challenges: the lack of adequate time given to the defense to study the final dossier and prepare its case; the lack of sufficient access to the accused by defense counsel; and concerns regarding the court's legitimacy and competence. The court granted an adjournment of the trial until 28 November 2005. At the time of drafting this Opinion (30 November 2005) another adjournment had been granted to 5 December 2005.

21. On 20 October 2005, the day following the opening hearing, Mr. Sadoum al-Janabi, counsel of one of Saddam Hussein's co-defendants, was abducted

from his office by armed men. He was subsequently found dead with two bullet wounds to the head. On 8 November 2005, in a drive-by shooting in Baghdad, gunmen killed Mr. Adel Muhammad al-Zubaidi, who represented another defendant in the *Dujail* trial, and injured a further defense lawyer, Mr. Thamer al-Khuzaie.

22. The source alleges that Mr. Saddam Hussein was initially detained as a prisoner of war, but has not been granted the full privileges of a prisoner of war under the terms of the Third Geneva Convention Relative to the Protection of Prisoners of War of 12 August 1949, In their replies, neither the US Government nor the Iraqi Government provided information on this allegation. It is however well known that from the early days of the conflict in Iraq, the US Government recognized that the Geneva Conventions applied comprehensively to individuals captured in the *conflict* in Iraq. The US Government also gave assurances that it intended to comply with article 5 of the Third Geneva Convention by treating all belligerents captured in Iraq as prisoners of war unless and until a competent tribunal determines that they were not entitled to POW status.[1]

23. The position of the Working Group is that although the invading coalition stated that the major combat operations finished on 1 May 2003, the total occupation still continued until 30 June 2004. Therefore as Saddam Hussein's detention took place in the context of an international armed conflict resulting in the invasion of Iraq by the American Government's forces and the armed coalition, his status is protected by the Third Geneva Convention at least until 30 June 2004.

24. consequently, and in accordance with paragraph 16 of its methods of work and 14 of its revised methods of work,[2] the Working Group will not assess the lawfulness of Mr. Saddam's detention for the period taking place between 13 December 2003 and 30 June 2004, as it occurred during an ongoing international armed conflict and the United States Government recognized that the Geneva conventions applied to individuals captured in the conflict in Iraq.

*25.* According to the fifth paragraph of Article 119 of the Third Geneva Convention it is permissible that prisoners of war against whom penal proceedings are pending may be detained until the close of such proceedings. The Working Group is also not in a position to assess the conformity to the applicable provisions of international humanitarian law (Arts. 12, 1 18 and 1 19 of the Third Geneva Convention to which the US and Iraq are parties) of the procedure under which Mr. Saddam Hussein was transferred by the CPA to the Interim Government of Iraq. It is, however, not disputed that, while *de jute* transferred, Mr. Saddam remains *de facto* in US custody. The United States Government, in its reply to the Working Group, recognises that *"the detainee is under the custody of the "Multinational Force Iraq" according to*

*an agreement reached with the Minister of Iraqi Justice although he is under the authority of an Iraqi court".*

26. The Working Group concludes that until 1 July 2004 Saddam 1-lussein was detained under the sole responsibility of the Coalition members as occupying powers or, to be more precise, under the responsibility of the US Government. Since then, and as the Iraqi criminal Tribunal is a court of the sovereign State of Iraq, the pre-trial detention of a person charged before the Tribunal is within the responsibility of Iraq. In light of the fact that Saddam Hussein is in the physical custody of the US authorities, any possible conclusion as to the arbitrary nature of his deprivation of liberty may involve the international responsibility of the US Government.

27. As of the period of detention subsequent to 30 June 2004, Saddam Hussein appeared before the Supreme Iraqi Criminal Tribunal for his first hearing on 1 July 2004. The hearing took place in a secret location and the defendant was not assisted by counsel, In addition, Mr. Saddam Hussein was informed of the charges brought against him. Because he was not assisted by legal counsel, he refused to sign the record of proceedings. Therefore, whatever the status under which he was detained prior to the 1 July 2004, he subsequently became a defendant in a criminal procedure, entitled to the protection of the International Covenant on Civil and Political Rights. Both the US and Iraq have ratified the ICCPR and therefore articles 9(3) and 14 ICCPR are applicable to his detention.

28. Although neither the Iraqi Government nor the US Government have provided detailed answers to the allegations concerning the characteristics of the process and the violations affecting the right of the defence, as invoked by the source, the Working Group had access to, and gathered information regarding the Supreme Iraqi Criminal Tribunal and its rules of procedure.

29. This tribunal was established by the Iraqi Governing Council on 10 December 2003, and in the first days of August 2004 the Interim Iraqi Assembly modified the statute that was regulating it. The Working Group does not know the criteria under which the Iraqi Government has nominated the judges who form this tribunal. However, the alleged withdrawal or substitution of several judges is a matter of concern. The atmosphere surrounding the preparation of the trial, which can negatively affect the independence and impartiality of the Tribunal — or at least give the impression that the tribunal lacks the requisite independence and impartiality—, is also a matter of concern to the Working Group. The murder of defence lawyers, the threatening behaviour of the crowd against some of the accused, motivated by past wrongs suffered in the previous regime, might exert an undue pressure on the tribunal. More specifically, the fact that capital punishment was recently re-established and that no appeal is allowed against conviction and sentence, which is in

complete disregard of Article 14 paragraph 5 of the International Covenant on Civil and Political Rights, may cast a shadow over the requisite fairness of the process.

30. In his annual report (2005) to the UN General Assembly, Leandro Despuy, the Special Rapporteur on the independence of judges and lawyers, raised his own concelils about the judicial proceedings taking place before the "Iraqi Special Tribunal". He stated that: *"Despite the commitment and personal efforts of the judges and the cooperation provided by several countries in setting up the tribunal, he is concerned that the pressure weighing on the judges and the prevailing insecurity in Iraq may undermine its independence. Moreover, the tribunal itself has its deficiencies, some of which can be traced back to the manner in which it was set up, and in particular to the restriction of its jurisdiction to specific people and a specific time frame; i.e., the tribunal may only try Iraqi citizens for acts committed prior to F' May 2003, when the occupation began. The tribunal 's power to impose the death penalty demonstrates the extent to which it contravenes international human rights standards, Because it was established during an occupation and was financed primarily by the United States, its legitimacy has been widely questioned, with the result that its credibility has been tarnished. The Special Rapporteur urges the Iraqi authorities to follow the example set by other countries with deficient judicial systems by asking the United Nations to set up an independent tribunal which complies with international human rights standards3. "*

31. The Working Group shares these concerns. It is also concerned about the criminal proceedings in Saddam Hussein's case, notably the right to counsel. Apparently Saddam can only meet his defence counsel in the presence of US officials; it is not clear whether he can meet them often enough to have the significant exchange necessary for such a complicated case, On 19 October 2005, at the hearing, defense counsel and some of the defendants raised three challenges: the lack of adequate time given to the defense to study the final dossier and prepare its case; the lack of sufficient access to the accused by defense counsel; and concerns regarding the court's legitimacy and competence. The Working Group was also made aware that there are discrepancies between the old Iraqi criminal procedure code and the rules of procedure of the SICT on important points, and it is not clear which law prevails.

32. Since procedural flaws amounting to the violation of the right to a fair trial may, in principle, be redressed during the subsequent stages of the criminal proceedings, the Working Group would find premature to take a position now on this point. The Working Group is fully aware that the ongoing judicial procedure in Iraq is aimed to bringing to justice the highest- ranking leaders of the past Iraqi regime of Saddam Hussein, including himself, for the most serious crimes they allegedly committed against the Iraqi people and some

neighboring nations. The crimes for which they are prosecuted comprise, but are not limited to genocide, crimes against humanity and war crimes.

33. As one of the mechanisms of the United Nations Commission on Human Rights, the Working Group is deeply committed to the principle that any violation of human rights, whether committed by politicians or others, must be inquired into and redressed, if necessary by putting the perpetrators to justice. Yet, any procedure aiming to put right gross human rights violation ,as such welcomed by the Working Group, shall scrupulously respect the rules and standards elaborated and accepted by the international community to respect the rights of any person charged of a criminal offence. The violation of the rights of the person charged may easily backfire. This is particularly true in the instant case; any lack of respect for the rights of the leaders of the former regime in the criminal proceedings against them may undermine the credibility of the Justice system of the newly emerging democratic Iraq.

34. The Working Group believes that under the circumstances the proper way to ensure that the detention of Saddam Hussein does not amount to arbitrary deprivation of liberty would be to ensure that his trial is conducted by an independent and impartial tribunal in strict conformity with international human rights standards.

35. On the basis of what precedes, the Opinion of the Working Group is that

a) It will not take a position on the alleged arbitrariness of the deprivation of liberty of Mr. Saddam Hussein during the period of international armed conflict;

b) The Working Group will follow the development of the process and will request more information from both concerned Governments and from the source. In the meantime and referring to paragraph 17(c) of its methods of work, it decides to keep the case pending until further information is received.

Adopted on 30 November 2005.

# Endnotes

*Endnotes*

[1] *Judgment of the Nuremberg International Military Tribunal*, 1949, *reprinted in* Trial of the Major War Criminals before the International Criminal Tribunal, Nuremberg, Vol. 1, p. 186 (1947).

[2] Para. 8(g) of UNSC Res. 1483, UN Doc. S/RES/1483 (22 May 2003).

[3] *See* National Security Decision Directive No. 139 of 5 April 1984 (still partially classified).

[4] *Id.*

[5] *See, for example*, Ramsey Clark, *Challenge to Genocide: Let Iraq Live* (New York: International Action Center, 1998); Ramsey Clark et al., *The Children Are Dying: the Impact of Sanctions on Iraq* (New York: International Action Center, 1998). Both these works argue that the people of Iraqi must be put ahead of narrow-sighted United States foreign policy objectives.

[6] Garfield, R., *Morbidity and Mortality among Iraqi Children from 1990 through 1998: Assessing the Impact of the Gulf War and Economic Sanctions* (March 1999) (a report evaluating the various studies on child mortality in Iraq and concluding that "Sustained increases in young child mortality are extremely rare in this century. Such a large increase as that found here [in Iraq] is almost unknown in the public health literature. In Iraq, a rate of mortality among under-five-year-olds in excess of 80 per one thousand births was last experienced about twenty years ago. Living conditions in Iraq, thus, represent a loss of several decades of progress in reducing mortality. This is a social disaster which should be urgently addressed. To the degree that economic sanctions complicate access to and utilization of essential goods, sanctions regulations should be modified immediately. In addition, the international community should urgently make available to Iraq materials and expertise to improve child health programs and policies in the fields of feeding and weaning practices, diarrhea and respiratory infection recognition and care, and maternal and child health care, family income, and education" at 38 [footnotes omitted]). *Also see* Food and Agriculture Organization (FAO), *Evaluation of Food and Nutrition Situation in Iraq*, Iraq, Doc. No. TCP/IRQ/4553 (Rome, Italy, 1995); Harvard Study Team, "Special Report: The Effect of the Gulf Crisis on the Children in Iraq," 325 *New England Journal of Medicine* 997-980 (1991); Alberto Arscherio, Robert Chase, Tim Cote et al Special Article: Effect of the Gulf War on Infant and child Mortality in Iraq. The New England Journal of Medicine Vol 327(1 3), p.931-936, 1992; "International Notes: Public Health Consequences of Acute Displacement of Iraqi Citizens-March-May 1991," 40(26) *Morbidity and Mortality Weekly Review* 443-446 (1991); Physicians for Human Rights, "The Children of Iraq on the Brink of Disaster," Briefing Memorandum (revised), Somerville, MA, USA (1991); Schaller, E., and Nightingale, E., "Children and Childhoods: Hidden Casualties of War and Civil Unrest," 268 *Journal of the American Medical Association* 642-44 (1992); Jeremy Bowen, "World, Middle East: Iraqis blame Sanctions for Child Deaths," *BBC* accessed at *news.bbc.co.uk* (12 August 1999); Reuters, "UN Says Sanctions have killed some 500,000 Iraqi children" (21 July 2000) (quoting Ms Anupama Rao Singh, country director for the UNICEF stating that '"In absolute terms we estimate that perhaps about half a million children under 5 years of age have died, who ordinarily would not have died had the decline in mortality that was prevalent over the 70s and the 80s continued through the 90s").

[7] Several Senior United Nations staff resigned because of the deadly impact of the sanctions including Mr. Denis Halliday, who had been appointed United Nations Humanitarian Coordinator in Iraq at the Assistant Secretary-General level in 1997; his successor Mr. Hans von Sponeck (who stated that he "cannot any longer be associated with a programme that prolongs sufferings of the people and which has no chance to meet even the basic needs of the civilian population"); and Ms Jutta Burghardt, head of the World Food Program in Iraq.

[8] Statement of Madeleine Albright on "60 Minutes," *CBS* (10 May 1986).

[9] "Statement of White House Press Secretary Ari Fleisher on 24 March 2003" accessed at http://www.whitehouse.gov/news/releases/2003/03/20030324-4.html (12 September 2005).

[10] William H. Taft, IV, and Bushwald, T.F., "Preemption , Iraq and International Law," 77, 83 in Falk , R., Gendzier, I., and Lifton, R.J., (eds.), *Crimes of War: Iraq* New York, USA: Nation Books (2006).

[11] Mathew Rycroft, "Memorandum to David Manning recording a meeting with Prime Minister Tony Blair," (marked Secret Strictly Personal – UK Eyes Only, also known as the "Downing Street Memo"), SI 95/02 (23 July 2002).

[12] *See, for example, Yearbook of the International Law Commission,* Part II, 247-9 (1966) (Commentary on draft Art. 50 of the Draft Articles on the Law of Treaties) and *Military and Paramilitary Activities Case, ICJ Reports* pp. 100-101 (1986). Both authoritative sources find that the prohibition of the use of force is *jus cogens.*

[13] Center for Economic and Social Rights, *UN Sanctioned Suffering: A Human Rights Assessment of United Nations on Iraq*1 (New York: Center for Economic and Social Rights, May 1996).

[14] International Study Team, *Aftermath of the Gulf War on Civilians* (March 1991) (the assessment of the rationing system was done by leading development economists Professor Jean Dreze and Dr. Haris Gazdar, working with a team of independent researchers, including but not limited to Iraqis).

[15] Roberts, L., Lafta, R., Garfield, R., Khudhairi, J., Burnham, G., "Mortality before and after the 2003 invasion of Iraq: cluster sample survey," 364 *The Lancet* 1857 (20 November 2004).

[16] On 5 March 2003 France, Germany and Russia issued a joint declaration. Available at http://www.un.int/france/documents_anglais/030305_mae_france_irak.htm. China's Foreign Minister Tang Jiaxuan's stated on 6 March that "China's position is consistent with the joint statement. China endorses and supports the content of the joint statement." Martin Parry, "Beijing Vows to Block New UN War Resolution," *Middle East Online* (6 March 2003). The European Parliament condemned any unilateral strike against Iraq on 9 January 2003 in a Resolution; the United Nations Secretary General Kofi Annan condemned the attack as illegal in a public statement on 16 September 2004; the Arab League, the African Union, and Organization of Islamic Conferences with a combined membership of more than 125 states all condemned the war as illegal; the majority of Permanent Member states in the United Nations Security Council (France, China and Russia) and the two most populous states in the world, China and India, both unequivocally condemned the invasion as illegal as did numerous other states, including, Canada, Belgium, Germany, Switzerland, The Vatican, India, Indonesia, Malaysia, Brazil, and Mexico. Numerous legal commentators also condemned the attack as illegal: News.com.au, "Iraq Invasion Violated UN Charter" (7 August 7, 2003); Statement by 500 Law Professors for the Rule of Law; Severin Carrell and Robert Verkaik, "War on Iraq Was Illegal, Say Top Lawyers," *The Independent* (25 May 2003); Peter Schwarz, "International Legal Experts Regard Iraq War as Illegal," *World Socialist Web Site* (March 26, 2003); Center for Economic and Social Rights, "Tearing up the Rules: The Illegality of Invading Iraq," (March 2003); Henry Michaels, "Canadian Law Professors Declare US-Led War Illegal," *World Socialist Web Site* (22 March 2003); Robin Miller, "This War Is Illegal," (21 March 2003); *Middle East Online,* "Chirac: Iraq War Breaches International Law" (21 March 2003); Irwin Cotler, "Is the War on Iraq illegal?" *The Globe and Mail* (21 March 2003); Jim Lobe, "Law Groups Say U.S. Invasion Illegal," *OneWorld.net* (21 March 2003); Joan Russow, "U.S. Engaged in an Illegal Act," *OneWorld.net* (20 March 2003); International Appeal by Lawyers and Jurists against the "Preventive" Use of Force (2003); Michael C. Dorf, "Is the War on Iraq Lawful?" *Findlaw* (19 March 2003); Emma Thomasson, "Iraq War Illegal but Trial Unlikely, Lawyers Say," *Reuters* (19 March 2003); Hilary Charlesworth and Andrew Byrnes, "No, This War Is Illegal, *The Age* [Melbourne, Australia] (19 March 2003); Matthew Happold, "A Talented Lawyer Arguing a Weak Case," *The Guardian* (17 March 2003); Keir Starmer, "Sorry, Mr Blair, But 1441 Does Not Authorise Force," *The Guardian* (17 March 2003); Greenpeace, "Analysis of the US Legal Position on the Use of Force Against Iraq" (16 March 2003); Richard Norton-Taylor, "Law Unto Themselves," *The Guardian* (14 March 2003); Robert Verkaik, "'Illegal War' Could Mean Soldiers Face Prosecution," *The*

*Independent* (12 March 2003); Anthony Howard, "War Against Iraq--The Legal Dilemma," *The Times* [London] (11 March 2003); Mark Littman, "A Supreme International Crime," *The Guardian* (10 March 2003); Johanna Neuman, "Pope's Emissary Meets With Bush, Calls War 'Unjust'," *Los Angeles Times accessed at* http://www.commondreams.org/headlines03/0306-04.htm (6 March 2003); "The UN Must Take Mr Blix's Report Seriously—by Voting Against Military Action," *The Independent* (editorial) (8 March 2003); "War Would Be Illegal," *The Guardian* (7 March 2003); Michael White and Patrick Wintour, "No Case for Iraq Attack Say Lawyers," *The Guardian* (7 March 2003); "War With Iraq 'Could Be Illegal,'" *BBC* (6 March 2003); Alan Elsner, "US War Without UN Approval Would Be Seen as Illegal," *Reuters* (6 March 2003); James Conachy, "Australian Legal Experts Declare an Invasion of Iraq a War Crime," *World Socialist Web Site* (27 February 2003); Bill Bowring, "Bush and Blair Must See Law Has a Life of Its Own," *AlertNet* (21 February 2003); Julie Mertus, "The Law(?) of Regime Change," *JURspecial Court* (www.jurist.com) (20 February 2003); Thalif Deen, "Of Man and God and Law," *Asia Times* (14 February 2003); Nathaniel Hurd, "UN SCR 1141 and Potential Use of Force Against Iraq," (6 December 2002); "In The Matter of the Potential Use of Armed Force by the UK Against Iraq and in the Matter of Reliance for that Use of Force on United Nations Security Council Resolution 1441," Campaign for Nuclear Disarmament, (November 2002); "Lawyers Statement on UN Resolution 1441 on Iraq," (27 November 2002); Mary Ellen O'Connell, "UN Resolution 1441: Compelling Saddam, Restraining Bush," *JURspecial Court* (www.jurist.com) (21 November 2002); Marjorie Cohn, "UN Resolution 1441: Blackmailing the Security Council," *JURspecial Court* (www.jurist.com) (21 November 2002); George P. Fletcher, "Did the UN Security Council Violate Its Own Rules in Passing the Iraq Resolution?" *CounterPunch* (6 November 2002); Public Interest Lawyers on behalf of Peacerights, "Legality of Use of Force against Iraq" (10 September 2002); and Mary Ellen O'Connell, "The Myth of Preemptive Self-Defense," (August 2002).

[17] Michael Scharf, who has both criticized and praised the court, but who is know as a defender of the court, benefits from the exposure and funding provided to academic projects to which he is connected. Mark Ellis and the International Bar Association [IBA] of which he is the Executive Director, has benefited handsomely from grants given to train the judges and other lawyers in Iraq. *See, for example*, House of Commons, International Development Committee, *Development Assistance in Iraq: Interim Report (Evidence)*, at p. 58 (7th Report of Session 2004-05) (Indicating that between September and March 2005 the IBA was given a grant of £1,300,000 GBP (approximately 2.4 million USD) to provide support (training) to the Iraqi Special Tribunal.

[18] Authorization for Use of Military Force Against Iraq Resolution of 2002, p. 116, *Stat.* 1498, Public Law 107-243, 107th Congress, H.J. Res. 114 (16 October 2002).

[19] "United States President George W. Bush's Statement to the Nation from the Oval Office of the White House" at 22:16 EST on 19 March 2003 accessed at www.whtehouse.gov on 21 March 2003. *Also see* Statement by White House Press Secretary Ari Fleisher on 24 March 2003 accessed at http://www.whitehouse.gov (12 September 2005).

[20] "Statement by Ambassador John D. Negroponte, United States Permanent Representative to the United Nations, on Iraq, Before the Security Council" on 27 March 2003, United States Permanent Mission to the United Nations, Press Release No. 40(03) (27 March 2003).

[21] *Judgment of the Nuremberg International Military Tribunal*, 1949, *reprinted in Trial of the Major War Criminals before the International Criminal Tribunal, Nuremberg*, vol. 1, p. 186 (1947).

[22] Statements of the United States government before the International Court of Justice in the *Case Concerning Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States) (Merits)*, I.C.J. Reports 1986, p. 14 at p. 99, para. 187.

[23] *International Law Commission Yearbook*, Vol. II, 247 (1966) *reaffirmed by* the International Court of Justice in the *Nicaragua Case, infra*, at para. 187, p. 99.

[24] 94 *L.N.T.S.* 57 (1929)

[25] *Report of the 38th Conference of the International Law Association Budapest* 67 (1934).

[26] *Case Concerning Military and Paramilitary Activities in and Against Nicaragua (Nicaragua v. United States), I.C.J. Reports*, No. 70, para. 181, p. 97 (27 June 1996),

[27] *International Law Commission Yearbook*, vol. II, 247 (1966).

[28] *Case Concerning Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States) (Merits), I.C.J. Reports* 1986, p. 14 at pp. 100-101, para. 190.

[29] Article 53 of the International Law Commission's Draft Articles on State Responsibility for International Wrongful Acts, International Law Commission, Draft articles on the Responsibility of States for Internationally Wrongful Acts, *Report of the International Law Commission on the work of its Fifty-third session*, U.N. GAOR, 56th Sess. Supp. No. 10 (A/56/10), chp.IV.E.1 (2001)

[30] United Nations Conference on the Law of Treaties, First Session, UN. Doc. A/CONF.39/11 (1969).

[31] UNGA Res. No. 2625(XXV), adopted without vote, (24 October 1970).

[32] Donald H. Berchoff, (Lieutenant Colonel in the United States Air Force ), "Critical Analysis of US Policy and Options in Dealing with Iraq," National Defense University National War College, United States Air Force Doc. No. 5601/5602, p. 4 (2003) (citing the Report signed by CIA Deputy Director John McLaughlin).

[33] Explanation of Vote by Ambassador John D. Negroponte, United States Permanent Representative to the United Nations, following the vote on the Iraq Resolution, Security Council, November 8, 2002, United States permanent Mission to the United Nations Press Release No. 187(02) (Revised) (8 November 2002).

[34] On 5 March 2003 France, Germany and Russia issued a joint declaration. Available at http://www.un.int/france/documents_anglais/030305_mae_france_irak.htm. China's Foreign Minister Tang Jiaxuan's stated on 6 March that "China's position is consistent with the joint statement. China endorses and supports the content of the joint statement." Martin Parry, "Beijing Vows to Block New UN War Resolution," *Middle East Online* (6 March 2003).

[35] The European Parliament condemned any unilateral strike against Iraq on 9 January 2003 in a Resolution, European Parliament Resolution, EP Res. PS_TA (2003)0032 (9 January 2003); the United Nations Secretary General Kofi Annan condemned the attack as illegal in a public statement on 16 September 2004, UN News Service, "Lessons of Iraq war underscore importance of UN Charter – Annan" (16 September 2004); the Arab League, the African Union, and Organization of Islamic Conferences with a combined membership of more than 125 states all condemned the war as illegal; the majority of Permanent Member states in the United Nations Security Council (France, China and Russia) and the two most populous states in the world, China and India, both unequivocally condemned the invasion as illegal as did numerous other states, including, Canada, Belgium, Germany, Switzerland, The Vatican, India, Indonesia, Malaysia, Brazil, and Mexico. *Also see* cited sources at note 16.

[36] *See* sources cited in note 16.

[37] Andrew Grice, "Thatcher reveals her doubts over basis for Iraqi war," *The Independent* (14 October 2005), accessed at http://news.independent.co.uk/uk/politics/article319542.ece (14 October 2005).

[38] *See* "Opposition to the Iraq War" in Wikipedia at en.wikipedia.org for an updated list of opposition to the war.

[39] This resolution was accepted by Iraq on 6 April 1991 in a letter from its Minister of Foreign Affairs to the UN Secretary-General.

[40] Para. 10 of the Declaration on Principles of International Law Concerning Friendly Relations and Cooperation Among States in Accordance with the Charter of the United Nations, UN Doc. A/RES/2625 (XXV) (24 October 1970) (widely agreed to reflect customary international law) and *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970), ICJ Reports 1971*, p. 16, at pp. 54-56, paras. 117-127.

[41] ILC Draft Articles on the Responsibility of States for Internationally Wrongful Acts, Report of the 53rd Sess., I.L.C. (2001), G.O.A.R., 56th Sess., Supp. 10.

[42] *Ratified on* 29 June 1934, *T.S.* 881, 49 Stat. 3097, *entered into force* for the United States on 26 December 1934.

[43] Bin Cheng, General Principles of Law as Applied by International Courts and Tribunals, Cambridge: Grotius Press, 1987, p. 389.

[44] According to CPA Doc. No. CPA/ORD/9 Dec 2003/48.

[45] CPA Doc. No. CPA/REG/16 May 2003/01.

[46] Speech by United States President George W. Bush on 14 December 2005 *available at* www.whitehouse.gov (*accessed* 15 December 2005); Speech by United States President George W. Bush on 12 December 2005 *available at* www.whitehouse.gov (*accessed* 15 December 2005); Speech by United States President George W. Bush on 7 December 2005 *available at* www.whitehouse.gov (*accessed* 15 December 2005).

[47] CPA Doc. No. CPA/ORD/9 Dec 2003/48.

[48] 6 *UST* 3516, 75 *UNTS* 287 (1950).

[49] *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)*, [1971] *ICJ Reports* 16 at para. 119 and 120-125.

[50] UNSC Resolution 1483, UN Doc. S/RES/1483 (22 May 2003).

[51] 12 August 1949, 6 *UST* 3516, 75 *UNTS* 287 (1950)

[52] *See* art. 43 of the Hague Regulations.

[53] *Commentary to the (IV) Geneva Convention Relative to the Protection of Civilian Persons in the Time of War*, p. 306 (1958, under the editorship of Jean S. Pictet) (hereinafter "*Commentary to GC IV*").

[54] *Id.* at 335.

[55] *Id.* at 337.

[56] Not only does the United States government control Iraqi militarily. Not only is Iraq dependent on United States aid. But the United States government also excluded from all political posts in Iraq all those individuals who oppose its illegal invasion of Iraq and those whose political views it does not agree. The interference of the occupying powers in the Iraqi government has been apparent from its formation in early 2006. On 1 February 2006 the United States intervened in the negotiations over the government with American Ambassador to Iraq Zalmay Khalilzad threatening to cut aid saying "[w]e are saying, if you choose the wrong candidate, that will affect US aid." Gareth Porter, "US shifts Iraq loyalities," *Asia Times* (1 February 2006). The Foreign Minister of the United Kingdom, a staunch United States ally participating in the occupation of Iraq, in talks with Iraqi President Jalal Talabani also threatened to cut aid and perhaps even withdraw British troops unless the Iraqis choose persons for their government who were acceptable to the United Kingdom. *See* Anne Penketh, "US threatens to cut aid to Iraq if new government is sectarian," *The Independent* (UK) (7 August 2006).

[57] Iraqi Law No. 160 of 1979 published in *Alwaqai Aliraqiya*, No. 2746 of December 1979.

[58] *Id.*

[59] *Id.*

[60] CPA Doc. CPA/ORD/16 May 2003/01.

[61] Mariam Karouny, "Iraqi says to ask U.N. to end US Immunity," *Reuters*, Monday, 10 July 2006 at 5:07 p.m. EST *accessed at* today.reuters.com (12 July 2006).

[62] Iraqi Law No. 160 of 1979 published in *Alwaqai Aliraqiya*, No. 2746 of December 1979.

[63] UN SCOR, 58th Sess., 4844th mtg., UN Doc. S/RES/1511 (2003)

[64] *Record of Negotiations of the ICCPR*, UN Doc. A/2929, Chap. VI, sec. 77

[65] Adopted by the 7th United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Milan, 26 August to 6 September 1985, UN Doc. A/CONF.121/22/Rev.1 at 59 (1985).

[66] Report of the Working Group on Arbitrary Detention, UN Doc E/CN.4/1996/40 at 26.

[67] 999 *UNTS* 171 (adopted 1966).

[68] 993 *UNTS* 3 (adopted 1966).

[69] 1577 *UNTS* 3 (entered into force 1990).

[70] 1249 *UNTS* 13 (entered into force 1980).

[71] 660 *UNTS* 195 (entered into force 1969).

[72] *TS* No. 539, 1 *Bevans* 631, *signed at* the Hague, 18 October 1907, *entered into force* 26 January 1910.

[73] 75 *UNTS* 135 (1950).

[74] 75 *UNTS* 135 (1950).

[75] O.A.S. Doc. OEA/SER.L.V/II.82 doc.6, rev. 1 at 17 (1992).

[76] *See, generally,* Muhammad Salim Awa, *Punishment in Islamic Law: A Comparative Study.* Indianapolis: American Trust Publications (1982), M. Cherif Bassiouni, (ed.), *The Islamic Criminal Justice System.* London: Oceana, (1982): Wael B. Hallaq, *Law and Legal Theory in Classical and Medieval Islam.* Brookfield, Vt.: Variorum (1995).

[77] *See* art. 9 of the Constitution of the Kingdom of Iraq (1925) and art. 20 of the Iraqi Constitution (1990). *Also see* art. 15 of the Transitional Administrative Law (2004), and art. 19 of the Iraqi Constitution of 2005 (adopted under occupation).

[78] *See, for example, Prosecutor v. Furundžija (Appeal),* ICTY Appeals Chamber, Case No. IT-95-17/1-A (21 July 2000) at para. 177.

[79] Nihal Jayawickrama, *The Judicial Application of Human Rights Law: National, Regional and International Jurisprudence* 480, Cambridge, UK: Cambridge University Press (2002).

[80] *See* Human Rights Watch, "Past U.S. Criticism of Military Tribunals," Washington, D.C, USA: Human Rights Watch (28 November 2001).

[81] A decision by the Court dated 19 February 2006 rejected this application claiming that it should have been submitted before 19 October 2005, an impossibility as the judge whose disqualification was sought did not join the IST until February 2006. This decision contained no explanation as to how defense could were suppose to have challenged the impartiality of a judge who was not on the IST and who was entirely unknown to them. Moreover, the decisions failed to respond to any of the issues raised in the disqualification motion, including witnesses allegations that the judge had said that President Saddam Hussein was guilty should be executed without trial.

[82] This motion received no response as it was only submitted to the IST on 20 February 2006, the day after the decision to the 1 February 2006 motion was apparent given according to its date (19 February 2006) and despite the fact that the decision of 19 February 2006 was no delivered to defense counsel until mid-March 2006.

[83] CPA Doc. No. CPA/REG/16 May 2003/01.

[84] Ryan J. Leibl, "Rule of Law in Postwar Iraq: From Saddam Hussein to the American Soldiers involved in the Abu Ghraib Prison Scandal, What Law Governs Whose Actions?" 28(1) *Hamline Law Review* 92, 94 (2004).

[85] CPA Doc. No. CPA/REG/13 July 2003/06.

[86] Jean-Pierre Krief, "Saddam Hussein: The Trial," for Arte France and KS Visions (French and English) (2005).

[87] Human Rights Watch, *The Former Iraqi Government on Trial: A Human Rights Watch Briefing Paper* 3 (16 October 2005).

[88] AI Doc. No. MDE 14/007/2005 (13 May 2005).

[89] CPA Doc. No. CPA/ORD/9 Dec 2003/48.

[90] Doc. No. CPA/REG/13 July 2003/06.

[91] CPA Doc. No. CPA/ORD/9 Dec 2003/48.

[92] Doc. No. CPA/REG/16 May 2003/01.

[93] Bassouni, C.M., Post-Conflict Justice in Iraq: An Appraisal of the "Iraq Special Tribunal," 38 *Cornell International Law Journal* 327, 345 (2005).

[94] CPA Order 17 (entitled "Status of the Coalition Provisional Authority, MNF—Iraq, Certain Missions and Personnel in Iraq") (27 June 2004).

[95] Bassouni, C.M., Post-Conflict Justice in Iraq: An Appraisal of the "Iraq Special Tribunal," 38 *Cornell International Law Journal* 327, 346, fn 27(2005).

[96] *See* Will Dunham, "US Formally Declares Saddam Enemy Prisoner of War," *Reuters* (9 January 2004) *accessed at* http://www.commondreams.org/ and "U.S. Gives Saddam POW Status," *BBC News* (9 January 2004) *accessed at* http://news.bbc.co.uk/ ("A Pentagon spokesman said he was given the status as he was the leader of the "old regime's military forces").

[97] For example, on 20 May 2005 the Sun (UK) newspaper published photographs of Iraqi President Saddam Hussein claming to have received these photographs from the United States military.

[98] Associated Press, "Hussein Judge Target of Plot" (28 November 2005).

[99] Associated Press, "Chief Judge in Hussein trial steps down" (15 January 2006) and Borzou Daragahi and Saad Fakhrildeen, "The World; Allawi Flees Mob in Najaf, Says He Escaped Assassins; Officials dispute the ex-Iraqi leader's claim; the melee worsens strife between Shiite factions. Plot to attack site of the Hussein trial is reported," *Los Angeles Times*, Part A, p. 3 (5 December 2005) (stating that "one of the five trial judges has recused himself after a document surfaced linking a defendant to the killing of the jurist's brother, a court official said. An alternate judge was reportedly ready to step in").

[100] Hamza Hendawi, "Saddam Lashes out at U.S. as Trial Resumes," *Associated Press* (28 November 2005).

[101] Ahmed Rasheed, "Government tries to persuade Saddam judge not to quit," *Reuters* (15 January 2006).

[102] Middle East Online, "Rizkar Mohammed Amin left his position for good, Hameesh named as new chief Saddam judge, New Chief Judge will hold post temporarily until judges elect new permanent replacement," at www.middlie-east-online.com (First Published 2006-01-17, Last Updated 2006-01-17 09:50:54).

[103] BBC News (Middle East), "New Saddam judge 'should resign'," Wednesday, 18 January 2006 at 19:04 GMT.

[104] Hamza Hendawi and Qassim Abdul-Zahra, "Saddam trial plunges deeper into disarray," *Jordan Times* p. 1 (25 January 2006).

[105] *Id.* at para. 5

[106] Hamza Hendawi, "Saddam Trial Goes On Without Defendants," *Associated Press* (2 February 2006).

[107] AFP and Middle East Times, "Court to Rule this Week on Saddam–less Trial" (7 February 2006).

[108] KUNA, "Saddam trial judge dies of heart attack," KurdishMedia.com (10 February 2006).

[109] Louise Roug and Borzou Daragahi, "Baghdad Violence Upstages Saddam Trial Resumption," *LA Times* (17 April 2006).

[110] At one point Judge Abdel Rahman criticized one of the defense lawyers for "daring to wear a red tie in this courtroom." All the lawyers were required, and were wearing, the usual bar robes over their suits.

[111] The statements in this paragraph are based on defense counsel's notes and recollection as no transcript has ever been provided despite repeated requests by defense counsel and the fact that the there is extensive audio visual surveillance of the courtroom by the United States authorities who could easily produce a transcript. By contrast, transcripts are provided the same day at the International Criminal Tribunal for the Former Yugoslavia.

[112] On 19 February 2006, the President of the IST issued a decision saying that the application to disqualify Judge Abdel Rahman should have been made before the proceedings on the merits had begun on 19 October 2005. On 3 April 2006, an appeals panel of the IST upheld this decision. Neither of these decisions was communicated to defense counsel until late in March 2006. Neither decision was based on any decision by the trial chamber of the IST because that chamber had refused to determine its own competence. Moreover, it was, of course, impossible for defense counsel to make and application to remove Judge Abdel Rahman on 19 October 2005, as Judge Abdel Rahman did not join the court until February 2006. At the start of proceedings on the merits in October 2005 Judge Abdel-Rahman was not

known to the defense lawyers and was not even one of the judges trained by foreign experts to be a judge of the IST. The reasoning of the President and appellate body of the IST contained no reasoning as required by the right to fair trial under international human rights law. In addition, defense counsel were not allowed to make any oral representations and the most experienced lawyers on the defense team were not even provided a copy of the 19 February and 3 April 2006 decisions until June 2006.

[113] This supplementary motion was apparently not even considered by the IST as the decision on the 1 February 2006 motion was handed down 19 February 2006, the day before this supplementary motion was submitted.

[114] John F. Burns, "Lawyer's Slaying Raises Questions on Hussein Trial," Late Edition - Final, Section A, p. 1, Col. 1, *New York Times* (22 October 2005) (also reporting the *Al-Arabiya* interviews).

[115] *See, for example,* Associated Press, "A Second Lawyer in Saddam Trial Killed," on *NewsMax.com Wires* (9 November 2005).

[116] Solomon Moore, "Killings Linked to Shiite Hit Squads in Iraqi Police Force," *Los Angeles Times* (29 November 2005); Paul Garwood, "Iraqi Sunni party says govt-backed hit squads should be confronted after raid," *Associated Press* (24 January 2006); and Paul Martin, "Iraqi interior chief aims to end corruption, rights abuses," *Washington Times* (11 January 2006).

[117] Statement attributable to the Spokesman for the Secretary-General on Iraq issued by United Nations Headquarters in New York on 8 November 2005.

[118] *See, for example,* Ahmed Rasheed and Michael Georgy, "Saddam's lawyer pays price for principles," *Reuters* (21 June 2006).

[119] Adam Ereli, Deputy Spokesman for the United States Department of State, Daily Press Briefing, Washington, D.C. USA, June 21, 2006, 12:40 p.m. EDT.

[120] John F. Burns and Christine Hauser, "Third Lawyer in Hussein Trial Is Killed," *New York Times* (21 June 2006).

[121] Ahmed Rasheed, "Saddam's daughter and wife on wanted list," *Reuters*, Sunday, July 2, 2006.

[122] Bushra Juhi, "Saddam Trial Adjourns 'Til October Verdict," *Associated Press* (27 July 2006).

[123] The position of the defense lawyers stands in stark contrast to the prosecution which had more than two years to prepare and present a defense, eight of tens months allocated fro the trial to present their case in court, and more than 200 million dollars of foreign funds provided by the occupying powers.

[124] On 13 June 2006, Mr. William Wiley who claimed to act on behalf of the IST, told the defense lawyers that e had copies of the Dujail court papers, but refused to give them to the lawyers saying he would do so at later date. Until this time, the IST had claimed that these papers were not available.

[125] BBC, "Interview with Sir David Frost" (broadcast on *BBC Radio* on 20 June 2004).

[126] See the section below on the lack of independence of the IST.

[127] Record of Negotiations of the International Covenant of Civil and Political Rights, U.N. Doc. A/2929, Chap. VI, sec. 77.

[128] U.N.S.C. Res. 1511, U.N. SCOR, 58th Sess., 4844th mtg., U.N. Doc. S/RES/1511 (2003).

[129] Art. 9 of Iraqi Law No. (160) of 1979, Judicial Organization, *The Official Gazette*, No (27) 2 July 1980.

[130] 312 *UNTS* 221 (1950).

[131] 1144 *UNTS* 123 (1978).

[132] O.A.U. Doc. No. CAB/LEG/67/3 Rev. 5 (1986).

[133] Adopted by the 7th United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Milan, 26 August to 6 September 1985, U.N. Doc. A/CONF.121/22/Rev.1 at 59 (1985).

[134] Report of the Working Group on Arbitrary Detention, U.N. Doc E/CN.4/1996/40 at 26.

[135] *Castillo Petruzzi et al. v. Peru*, Ser. C, No. 52, Inter-American Court of Human Rights, para. 129 (30 May 1999).

[136] Hamza Hendawi, *Saddam Lashes out at U.S. as Trial Resumes, Associated Press* (28 November 2005).

[137] Ahmed Rasheed, "Government tries to persuade Saddam judge not to quit," *Reuters* (15 January 2006).

[138] Middle East Online, "Rizkar Mohammed Amin left his position for good, Hameesh named as new chief Saddam judge, New Chief Judge will hold post temporarily until judges elect new permanent replacement," at www.middlie-east-online.com (First Published 2006-01-17, Last Updated 2006-01-17 09:50:54).

[139] BBC News (Middle East), "New Saddam judge 'should resign'," reported on Wednesday, 18 January 2006 at 19:04 GMT.

[140] Interview with Jalal Talabani, *Radio Free Europe* (5 October 2005).

[141] "Saddam judge denies links with Baath party," *Reuters* (19 January 2006).

[142] Arab Times (Kuwait), "Execution of Saddam Soon," (6 July 2006).

[143] CNN, "Talabani: Saddam confesses to execution orders," reported on Tuesday, 6 September 2005 at 7:00 p.m. EDT (23:00 GMT).

[144] Francis Curta, "Saddam defense wants trial delayed," *AFP* (28 November 2005).

[145] Associated Press, "Iraqi Shi'ite cleric calls U.S., Britain and Israel a 'Triad of Evil'," (11 March 2006).

[146] Associated Press, "Hussein Judge Target of Plot" (28 November 2005).

[147] Thanassis Cambanis, "Flash of old Hussein Sets off Ripples," *Boston Globe* (29 November 2005).

[148] Patrick Cockburn,"Delay in Putting Saddam on Trial is 'damaging the country'," *The Independent* (8 September 2005).

[149] Adam Nichols, *Saddam Executioners Lining Up*, New York Daily News, Oct. 16, 2005.

[150] Online NewsHour on 30 June 2004 accessed at *www.pbs.org* (1 October 2005).

[151] Luke Baker, *Doubts and questions deepen as Saddam trial to resume, Reuters* (4 December 2005).

[152] Art. 5(c) of the Statute of the IST.

[153] Basic Principles of the Independence of the Judiciary, 7th UN Congress on the Prevention of Crime and the Treatment of Offenders, U.N. Doc. A/CONF.121/22/Rev.1 (1985); U.N. GAOR, 40th Sess., Supp. No. 38, U.N. Doc. A/40/146 (1985).

[154] Artt. 7(a) and 8(j) of the Statute of the IST.

[155] Art. 41 of the Law of Prosecutors, Law No. 159 (1979).

[156] Basic Law of Germany, art. 97(1) (official trans.) ("Judges shall be independent and subject only to the law"); Constitution of France art. 64 ("The President of the Republic shall be the guarantor of the independence of the judicial authority"); Constitution of Japan, art. 76(3) (official translation) ("All judges shall be independent in the exercise of their conscience and shall be bound only by this Constitution and the laws"); Constitution of the Russian Federation, art. 120 ("Judges shall be independent and subject only to the Constitution of the Russian Federation and federal law"); Constitution of China (1982), art. 126 ("exercise judicial power independently, in accordance with the provisions of the law").

[157] Art. 14 of the International Covenant of Civil and Political Rights, art. 84 of the Third Geneva Convention, art. 26 of the African Charter on Human and Peoples' Rights, art. 40 of the Rome Statute of the International Criminal Court, art. 6 of the European Convention for the Protection of Human Rights and Fundamental Freedoms, art. 8 of the American Convention on Human Rights, art. XVIII of the American Declaration on the Rights and Duties of Man.

[158] *Gonzáles del Rio v. Peru*, Communications to the UN Human Rights Committee No. 263/1987 (28 October 1992).

[159] *See, for example, Gregory v. United Kingdom*, European Court of Human Rights, 25 *EHHR* 577 (1997).

[160] This anecdote is related by Professor M. Cherif Bassiouni who is a person intimately familiar with the IST. *See* M. Cherif Bassiouni, "Post-Conflict Justice in Iraq: An Appraisal of the Iraq Special Tribunal," 38 *Cornell International Law Journal* 327, 371-372, fn. 346 (2005).

[161] United States Department of State, *Country Reports on Human Rights Practices for 1995*, 366, Washington, D.C., USA: U.S. Government Printing Office (April 1996).

[162] CPA Regulation No. 1, Doc. No. CPA/ORD/16 May 2003/01 (De-Ba'athification Order) and CPR Memorandum No. 1 on the Implementation of De-Ba'athification Order No. 1. *Also see* art. 33 of the Statute of the Tribunal that prohibits from being a judge any persons who was "a member of the Ba'ath Party.

[163] "Saddam Hussein: The Trial," a film by Jean-Pierre Krief for Arte France and KS Visions (2005).

[164] Film by Jean-Pierre Krief produced for Arte France and KS Visions and shown in France in 2005.

[165] BBC profile of Judge Raouf Abdel-Rahman at http://news.bbc.co.uk/2/hi/middle_east/4659836.stm (3 March 2006). Also reported in EIN News at http://www.einnews.com (1 March 2006 at 9:52 GMT); CBS News, "More Chaos At Saddam Trial," at http://www.cbsnews.com (29 January 2006).

[166] BBC profile of Judge Raouf Abdel-Rahman at http://news.bbc.co.uk/2/hi/middle_east/4659836.stm (3 March 2006).

[167] CBS News, "More Chaos at Saddam Trial," at http://www.cbsnews.com (29 January 2006).

[168] Kuwait Times, "Defense Team to Meet Saddam May End Trial," (27 January 2006).

[169] Mussab al-Khairalla, "Saddam and defense team boycott trial," accessed at http://www.int.iol.co.za story attributed to Reuters (1 February 2006 at 7:09 a.m.).

[170] Richard Boudreaux, "Iraqi Trial Adjourns at Impasse," *Los Angles Times* (3 February 2006) accessed at http://www.latimes.com (3 March 2006).

[171] This statement is reported on the Transitional Justice Forum at *tj-forum.org* by Christopher J. Le Mon at 12:02 on 7 February 2006.

[172] BBC News, "Iraq trial resumes without Saddam," published on 24 July 2006 at 15:30:12 GMT accessed at http://news.bbc.co.uk/go/pr/fr/-/1/hi/world/middle_east/5209018.stm (15 August 2006).

[173] Film by Jean-Pierre Krief produced for Arte France and KS Visions and shown in France in 2005.

[174] *Karttunen v. Finland*, Comm. No. 387/1989 (23 October 1992), UN Doc. A/48/40 (1993) at p. 120, para7.2.

[175] Comments made on 13 June 2006 after claiming to have submitted a motion to the special Court to have Mr. Wiley prevented from speaking to defense witnesses or defense lawyers.

[176] *Suarez-Rosero Case*, IACHR 8, para. 70 (12 November 1997). *Also see Annette Pagnoulle (on behalf of Abdoulaye Mazou) v. Cameroon*, ACHPR, Com. No. 39/90 (2000) (holding that administrative detention of two years without reason violated the defendant's human rights).

[177] *Civil Liberties Organisation, Legal Defense Centre, Legal Defense and Assistance Project vs. Nigeria*, African Comm. Hum. & Peoples' Rights, Comm. No. 218/98 (not dated), para. 31.

[178] *McVicar v United Kingdom* ECHR 46311/99 (2002).

[179] *See Ocalan v. Turkey, ECHR* 46221/99 at § 162 (2005).

[180] *Further Decision on Motion by Defense of Milan Martic For Access to Confidential Transcripts and Documents, Prosecutor v. Radoslav Brdanin*, IT-95-11-PT (26 May 2004).

[181] *Avocats Sans Frontieres (on behalf of Gaetan Bwampamye) v. Burundi*, ACPHR, Comm. No. 231/99 (2000).

[182] *Ocalan v. Turkey, ECHR* 46221/99 at §131 (2005).

[183] Article 19(Fourth)(B) of the new Statute of the IST and article 18(c) of the old Statute of the IST.

[184] Basic Principles on the Role of Lawyers, adopted 8th UN Congress on the Prevention of Crime and the Treatment of Offenders in Havana, Cuba from 27 August to 7 September 2006, U.N. Doc A/CONF/.144/28/Rev.1 at 118 (1990).

[185] Law No. 111 (1969), published in *Al-Waqai' Al-'Iraqiya*, No 2796 (26 September 1980).

[186] *See Prosecutor v. Dusko Tadiç, a.k.a. 'Dule', Decision on the Defense Motion for Interlocutory Appeal on Jurisdiction*, para. 141, ICTY Case No. IT-94-I (2 October 1995).

[187] *See, for example, Judgment of the International Military Tribunal at Nüremberg* (30 September and 1 October 1946) (stating in relevant part that "[t]o constitute crimes against humanity, the acts relied on … must have been in execution of, or in connection with, any crime within the jurisdiction of the Tribunal…). *See, for example*, Peter Calvocoressi, *Nuremberg—The Facts, the Law and the Consequences* 57-58 (1948).

[188] *Veeber v. Estonia*, (No. 2), Appl. No. 45771/99 at §31 (21 January 2003).

[189] *See* Cherif Bassiouni, "Post-Conflict Justice in Iraq: An Appraisal of the Iraq Special Tribunal," 38 *Cornell International Law Journal* 327, 373 (2005).

[190] *Allenet de Ribemont v. France, ECHR*, Ser. A, No. 308, at p. 16, para. 35 (10 February 1995).

[191] *Minnelli v. Switzerland, ECHR*, Appl. No. 8660/79 (1983).

[192] Film by Jean-Pierre Krief produced for Arte France and KS Visions and shown in France in 2005.

[193] *Id.*

[194] UNGA Res. 43/173 (9 December 1988).

[195] Statement by L. Paul Bremer in CPA Transcripts 23 April 2004, entitled "Bremer affirms: Iraq Turns the Page."

[196] Edwards Wong and John Burns, "Saddam Hussein Goes on Trial for Crimes Against Humanity," *New York Times* (19 October 2005) at http://johnfburns.blogspot.com/2005/10/saddam-hussein-goes-on-trial-for.html.

[197] *See* Neil A. Lewis and David Johnston, "The Struggle for Iraq: War Crimes; U.S. Team is Sent to Develop Case in Hussein Trial," *New York Times* p. 1 (7 March 2004).

[198] Nick Wadhams, "The Ex-Dictator: Hussein Unlikely to Be Tried Till 2006," *Associated Press* (13 December 2004).

[199] Alissa J. Rubin, "The Conflict in Iraq: Trials to Start for Heads of Former Iraqi Regime," *Los Angeles Times* (15 December 2004).

[200] Art. 59 of the Third Geneva Convention, *supra*, note 13.

[201] Email from Capt McCoy, Michael D (Baghdad) McCoyMD@state.gov entitled "Transportation and Housing Arrangements for Baghdad" (sent 1 December 2005 3:18 PM).

[202] *Commission Nationale des Droits de l'Homme et des Libertes vs. Chad*, African Comm. Hum. & Peoples' Rights, Comm. No. 74/92 (1992), § 22.

[203] IST Clerk Riza Hasan made this statement to defense counsel on 21 December 2005.

[204] *Öcalan v. Turkey*, Appl. No. 46221/99 (12 March 2003) at para. 88.

[205] *Id.*

[206] The Prosecutor called for the death penalty for President Saddam Hussein in the hearing on 10 July 2006.

[207] American President George W. Bush, the commander-and-chief of the army illegally occupying Iraq and the author of the war of aggression against the Iraqi people stated that "I think he ought to receive the ultimate penalty ... for what he has done to his people. I mean, he is a torturer, a murderer. They had rape rooms. This is a disgusting tyrant who deserves justice, the ultimate justice." U.S. President George Bush in an interview with ABC News' Diane Sawyer (16 December 2003).

[208] Interview with Jalal Talabani, *Radio Free Europe* (5 October 2005).

[209] Arab Times (Kuwait), "Execution of Saddam Soon," (6 July 2006).

[210] Judge Abdel-Rahman has never refuted the allegations made on "information and belief" and submitted by the defense lawyers to the IST on 20 February 2006 that alleged that on the Iraqi television station Al-Fayha he "called for imposing death penalty against President

Saddam Hussein claiming at a demonstration that took place in Halabja that there is no need for any trial to try Saddam for the crimes he committed against the Iraqi people."

[211] Report of the Special Rapporteur on the independence of judges and lawyers to the UN Commission on Human Rights (now Council on Human Rights), Professor Leandro Despouy, UN Doc. E/CN.4/2006/52 (23 January 2006) excerpt from page 17, paras. 56-58.

Declaration of Ramsey Clark

1.   My name is Ramsey Clark, I am a lawyer first admitted to practice in a United States

District Court in 1951, in the Supreme Court of the United States in 1956, in the District of

Columbia and the U.S. District Court and Court of Appeals for the District of Columbia in 1969.

I am presently admitted in these Courts and other state and federal courts and in good standing.

2.   I have actively participated in cases in state and federal courts since 1951.

3.   I served as a lawyer in the U.S. Department of Justice in positions of responsibility

from 1961 to 1969.

4.   I have participated in trials in the Courts of many countries on six continents and in

proceedings in international tribunals including the European Court of Human Rights, the Inter

American Commission and the Inter American Court for Human Rights, the International

Criminal Tribunal for the Former Yugoslavia, the International Criminal Tribunal for Rwanda and

lectured at the International Criminal Court.

5.   I first visited Iraq in 1986, returned in 1990 and each year thereafter to date except

2004.

6.   I spent two weeks in Iraq in February 1991, during the Gulf War travelling across and

up and down Iraq, from the Jordanian border, to Baghdad, south of Basra and north of Samarra,

observing civilian damages and casualties following which I wrote a book The Fire This Time,

U.S. War Crimes in the Gulf, Thunderhead Press, 1992, First Trade Paperback Edition, 1999,

republished with additional material in 2002.

7.   During the years 1992 to 2003 I travelled at least once a year to Iraq to observe and

1

report on the continuing effects of the bombing of civilian facilities, water distribution and
purification, electricity, transportation, telephone service, food production, storage, distribution
and processing in 1991 and the economic sanctions imposed by the U.N. Security Council on
August 6, 1990 and remaining in effect until 2003.  On each trip I visited hospitals, many of which
I visited in 1991, in all parts of the country and the government rationed food distribution centers
and local merchants shops where families received their bi-weekly rations, in order to evaluate the
effect of the sanctions and efforts of the Iraqi government to provide health care and food to the
people.  Hundreds of thousands of Iraqis, more than half children under five, the other
predominantly the elderly, pregnant women and nursing mothers and persons needing medication,
treatment fo diabetes, cancer, asthma, kidney failure and other critical health problems, as
reported by UNICEF, the U.N. Food and Agriculture Organization, World Food Program and
other agencies.  I participated in writing a number of reports on conditions in Iraq, including The
Children Are Dying, the Impact of Sanctions, 1996, 164 pp. featuring the U.N. Food and
Agriculture Organization's report of 1995 from which it was estimated more than 500,000
children had died as a direct result of the sanctions against Iraq between 1990 and 2005.  By these
activities I became familiar with Iraq, its people and their condition.

    8.  I left Iraq on February 26, 2003, three weeks before the U.S. attack having met with
Tariq Aziz and Saddam Hussein to persuade Saddam Hussein to agree to a lengthy interview for
CBS with Dan Rather in the hope that if Saddam Hussein was seen person to person on U.S. TV
in a substantive discussion of the crisis it might help avoid a U.S. attack.  The interview, nearly
two hours, took place and was shown extensively and repeatedly on CBS in the U.S. and around

the world through other TV outlets.

9.  When Tariq Aziz, suffering a feared heart attack, surrendered to the U.S. in May 2003, seeking medical help, I wrote the Secretary of Defense, among four, or five other U.S. officials, asking to meet with Tariq Aziz in order to assure protectionof his rights.  While some responses were more personal all confirmed the statement from the Acting General Counsel of the Department of Defense, dated June 20, 2003 replying for Secretary Rumsfeld:

> Please be assured that while Mr. Aziz remains under U.S. control, his care will be in accordance with applicable law.

See Ex. B-1.  I have never been permitted to meet with Tariq Aziz.

10.  When the arrest of Saddam Hussein by U.S. troops was announced by President Bush in December 2003, I wrote the Secretary of Defense among four, or five other U.S. officials asking to meet with Saddam Hussein in order to assure protection of his rights.  All responses confirmed the statement from the Deputy General Counsel(international Affairs) of the Department of Defense, dated March 19, 2004 replying for Secretary Rumsfeld:

> Please be assured that while **[Saddam Hussein]** remains under U.S. control, his care will be in accordance with applicable law.

See Ex. B-2.  Both letters state clearly that the subject was "under U.S. control," an undeniable fact that remains true to this date.  No defense lawyer met Saddam Hussein until more than a year after his arrest after extensive interrogation and the Iraqi equivalent of an arraignment at which he was not represented by counsel.

11.  The first meeting by a defense attorney, Khalil al Doleimi, with Saddam Hussein after his seizure by U.S. troops on December 13, 2003, took place in the heavily protected U.S. enclave which includes the Baghdad International Airport at a location called Camp Cropper on

3

December 16, 2004.  On being informed after that visit, that Saddam Hussein had asked for me to

serve on his defense trial team, I flew to Amman, Jordan, in late December 2004, met with

other lawyers being considered for the trial team and agreed to serve.  It was months before the

U.S. permitted me to meet and confer with Saddam Hussein who was held by the U.S. with all

other defendants in the Dujail case including Petitioner, in isolation, without telephone or other

access with the outside world.

     12.  I first met Saddam Hussein in October 1990.  The Ambassador of Iraq to the United

States in Washington, D.C., contacted me to say President Saddam Hussein invited me to meet

him in Baghdad as soon as possible to discuss the crisis arising from Iraq's invasion and

occupation of Kuwait.  I went to Baghdad and met him for about two hours during which he

explained he wanted to withdraw Iraqi forces from Kuwait peacefully, believed it would be

possible only through international intervention and sought help.  During the 1990's I met him

three or four times at his initiative and then in February 2003 as described in paragraph 8, above.

In all the meetings he had two translators or three translators.  Usually we met alone, but Tariq

Aziz was in the 2003 meeting.

     13.  Since 2004, I have met with Saddam Hussein many times.  All my meetings with

Saddam Hussein have taken place at Camp Cropper where he is held in the exclusive custody of

U.S. military personnel, or in the Court building used by the IST/IHCC in the International

(Green) Zone in central Baghdad where he is held in the exclusive custody of U.S. military

personnel.

     14.  Among many media and published reports of the exclusive U.S. military custody of

Saddam Hussein is an article in the magazine GQ for July 2005, pp. 120-125, 178-179 which

describes in grim detail his exclusive custody over a period from April 2004 to February 2005 by members of the Pennsylvania National Guard.  The first sentence of the article states "Sean O'Shea and four other members of the Pennsylvania National Guard spent ten months guarding one of the most highly valued detainees in history.  For the first time, they tell how they got to know Saddam Hussein as few others have."

15.  I have been present at many hearings in the Dujail trial from October 19, 2005 when the trial began until November 5, 2005 when the Court announced its judgment and sentenced seven defendants, three to death, without an opinion at that time.  I am familiar with the entire trial proceeding.

16.  Petitioner, Judge Bandar, has been present in the courtroom as a defendant in the Dujail trial, placed in an elevated platform with rails in front of the Judges and Court aides during trial sessions on all occasions, held in the exclusive custody of U.S. Military personnel with all other defendants.   His first attorney of choice was present on October 19, 2005 and was kidnapped, tortured and murdered the next night.  Petitioner's son Badir al Bandar first appeared in the trial as a counsel for his father in the next session in November 2005 and has been present at all subsequent sessions of the Court.

17.  From meetings over the past two years with lawyers serving as counsel of choice for all of the eight defendants in the Dujail case, including Petitioner,  I am informed that all counsel believe from their direct observation, statements of their clients and statements by U.S. military personnel, that their clients, including Petitioner, are held in the exclusive custody of the United States Military and are held by U.S. military personnel at Camp Cropper when they are not in the Court building where the IST/IHCC trial sessions are held within the international zone in

5

Baghdad.

18.   From meetings over the past two years with counsel of choice for all defendants in the Dujail case I am informed that all arrangements for all meetings by all counsel of choice with all defendants, including Petitioner, have been and must be made directly with U..S. military personnel and that for defense counsel who speak Arabic through their translators.  Every meeting I have had with Saddam Hussein has been made directly and exclusively withU.S. military personnel.

19.   From meetings over the past two years with counsel of choice for all defendants in the Dujail case, including Petitioner, I am informed that arrangements for all transportation from Baghdad International Airport, or from the International (Green) Zone to Camp Cropper must be made exclusively with U.S. military personnel and the transportation to the meeting place in Camp Cropper is always in vehicles in which the passengers cannot see outside the vehicles that are driven and guarded by U.S. military personnel.  This has been my personal experience on each occasion I have gone to Camp Cropper.

20.   From meetings over the past two years with counsel of choice for all defendants, including Petitioner, I am informed, as has been my experience, that arrangements for all transportation by counsel to the Court building used by the IST/IHCC in the International (Green) Zone must be made by U.S. military personnel with the transportation provided by and guarded by U.S. military personnel, other U.S. personnel and on occasion U.S. contractors, with armed escort.

21.  I have studied the history and text of the Iraqi Special Tribunal and the Iraqi High Criminal Court and prepared legal briefs challenging the legality and independence of the Court

6

and the impartiality of its judges that were presented to the Court and the appellate court

presently considering the appeal of the first trial in the IST/IHCC, the trial chamber in the Dujail

case, in which I was one of the attorneys for the defendant Saddam Hussein.  My opinion on these

issues and major facts and law supporting it are set forth in Exhibit A attached to the Petition.

     I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.  Signed on December 26, 2006.


_____
     Ramsey Clark



## DEPARTMENT OF DEFENSE
### OFFICE OF GENERAL COUNSEL
#### 1600 DEFENSE PENTAGON
#### WASHINGTON, DC 20301-1600

**JUN 2 0 2003**

The Honorable Ramsey Clark
Law Offices
36 East 12th Street
New York, New York 10003

Dear Mr. Clark:

This is in response to your letter to Secretary Rumsfeld requesting permission to meet with Mr. Tariq Aziz. I regret to inform you that such a meeting cannot be arranged.

Please be assured that while Mr. Aziz remains under U.S. control, his care will be in accordance with applicable law.

Sincerely,

Daniel J. Dell'Orto
Acting General Counsel





## DEPARTMENT OF DEFENSE
### OFFICE OF GENERAL COUNSEL
1600 DEFENSE PENTAGON
WASHINGTON, DC 20301-1600

March 19, 2004

The Honorable Ramsey Clark
Law Offices
36 East 12th Street
New York, NY 10003

Dear Mr. Clark:

Thank you for your letter to Secretary Rumsfeld concerning Saddam Hussein. You requested permission to meet with Saddam Hussein and that a copy of your letter be delivered to him. I regret to inform you that your requests cannot be accommodated.

Please be assured that while Saddam Hussein remains under U.S. control, his care will be in accordance with applicable law.

Sincerely,

*Charles A. Allen*

Charles A. Allen
Deputy General Counsel (International Affairs)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AWAD HAMED AL-BANDAR )
Detainee, Prisoner of War )
US Military Custody )
Baghdad, Iraq )
 )
Petitioner, )
v. )
GEORGE WALKER BUSH, )
President of the United States )
The White House )
1600 Pennsylvania Ave., N.W. )
Washington, D.C. 20500 )    CIVIL CASE NO. ___
 )
General John ABIZAID, )
Commander of CENTCOM, US Army )
United States Department of Defense )
The Pentagon )
Arlington, Virginia )
 )
General George Casey )
Commander of CENTCOM, US Army )
United States Department of Defense )
The Pentagon )
Arlington, Virginia )
 )
Major General Lloyd J. AUSTIN III )
Chief of Staff of Command of CENTCOM, US Army )
Commander of CENTCOM, US Army )
United States Department of Defense )
The Pentagon )
Arlington, Virginia )
 )
Respondents, )
 )
All sued in their official capacities. )
 )
 )

## DECLARATION OF DR. CURTIS F.J. DOEBBLER

I declare under penalty of perjury that the following is true and correct:

1.      My name is Curtis F.J. Doebbler and I am a legal representative for various persons before the Iraqi Special Tribunal, including Judge Awad Hamed al-Bandar.

2.      I am familiar with from practice before it and have studied the Iraqi Special Tribunal since its creation examining its history, its functioning, and its will and ability to ensure fair trials.

3.      I have traveled to Iraq several times, including about a half dozen times since January 2006 to appear before the Iraqi Special Tribunal. I last traveled to Iraqi in September 2006.

4.      I possess expertise in international human rights law as Visiting Professor of Law at An-Najah National University in Nablus, Palestine, and a member of the Bar of the District of Columbia (Bar No. 481243).

5.      I have published three books on international law and have a fourth book currently in production.

6.      I have been called to testify as an expert in international law before the courts of law in Ireland.

7.      I speak basic Arabic and have worked in the Middle East and the Arab speaking worked from more than a decade. I have become familiar with the Iraqi court system and the military situation in Iraq through frequent visits.

8.      I have met Petitioner Judge Awad Hamed al-Bandar several times while he is in custody of the United States between January 2006 and June 2006.

9.      I From my visits I have the knowledge that he is being held under the exclusive custody of the United States government's military forces in Iraq.

10.     To the best of my knowledge each time any of the defense lawyers visit any of the Petitioners, they are required to arrange them with the United States Forces in Iraq, first Captain Michael McCoy and then Captain Lawrence Lee. Furthermore, from the time I enter Iraq at the Baghdad airport until the time of my visit with my clients my movements are controlled exclusively by the United States military. And during my meetings with my clients, we are observed by United States military personnel who can both see and hear our conversations. At no time during this process are Iraqis involved in authorizing, allowing or facilitating my visits, except those Iraqis who may serve as translators to the American authorities.

11.     When I have been prevented from visiting our clients it has been by the United States government authorities that have refused us the right.

12.     I am aware of the following facts:

       a.      that four defense lawyers have been killed;

       b.      protection for all defense lawyers has been inadequate;

       c.      that the proceedings before the Iraqi Special Tribunal lack due process and any punishment imposed will therefore be cruel, inhumane and degrading,

       d.      that there has been significant political interference in the functioning of the Iraqi Special Tribunal, that among other consequences, has led to replacement of three different Chief Judges for what is widely perceive as political reasons;

e.    that the Chief Judge of the Iraqi Special Tribunal, Raul Rasheed Abdel

Rahman, has expressed clear bias against the defendants and prevented defense

counsel from being able to prepare and present a defense;

f.    that three United Nations Special Rapporteurs—namely the Special

Rapporteur on the Independence of Judge and Lawyers, the Special Rapporteur on

torture and other cruel, inhuman or degrading treatment or punishment, Special

Rapporteur on extrajudicial, summary or arbitrary executions, and the U.N.

Working Group on Arbitrary Detention—have found the proceedings to violate

the most basic standards of due process and therefore the right to a fair trial.

13.    To the best of my knowledge and from my study of the reports of international

human rights bodies, including United Nations mechanisms dealing with human rights in

Iraq as well as non-governmental organizations considering the proceedings, I have

learned that:

a.    violence is increasing in Iraq,

b.    torture by the government of Iraq is prevalent in Iraq,

c.    arbitrary, extrajudicial and summary executions are widespread and common place

in Iraq,

d.    the Iraqi government lacks the ability or will to prevent this violence and has been

frequently considered to contribute to the violence,

e.    the Iraqi Special Tribunal is widely believed to have been created as a consequence

of an illegal use of force and in violation of international humanitarian law and is

therefore illegal,

f.    the Iraqi Special Tribunal lacks either the will or the ability to ensure respect for due process, fair trial, and the rule of law.

14.    To the best of my knowledge and from my study of the reports of international human rights bodies, including United Nations mechanisms dealing with human rights in Iraq as well as non-governmental organizations considering the proceedings, I believe that it is likely that any person turned over to the Iraqi authorities, including the Iraqi Special Tribunal, will likely be subject to torture, cruel, inhumane or degrading treatment or punishment and may be summary executed after an unfair trial and without due process of law.

Executed: 24th day of December 2006

_____

Curtis F.J. Doebbler



IRAQ

# Judging Dujail
## The First Trial before the Iraqi High Tribunal

HUMAN
RIGHTS
WATCH



NOVEMBER 2006

VOLUME 18, NO. 9 (E)

# Judging Dujail
## The First Trial before the Iraqi High Tribunal

Glossary...................................................................................................... 1

I.    Introduction and Overview ...........................................................................2

II.   Background ................................................................................................ 8

III.  Administrative Concerns ...........................................................................12
      1.   Victims and Witnesses Protection ........................................... 14
      2.   Court Documentation ............................................................. 17
      3.   Security for Private Defense Counsel ......................................20
      4.   Outreach and Communications ...............................................24
      5.   IHT Defense Office...................................................................28

IV.   Procedural Concerns in the Conduct of the Trial .......................................... 36
      1.   Concerns Affecting the Independence and Impartiality of the
           IHT and the Presumption of Innocence .................................... 37
      2.   The Defendants' Right to be Informed of the Charges...............................44
      3.   Equality of Arms and the Defendants' Right to Adequate
           Time and Facilities to Prepare a Defense ................................48
           a.    Continuous late or same-day disclosure of incriminating
                 evidence and non-disclosure of some witness statements ............49
           b.    Non-disclosure of exculpatory evidence ........................................ 52
           c.    Non-disclosure of trial session notes and late disclosure of
                 defendants' statements made to the investigative judge...............53
           d.    Refusal to require information concerning chain of custody of
                 documentation and refusal to permit defense to nominate
                 own expert for document examination .........................................55

|   | e. | Ex parte scheduling of trial sessions and closing of the defense case ............................................................... 58 |
| 4. |   | The Defendants' Right to Confront and Examine Witnesses.................... 60 |
|   | a. | Reading of 29 witness statements into the court record................ 61 |
|   | b. | Constructive anonymity and blanket use of protective measures.................................................................... 62 |
| 5. |   | No Reasoned Written Decisions on Key Procedural Issues .................... 63 |
| 6. |   | Judicial Turnover and Judicial Demeanor................................... 64 |
|   | a. | Turnover of sitting judges................................................ 64 |
|   | b. | Lapses in judicial demeanor by the presiding judge ..................... 65 |
| 7. |   | Conduct of Defense Counsel ................................................ 69 |

**V.  Substantive Concerns** .............................................................. **73**

1.   Relevant Legal Principles.......................................................... 75

2.   Lack of 'Linkage' Evidence Relating to Knowledge and Intention ................................................................. 78

**VI.  The Role of International Advisors** ................................................. **84**

**VII.  Death Penalty** ...................................................................... **87**

**VIII. Conclusion**.......................................................................... **88**

**IX.  Recommendations** ................................................................... **90**

To the Iraqi Government ...................................................................90

To the Iraqi Parliament and the IHT.......................................................90

To the IHT....................................................................................91

**X.  Acknowledgments** ..................................................................... **93**

# Glossary

| | |
|---|---|
| Ba'th Party | The Ba'th Arab Socialist Party |
| CPA | Coalition Provisional Authority |
| ICTJ | International Center for Transitional Justice |
| ICTR | International Criminal Tribunal for Rwanda |
| ICTY | International Criminal Tribunal for the former Yugoslavia |
| IHT | Iraqi High Tribunal |
| IST | Iraqi Special Tribunal |
| NDBC | National De-Ba'thification Commission |
| RCLO | Regime Crimes Liaison Office (United States Embassy) |
| SCIRI | Supreme Council of the Islamic Revolution in Iraq (a Shi'a political party) |
| VWP | Victims and Witnesses Protection |

1

# I.    Introduction and Overview

On October 19, 2005, much of daily life in Iraq paused to watch an unprecedented event: the opening of the trial of former President Saddam Hussein, three other senior former government officials, and four lower-level Ba'th Party members,[1] all charged with crimes against humanity. The trial concerned events centered on Dujail, a town in Iraq's central Salahaddin governorate, between 1982 and 1985.

On July 8, 1982, there was an assassination attempt against then-President Saddam Hussein during a visit to Dujail. The prosecution at the trial of Saddam Hussein and his co-defendants claimed that, soon after the assassination attempt and in retaliation for it, Dujail was the object of a "widespread and systematic attack" in which nearly 800 men, women, and children were detained, of whom an unspecified number were tortured. After a year of detention in Baghdad, approximately 400 detainees were transferred to internal exile in a remote part of southern Iraq. Another 148 male detainees were referred to trial before the Revolutionary Court, are recorded as having been convicted and sentenced to death in 1984 after a summary trial (the number who actually stood trial is disputed[2]), and most of them were executed in 1985.[3] Large swathes of agricultural land and some homes in Dujail were confiscated by the government and bulldozed.

The Dujail trial was the first case brought before the Iraqi High Tribunal (IHT), the Iraqi court created to try persons responsible for grave human rights violations committed in Iraq between 1968 and 2003. Given the legacy of severe human rights

---

[1] The defendants in the Dujail case are: Saddam Hussein, former president of Iraq; Barzan al-Tikriti, head of the General Intelligence Directorate (*Mudiriyyat al-Mukhabarat al'Amma*) between 1979 and 1983; Taha Yassin Ramadan, former vice-president of Iraq; 'Awwad al-Bandar, chief judge of the Revolutionary Court between 1983 and 1990; 'Abdullah Kadhim Ruwayid Fandi al-Mashaikh, a farmer from Dujail and former Ba'th Party member; Mizher 'Abdullah Kadhim Ruwayid Fandi al-Mashaikh, a postal worker from Dujail and former Ba'th Party member (and son of 'Abdullah Kadhim); Muhammad 'Azzawi 'Ali al-Marsumi, a mechanic from Dujail and former Ba'th Party member; and 'Ali Dayeh 'Ali al-Zubaidi, a teacher and former Ba'th Party member from Dujail.

[2] See below, Section IV.6.b.

[3] Documents produced in court suggested that two persons listed for execution were mistakenly transferred to detention in southern Iraq, while another 10 listed for execution were not executed until 1989.

violations of the previous government,[4] the Dujail trial is likely to be one of several that eventually comes before the court. The scale of human rights violations in Iraq under the Ba'thist government was so serious that they reached the level of international crimes, such as genocide, crimes against humanity, and war crimes.

The significance of the trials before the IHT is difficult to overstate. For the first time since the post-Second World War Nuremberg trials, almost the entire senior leadership cadre of a long-lived repressive government faces trial for gross human rights violations committed during their tenure. At stake is not only justice for hundreds of thousands of victims, but, as at Nuremberg, the historical record itself. The trials represent the first opportunity to create a historical record concerning some of the worst cases of human rights violations, and to begin the process of a methodical accounting of the policies and decisions that gave rise to these events. Long shrouded in secrecy, the former government's "bureaucracy of repression"[5] could now potentially be examined in meticulous detail, evidence analyzed and tested, and individual criminal responsibility determined for human rights crimes.

In a political environment that has become even more intensely polarized since the Dujail trial commenced, the IHT must ensure that the legal and factual record it establishes through its proceedings and judgments is fair, credible, and withstands scrutiny. It should strive to make sure it is unimpeachable. Human Rights Watch believes that trials that meet international human rights standards of fairness will be more likely to ventilate and verify the historical facts at issue, contribute to the public recognition of the experiences of victims of different religious groups and ethnicities, and set a more stable foundation for democratic accountability after periods of conflict and/or repression.

The IHT as an institution has the heavy responsibility of being, up to now, the only mechanism for justice and accountability for these crimes in Iraq. But at the same

---

[4] See, for example, Middle East Watch (now Human Rights Watch/Middle East), *Genocide in Iraq: The Anfal Campaign Against the Kurds* (New York: Human Rights Watch, 1993); Middle East Watch, *Endless Torment: The 1991 Uprising in Iraq and its Aftermath* (New York: Human Rights Watch, 1992); Human Rights Watch/Middle East, *Iraq's Crime of Genocide: The Anfal Campaign Against the Kurds* (New Haven: Yale University Press, 1994); and Physicians for Human Rights, *Winds of Death: Iraq's Use of Poison Gas against Its Kurdish Population* (Boston: Physicians for Human Rights, 1989).

[5] Middle East Watch (now Human Rights Watch/Middle East), *Bureaucracy of Repression: The Iraqi Government in Its Own Words* (New York: Human Rights Watch, 1994).

time, the court is a newly created institution in a recently reconstituted legal system, in which lawyers and judges were previously isolated from developments in international criminal law and had no experience in investigating and trying complex international crimes. The United States-led Coalition Provisional Authority (CPA)[6] insisted on an "Iraqi-led" process,[7] and the US government strongly opposed an international tribunal or mixed Iraqi-international court under United Nations (UN) management, so significant international involvement in the creation of the court was largely foreclosed.[8] There was also a strong demand among many Iraqis for "Iraqi control" of any court.[9] The IHT Statute requires that the judges, prosecutors, and staff of the court, and the principal defense lawyer for the accused, be Iraqi nationals.[10]

Based on its long-standing commitment to ensuring justice and accountability for grave international crimes committed during the Ba'th Party's three-decade rule in Iraq, Human Rights Watch has closely followed the development of the IHT since before and through its creation in 2003 under a CPA order.[11] Human Rights Watch strongly urged over many years the investigation and prosecution of leaders of the now-deposed Ba'thist regime.

---

[6] The CPA was the occupying power in Iraq between April 2003 and June 30, 2004.

[7] See comments of then-US Ambassador-at-Large for War Crimes Pierre Prosper in April 2003, quoted in Peter Landesman, "Who vs. Saddam?" *New York Times*, July 11, 2004.

[8] See the background to the creation of the court, and the reasons for the lack of international participation, in Human Rights Watch, *The Former Iraqi Government on Trial: A Human Rights Watch Briefing Paper*, October 2005, http://hrw.org/backgrounder/mena/iraq1005/iraq1005.pdf, pp. 2–3.

[9] See International Center for Transitional Justice and Human Rights Center, University of California at Berkeley, *Iraqi Voices: Iraqi Attitudes Towards Transitional Justice and Social Reconstruction*, May 2004, http://www.hrcberkeley.org/download/Iraqi_voices.pdf (accessed October 20, 2006).

[10] Law of the Iraqi High Tribunal (IHT Statute), Official Gazette of the Republic of Iraq, No. 4006, October 18, 2005, English translation by the International Center for Transitional Justice, http://www.ictj.org/static/MENA/Iraq/iraq.statute.engtrans.pdf, art. 28 (judges, prosecutors, and staff), art. 19.4(B) (principal defense lawyer).

[11] See, for example, Human Rights Watch, *Justice for Iraq: A Human Rights Watch Policy Paper*, December 2002, http://www.hrw.org/backgrounder/mena/iraq1217bg.htm; *Iraq – The Mass Graves of Al-Mahawil: The Truth Uncovered*, vol. 15, no. 5(E), May 2003, http://www.hrw.org/reports/2003/iraq0503/; *Iraq: State of the Evidence*, vol. 16, no. 7(E), November 2004, http://www.hrw.org/reports/2004/iraq1104/; *Memorandum to the Iraqi Governing Council on 'The Statute of the Iraqi Special Tribunal,'* December 2003, http://www.hrw.org/backgrounder/mena/iraq121703.htm; *Briefing Paper: The Iraqi Special Tribunal – Rules of Procedure and Evidence Missing Key Protections*, April 2005, http://hrw.org/english/docs/2005/04/22/iraq10533.htm; and *The Former Iraqi Government on Trial*, October 2005.

The evolution of the IHT over the past three years has given rise to serious concerns about its capacity to fairly and effectively try these massive crimes in a manner that is consistent with international criminal law and fair trial standards.[12] Underlying many of the concerns was the reality that, at the time the court was created, Iraq "lack[ed] the professional and technical investigative and judicial expertise to [prosecute crimes against humanity and war crimes] on its own."[13] At the same time, US advisors to the court insisted that sufficient training and advice could make up for this lack of capacity. The first trial would thus be a critical test of the functioning of the court, and an opportunity to carefully and objectively evaluate the proceedings—both from the point of view of their procedural fairness, and in terms of whether the court and its personnel had developed sufficient expertise to competently investigate and try complex international crimes.

From the beginning of the Dujail trial, Human Rights Watch engaged in intensive monitoring of the proceedings before the first trial chamber of the IHT. Human Rights Watch and the International Center for Transitional Justice (ICTJ) were the only international human rights organizations to consistently observe the trial and investigate the functioning of the court. Working collaboratively, the monitoring presences fielded by the two organizations achieved almost complete coverage of all trial sessions.[14] In addition, Human Rights Watch conducted over three dozen interviews over the course of the trial with key actors in the tribunal, including prosecutors, judges, defense lawyers, and administrators. Human Rights Watch researchers also reviewed the dossier of evidence submitted by the investigative judge to the trial court, and examined the statements given by the defendants to the investigative judge. While much of the media and public attention on the trial concerned the behavior of key defendants such as Saddam Hussein, and the often-

---

[12] For further discussion of the development of the IHT, and Human Rights Watch's concerns about its statute, see Human Rights Watch, *The Former Iraqi Government on Trial.*

[13] US Department of State, *Quarterly Update to Congress: Section 2207 Report on Iraq Relief and Reconstruction* (January 2004), http://www.whitehouse.gov/omb/legislative/20040105-sec2207_main_report.pdf (accessed October 20, 2006), p. 43. The weaknesses of the post-conflict Iraqi legal system were also documented in the CPA's "Report of the Iraq Judicial Assessment Team," June 2003, and World Bank and United Nations Development Group, *Legal Needs Assessment Mission to Iraq,* August 2003.

[14] For Human Rights Watch, trial monitoring was conducted principally by a Middle East-based researcher, who was joined for part of the trial by a researcher from the Human Rights Watch office in New York. Human Rights Watch and ICTJ shared all information obtained through their respective trial monitoring presences, and often jointly conducted interviews with tribunal personnel and defense lawyers.

tumultuous courtroom proceedings, Human Rights Watch's focus was on the fairness of the proceedings and the capacity of the court to prosecute and adjudicate the crimes charged, in a manner consistent with international law.[35]

The picture that emerges from this research is of an institution struggling with all aspects of conducting these legally and factually complicated trials, and also beset by external problems: misunderstanding and hostility in public opinion and from political leaders; grave and increasing security threats to all participants; a bitterly divided legal profession; and a deepening reluctance by other international actors to assist the process. Cumulatively, these limitations have meant that, in the Dujail trial, the court has not met essential fair trial standards and that the credibility of the trial process is doubtful. Human Rights Watch has documented serious administrative, procedural, and substantive legal defects in the trial.

Taken together, these problems point strongly to the conclusion that the level of legal and practical expertise of the key Iraqi actors in the court—trial judges, administrators, prosecutors, and defense lawyers—is not sufficient to fairly and effectively try crimes of this magnitude. In addition, while non-Iraqi advisors provided by the US Embassy have been indispensable to the day-to-day functioning of the court, they have proved a poor substitute for the direct participation of international judges, counsel, and managers in the court. In the last instance, it appears that "advisors" can advise, but cannot actively participate to ensure that essential international standards are met.

In this report, Human Rights Watch sets out the principal concerns arising out of its observation of the Dujail trial and its research into the court. These concerns are divided into three categories: administrative difficulties that have significantly hampered the smooth functioning of the trial and also impacted on its fairness; procedural problems arising in the course of the trial; and substantive problems with the case presented by the prosecution and investigative judges, indicating a lack of

---

[35] Crimes such as genocide and crimes against humanity achieved recognition as crimes through international law; the legitimacy of trying them is thus inextricably linked to whether the trial meets international fair trial standards and correctly applies substantive international criminal law.

sufficient understanding of the elements of proof required to establish individual criminal responsibility under international criminal law.

Because of severe security threats to all persons involved in the court process, and the desire of interviewees to be able to speak candidly about their concerns, persons quoted in this report are not referred to by name, but according to their role (for example "judge," "Defense Office lawyer," etc.).

* * *

On August 21, 2006, the second trial before the IHT commenced. The trial concerns a series of large-scale attacks mounted by the Iraqi army against the Kurdish populations of northern Iraq during 1988 and known as the "Anfal" campaign. The campaign involved the repeated use of chemical weapons, and resulted in the deaths of between 50,000 and 100,000 Kurdish civilians. Saddam Hussein is a defendant in that trial also (charged with genocide, war crimes, and crimes against humanity), along with six others.[16] At this writing the trial is ongoing.

---

[16] The other defendants in the Anfal trial are Ali Hassan al-Majid al-Tikriti (charged with genocide, war crimes, and crimes against humanity), Tahir Tawfiq al-'Ani (charged with crimes against humanity), Sabr Abdul-Aziz al-Douri (charged with war crimes and crimes against humanity), Farhan Mutlak al-Juburi (charged with war crimes and crimes against humanity), Sultan Hashem Ahmed al-Ta'i(charged with war crimes and crimes against humanity), and Hussein Rashid al-Tikriti (charged with war crimes and crimes against humanity).

## II.    Background[17]

Between December 2003 and October 2005 the Iraqi High Tribunal was known as the Iraqi Special Tribunal (IST). The IST Statute was promulgated as an Order of the CPA on December 10, 2003.[18] In early August 2005 the IST Statute was revoked by Iraq's Transitional National Assembly, and replaced by an amended statute that renamed the Special Tribunal as the High Tribunal. The August enactment proved legally defective due to a failure to follow the proper legislative process,[19] and was therefore re-debated and re-enacted in September 2005. The new law, Law No. 10 of 2005,[20] was promulgated in the Official Gazette on October 18, only one day before the commencement of the Dujail trial.[21]

The IHT has jurisdiction over Iraqis, and non-Iraqis residing in Iraq, accused of committing genocide, crimes against humanity, and war crimes between July 1968 and May 2003.[22] The IHT Statute adopts the definitions of these crimes from the Rome Statute of the International Criminal Court. However, the IHT Statute also includes crimes from a 1958 Iraqi law that are of a breadth and vagueness that makes them susceptible to politicized interpretation and application, and therefore could be regarded as political offenses.[23] For example, the IHT Statute allows individuals to be

---

[17] This section draws on Human Rights Watch's previous analysis of the IHT in *The Former Iraqi Government on Trial.*

[18] *Coalition Provisional Authority Order Number 48: Delegation of Authority Regarding an Iraqi Tribunal,* CPA/ORD/9 Dec 2003/48 (2003) (IST Statute).

[19] Draft legislation should normally be referred by the relevant ministry or the Council of Ministers to the State Consultative Council (*Majlis Shura al-Dawla*) for review before being debated in parliament. In this instance, the Council of Ministers sent the draft statute to the State Consultative Council and the Transitional National Assembly simultaneously. Consequently, in August 2005 parliament debated and adopted a draft law that had not been reviewed by the State Consultative Council. When the error was discovered, the adopted law was sent to the State Consultative Council for review, then re-debated and re-enacted with further amendments in September 2005.

[20] The Rules of Procedure and Evidence were also revised at this time, and were promulgated as an annex to Law No. 10 of 2005 on the same day. Rules of Procedure and Gathering of Evidence With Regard to the Iraqi High Tribunal (IHT Rules of Procedure and Evidence), Official Gazette of the Republic of Iraq, No. 4006, October 18, 2005, English translation by the International Center for Transitional Justice, http://www.ictj.org/static/MENA/Iraq/IraqTribRules.eng.pdf.

[21] IHT Statute, Official Gazette of the Republic of Iraq, October 18, 2005.

[22] IHT Statute, art. 1(2).

[23] Ibid., art. 14. Two of the crimes listed in article 14 appear to have their origins in the military tribunal that was constituted to try leaders of the monarchical government after the 1958 revolution led by 'Abdel Karim Qassim. This tribunal, known as the Mahdawi Court, conducted overtly political trials more concerned with discrediting the monarchy than with establishing the

charged with "the wastage of natural resources and the squandering of public assets," and "the abuse of position and the pursuit of policies that may lead to the threat of war or the use of the armed forces of Iraq against an Arab country." These offenses are not defined, either in the IHT Statute or in the 1958 Law from which they are drawn.

Investigations and trials before the IHT are regulated primarily by the Iraqi Code of Criminal Procedure.[24] This is based on the civil law system of criminal procedure as used in countries such as France in the 1950s.[25] It concentrates powers of fact-finding and investigation in the hands of an investigative judge. The investigative judge plays the role of an inquisitor whose objective is to ascertain the truth,[26] and has broad powers to compel testimony, seek out experts, and collect and preserve evidence.[27] He or she must seek out both exculpatory and inculpatory evidence in order to assess whether there is sufficient evidence for trial. All evidence collected and testimony taken are compiled in a written dossier. During the investigative phase, the accused and the accused's lawyer can seek to be present while the investigative judge collects evidence and questions witnesses,[28] and may only question a witness through the investigative judge and with the latter's permission.[29] However, the investigative judge has an unfettered discretion to exclude the accused and his or her lawyer from investigative hearings.[30] The accused can submit comments on witnesses' testimony, to be included in the dossier.[31]

---

guilt or innocence of the accused. It is troubling that these offenses have been included in the substantive jurisdiction of the IHT.

[24] IHT Statute, art. 16. The principal law is the Code of Criminal Procedure, No. 23 of 1971, as amended.

[25] In 1993 and 2000, French criminal procedure law was amended in order to expand the rights of defendants, which were considered insufficiently protected under the earlier laws. See Stewart Field and Andrew West, "Dialogue and the Inquisitorial Tradition: French Defense Lawyers in the Pre-Trial Criminal Process," *Criminal Law Forum*, vol. 14, no. 3 (2003), pp. 261–316.

[26] Christoph J.M. Safferling, *Towards an International Criminal Procedure* (Oxford, UK: Oxford University Press, 2001), p. 217.

[27] Iraqi Code of Criminal Procedure, Law No. 23 of 1971, arts. 51-129.

[28] Ibid., art. 57.

[29] Ibid., art. 64.

[30] Ibid., art. 57. Under the IHT Statute, the accused is guaranteed the right for counsel to be present when the accused himself or herself is being questioned as part of the investigative process.

[31] Iraqi Code of Criminal Procedure, art. 63.

If the case is referred to trial, everything contained in the dossier constitutes evidence, and the trial court is entitled to treat all witness testimony in the investigative dossier as having been given at trial.[32]

The Rules of Procedure and Evidence (IHT Rules) provide that the IHT will establish a Defense Office, headed by a director and supported by the Administration of the IHT, to ensure adequate facilities for counsel in the preparation of defense cases.[33]

Each trial chamber of the IHT consists of five judges.[34] The conduct of a trial is controlled by the judges, who decide which witnesses shall be called and what questions are put to the witnesses and the defendant. Lawyers for the prosecution and the defense may address questions to witnesses only through the judges.[35] Proceedings at the trial stage can be expected generally to entail a review of the evidence contained in the dossier, followed by statements by the lawyers for the prosecution and defense. Where the judges are satisfied of the guilt of the defendant, they issue a verdict and sentence in a written opinion. Convictions may be appealed to the Appeals Chamber of the IHT, which is constituted by nine appeals judges including the president of the IHT.[36] A conviction and sentence may be reversed, revised, or set aside and the case sent back for re-trial.

The IHT applies the penalties that are available in Iraqi law.[37] Where the defendant is convicted of a crime that would also amount to murder or rape under domestic Iraqi law, the penalties for those offenses will apply.[38] The death penalty is widely prescribed in the Iraqi Penal Code, including for the murder of more than one

---

[32] Defense counsel in the Dujail case were not invited to participate in the investigative judge's taking of witness statements, and thus could not question or submit comments on witness testimony during the investigative phase. See Human Rights Watch, *The Former Iraqi Government on Trial*, p. 11, and also below, Section IV.4.a.

[33] IHT Rules of Procedure and Evidence, rule 30(3)(c).

[34] IHT Statute, art. 3(4)(B).

[35] Iraqi Code of Criminal Procedure, art. 168(B). Article 16 of the IHT Statute makes the Code of Criminal Procedure the governing procedure for the trials, supplemented by the Rules of Procedure and Evidence.

[36] IHT Statute, art. 3.4(A).

[37] Ibid., art. 24.

[38] Ibid., art. 24(4).

person.[39] Consequently, most offenses over which the IHT has jurisdiction may incur the death penalty.

The IST Statute as originally promulgated permitted the appointment of non-Iraqi judges with expertise in international criminal proceedings to the trial chamber. The amended version that is the IHT Statute provides that non-Iraqi judges may be appointed only if a foreign state is a party to proceedings before the IHT.[40] To date, no non-Iraqi judges have been appointed to any chamber of the IHT. Non-Iraqi lawyers with experience in international criminal law may be appointed, at the discretion of the court's president, as "advisors" to judges and prosecutors in order to provide "assistance in the field of international law" (the exact role of advisors, to whom they are accountable, and how they exercise an "assistance" function are unspecified, however).[41] Non-Iraqi defense lawyers are permitted to assist the principal lawyer, but non-Iraqis cannot register as representing the accused unless they present proof of accreditation with the legal professional association in their country, and are then approved by the Iraqi Ministry of Justice.[42]

Almost the only source of non-Iraqi advisors and assistance has thus far been the US Embassy's Regime Crimes Liaison Office (RCLO), established in March 2004 by the US Department of Justice and funded by the US Congress.[43] Non-Iraqi defense lawyers were privately retained in the Dujail trial by Saddam Hussein, Barzan al-Tikriti, and Taha Yassin Ramadan (see also Section III.5, below).

---

[39] Iraqi Penal Code, Law No. 111 of 1969, art. 406 (1). The CPA suspended the application of the death penalty by means of Order No. 7 of June 10, 2003, section 3(1): *CPA Order Number 7: Penal Code*, CPA/ORD/9 June 2003/07, http://www.iraqcoalition.org/regulations/20030610_CPAORD_7_Penal_Code.pdf (accessed November 3, 2006). The Iraqi Interim Government reintroduced capital punishment for a range of offenses by means of Order No. 3 of August 8, 2004. The offenses for which the death penalty was reintroduced include premeditated murder. All the defendants in the Dujail case were charged with murder as a crime against humanity.

[40] IHT Statute, art. 3(5).

[41] Ibid., arts. 7(2), 8(9), 9(7).

[42] Ibid., art. 19(4)(D).

[43] See the discussion in Human Rights Watch, *The Former Iraqi Government on Trial*, pp. 17–18. Further discussion of the role of the RCLO is found below, in Section VI. According to the Foreign and Commonwealth Office website, the United Kingdom has provided 1.2 million UK pounds in training-related assistance to the IHT (this is less than 2 percent of the amount contributed to the IHT by the United States, which allocated US 128 million dollars to supporting the IHT between 2003 and 2006). See http://www.fco.gov.uk/servlet/Front?pagename=OpenMarket/Xcelerate/ShowPage&c=Page&cid=1024313967149 (accessed September 22, 2006). As discussed further below, two non-RCLO international advisors have been appointed, one to the first trial chamber shortly before the opening of the Dujail trial, and the second to the Defense Office in late April 2006, six months after the commencement of the Dujail trial.

## III.  Administrative Concerns

Competent administration is essential for any court to run effectively, but in the case of courts adjudicating multi-defendant trials concerning large-scale crimes, court administration is the fulcrum on which the trial pivots. For example, the administrative organ of the ad hoc international criminal tribunals for the former Yugoslavia and for Rwanda (ICTY, ICTR), usually known as the Registry, is independent of the judiciary and prosecution, and undertakes multifaceted tasks indispensable to both the efficiency and fairness of the trials. These tasks include servicing the judiciary's administrative and personnel needs, managing vast amounts of documentation, liaising between prosecution and defense, ensuring defense access to clients, supervising witness protection, supervising conditions of the accused's detention, and managing outreach and communications for the court.

Prior to its amendment in September 2005, the IHT (then-IST) Statute provided for an Administrative Department, [44] headed by an administrative director. [45] In its original form, the department was charged with addressing the administrative needs of judges and prosecutors, but not defense lawyers, and in addition was responsible for Victims and Witnesses Protection (VWP), detention conditions of the accused, communication with parties, [46] outreach and communications, [47] and the creation of the Defense Office. [48] In the 2005 revisions of the IHT Statute, the appointment of the administrative director and tribunal spokesperson was brought under the control of the president of the IHT, making the president ultimately responsible for the overall administration of the court. [49]

The first administrative director was Salem Chalabi, who assumed a prominent role in the drafting of the IST Statute up to December 2003, and in nominating judges and

---

[44] IST Statute (revoked), art. 3(c).

[45] Ibid., art. 9(a).

[46] IHT Rules of Procedure and Evidence, rules 13–15.

[47] IST Statute (revoked), art. 9(e).

[48] IHT Rules of Procedure and Evidence, rule 30.

[49] IHT Statute, art. 7(1).

other key personnel during the court's start-up phase in mid-2004. However, Chalabi was dismissed as administrative director in September 2004,[50] and his dismissal was followed by efforts to have "Chalabi loyalists" removed from the IST and replaced by personnel selected by officials in the government headed by then-interim Prime Minister Ayad Allawi. In the subsequent months the position of administrative director was filled by two other IST personnel on a temporary basis, during which time the administrative affairs of the court fell into disarray.[51] In September 2005 an Iraqi-American was nominated as administrative director, but his nomination was not accepted by the IST president, and a judge of the Appeals Chamber assumed the role temporarily. The 2005 amendments to the court's statute, which took effect in October and concentrated administrative powers in the hands of the IHT's president,[52] meant that the position of administrative director was effectively downgraded. As far as Human Rights Watch has been able to determine, the position has not been permanently filled since, and its functions were disaggregated and exercised by different officials within the court on an as-needed basis.

Although the IHT Rules continued to stipulate that the Administrative Department was responsible for VWP, detention conditions, communication with the parties,[53] and the creation of a Defense Office, in practice these essential functions have been taken over by other officials within the IHT. VWP is managed by the chief investigative judge,[54] who also functions as the court's spokesperson and media liaison. The defendants in all cases before the IHT are detained by the US military, and thus the US military is responsible for their detention conditions. At the court, it is unclear who is responsible for the court's supervision of the defendants' detention.

---

[50] Nancy Youssef, "Salem Chalabi Reportedly Removed from Post Overseeing Saddam Trial", *Knight Ridder News Service*, September 8, 2004. Charges were brought against Chalabi in an unrelated criminal case and referred to the Central Criminal Court of Iraq.

[51] John Burns, "Hussein Tribunal Shaken by Chalabi's Bid to Replace Staff," *New York Times*, July 20, 2005; John Burns, "Ignoring U.S., Chalabi Pursues Attempt to Fire Hussein Judge," *New York Times*, July 27, 2005; Edward Wong, "Iraqi Leader Vows to Block Purges on Hussein Tribunal," *New York Times*, July 29, 2005; Kathleen Ridolfo, "Iraq: Debaathification Commission Backs Away from Tribunal Purge," Agence France-Presse, July 29, 2005.

[52] IHT Statute, art. 7(1)(D).

[53] IHT Rules of Procedure and Evidence, rules 13–15.

[54] Human Rights Watch interview with chief investigative judge, Baghdad, February 2006; Human Rights Watch interview with non-Iraqi diplomatic official observing the court, Baghdad, November 2005.

The lack of administrative direction in the management of the IHT was a common theme among court personnel and lawyers interviewed by Human Rights Watch. Court administrative staff themselves complained that they received no training or instruction in administrative procedures relevant to trials of this kind,[55] while several judges asserted that the administration of the documentation and records of court proceedings was so poor that they could not easily determine what motions and documents had been received.[56] Judges also consistently stated that the then-president of the court was unresponsive to proposals to improve aspects of court administration.[57] As one judge commented,

> It pains me to say this, but there is a lack of discipline in the administration of the court. The president is aged—he has my respect, I like him and he is a humane person, but ... [he] is a judge, not an administrator.[58]

Overarching administrative problems have had a serious impact on the functionality of the court, and its capacity to perform tasks essential for a fair and effective trial, including witness protection, document management, security arrangements, the Defense Office, and outreach and communications.

## 1. Victims and Witnesses Protection

Witnesses (who may also be direct victims) in trials for genocide, war crimes, or crimes against humanity face serious risks. They may confront direct threats to the safety of their families and themselves—before or after testifying in court—and may also be in need of ongoing psychosocial support in the aftermath of testifying about deeply traumatic events. In circumstances where a conflict is ongoing, such as Iraq, the risks to all witnesses, whether for the prosecution or the defense, can be expected to be very grave, and a comprehensive program of protection and support is thus indispensable to ensuring both an effective prosecution and an effective

---

[55] Human Rights Watch interview with court administrative staff, Baghdad, March 2006.

[56] Human Rights Watch interviews with IHT judges, Baghdad, November 2005, February 2006 and March 2006.

[57] Human Rights Watch interviews with IHT judges, Baghdad, February and March 2006.

[58] Human Rights Watch interview with IHT judge, Baghdad, March 2006.

defense. At minimum, a witness protection program in such circumstances would be expected to include pre-trial and post-trial risk assessments for each witness; in-court protective measures (based on the risk assessment and duly authorized by the court on a witness-by-witness basis);[59] safe transportation to and from the court and safe accommodation during court attendance; post-trial follow up and threat monitoring; and relocation arrangements, including international relocation agreements, for the most at-risk witnesses.[60]

The IHT Rules envisage the creation of a "Victims and Witnesses Unit."[61] However, concrete planning for the operationalization of such a unit does not appear to have commenced in earnest before July-August 2005, when a consultant expert in witness protection was funded by the United Kingdom (UK) Foreign and Commonwealth Office to develop a plan for the court. The consultant's report was submitted to the court in September 2005, but in interviews with Human Rights Watch in November 2005, non-Iraqi diplomatic personnel familiar with the court's workings stated that the Victims and Witnesses Unit existed only on paper.[62] Another diplomat familiar with the issue stated that there were "100 witness protection staff on the books, but they don't do anything."[63] Instead of someone with direct experience in creating and managing a victims and witnesses protection program being appointed to lead the unit, the chief investigative judge assumed responsibility for the program, in addition to his judicial duties and his role as the court's spokesperson.

In practice, the RCLO and the US military assumed complete responsibility for the safe transport of witnesses to and from the courtroom, and for accommodating them in Baghdad's International Zone during their time at the court. Defense witnesses within Iraq but outside Baghdad who wanted to testify were transported by helicopter from the US Forward Operating Base (FOB) nearest their home town, and

---

[59] For concerns about the court's approach to in-court protective measures see below, Section IV.4.b.

[60] See, for example, discussion in Eric Stover, *The Witnesses: War Crimes and the Promise of Justice in The Hague* (Philadelphia: University of Pennsylvania Press, 2005), pp. 41–43. See also Human Rights Watch, *Justice in Motion: The Trial Phase of the Special Court for Sierra Leone*, vol. 17, no. 14(A), October 2005, http://hrw.org/reports/2005/sierraleone1105/, pp. 20-27.

[61] IHT Rules of Procedure and Evidence, rule 15.

[62] Human Rights Watch interview with non-Iraqi diplomatic personnel, Baghdad, November 2005.

[63] Human Rights Watch interview with non-Iraqi diplomatic personnel, Baghdad, November 2005.

were returned there after the completion of their testimony (it was incumbent upon the defense lawyer seeking to have the witness come forward to arrange for the witness to report to the FOB at an arranged time, in order to be transported to the International Zone). A number of witnesses for Saddam Hussein were first relocated out of Iraq, because the defense lawyers insisted that this was the only way to ensure the witnesses' safety.[64] When they were due to testify, the witnesses were flown back into Baghdad International Airport, and the RCLO provided secure transportation between the airport and the International Zone.

No systematic post-testimony mechanism of threat assessment or individual protection was available for either prosecution or defense witnesses. However, the town of Dujail did benefit during trial days from some additional deployments of Iraqi military personnel and increased vigilance by US military forces stationed nearby.

The RCLO also assumed responsibility for arrangements to relocate the most seriously at-risk witnesses. But no coherent and integrated program was operational by the beginning of the Dujail trial, and relocation arrangements appear to be largely ad hoc and dependent on the RCLO.

According to a Dujail-based witness ("Witness A") who testified before the court in the Dujail trial,[65] prosecution witnesses and complainants[66] were frightened to attend the first session of the trial on October 19, 2005, because no arrangements for their protection had been made, and threats had been received from the families of certain defendants. In early February 2006, lawyers for the victims complained in court that witnesses and complainants had received kidnap threats, and asked the court to "activate" its witness protection mechanisms.[67] According to Witness A, no risk

---

[64] Human Rights Watch interview with private defense lawyers, Amman, September 2006; Human Rights Watch interview with RCLO representatives, Baghdad, October 2006. The defense lawyers claimed that there was an agreement with the RCLO that the costs of transporting the witnesses for Saddam Hussein out of Iraq and accommodating them in a neighboring country would be reimbursed by the RCLO to the defense lawyers, and that the RCLO reneged on this agreement. The RCLO confirmed that they were willing to meet some costs, but that the defense lawyers concerned demanded a lump-sum of cash up front. This was unacceptable to the RCLO, particularly without guaranteed proper accounting of expenditures, and no reimbursement agreement was ultimately reached.

[65] Human Rights Watch interview with Witness A, March 2006.

[66] Under Iraqi law, a complainant is someone who alleges that they suffered injury as a result of the crime, and who has a right to file suit for compensation with the criminal court trying the case. Iraqi Code of Criminal Procedure, arts. 9, 25.

[67] Human Rights Watch–ICTJ trial observation notes, February 13, 2006.

assessments were undertaken for him or his family, and he arranged his own protection for his family (who remained in Dujail when he traveled to Baghdad to testify) through "local groups." After completing his testimony, Witness A was offered the option of relocating to the Kurdistan region, but he chose to return to Dujail in the belief that the court's witness protection program was now activated. However, sectarian conflict and threats intensified in Dujail, and Witness A returned to Baghdad on his own initiative to seek help. With the assistance of a Cabinet advisor, the witness was able to move into the International Zone and his family traveled to join him there. Witness A was subsequently contacted by an RCLO official, who offered to make arrangements for international relocation for Witness A and his family.

These arrangements were the result of the witness's own initiatives and the intercession of an Iraqi government advisor. They were not the product of a coordinated response by the Victims and Witnesses Unit. Witness A stated,

> The government is weak. The witnesses cannot leave Dujail. They protect themselves. They cannot go to Baghdad without being killed ... There is no counseling or support for female witnesses. I don't think the court takes witness protection seriously. I am confused.[68]

## 2. Court Documentation

Based both on in-court observation and on interviews with key actors in the trial process, it became evident that during the Dujail trial the court encountered significant difficulties in the management of trial-related documents. These difficulties were concentrated along two axes: private defense lawyers' problems in receipt and transmission of documents, and problems with the internal management of documents received by the court, such as motions and powers of attorney.

In pre-trial interviews with privately retained defense lawyers (including lawyers representing accused who were not defendants in the Dujail trial), Human Rights Watch received consistent complaints that the court failed to process powers of attorney submitted by defense lawyers, and was unresponsive to written

---

[68] Human Rights Watch interview with Witness A, March 2006.

communications.[69] A court official denied this claim, and attributed problems in certifying powers of attorney to a lack of due diligence on the part of defense lawyers. However, it was apparent during trial proceedings that the court regularly could not find powers of attorney that defense lawyers claimed to have submitted, and the court lacked a system for verifying and tracking the receipt of documents.[70]

The same problem arose in relation to motions claimed to have been submitted to the court,[71] and more than one judge admitted that he was unable to determine exactly how many motions had been submitted.[72] Court officials contradicted each other about whether a comprehensive list of submitted motions was maintained by the court, and despite repeated requests by Human Rights Watch to inspect such a list one was never made available. While Human Rights Watch was unable to substantiate each claim of document mishandling, it became clear in the course of observing proceedings that the only way for a lawyer to ensure that a legal document reached the trial judges was to submit it in person during a court session.

Private defense lawyers complained that part of the problem of submitting documents to the court, outside of court sessions, was that the court's administrative offices within the International Zone were difficult and very time-consuming to access.[73] These lawyers also expressed reservations about the security risk posed by regularly entering

---

[69] See Human Rights Watch, *The Former Iraqi Government on Trial*, p. 12. Human Rights Watch interview with private defense lawyer for a non-Dujail accused, October 2005.

[70] Human Rights Watch–ICTJ trial observation notes, October 19 and December 5, 2005; April 19 and July 11, 2006.

[71] For example, on April 19, 2005, lawyers for the victims asked about a motion they had submitted to the court, and the court could find no record of it. Human Rights Watch–ICTJ trial observation notes, April 19, 2006.

[72] Human Rights Watch interviews with IHT judges Baghdad, February and March 2006.

[73] Because the renovation of the building housing the courtroom is ongoing, the court's administrative offices (for prosecutors, investigative judges, trial judges, and appeal judges) have been provisionally located on one floor of a multi-storey building in the heart of the International Zone (this office building also accommodates numerous other Iraqi government agencies, such as the National De-Ba'thification Commission). Privately retained defense lawyers are not provided with badges that would allow them direct access to the building. Instead, they must place a phone call 24 to 48 hours ahead of the desired visit, and arrange to have their names listed at the entrance to the building. On the day they seek to visit, the lawyers must enter the International Zone on foot through the pedestrian checkpoint ("Checkpoint 3") and then traverse two other checkpoints over approximately 500 meters, before reaching the court administrative building. Once they arrive at the building, there is no guarantee that their names have in fact been communicated to the security desk at the entrance. If the name has not, the lawyer will be unable to enter; if the name is at the entrance, the lawyer may still have to wait for an hour or more before gaining access to the building. Once they enter the building, they are not permitted to go beyond the lobby area, and must wait for a court employee to meet them to either hand over documents or receive them. Private defense lawyers indicated that because the process is both time-consuming and fraught with uncertainty they rarely try to gain access to the administrative offices of the court.

and exiting the International Zone on foot.[74] The court did not provide badges that could have facilitated private defense lawyers' entry into the International Zone.

Among court officials there was confusion about how a private defense lawyer could effectively submit documents to the court if unable to reach the court offices. Some officials claimed that there was an arrangement with the Iraqi Bar Association, whereby lawyers could submit documents to the Bar Association and the court would send an employee to collect them;[75] private defense lawyers expressed support for this as an idea, but claimed that the procedure was not in fact in place, and documents were only collected from the Bar Association on an irregular basis.[76] By contrast, a trial judge firmly denied that any documents were received, or could be submitted, through the Bar Association.[77] Email submission of documents to the court was possible, and the court did receive motions from defense lawyers by email.[78] However, the court never instituted a practice of acknowledging the receipt of documents via email, leaving defense lawyers uncertain as to whether the documents had been received by the court.[79] As of March 2006 no standard protocol or procedure governing the modalities of submitting documents to the court had been established, and no court official had been appointed to liaise with private defense lawyers concerning the transmission of documents. Human Rights Watch has not been able to establish whether this situation has since changed.

The dossier of evidence in the Dujail case—containing witness statements and documentation collected by the investigative judge—was made available to defense counsel on August 10, 2005. On the first trial day, defense counsel complained that large portions of the dossier were illegible.[80] Human Rights Watch reviewed copies of

---

[74] Human Rights Watch's experience was that entry via Checkpoint 3 was possible if the entrant had two forms of legible photo identification. However, what amounted to acceptable identification could vary, and thus entrants can occasionally be refused. The pedestrian checkpoint has also been the subject of several suicide attacks in the past 12 months.

[75] Human Rights Watch interview with IHT judge, Baghdad, March 2006; and Human Rights Watch interview with prosecutor, Baghdad, February 2006.

[76] Human Rights Watch interview with private defense lawyers, Baghdad, March 2006.

[77] Human Rights Watch interview with IHT judge, Baghdad, March 2006.

[78] Human Rights Watch interview with IHT judge, Baghdad, February 2006.

[79] Human Rights Watch interview with private defense lawyer, New York, April 2006.

[80] Human Rights Watch–ICTJ trial observation notes, October 19, 2005.

the dossier disclosed on August 10, 2005, and found approximately 30 percent of its pages to be unreadable.[81] The dossier was also poorly assembled and organized, with inconsistent pagination and some documents presented out of sequence or with missing pages. The dossier contained multiple copies of the same documents for no apparent reason, as well as documents that had no apparent connection with the Dujail case. Given that the dossier constitutes the principal basis for the conduct of the case, and for a defendant to understand the case against him, such haphazard collation of the material is problematic. As far as Human Rights Watch can determine, some defense counsel received more legible copies by late November 2005.

### 3. Security for Private Defense Counsel

Since the creation of the IHT (then-IST) in December 2003, the security situation in Iraq has declined steadily, with a dramatic deterioration from late 2004. In such an environment, and with trials concerning individuals and events that provoke very powerful emotions and polarized political views, all persons involved with the trials are at grave risk. At least five persons working for the court, including an investigative judge and the chief of security, were killed before the opening of the Dujail trial.[82] Over the course of 2005, apartments inside the International Zone were renovated for use by prosecutors and judges, and as an interim measure some judges and prosecutors, and their families, were provided temporary hotel accommodation inside the International Zone. The RCLO played the primary role in devising security arrangements for court personnel, and for securing the court building in the start-up phase of the court.

However, a similar level of advanced planning for the security of defense counsel does not appear to have been undertaken. The ability of defense counsel to vigorously represent their clients without fear of reprisal or retaliation is essential for a fair trial. In Iraq's deteriorating security environment, the high level of risk to defense counsel for senior figures of the former regime such as Saddam Hussein, 'Awwad al-Bandar, Taha Yassin Ramadan, and Barzan al-Tikriti, was foreseeable.

---

[81] The original dossier contained approximately 900 pages. It was supplemented by further material disclosed by the prosecutor in late January and early March 2006. For concerns about the practice of disclosure during the trial see below, Section IV.3.a–c.

[82] Human Rights Watch interview with IHT judge, Baghdad, October 2005.

Whereas from among the prosecutors and the five-member bench only the faces of the chief prosecutor and the presiding judge were broadcast on the first day of the Dujail trial, the faces of all defense lawyers were visible. Defense lawyers stated that they gave their permission to be televised, but that they were consulted only a few minutes before the trial opened.[83] The following day (October 20, 2005), Sa'doun al-Janabi, lawyer for defendant 'Awwad al-Bandar, was kidnapped from his offices and murdered. Three weeks later, Adel al-Zubeidi and Thamer al-Khuza'i, defense counsel for defendants Taha Yassin Ramadan and Barzan al-Tikriti, were attacked by gunmen. Al-Zubeidi was killed, and al-Khuza'i was injured and fled Iraq. On June 21, 2006, Khamis al-Obeidi, defense counsel for Saddam Hussein, was abducted from his home in Baghdad and shot dead.

Up until the assassination of al-Janabi, neither the court administration nor the RCLO appears to have developed specific proposals to ensure the security of defense counsel. Defense Office lawyers, who are retained by the court, also complained that no security measures for them were planned or implemented before the beginning of the trial.[84] After al-Janabi's killing, a representative of the RCLO contacted private defense lawyers in the Dujail case and offered to relocate them and their families into the International Zone.[85] As an alternative, the Iraqi government offered security guards from the Ministry of Interior.

The private defense lawyers rejected security guards provided by the Interior Ministry, as they regarded it as hostile to them and their clients.[86] They also rejected the offer

---

[83] Human Rights Watch interview with private defense lawyer, Baghdad, October 2005.

[84] Human Rights Watch interview with Defense Office lawyers, Baghdad, November 2005. See Section III.5, below, for further discussion concerning the Defense Office.

[85] Human Rights Watch interviews with private defense lawyers, Baghdad, October–November 2005. According to representatives of the RCLO, the RCLO was able to secure one apartment in the International Zone in November 2005 that could have been made immediately available. Human Rights Watch interview with RCLO representatives Baghdad, July 2006. Under the security conditions prevailing in Iraq, the RCLO was unable to safeguard defense lawyers living outside the International Zone, and they made this clear to the defense lawyers when the latter made their choices.

[86] The killings of al-Janabi and al-Zubeidi came at a time when militia activity was intensifying in Baghdad, and there were persistent rumors that "death squads" and secret detention facilities were being operated by the Ministry of Interior. The Ministry of Interior was frequently alleged to be dominated by the paramilitary forces of the Shi'a political party the Supreme Council of Islamic Revolution in Iraq (SCIRI). Subsequently, the Ministry of Interior was indeed found to be operating secret detention facilities, and there were continued reports of death squads operating from among the police force and the ministry. See, for example, "Widespread abuse of Iraqi prisoners and detainees by Iraqi police and commandos," in "All Things Considered," National Public Radio, July 12, 2005, 8:00 PM EST; John F. Burns, "If It's Civil War, Do We Know It?" *New York Times*, July 24, 2005; Peter Beaumont, "Revealed: Grim world of new Iraqi torture camps," *Observer* (London), July 3, 2005; Edward Wong and John F. Burns, "Iraqi Rift Grows As Secret Prison Enrages Sunnis," *New York Times*, November 17, 2005;

to relocate into the International Zone on the grounds that living there—the heart of the US presence in Iraq and the seat of the new government—compromised their perceived independence and their ability to defend their clients. For those lawyers who maintained a legal practice in Baghdad's ordinary courts, International Zone relocation also implied restrictions on their ability to continue their other legal work and an added risk of having to regularly enter and exit the International Zone. Defense lawyers further noted that, insofar as they feared violence from persons associated with the new government (such as Interior Ministry forces), living in the International Zone would not necessarily afford protection.[87]

After the November 2005 killing of al-Zubeidi, defense lawyers negotiated an arrangement with the Iraqi government and US advisors to the court under which defense lawyers would be provided weapons licenses to carry a sidearm themselves, and the Iraqi government would pay the salaries for three armed guards for each defense lawyer. The armed guards would be nominated by each defense lawyer and approved by the Ministry of Interior. However, in interviews with Human Rights Watch over several months, defense lawyers consistently complained that the salaries for the three armed guards were never provided by the Iraqi government. Some lawyers also experienced difficulties obtaining the weapons licenses, with delays in the processing of the paperwork. Because the armed guards went unpaid, those defense lawyers who did not have their own resources to keep up payments were forced to let the guards go, and rely instead on relatives to volunteer their time as guards. This appears to have been the case with Khamis al-Obeidi, whose relatives were unable to guard him 24 hours a day.

Human Rights Watch raised these concerns with US advisors to the court in March 2006, but the situation did not improve. No single official among the court staff or in the Iraqi government was given responsibility for ensuring that the security arrangement negotiated in November 2005 was properly implemented. Defense lawyers who raised the concern with the court were told to speak to the RCLO, but

---

Solomon Moore, "The Conflict in Iraq; Killings by Shiite Militias Detailed," *Los Angeles Times*, September 28, 2006; Ali Al-Fadhily and Dahr Jamail, "Government Death Squads Ravaging Baghdad," IPS News, October 19, 2006. See also "Iraq: End Interior Ministry Death Squads, Police Must be Held Accountable for Killings," Human Rights Watch news release, October 29, 2006, http://www.hrw.org/english/docs/2006/10/29/iraq14473.htm.

[87] Human Rights Watch interview with private defense lawyers, October 2005.

the RCLO was in no position to ensure that the Iraqi government met its commitment to pay the guards. As a result, and in light of the other serious administrative difficulties faced by the court, no effective follow up seems to have occurred.

RCLO officials did expend considerable effort to be able to give the private defense lawyers an undertaking that the deaths of al-Janabi and al-Zubeidi would be independently investigated by US investigators. However, due to the continuing deterioration of security conditions the investigation did not progress, and the murders of all three lawyers remain unsolved.[88]

After al-Zubeidi's killing, several Iraqi defense lawyers responded to the security risks by choosing to leave Iraq whenever the IHT was not in session. US advisors to the court facilitated this choice by providing secure transportation to and from Baghdad International Airport for those lawyers leaving Iraq between court sessions and returning for hearings. This transportation has so far been provided free of charge. Those defense lawyers who felt that they could not leave the country between court sessions—because they felt that they could not leave their homes unattended for fear of theft, or because they could not afford to take their families with them outside the country—were essentially left to make whatever security arrangements they could on their own.

On December 7, 2005, defense lawyers for all defendants submitted to the IHT trial chamber in open court a detailed, seven-page motion concerning security. The motion included a proposal for security arrangements that defense lawyers believed would adequately protect them and ensure their ability to fully participate in the trial. According to correspondence seen by Human Rights Watch, the presiding judge of the trial chamber referred the motion to the IHT president,[89] but no response was forthcoming. In failing to accept, reject, or rule on it in any way, the court effectively ignored this motion and the attached proposal.

A durable solution to the problem of security for private defense lawyers was not developed by the court over the course of the Dujail case. Insofar as the private defense

---

[88] Human Rights Watch interview with RCLO representatives, Baghdad, March 2006.

[89] Letter from Judge Rizgar Amin, dated December 7, 2005, viewed by Human Rights Watch on December 9, 2005.

lawyers for high-profile defendants in the Dujail case regarded relocation to the International Zone as unsafe and unacceptable, they were effectively left with one option: to relocate their families outside Iraq at their own cost, and return to Iraq for trial sessions. Such circumstances impose considerable practical constraints on the capacity of retained lawyers to conduct an effective defense, and are also an enormous disincentive for private Iraqi criminal lawyers to accept a high-profile defendant as a client. If the court fails to act decisively to develop security arrangements that regain the confidence of defense counsel in the court's capacity to protect them and all persons involved in the trial process, it is difficult to envisage how the court can ensure effective defense participation in current and future cases before the court.

Human Rights Watch has been informed that several lawyers who had accepted clients accused in the on-going Anfal trial withdrew from the case, on the grounds of personal security.

## 4. Outreach and Communications

Trials of a deposed political leadership for international crimes, applying international fair trial standards and international criminal law, are unprecedented in Iraqi history. All previous regime changes resulted in show trials for political crimes (such as the 1958-60 Mahdawi trials of leaders of the monarchical government), or summary executions and exile (1958, 1963, 1968). A countrywide qualitative interview study of Iraqi attitudes towards justice for the Ba'thist government revealed, on the one hand, some support for the idea of legal trials, and on the other, almost no knowledge about how trials under international criminal law, and applying international fair trial guarantees would work.[90] Understandably, among many sectors of the Iraqi population directly affected by human rights violations under the Ba'thist government, the desire for vengeance also ran high.[91]

Moreover, the ordinary legal system in Iraq deteriorated over three decades of authoritarian rule, when special or political courts were used to marginalize civilian courts. Fair trial guarantees found in the Iraqi Code of Criminal Procedure were

---

[90] See International Center for Transitional Justice and Human Rights Center, University of California at Berkeley, *Iraqi Voices.*
[91] ibid, pp. 26–27.

regularly violated in practice. Even after the end of the Ba'thist government, and despite investment in judicial training and capacity building, felony trials in ordinary criminal courts monitored by Human Rights Watch are essentially summary in nature.[92]

In such an environment—and faced with defendants who are notorious and widely detested—public understanding of, and tolerance for, the need to uphold defendants' fair trial guarantees is likely to be low. In addition, the IHT is an entirely new institution within Iraq, with a unique set of procedures that mix Iraqi and international law. Understanding of the IHT Statute and IHT Rules is minimal beyond those individuals directly involved with the court. Indeed, after the commencement of the Dujail trial, there was intense public criticism of the court and the trial judges for not being sufficiently harsh with the defendants. Steps aimed at ensuring basic fair trial guarantees—such as postponing a hearing to ensure that a defendant's lawyer could be accredited—were vociferously condemned as excessive leniency in favor of defendants.[93] Even prior to the opening of the trial, a climate of hostile public opinion and a number of highly prejudicial comments made by political figures (see below, Section IV.1) threatened both the defendants' right to be presumed innocent and the ability of the court to preserve its appearance of impartiality.

Under such conditions, an effective outreach and communications strategy for the court is imperative. Outreach and communications are also essential if the trials are to have a "demonstration effect" in terms of educating the broader public about the content of a fair trial, and in order to enhance public comprehension of why the court behaves in the way it does. This comprehension may in turn help ameliorate an understandable frustration and impatience with the legal process.

In other national or national-international courts trying international crimes, such as the Special Court for Sierra Leone (the Special Court),[94] specific Outreach Units have

---

[92] As part of its research on torture in detention, Human Rights Watch conducted regular observation of felony trial proceedings at the Central Criminal Court of Iraq, Baghdad, during 2004–05.

[93] Human Rights Watch–ICTJ observer notes on Arabic-language press coverage in Baghdad, Iraq, December 2005 and February–March 2006. See below, Section IV.1., for further discussion of prejudicial comments made by public and political figures throughout the course of the Dujail trial.

[94] Human Rights Watch, *Bringing Justice: The Special Court for Sierra Leone – Accomplishments, Shortcomings, and Needed Support,* vol. 16, no. 8(A), September 2004, http://hrw.org/reports/2004/sierraleone0904/, p.33; *Justice in Motion,* p. 28.

been created at the inception of the court to help maximize public understanding and impact. These units have developed a variety of innovative and potentially far-reaching initiatives to enhance comprehension—and combat misperception—about their respective courts. For example, the Outreach Unit of the Special Court based outreach staff in Sierra Leone's provinces, where they tapped into local social networks to disseminate information about the court through workshops, trainings, and screenings of specially prepared video materials. These materials covered such issues as the role of the judge, the prosecutor, and the defense lawyer in a fair trial, and simple explanations of complex legal issues such as jurisdiction and challenges to the court's legal foundation.[95] The Special Court's Outreach Unit also undertook workshops to educate the Sierra Leonean legal profession about the court and its rules, helping overcome misperceptions and confusion about the court in this important local constituency.

While some of these measures may not be feasible in Iraq due to the severe security risks facing court personnel, the IHT has failed to devise and implement any kind of outreach strategy, or create a specific outreach unit staffed with the relevant expertise. The IHT's communications strategy has thus far consisted of only two basic activities: media briefings provided by the chief investigative judge as the court's spokesperson, and the televising of court sessions on a "gavel-to-gavel" basis.[96] Neither of these activities can be considered adequate to ensure widespread knowledge and understanding of the court in Iraq. The mere provision of media briefings to Iraqi media is unlikely to be effective if the media personnel have not benefited from workshops or trainings to familiarize them with court procedures, relevant principles of international criminal law and fair trials, or other essential background knowledge. Indeed, a member of the Iraqi media pool covering the IHT stated to an international trial observer that most of the Iraqi media pool reporters could not easily follow the legal terminology used in the trial, and had a limited grasp of key principles such as the role of the defense.[97] Similarly, televising of proceedings without disseminating

---

[95] Human Rights Watch, *Justice in Motion*, p. 29.

[96] The court televises trial sessions with a 20-minute delay to allow for deletion of sensitive information, or to edit out remarks by defendants that the court deems inflammatory or prejudicial to national security. The exact criteria applied when redacting the televised sessions are not publicly available, and it is unclear whether they are consistently applied. Closed sessions are not televised.

[97] ICTJ trial observation consultant report, March 28, 2006, paras. 68–88.

simple, accessible, and neutral explanations of the workings of the court and its laws may spread confusion as much as comprehension. Over the course of 2005 the IHT website was only intermittently updated and for much of 2006 the website did not function at all.

Furthermore, under the Iraqi legal system key documents such as indictments and records of court proceedings are not publicly posted.[98]

The role of the chief investigative judge as the court's spokesperson is also a matter of concern.[99] The IHT Statute requires that the spokesperson for the court be a judge or a prosecutor,[100] but casting either of these court personnel in such a role raises the risk that the perceived impartiality of the court will be diminished. A court spokesperson will be required not only to explain the actions of the court, but also at times to defend the court's decisions from criticism by defense lawyers, among others. Having a judge play this function is potentially in conflict with the need for judges to maintain the appearance of impartiality in their dealings with parties to a case. Similarly, appointing a prosecutor as spokesperson can create the impression that the judiciary and prosecution "speak with one voice." Several trial judges interviewed by Human Rights Watch stated their discomfort with the fact that a judge was acting as the court's spokesperson, on the grounds that judges should not make out-of-court statements to the media.[101]

The spokesperson's role was not consistently respected. Former presiding judge in the Dujail case Rizgar Amin gave an interview to the press while he was still a sitting judge in the case,[102] and an IHT judge complained to Human Rights Watch that some judges had taken to speaking directly to the media because the court lacked

---

[98] The IHT does not maintain verbatim transcripts of any session. For further discussion, see below, Section IV.3.c.

[99] A court spokesperson, who was not the chief investigative judge, was in fact appointed initially, but his tenure was short-lived. Because of concerns about his security, the spokesperson could not reveal his name and this proved unacceptable to journalists. The chief investigative judge, whose identity was already publicly known, then stepped into the gap. After the amendment of the statute of the court in September 2005, it became a requirement that the spokesperson be a judge or prosecutor.

[100] IHT Statute, art. 7(1)(f).

[101] Human Rights Watch interviews with IHT judges, Baghdad, November 2005 and February–March 2006.

[102] Interview by the Arabic-language *Al-Hayat* newspaper (London) with Judge Rizgar Amin, December 21, 2005 (summary on file with Human Rights Watch).

sufficient communications expertise.[103] The chief prosecutor regularly spoke to the media concerning such matters as the scheduling of trial sessions.

In a meeting with the then-president of the IHT in March 2006,[104] Human Rights Watch raised its concerns about both the lack of any outreach strategy, and about the role of the chief investigative judge as court spokesperson. The president of the IHT stated his view that the IHT's efforts at communicating information about the court and the trial were more than sufficient, arguing that the Iraqi people were sufficiently knowledgeable about legal matters to comprehend the working of the court. He also saw no difficulties in respect of having the chief investigative judge as court spokesperson. According to a representative of the RCLO, the position of an outreach coordinator has been advertised but had not been filled as of October 2006.[105]

## 5. IHT Defense Office

A fundamental component of a fair trial is "equality of arms." Equality of arms refers to the principle that every party must be afforded a reasonable opportunity to present his or her case under conditions that do not place the party at a substantial disadvantage vis-a-vis the opponent.[106] This includes not only equality in presenting arguments, but also equality in being able to present evidence. In international or mixed national-international courts the prosecution typically has the benefit of considerable international assistance and expertise, including forensic analysts, military analysts, international legal experts, and experienced investigators and prosecutors. While such a level of prosecution resources is necessary if the prosecution is to meet its burden of proving guilt for massive crimes, it has been increasingly recognized that an effective defense of such cases also requires significant institutional, logistical, investigative, and legal support. One mechanism by which this support can be provided is through the creation of a Defense Office, which is an independent office within the court that endeavors to strengthen defense

---

[103] Human Rights Watch interview with IHT judge, Baghdad, March 2006.

[104] Human Rights Watch interview with IHT president, Baghdad, March 2006. The president of the court died in June 2006 while undergoing surgery, and has been replaced by another Appeals Chamber judge.

[105] Human Rights Watch interview with RCLO representative, Baghdad, October 2006.

[106] European Commission of Human Rights, *Kaufman v. Belgium* (App. 10938/84); (1986) 50 DR 98, p. 115; European Court of Human Rights, *Foucher v. France* (App. 22209/93), Judgment of 18 March 1997; (1998) 25 EHRR 234, para. 34.

capacity in various ways. For example, the Defense Office of the Special Court for Sierra Leone maintains a list of qualified counsel to represent accused who cannot afford legal assistance; advocates with the court administration and judges to ensure that defense lawyers (both privately retained and court-funded) have the necessary resources to prepare a defense; hires defense investigators to inquire into factual issues relevant to an accused's defense; and participates in regular discussions with court management concerning the needs of defense counsel.[107]

Bosnia's War Crimes Chamber has a Criminal Defense Support Section (known by its Bosnian acronym OKO), headed by an experienced international defense lawyer, which forms part of the administrative and management structure of the War Crimes Chamber's Registry. As well as providing logistical and administrative support to all defense counsel, the OKO also engages in intensive training and capacity-building for Bosnian lawyers participating in trials before the War Crimes Chamber. The OKO manages the accreditation of lawyers seeking to appear before the War Crimes Chamber, in part to ensure that the lawyers have the necessary training and expertise. It also maintains five regionally-based teams that provide assistance to individual Bosnian lawyers defending persons indicted by the chamber. The assistance provided includes helping with the preparation and presentation of legal arguments, and the hiring of expert consultants if necessary.

There is a profound need for a Defense Office fulfilling these kinds of functions at the IHT. As previously noted, the Iraqi legal system has never before undertaken trials of this scope or complexity, and Iraqi lawyers have been isolated from the rapid development of international criminal law over the last 15 years. Yet contesting cases under the IHT's substantive jurisdiction requires a deep knowledge of international criminal law and international law more generally, as well as knowledge of modern investigative techniques and methods. The RCLO sought to build this capacity among IHT prosecutors and judges, including tens of millions of dollars worth of investigative assistance and substantial training programs. However, private Iraqi defense lawyers were not incorporated into these training programs, and no expert legal or investigative assistance was made available in the lead-up to the Dujail trial. Hence, the degree of inequality of arms between the prosecution and the defense—

---

[107] Human Rights Watch, *Bringing Justice*, pp. 21–28; *Justice in Motion*, pp. 15–17; *Looking for Justice*, pp. 22–23.

in terms of institutional support, expertise and training, and infrastructure—is potentially considerable.[108] A robust and well resourced Defense Office, with international advisors, would be one way to redress this imbalance.

The Rules of Procedure provide for the creation of a Defense Office that could potentially play a role similar to those at the Special Court and the War Crimes Chamber.[109] However, the poor implementation of these provisions has meant that, in fact, the IHT Defense Office has not realized this potential, and functions essentially as a "legal aid" office for indigent accused. The picture is one of disarray in terms of recruitment and training, and fraught relations between private counsel and Defense Office lawyers, with the latter reluctant to provide any assistance or support to non-Defense Office defense lawyers.

A director for the Defense Office was not appointed until early September 2005[110]— six weeks prior to the start of the Dujail trial—and the Defense Office came into existence around the same time. Two other Iraqi lawyers were appointed to it shortly after that. These three lawyers participated in two training sessions in international criminal law in September 2005. One of the Defense Office lawyers was appointed to represent defendant Muhammad 'Azzawi in the Dujail proceedings, but did not meet with his client for at least a month after the opening of the trial.[111]

When private defense lawyers for the Dujail defendants threatened to boycott the trial after the assassinations of Sa'doun al-Janabi and Adel al-Zubeidi, an additional

---

[108] As noted above (see Section II), Saddam Hussein, Barzan al-Tikriti, and Taha Yassin Ramadan privately retained non-Iraqi defense counsel. However, apparently only one of Saddam's non-Iraqi lawyers, US attorney Ramsey Clark, has international criminal trial experience (he has defended individuals before the International Criminal Tribunal for Rwanda). The Dujail trial chamber did not provide legal-quality translation for non-Arabic-speaking lawyers such as Ramsey Clark, and was generally reluctant to allow him to speak in court. For example, on December 5, 2005, the court initially declined to hear Clark on the grounds that he did not speak Arabic, and then changed its mind. Overall, the poor quality of translation meant that his ability to follow proceedings was impeded. Under these conditions, non-Arabic-speaking, non-Iraqi lawyers with direct experience in defending international criminal cases are effectively precluded from directly participating in defending the accused. In the first days of the Anfal case, the court has ruled orally that non-Iraqi lawyers cannot have a speaking role in court.

[109] IHT Rules of Procedure and Evidence, rule 30. This provides that the director of administration shall establish a Defense Office and appoint a director for the office from among the lawyers working for the office. The director of the Defense Office serves at the pleasure of the director of administration, who may remove the Defense Office director "at any time." The Defense Office is mandated to provide legal counsel to accused persons who cannot afford counsel, to appoint a lawyer on a temporary basis to persons in detention who have not yet appointed a lawyer, and to provide "the required facilities to enable the lawyer in preparing his defense."

[110] Human Rights Watch interview with Defense Office lawyer, Baghdad, November 2005.

[111] Human Rights Watch interview with Defense Office lawyer, Baghdad, November 2005.

five Iraqi defense lawyers were recruited by the Defense Office in October and November 2005. These lawyers were recruited to act as "stand-by counsel" in the event that the private defense lawyers failed to appear in court, and were given copies of the dossier of evidence. However, because they were recruited only a few weeks before the trial was to resume, they were not provided with any training in international criminal law. The threatened defense boycott of the court session of November 28, 2005, did not materialize, but in December six of the Defense Office lawyers resigned en bloc because their names had been inadvertently revealed to the media by a court official.[112] To replace them new lawyers were recruited, but these also did not have the opportunity to undergo training in international criminal law before a January 2006 boycott by the private defense lawyers led the trial court to appoint the new Defense Office lawyers as counsel for the defendants until their own counsel returned to court.[113] When Human Rights Watch interviewed the Defense Office lawyers again in March 2006, they stated that they had not yet received further training, and that they did not have access to international criminal law judgments in Arabic.[114]

Human Rights Watch's concerns about the in-court performance of Defense Office lawyers are detailed below (see Section IV.7), but it is clear that the Iraqi lawyers staffing the office have not had adequate training in substantive international criminal law, or in the relevant aspects of the fair trial procedure that should underpin any international criminal law prosecution. It appears that the Defense Office was eventually given a compact disc containing Arabic translations of key international criminal law judgments in May or June 2006. However, by their own admission, the Defense Office lawyers did not read these judgments. Indeed, it would be unrealistic to expect the lawyers to become conversant with judgments that are often hundreds of pages long, and which concern criminal laws not

---

[112] Human Rights Watch interview with Defense Office lawyers, Baghdad, February 2006.

[113] Human Rights Watch interview with Defense Office lawyers, Baghdad, February 2006. The Defense Office lawyers were imposed on the defendants against their will. For our concerns about the imposition of lawyers against the will of the accused, see Human Rights Watch, *The Iraqi High Tribunal and Representation of the Accused*, February 2006, http://hrw.org/backgrounder/mena/iraq0206/.

[114] Human Rights Watch interview with Defense Office lawyers, Baghdad, March 2006. The RCLO undertook the translation of over 12,000 pages of international criminal law judgments from English to Arabic. These were provided to judges of the court in December 2005.

previously contained in Iraqi law, in the absence of formal instruction and some guidance.

It is noteworthy that the closing statements for the defendants read by Defense Office lawyers in July 2006 (after another boycott by private defense lawyers) did contain extensive reference to and discussion of the relevant international criminal law principles. However, Human Rights Watch has determined that these statements were written not by the Defense Office lawyers but by international advisors to the IHT. The statements were drafted in English, translated into Arabic, and provided to the Defense Office lawyers to read aloud in court—indicating the underlying lack of capacity among the Defense Office lawyers themselves.[115]

The Defense Office has not hired any investigators to work on behalf of defendants in the Dujail trial or any other trial before the IHT.[116] The Defense Office also does not provide logistical, administrative, or other support to privately retained defense lawyers.[117] In interviews over several months, the director of the Defense Office reiterated his view that the Defense Office did not, and would not, have a role in supporting or assisting the private defense lawyers in the Dujail case.[118] Other Defense Office lawyers emphatically seconded this view, arguing that the role of the Defense Office is to assist court-appointed lawyers only. They also stated that they preferred to keep their distance from the private defense lawyers out of concern for their own security.[119]

---

[115] The advisor told Human Rights Watch that he had provided international criminal law references to the Defense Office lawyers as part of his assistance with the closing statements. However, Defense Office lawyers confirmed Human Rights Watch's conclusion that the advisor had written the text of the closing statements. Human Rights Watch interviews with Defense Office lawyers, Baghdad, July and September 2006.

[116] While the investigative judge is under an obligation to seek out exculpatory evidence, this does not necessarily mitigate the need for defense investigators in lengthy and complex criminal cases. For example, in the Dutch trial of two former Afghan military officers for torture committed in Afghanistan in the 1980s, the court authorized an investigator to travel to Afghanistan on behalf of the defense to collect evidence to present to the investigative judge. See Human Rights Watch, *Universal Jurisdiction in Europe: The State of the Art*, vol. 18, no. 5(D), June 2006, http://hrw.org/reports/2006/ij0606/, pp. 17–18. It is noteworthy that the Bosnian War Crimes Chamber's Criminal Defense Support Section, which functions in a civil law system, also facilitates the hiring of defense investigators.

[117] One exception to this was the attempt by an international advisor to the Defense Office to provide legal assistance to privately retained lawyers.

[118] Human Rights Watch interviews with Defense Office director, Baghdad, November 2005 and February–March 2006.

[119] Human Rights Watch interviews with Defense Office lawyers, Baghdad, November 2005 and March 2006.

Relations between Defense Office lawyers and private defense lawyers deteriorated further after January 2006 when the Defense Office lawyers were brought into court to replace the boycotting private lawyers. The private defense lawyers filed a complaint with the Iraqi Bar Association, arguing that the payment arrangements between Defense Office lawyers and the IHT amounted to a "salary," and this violated the Iraqi Law of the Legal Profession.[120] The Iraqi Bar Association demanded that the IHT disclose to it the identity of the Defense Office lawyers, but the court declined to do so.[121] These divisive developments have resulted in little or no professional interaction between the Defense Office lawyers and the privately retained lawyers.

The Defense Office premises are located in the same building as the IHT's administrative offices, and thus Defense Office lawyers do not have the difficulties in gaining access to the court administration encountered by private lawyers. However, when Human Rights Watch visited the premises of the Defense Office in November 2005, it found the accommodations to be very basic: one office with three desks and two computers with no internet connection, shared among seven lawyers. Defense Office lawyers complained consistently that the IHT had not allocated resources to improve the facilities available to them, and that they had no administrative or secretarial support. On subsequent visits to the Defense Office premises in July 2006 Human Rights Watch found no improvement in the conditions and indeed observed that the office no longer had computers.

No security arrangements were in place for Defense Office lawyers at the opening of the Dujail trial in October 2005. When Human Rights Watch interviewed the Defense Office lawyers in November 2005 and February and March 2006, they stated that they had been offered relocation into the International Zone after the killing of Sa'doun al-Janabi, but living accommodation had still not been made available. The Defense Office lawyers noted that while the court was in session they stayed in the International Zone, but when the court adjourned for a recess the lawyers left the International Zone without secure transportation.[122] Their homes also remained

---

[120] Human Rights Watch interview with Defense Office lawyers, Baghdad, March 2006.

[121] The Iraqi Bar Association itself was reportedly plagued with governance problems, and its governing officers were alleged by many lawyers to be corrupt and strongly supportive of the former Ba'thist government.

[122] Human Rights Watch interviews with Defense Office lawyers, Baghdad, February–March 2006.

unprotected. Like the private defense lawyers, Defense Office lawyers were also given the option of being licensed to carry a handgun, and handguns were issued to them in mid-February 2006.[123] Also, like the private defense lawyers, the Defense Office lawyers were given the option of nominating three guards, to be approved by the Ministry of Interior and paid for by the Iraqi government. According to the Defense Office lawyers, some of them had one or two nominated guards approved by the Ministry of Interior, but none of the approved guards' salaries had been paid.[124]

The Defense Office lawyers complained that, despite repeated requests to the court's administration to improve their security arrangements, the court was not responsive and the Defense Office lawyers asked the RCLO to intercede.[125] The RCLO responded by taking up the issue directly with the Prime Minister's Office, which has responsibility for allocating secure apartments within the International Zone. Representatives of the RCLO noted that the waiting list for accommodation within the International Zone runs to 1,500 families but they continued to press the issue with the Prime Minister's Office.[126] When Human Rights Watch again interviewed Defense Office lawyers in July 2006 they stated that apartment accommodation had recently become available in the International Zone and that some had been able to relocate to these apartments with their families.[127]

Rule 30(6)(a) and (b) of the IHT's Rules of Procedure and Evidence permit the director of administration to appoint an international advisor to the Defense Office. The advisor is required to have experience and expertise in "international war crimes trials."[128] An international advisor was not appointed to the Defense Office until mid-April 2006. The advisor appointed had considerable experience as an investigator with international criminal tribunals, but was not a lawyer. He appears to have made a good faith effort to offer assistance to the private defense lawyers during the Dujail trial, but over some time private defense lawyers became reluctant to accept his

---

[123] Human Rights Watch interviews with Defense Office lawyers, Baghdad, February 2006.

[124] Human Rights Watch interviews with Defense Office lawyers, Baghdad, July 2006.

[125] Human Rights Watch interviews with Defense Office lawyers, Baghdad, March 2006.

[126] Human Rights Watch interview with RCLO representatives, Baghdad, July 2006.

[127] Human Rights Watch interview with Defense Office lawyers, Baghdad, July 2006.

[128] IHT Rules of Procedure and Evidence, rule 30(6)(b).

assistance on the grounds that the international advisor was regarded as serving the interests of the RCLO (which played a role in his recruitment).[129] Private defense lawyers accused the advisor of talking to defense witnesses *ex parte* and without the permission of the defense lawyers.

---

[129] Human Rights Watch interview with private defense lawyers, Baghdad, September 2006.

# IV.  Procedural Concerns in the Conduct of the Trial

Based on its extensive monitoring of trial sessions, and its interviews with key actors in the trial process, Human Rights Watch has identified a number of serious procedural concerns that, cumulatively, significantly diminished the fairness of the Dujail trial.

The Republic of Iraq ratified the International Covenant on Civil and Political Rights (ICCPR) in 1976, and all successor governments remain bound by it. Article 14 of the ICCPR provides that any person charged with a criminal offense is entitled to "a fair and public hearing by a competent, independent and impartial tribunal established by law."[130] A "fair trial" under the ICCPR means that a person being tried for a criminal offense must be guaranteed, at a minimum, the following rights:[131]

- To be presumed innocent until proved guilty according to law;[132]
- To be informed of the charges against her/him in detail and promptly, in a language she/he understands;
- To have adequate time and facilities for the preparation of a defense and communication with counsel of her/his own choosing;
- To be tried without undue delay; to be tried in her/his own presence, and to defend her/himself in person or through legal counsel of her/his own choosing;
- To examine witnesses against her/him and be able to obtain the attendance and examination of witnesses on her/his behalf, under the same conditions as the prosecution;
- Not to be compelled to confess guilt or incriminate her/himself;
- To be able to appeal to a higher tribunal against conviction and sentence.[133]

---

[130] International Covenant on Civil and Political Rights (ICCPR), adopted December 16, 1966, G.A. Res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force March 23, 1976, art. 14(1).

[131] Ibid., art. 14(3)(a)-(g).

[132] Ibid., art. 14(2).

[133] Ibid., art. 14(5).

These basic fair trial guarantees apply irrespective of whether the legal system of the country conforms to an adversarial model (such as in the United States or the United Kingdom) or an inquisitorial model (such as in Iraq). They are the minimum requirements for a trial to be considered "fair" in international law.

The procedural flaws identified by Human Rights Watch over the course of the Dujail trial undermine several of these fair trial guarantees, including: the right to an independent and impartial tribunal; the right to be presumed innocent; the right to be promptly informed of charges against the accused; the right to adequate time and facilities to prepare a defense; and the right to examine witnesses against the accused.

## 1. Concerns Affecting the Independence and Impartiality of the IHT and the Presumption of Innocence

A basic element of a fair trial is that the court conducting the proceedings be independent from interference by litigants, the political branches of government, or any other source. Critical determinants of the independence of a court are the laws and procedures governing the appointment of judges, the conditions governing the transfer and cessation of their functions, and the "actual independence of the judiciary from the executive branch and the legislative."[134] The UN Basic Principles on Independence of the Judiciary require that procedures for the suspension, removal or disciplining of a judge be determined in accordance with established standards of judicial conduct and be subject to independent review.[135]

The IHT Statute declares the "complete independence"[136] of the court, and the statute and rules contain judicial procedures governing the disciplining of a judge for misconduct,[137] and concerning the recusal of a judge where there is an allegation of

---

[134] UN Human Rights Committee, General Comment 13, Article 14 (Twenty-first session, 1984), Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, UN Doc. HRI\GEN\1\Rev.1 (1994), para. 3. The Human Rights Committee monitors the implementation of the ICCPR.

[135] Basic Principles on the Independence of the Judiciary, adopted by the Seventh United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Milan, 26 August to 6 September 1985, U.N. Doc. A/CONF.121/22/Rev.1 at 59 (1985).

[136] IHT Statute, art. 1(1).

[137] IHT Statute, arts. 4–6.

bias.[138] The Iraqi constitution also guarantees the independence of judges in the exercise of their functions.[139]

However, the IHT Statute contains two provisions—articles 4(4) and 33—that are open to abuse, and have in fact been abused to seriously undermine the independence of the court by the transfer or suspension of judges in the midst of ongoing trials.

Despite specific provisions governing the suspension and dismissal of judges for misconduct,[140] article 4(4) of the IHT Statute allows the Council of Ministers (the Prime Minister and Cabinet) to transfer a judge from the IHT to the Higher Judicial Council "for any reason." While a judge so transferred does not lose his status as a judge, he is removed from any role in adjudicating cases before the IHT and may also lose certain privileges associated with being an IHT judge, such as secure accommodation in the International Zone.

Article 33 of the IHT prohibits any person who belonged to the Ba'th Party from holding any position within the court. However, it does not specify any procedures for investigating whether a court employee was a member of the Ba'th Party, or which governmental institution is responsible for enforcing this provision. A de facto "pause" in the applicability of article 33 meant that former Ba'th members were in fact appointed to the IHT, although they remain vulnerable to dismissal should the article be enforced. Membership of the Ba'th Party was a prerequisite for admission to judicial training under the former government, and does not necessarily imply that the member was a supporter of the Ba'th Party or the government of Saddam Hussein, so former membership of the Ba'th Party, without regard to rank or extent of participation, is unlikely of itself to be sufficient to render a person unfit for office with the IHT.

The susceptibility of judicial personnel to dismissal at any time is a threat to the independence of the IHT. It creates the possibility that judges who belonged to the Ba'th Party may be selectively dismissed or threatened with dismissal. Any

---

[138] IHT Rules of Procedure and Evidence , rules 7–8.

[139] Constitution of Iraq (as adopted by referendum on October 15, 2005), art. 88.

[140] IHT Statute, arts. 5–6.

procedure for the dismissal of judges must preserve the independence of judicial personnel, for example by considering their performance on an individual basis, and with avenues for review against a dismissal decision. Article 33 is also at variance with the general rules for de-Ba'thification applied by the National De-Ba'thification Commission (NDBC), which render persons holding any of the top four levels of Party membership potentially ineligible for government employment.[141]

In July 2005 the NDBC relied on article 33 to seek the dismissal of over 20 personnel from Iraqi courts, including judges. On that occasion the dismissals were avoided only due to the direct intervention of Iraqi President Jalal Talabani and then-Prime Minister Ibrahim al-Ja'fari. But in January 2006 the NDBC intervened again, this time in relation to a judge sitting on the Dujail case. After the resignation of the first presiding judge in the Dujail case (discussed below), the next most senior judge on the trial chamber, Judge Saeed al-Hammashi, was to take over as presiding judge. However, before Judge al-Hammashi could continue hearing the case in January, the NDBC demanded his removal on the grounds that he was previously a Ba'th Party member. Judge al-Hammashi denied the charge, and in November 2006 the NDBC notified Judge al-Hammashi that the case against him had been dropped. Nevertheless, due to the NDBC's invocation of article 33, Judge al-Hammashi was removed from the Dujail trial. The NDBC's intervention forced the IHT to negotiate with the Prime Minister's Office in order to forestall Judge al-Hammashi's dismissal from the IHT altogether; he remains a judge of the IHT but has not been reassigned to any case.

Article 33 has thus become a "sword at the necks"[142] of sitting IHT judges, and has been used by the NDBC to exercise considerable power in terms of having sitting judges suspended from their duties. In October 2006, a further four trial judges—including one judge sitting on the ongoing Anfal trial—received letters stating that they were being transferred from the IHT to the Higher Judicial Council. According to one of the judges, those transferred were made to understand that if they protested the transfer they would become subject to investigation by the NDBC.[143]

---

[141] Coalition Provisional Authority, Order Number 1, De-Ba'thification of Iraqi Society, CPA/ORD/16 May 2003/01, paras. 2–3.

[142] Human Rights Watch interview with IHT judges, Baghdad, October 2006.

[143] Human Rights Watch interview with IHT judges, Baghdad, October 2006.

Article 4(4) of the IHT Statute was used by the Council of Ministers to remove the presiding judge in the Anfal trial, 'Abdullah al-Amiri, on September 19, 2006. Five days earlier, Judge al-Amiri had had an exchange with defendant Saddam Hussein in which the judge stated, "I will answer you: you are not a dictator. Not a dictator. You were not a dictator. The people or those who are around the official make him a dictator, and it is not just you. This is the case all over the world."[144] These comments were interpreted as showing leniency or bias towards Saddam Hussein, and were the subject of intense public criticism. Members of parliament demanded the removal of Judge al-Amiri,[145] and a representative of the prime minister was also dispatched to the president of the IHT to demand the judge's transfer off the case.[146] The IHT president then wrote to the Council of Ministers, requesting the transfer of Judge al-Amiri from the IHT to the Higher Judicial Council under article 4(4) of the IHT Statute, and the Council of Ministers authorized the transfer. A spokesperson for the prime minister confirmed that the Cabinet acted to remove Judge al-Amiri because of its view that he was biased in favor of Saddam Hussein, and because of popular anger over al-Amiri's comments.[147] The executive's intervention to transfer Judge al-Amiri—despite the existence of judicial procedures to resolve allegations of bias[148]—seriously undermined the IHT's independence and reflected a disturbing readiness to intervene in a judicial matter in response to public opinion. When challenged about the propriety of transferring a judge for such reasons, a Cabinet advisor responded that Iraqi law gives the government the right to "hire, fire and transfer judges. We are responsible and the Iraqi government does pay the salaries of these judges. The only thing is, we have no influence over the verdict and what goes on in court because it's an independent system."[149] This statement suggests a failure to grasp fully the principle of independence of the judiciary.

---

[144] Paul von Zielbauer, "Judge Tells Hussein, 'You are Not a Dictator,'" *New York Times*, September 15, 2006.

[145] Richard Oppel, "After Remark, Judge in Trial of Hussein Loses His Post," *New York Times*, September 20, 2006.

[146] Brian Bennett, "Behind the Saddam Judge's Ouster", *Time Magazine*, September 20, 2006. This was confirmed by Human Rights Watch interviews with IHT judges, including a judge in the Anfal trial, Baghdad, October 2006.

[147] See comments by spokesman for Nouri al-Maliki, Ali Dabbagh, reported in "Saddam Hussein ejected from Trial," CNN, September 20, 2006, http://edition.cnn.com/2006/WORLD/meast/09/20/iraq.saddam/index.html (accessed November 3, 2006). See also Liz Sly, "Hussein Trial Judge Removed," *Chicago Tribune*, September 20, 2006.

[148] IHT Rules of Procedure and Evidence, rules 7 and 8.

[149] Bassam Ridha, quoted in Sly, "Hussein Trial Judge Removed," *Chicago Tribune*.

The IHT's independence and its appearance of impartiality have also been undermined by fierce public criticism of the court and its judges by senior government officials. This has occurred regularly since the beginning of the Dujail trial. The uncertain and faltering start to the trial, and the difficulties in controlling the behavior of the defendants encountered by former presiding judge Rizgar Amin, gave rise to vituperative attacks from members of parliament and the then-minister of justice. Members of parliament denounced the court and Judge Amin as "weak" and excessively lenient with the defendants, and demanded his resignation.[150] During one trial session at which Human Rights Watch was in attendance, a prominent parliamentarian in the public gallery was heard to declare that "this Kurdish judge must go."[151] The then-minister of justice also denounced Judge Amin as weak and demanded his resignation on more than one occasion in the press.[152] Then-Prime Minister Ibrahim al-Ja'fari during a press conference also criticized the conduct of the trial by the presiding judge.[153] The Iraqi government did nothing to defend the court from these attacks, and did not warn ministers or other public officials against making such statements. In January 2006 Judge Amin resigned. Judges interviewed by Human Rights Watch stated that the resignation was principally caused by the severity and intensity of official criticism of his conduct of the trial.[154] Judges observed that the attacks by government figures created an enormous sense of pressure upon them, and that there was in fact little understanding within the government about the IHT and its procedures.[155] One judge explained,

> The attitude of the cabinet towards the court and the trial is one of a consumer who pays money for a product: they give money, and they demand results. The government treats the court like a factory.[156]

---

[150] Iraqi press summaries, December 2005–March 2006, on file with Human Rights Watch.

[151] Human Rights Watch-ICTJ trial observation notes, November 28, 2005. In a similar vein, Shi'a parliamentarian and Da'wa Party member Ali al-Adeeb stated to the press, "The chief judge should be changed and replaced by someone who is strict and courageous." See Hamza Hendawi, "Saddam Lashes out at US as Trial Resumes," Associated Press, November 28, 2005.

[152] Iraqi press summaries, December 2005–March 2006, on file with Human Rights Watch.

[153] Iraqi press summaries, December 2005–March 2006, on file with Human Rights Watch.

[154] Human Rights Watch interviews with IHT judges, February, March and October 2006.

[155] Human Rights Watch interviews with IHT judges, November 2005 and March 2006.

[156] Human Rights Watch interview with IHT judge, March 2006.

The pressure was compounded by impatience and a lack of understanding in the wider Iraqi public, and the failure of the IHT to develop an effective outreach and communications strategy (discussed in Section III.4, above). This public impatience was intensified by statements from government officials demanding a rapid trial and speedy execution of Saddam Hussein.[157]

Through comments prejudging the guilt of the defendants, senior government officials and political figures have also run the risk of appearing to or actually seeking to influence the outcome of the trial. State officials and political figures must not prejudice the accused's fair trial rights or undermine the perceived impartiality of the tribunal by prejudging the assessment of the facts by the competent judicial authority.[158] From well before the beginning of the Dujail trial, senior Iraqi government officials and political figures made statements declaring Saddam Hussein guilty and deserving of execution.[159] These statements continued throughout the Dujail trial: On November 28, 2005, Abdul Aziz al-Hakim, leader of the powerful Shi'a political party the Supreme Council of the Islamic Revolution in Iraq (SCIRI), stated that "the government wants to see Saddam dead, it wants him to face the death penalty because that is the will of the people."[160] Another prominent SCIRI

---

[157] Iraqi press summaries, December 2005–March 2006, on file with Human Rights Watch. See also statement by a leader of SCIRI, Adel Abdul Mahdi, that Saddam Hussein should have been "put to death without trial" quoted in Ali Rifat, "Saddam trial is bad for us, says top Iraqi," *Sunday Times* (London), January 8, 2006. See also Ellen Knickmeyer, "Iraq's Premier Urges a Speedy Trial for Hussein," *Washington Post*, October 18, 2005; and "Maliki: Saddam's Execution is Imminent," United Press International, July 5, 2006.

[158] UN Human Rights Committee (HRC), General Comment 13, para. 7; HRC, Decision: Gridin v. Russian Federation, CCPR/C/69/D/770/1997, July 18, 2000, para. 8.3; European Court of Human Rights (ECtHR), *Allenet de Ribemont v. France*, Judgment of 10 February 1995; (1995) 20 EHRR 557, para.35; African Commission on Human and Peoples' Rights (ACHPR), *International Pen and Others (on behalf of Ken Saro-Wiwa Jr. and Civil Liberties Organization) v. Nigeria*, Communication Nos. 137/94, 139/94, 154/96, and 161/97, decision adopted on October 31, 1998, paras. 94-96.

[159] On May 9, 2005, Iraqi President Jalal Talabani stated that Saddam Hussein "will not escape punishment for his terrible crimes" (as quoted in "Iraqi president on national unity, government, terrorism, foreign presence" (in Arabic), *Al-Ra'y* (Amman), May 9, 2005, p. 6, reproduced in English translation by BBC Monitoring Middle East – Political), and on May 31 Talabani stated that "Saddam Hussein is a war criminal" (as quoted in "Talabani: Saddam Likely to Face Trial Soon," Associated Press, May 31, 2005). In an interview with Iraq's state-funded broadcaster Al-Iraqiya on September 6, 2005, President Talabani stated, "I received the investigating magistrate who is in charge of questioning Saddam [Hussein]. I encouraged him to continue his interrogation. He told me good news, saying that he was able to extract important confessions from Saddam Hussein." Talabani added that "Saddam signed these confessions," and that "Saddam Hussein is a war criminal and he deserves to be executed 20 times a day for his crimes against humanity." See "Iraq's Talabani says Saddam 'confessed' and deserves to die" (in Arabic), Al-Iraqiya TV (Baghdad), September 6, 2005, 17:35 GMT, reproduced in English translation by BBC Worldwide Monitoring, September 7, 2005. On June 24, 2005, SCIRI head Abdul Aziz Hakim stated in an interview with Reuters that "there is no doubt that Saddam deserves more than just execution... I am among those who are going to file a complaint for killing 64 members of my family. For these crimes alone he deserves 64 executions." See Mariam Karouny, "Iraqi Shiite Leader Wants Insurgents Wiped Out," Reuters, June 24, 2005.

[160] Muhammad Shakeel, "Trial of Saddam Set to Resume, Former PM warns against Rising Abuse in Iraq," *World Markets Analysis*, November 28, 2005.

figure (and currently one of Iraq's two vice-presidents), Adel Abdul Mahdi, stated in January 2006 that Saddam "deserves to be put to death without trial" and that "the continuing [trial process] is unnecessary and will only hurt the Iraqi people."[161] On February 20, 2006, Shi'a cleric Muqtada al-Sadr stated that Saddam deserved the death penalty because he was responsible, directly or indirectly, for all those killed in Iraq while he was president.[162] In an interview published on July 12, 2006, Muqtada al-Sadr—whose faction now formed part of the Iraqi government—asserted that "Saddam needs no trial and he must be treated as he treated the Iraqi people ... I demand his execution immediately."[163] On July 5, Prime Minister Nouri al-Maliki stated of Saddam Hussein, "his execution for the crimes he committed will come soon, just after the court ruling."[164]

The statements of officials indicate that the Iraqi government has not only failed to promote a climate of public opinion conducive to a fair trial, but has actively encouraged the prejudgment of the outcome of the case. While the trial of someone as notorious as Saddam Hussein will inevitably be accompanied by strong opinions and public discussion as to his guilt or otherwise, public authorities and in particular leading political figures are not relieved of their obligation to refrain from prejudging the outcome of the trial. In creating an environment in which judges feel intense pressure to be seen as dealing severely with the accused, such behavior undermines the guarantee of presumption of innocence at trial.

---

[161] Rifat, "Saddam trial is bad for us, says top Iraqi," *Sunday Times*.

[162] Iraqi press summaries, December 2005–March 2006, on file with Human Rights Watch.

[163] "Iraqi Shi'i cleric Al-Sadr denies Al-Mahdi Army's involvement in recent killings" (in Arabic), Al-Iraqiya TV (Baghdad), July 12, 2006, 1710 GMT, reproduced in English translation by BBC Monitoring International Reports, July 14, 2006.

[164] "Maliki: Saddam's Execution is Imminent," United Press International. While in Baghdad in December 2005, Human Rights Watch also observed that, during the breaks in the telecast of the trial on the government-funded Al-Iraqiya television channel, material was broadcast that strongly suggested the guilt of the defendant Saddam Hussein. This is also described by journalist Jonathon Steele in "This faltering trial has put Saddam back in charge," *Guardian* (London), December 9, 2005: "Whenever the courtroom had a break, the screen was filled with a propaganda commercial showing Saddam's face. Blood slowly pours across it. Pictures of the former President bringing his hand down firmly to make a point are intercut with archive footage of a prisoner lying on the ground while a man uses a baseball bat to smash his wrists. In the style of Shi'a religious mourning, a voice wails a poem that taunts Saddam with God's judgment: 'Where will you hide from all your crimes?'"

## 2. The Defendants' Right to be Informed of the Charges

Article 14(3)(a) of the ICCPR provides that the defendant has the right to be informed "promptly and in detail ... of the nature and cause of the charge against him."[165] A basic prerequisite for the fairness of a trial is that a defendant has sufficient information about what is alleged against him or her, so that he or she can adequately defend him or herself against the charge.[166] At minimum, a defendant must be provided with information that identifies the material facts alleged against him or her that are at the basis of the accusation, and the legal characterization of these material facts.[167] The level of detail that is necessary will depend on the nature of the case, and needs to be considered in terms of what would amount to sufficient information to prepare an adequate defense to the charges.[168]

In international criminal law cases, the crimes alleged will likely have been committed by numerous individuals, playing distinct roles over an extended period of time. International criminal law contains several different theories of individual criminal liability that could be used to connect the defendant in court to the large-scale crime that occurred. Individuals brought before a court may bear different kinds of responsibility, from a commander to a participant to an aider-and-abettor. Each of these forms of liability will require specific kinds of criminal intention (*mens rea*) and criminal act (*actus reus*) to be proved in order to convict the individual defendant. Thus, in cases involving accusations of international crimes (such as crimes against humanity), international tribunals have consistently held that sufficient detail about the nature and cause of the charge must be provided to the defendant, so that a defendant can properly understand *in what capacity* he or she is alleged to be responsible for the crime. International courts have held that, at minimum, the *particular nature* of the defendant's responsibility (for example, as a planner, commander, instigator, or aider of the crime) must be clearly identified, *and*

---

[165] This guarantee appears in almost identical form in article 6(3)(a) of the European Convention on Human Rights. The holdings of the European Court of Human Rights are therefore relevant to the interpretation of this fair trial guarantee, particularly because the European Court frequently interprets fair trial guarantees in the context of inquisitorial or civil law systems.

[166] European Court of Human Rights, *Mattoccia v. Italy* (App. 23969/94), Judgment of 25 July 2000, para. 59.

[167] Ibid.

[168] European Court of Human Rights, *Sadak and Others v. Turkey* (App. 29900/96, 29901/96, 29902/96 and 29903/96), Judgment of 17 July 2001, para. 50.

the defendant must be given *a concise statement of the material facts* that will be used to establish the defendant's specific mode of responsibility.[169] The kinds of facts that may be material for someone alleged to have planned or directed a crime will be quite distinct from those facts that are material for someone accused of aiding a crime.

Thus, in order to effectively prepare a defense, the defendant must be able to determine the "theory of liability" to be applied against him or her, and what facts will be proved in order to sustain that theory. For example, the international courts have held that if a defendant is accused of having "command responsibility" for the crime, he or she must be given notice of the following material facts that will be proved against him or her:[170]

(a) what command position he or she is alleged to have held;
(b) the identities of the subordinates over whom he or she exercised effective control and for whose acts he or she is alleged to be responsible;
(c) the conduct of the defendant that shows that he or she knew that a crime was being committed, or was about to be committed, by those identified subordinates and;
(d) the conduct of the defendant that shows that he or she failed to take the necessary and reasonable measures to prevent such acts or to punish the persons who committed them.

If someone is alleged to have personally participated in the crime, material facts such as the identity of the victim, the time and place of the event, and the means by which the criminal acts were committed have to be notified to the defendant.[171] The facts that will be proved to show the defendant's mental state, and his or her criminal intent, also should be stipulated.[172]

---

[169] *Prosecutor v. Kupreskic et al.*, ICTY, Case No. IT-95-16, Judgment (Appeals Chamber), October 23, 2001, para. 95; *Prosecutor v. Mejakic et al.*, ICTY, Case No. IT-02-65, Decision on Dusan Fustar's Preliminary Motion on the Form of the Indictment, April 4, 2003; *Prosecutor v. Sesay*, Special Court for Sierra Leone (SCSL), Decision and Order on Defence Preliminary Motion for Defects in the Form of the Indictment, October 13, 2003, para. 12.

[170] *Prosecutor v. Blaskic*, ICTY, Case No. IT-95-14, Judgment (Appeals Chamber), July 29, 2004, para. 218.

[171] *Kupreskic*, Judgment (Appeals Chamber), para. 90.

[172] *Blaskic*, Judgment (Appeals Chamber), para. 219.

Without this kind of specification of the defendant's alleged role in a large-scale, multiple-perpetrator crime, and identification of what facts will be established to prove that role, the defendant is essentially left to guess at the "nature and cause" of the case against him or her.

The charge sheet in the Dujail case was in the form of a "referral decision" from the IHT's chief investigative judge, and was provided to defendants along with the dossier of evidence on August 10, 2005. The referral decision and dossier were identical for all eight defendants, even though the defendants ranged from the former President of the Republic through to minor Ba'th Party officials from Dujail. The referral decision was the only notice of charges provided to the defendants before the trial commenced. The referral decision contained no information whatsoever about each defendant's alleged role in the crime, or what theory of liability was to be used against each defendant. No material facts to be proved against each defendant were described. Indeed, no material facts were stipulated at all; the referral decision simply stated that each defendant was charged with "[c]rimes against humanity against a number of citizens in the town of Dujail in Salahuddin Governorate on July 8, 1982. This is in accordance with Clauses A, D, E and F of Paragraph 'First' of article 12 of the court law. It consists of:
A. Premeditated murder.
D. Removal of population or forcible removal of population.
E. Imprisonment or arbitrary deprivation of physical freedom contrary to the basic rules of international law.
F. Torture."

The referral decision does not constitute adequate notice of the cause and nature of the charge. The disclosure of the dossier of evidence does not amount to adequate notice, because the dossier was not tailored to each defendant, and thus does not inform a defendant of the material facts related to his role that will be proved at trial.[173]

Under Iraqi law, no "indictment" or similar document is produced before the beginning of the prosecution case. However, a more detailed "charging document" is

---

[173] *Prosecutor v. Naletilic and Martinovic*, ICTY, Case No. IT-98-34, Judgment (Appeals Chamber), May 3, 2006, para. 27; *Prosecutor v. Jean Mpambara*, ICTR, Case No. ICTR-01-65-T, Judgment (Trial Chamber), September 11, 2006, para. 30.

drafted after the close of the prosecution case and before the commencement of the defense case.[174] In the Dujail case, this more detailed charging document was read out in court on May 15, 2006, eight months after the beginning of the trial. The charging document did contain more details concerning the specific role that each defendant was alleged to have played in the events at Dujail. However, because it was formulated only after the close of the prosecution case, the defendants cannot be considered to have had adequate notice of the charges against them during the presentation of prosecution witnesses and documentary evidence. The defendants' ability to prepare challenges to this evidence was thus circumscribed.

In addition, the May 15 charging documents added two new charges against seven out of the eight defendants: in addition to murder, forcible displacement, arbitrary detention, and torture, the charges of enforced disappearance and "other inhumane acts" were added against Saddam Hussein, Taha Yassin Ramadan, Barzan al-Tikriti, 'Abdullah Kadhim Ruwayid, Mizher 'Abdullah Kadhim Ruwayid, 'Ali Dayeh 'Ali al-Zubaidi, and Muhammad 'Azzawi 'Ali al-Marsumi. The defendants had no notice during the prosecution case that these charges would be added, and thus could not effectively address prosecution evidence that may have been relevant to proving disappearance or "other inhumane acts." The court required the defendants to open their defense case on the same day that the charging document was read out in court, effectively denying them any opportunity to revise or amend their defense in accordance with the more detailed notice and in light of the new charges.

It is also questionable whether even the May 15 charging document constituted adequate notice of the charges against each defendant. The charging document does include more specific allegations concerning the acts of each defendant, but

---

[174] Iraqi Code of Criminal Procedure, art. 181(C), (D). This provides:

"C – If it appears to the court, after the aforementioned steps have been taken, that the evidence indicates that the defendant has committed the offense being considered, then he is charged as appropriate, the charge is read to him and clarified and he is asked to enter a plea.

"D – If the defendant confesses to the charge against him and the court is satisfied of the truth of the confession and that he understands its implications, then it listens to his defense and issues a judgment in the case without any requirement for further evidence. If he denies the charge or does not offer a defense, if he requests a trial or if the court considers that his confession is confused, or that he does not understand the consequences or if the offense is punishable by death then the case goes to trial, defense witnesses are heard and the remaining evidence in his defense is heard, unless the court finds it to be an unjustified attempt to impede the investigation or mislead the court. When this has been completed the commentary of the other parties, the public prosecutor and the defense of the defendant are heard. The end of the trial is then announced and the court issues its verdict in the same session or in another session held soon afterwards."

does not stipulate material facts such as the facts showing the effective authority of defendants charged in a "command responsibility" role, the facts proving the mental state of the defendants, or the facts showing that a defendant knew that crimes were being committed by a subordinate. Moreover, the charging document does not clarify which theory of liability is being applied to each defendant—participation, instigation or joint criminal enterprise—or whether any high-level defendant is also accused of a "failure to prevent or punish" subordinates.

## 3. Equality of Arms and the Defendants' Right to Adequate Time and Facilities to Prepare a Defense

As noted above (see Section III.5), a fundamental element of a fair trial is that every party must be afforded a reasonable opportunity to present his or her case under conditions that do not place the party at a substantial disadvantage vis-a-vis the opponent.[175] Implicit in the notion of equality of arms,[176] and explicit in article 14(3)(b) of the ICCPR, is that a defendant has a right to adequate time to prepare his or her case. The meaning of "adequate" will depend on the size and complexity of the case against the defendant.[177]

Human Rights Watch has concluded that a number of aspects of the conduct of proceedings in the Dujail trial violated the principle of equality of arms, and deprived the defendants of adequate time and facilities to prepare their defense. In addition, Human Rights Watch observed a troubling indifference on the part of the court when these procedural concerns were raised by the defense. The court never engaged in a public or reasoned process of evaluating these concerns in light of fair trial principles, despite the seriousness of some of the concerns, as outlined below.

---

[175] European Commission of Human Rights, *Kaufman v. Belgium* (App. 10938/84); (1986) 50 DR 98, p. 115; European Court of Human Rights, *Foucher v. France* (App. 22209/93), Judgment of 18 March 1997; (1998) 25 EHRR 234, para. 34; UN Human Rights Committee, Decision: Morael v. France, Comm. No. 207/1986, UN Doc. Supp. No. 40 (A/44/40) at 210 (1989), para. 9.3 ("... the concept of a fair hearing in the context of article 14(1) should be interpreted as requiring a number of conditions, such as equality of arms ...").

[176] *Prosecutor v. Kordic and Cerkez*, ICTY, Case No. IT-95-14/2, Judgment (Appeals Chamber), December 17, 2004, para. 175.

[177] UN Human Rights Committee, General Comment 13, para. 9.

### a. Continuous late or same-day disclosure of incriminating evidence and non-disclosure of some witness statements

Timely disclosure of prosecution evidence is essential for defendants to adequately prepare their defense. The IHT Rules provide that prosecution evidence must be disclosed 45 days before the start of the trial.[178] Approximately 900 pages of the trial dossier were disclosed in accordance with this rule, on August 10, 2005, seven weeks before the opening of the Dujail trial. The bulk of the 900 pages consisted of photocopies of official documents. On January 22, 2006—three months after the commencement of the trial—a further several hundred pages of documentation were provided to the defense, but with no explanation (and no explanation was requested by the court) as to why the material had not been made available in accordance with the Rules.[179]

Of more serious concern was a tendency by the prosecution to engage in "trial by ambush,"[180] in which incriminating documents were not disclosed to the defense until the day that the document was used in court by the prosecution. Human Rights Watch documented a number of instances in which critical, incriminating documents were disclosed to the defense only on the day that they were used in court, and in some cases well after the close of the prosecution case.

On February 13, 2006, the court read the statements of 23 prosecution witnesses into the court record, without making these witnesses available for questioning by the defense.[181] Of those 23 witness statements, 13 were not in the dossier and were not subsequently disclosed to the defendants during the trial. During the prosecution's presentation of its documentary evidence on March 1, 2006, over 40 previously undisclosed documents were presented to the court, including the most important incriminating evidence against three of the "low-level" defendants: three letters addressed to former Minister of Interior Sa'doun Shaker naming suspected

---

[178] IHT Rules of Procedure and Evidence, rule 40.

[179] Human Rights Watch examined the documents disclosed on January 22, 2006, and found that some were copies of documents previously disclosed but the majority were new documents, not previously disclosed.

[180] This term is used by Judge Richard May and Marieke Wierda in *International Criminal Evidence* (Ardsley, New York: Transnational Publishers, Inc.), p. 70.

[181] See below, Section IV.4 (on the right to confront and examine witnesses) for discussion of other concerns raised by this aspect of proceedings.

Da'wa Party members in Dujail in the aftermath of the 1982 assassination attempt, and allegedly written by 'Ali Dayeh 'Ali, 'Abdullah Kadhim Ruwayid and Mizher 'Abdullah Kadhim Ruwayid. Also presented on that day, but previously undisclosed to the defense, was a compact disc containing a recording of a conversation allegedly between Saddam Hussein and former Ba'th Party Regional Command member Abdel Ghani al-Ghafour, in which the latter refers approvingly to the destruction of orchards in Dujail. The date of the recording was not disclosed, nor its source or means of interception.

The prosecution case effectively closed on March 1, 2006. On March 15, during the taking of statements from the defendants, the prosecutor confronted defendant Taha Yassin Ramadan with a previously undisclosed document concerning the detention of individuals from Dujail, which Ramadan allegedly had signed. As far as Human Rights Watch can ascertain, this document was never actually disclosed in full to Ramadan's defense lawyers, even after it was displayed in court. Further new documents were introduced on April 6 concerning the age of some of those convicted by the Revolutionary Court in connection with the Dujail incident.

On April 24, 2006, the prosecution introduced another compact disc recording, this time purporting to be a conversation between Saddam Hussein and Taha Yassin Ramadan concerning the fate of properties in Dujail. On June 13, 2006—the last day of the *defense* case—the prosecution produced in court a further three undisclosed documents allegedly signed by Taha Yassin Ramadan concerning land seizures in Dujail, and another compact disc recording of a conversation alleged to be between Taha Yassin Ramadan and Saddam Hussein.[182]

The court always retains discretion to permit evidence that has not been disclosed in a timely manner to the defense, where the evidence is clearly probative. However, the exercise of this discretion requires a reasoned process of weighing the value of the evidence against the potential prejudice to the defendant due to late disclosure, and consideration of steps that might mitigate that prejudice (such as granting an

---

[182] The conversation appeared to refer to a town by a code name, although identification of this town as Dujail was never established by evidence.

adjournment or a delay to permit review of the new evidence).[183] Moreover, international tribunals have emphasized that the prosecution bears the burden of explaining why the evidence was not disclosed earlier or could not reasonably have been made available in time[184]—in part to ensure that the prosecution does not reap the benefit of failing to comply with court rules.

However, as best Human Rights Watch could determine, the IHT trial chamber did not consider these issues and permitted the prosecution to introduce new evidence as and when it wished. It also did not seek an explanation from the prosecution as to why disclosure was not made earlier, and never undertook a reasoned examination of whether permitting the evidence would be prejudicial to the defendants or how ensuing prejudice could have been remedied. The court appears to have been essentially indifferent to the potential threat to the defendants' fair trial rights flowing from consistent late disclosure or non-disclosure. The court also appears to have applied a different standard to defense late disclosure than to the prosecution: on May 30, 2006, the defense sought to have shown in court a compact disc of television footage suggesting that a complainant was not speaking truthfully during some of his in-court statements.[185] Whereas the presiding judge always permitted the prosecution to play its newly introduced recordings in court without consulting the defense, on this occasion he refused to allow the footage to be played until the defense obtained the permission of the prosecution. The judge insisted that all such material must be given in advance to the prosecution before it could be used in court. The prosecution examined the compact disc overnight and gave its consent the next

---

[183] See, for example, *Prosecutor v. Bagosora*, Case No. ICTR-96-7-T, Decision on the Motion by the Defense Counsel for Disclosure, November 27, 1997; *Prosecutor v. Brima et al.*, Case No. SCSL-04-16-PT, Decision on Application for Leave to File an Interlocutory Appeal Against Decision on Motions for Exclusion of Prosecution Witness Statements and Stay on Filing of Prosecution Statements, February 4, 2005.

[184] *Prosecutor v. Delalic et al.*, ICTY, Case No. IT-96-21, Judgment (Appeals Chamber), February 20, 2001, para. 279.

[185] The complainant, Ali al-Haydari, had stated in court that the incident at Dujail on July 8, 1982, was "not an assassination attempt" against Saddam Hussein. The footage, shown on Al-Arabiya television channel on May 30, 2005, shows al-Haydari addressing a commemoration ceremony in Dujail in August 2004. Al-Haydari states, "Heroes from the sons of the *mujahid* and heroic city of al-Dujail turned the day of the tyrant Saddam's visit to that city into a historic day in the life of that city, when they tried to kill the most vicious tyrant of modern history, and even the most vicious tyrant known by mankind." See "Al-Arabiya airs video of Saddam prosecution witness contradicting his testimony," BBC Monitoring Middle East – Political, May 30, 2006, 0705 GMT.

day, and the footage was shown on May 31. Treating the two parties unequally in this manner raises concerns that the principle of equality of arms has been violated.[186]

### b. Non-disclosure of exculpatory evidence

Rule 42 of the IHT Rules requires the prosecution to disclose, on a continuing basis, any evidence that mitigates the guilt of the accused. The obligation to disclose exculpatory evidence that is within the prosecutor's custody and control is considered as "important as the obligation to prosecute."[187] International tribunals have held that the equivalent obligation in their own rules is "fundamental to the fairness of proceedings before the Tribunal."[188]

The prosecution does not appear to have exercised due diligence in complying with its obligation under the IHT Rules to disclose exculpatory evidence. On May 29, 2006, while questioning a defense witness, the prosecution showed in court documents apparently issued by a "compensation committee" formed to compensate Dujail residents whose lands had been seized by the government. One of the contentions of the defense case for Saddam Hussein and Taha Yassin Ramadan was that the razing of orchards in Dujail was unrelated to the assassination attempt against Saddam Hussein, but was undertaken pursuant to an agricultural redevelopment program in which compensation was paid to expropriated landowners. Documents suggesting the existence of a "compensation committee" for Dujail clearly tend towards supporting this aspect of the defense case, but were never disclosed to the defendants.

The defendant 'Awwad al-Bandar, the former chief judge of the Revolutionary Court who presided over the 1984 trial and sentencing of men and boys from Dujail, repeatedly claimed that the soundness of the legal procedures he employed could be verified by having regard to the full file of the Revolutionary Court proceedings. Documents in the Dujail trial dossier clearly indicated that the Revolutionary Court file

---

[186] See, for example, *Frank Robinson v. Jamaica*, Comm. No. 223/1987, U.N. Doc. CCPR/C/35/D/223/1987 (1989), para. 10.4, in which the Human Rights Committee commented, "The refusal of the trial judge to order an adjournment to allow the author to have legal representation, when several adjournments had already been ordered when the prosecution's witnesses were unavailable or unready, raises issues of fairness and equality before the courts. The Committee is of the view that there has been a violation of article 14, paragraph 1, due to inequality of arms between the parties."

[187] *Blaskic*, Judgment (Appeals Chamber), para. 264.

[188] *Prosecutor v. Krstic*, ICTY, Case No. IT-98-33, Judgment (Appeals Chamber), April 19, 2004, para. 180.

consisted of 361 pages, but only four of these pages were extracted in the Dujail trial dossier. Lawyers for al-Bandar repeatedly demanded that the court or the prosecution produce the entire Revolutionary Court file, but the court declined to order the prosecution to do so. Indeed, at one point the court suggested that the defendant al-Bandar should have kept a copy for himself when he left the Revolutionary Court in 1989, and that any failure to find the file was al-Bandar's responsibility.[189]

It appears that the prosecution also took no steps to review documents in its custody and control in order to determine whether the Revolutionary Court file was in its possession. The investigative judge responsible for compiling the Dujail trial dossier, who has an express legal obligation to search out exculpatory evidence,[190] also does not appear to have sought to locate the file among the millions of pages of documents to which the court has access.[191] The file was, in fact, among those documents within the control of the court, as it was located by a representative of the RCLO shortly before the end of the trial.[192] The file was never produced in open court, and no explanation was proffered by the prosecution—or sought by the court—as to why it could not have been located earlier.

## c. Non-disclosure of trial session notes and late disclosure of defendants' statements made to the investigative judge

The Dujail trial was conducted without a verbatim written transcript being taken.[193] Although the trial was relatively short compared to other major international criminal trials, it nevertheless ran for 40 trial days, with approximately 70 witnesses and over 1,000 pages of documentation. The absence of a transcript makes it exceptionally difficult to determine exactly what a witness or defendant said, and also makes the task of preparing and adjudicating an appeal both imprecise and cumbersome. The court did maintain a video recording of all sessions, but using video footage to

---

[189] Human Rights Watch-ICTJ trial observation notes, April 6, 2006. The judge made a similar statement on June 5, 2006.

[190] IHT Rules of Procedure and Evidence, rule 23.

[191] The court maintains a "Secure Evidence Unit" overseen by the RCLO, which is responsible for reviewing and cataloging documents seized by investigators. The documents include some of those seized by the US military after the fall of the former government, which were initially transported to Qatar for review as part of the search for weapons of mass destruction.

[192] Human Rights Watch interview with RCLO representative, Baghdad, October 2006.

[193] Ordinary Iraqi criminal courts do not as a matter of practice maintain a verbatim transcript for court proceedings. Rather, the presiding judge dictates the court record to the clerk.

pinpoint witness testimony or trial events is significantly more time-consuming than using a verbatim transcript.

In place of a verbatim written transcript, the court maintained a "court record" of trial session notes, written in longhand by court clerks. The trial session notes are essentially a summary of what was said in court (although Human Rights Watch observers frequently noted that the court clerks were writing little or nothing at all as testimony was given). These trial session notes were not made available to private defense counsel, despite repeated in-court requests. When Human Rights Watch raised the issue with an IHT prosecutor, he stated that "Iraqi law" did not require the sharing of trial session notes with defense lawyers.[194] The court itself never made such a ruling, but it failed to respond to requests by the private defense lawyers that copies of the notes be made available to them. In the absence of either a transcript or the trial session notes, the ability of private defense counsel to review evidence and other statements given in court is severely circumscribed, and constrains their opportunity to prepare an adequate defense.

The court did not make available to the defendants copies of their statements given before the investigative judge, until the morning of the trial session at which defendants were to be questioned by the trial chamber concerning those statements.[195] The dossier of evidence handed over in August 2005 did not include these statements,[196] and the statements were also not included in additional documents disclosed by the prosecution in January and early March 2006. When Human Rights Watch raised this with two IHT prosecutors, they both stated (in separate interviews) that "Iraqi law" does not require that copies of defendants' statements be provided to defendants or their counsel.[197] The court did not rule on in-court demands by private defense counsel that copies of the statements be provided. Only shortly before the opening of the trial session of March 12, 2006 (in

---

[194] Human Rights Watch interview with IHT prosecutor, Baghdad, July 2006.

[195] Human Rights Watch–ICTJ trial observation notes, March 12, 2006.

[196] Human Rights Watch reviewed a copy of the dossier.

[197] Human Rights Watch interview with IHT prosecutor, Baghdad, March 2006; Human Rights Watch interview with IHT prosecutor, Baghdad, July 2006. Human Rights Watch's review of the Iraqi Code of Criminal Procedure has not identified any express provisions stating that providing copies of the defendants' statements is not obligatory, so this assertion appears to be based instead on common practice in the Iraqi legal system.

which defendants would be questioned by the trial chamber concerning their statements), were copies given to private defense counsel. The late provision of these documents made it effectively impossible for private defense counsel to prepare with their clients for questioning by the trial chamber. It also made it impossible for defense counsel to know exactly what their clients were alleged to have said to the investigative judge. This information must be disclosed prior to trial because it is highly material to the preparation of a defense and in particular if counsel wishes to challenge whether any of what is recorded in the statement was in fact uttered by their client.

The charging documents read in court on May 15, 2006, were also not provided in a timely manner to the defendants. The court did not provide a written copy to private defense counsel on May 15, stating that printed copies were still being prepared. This was despite the fact that the court required the defense to commence their case on May 15, just subsequent to the reading of the charges. Private defense counsel repeated their requests for written copies every day for the next three trial sessions, to no avail, and a copy was only provided after one privately retained lawyer, who was considered more cooperative by the court, intervened informally with the trial chamber and repeated the request. As best Human Rights Watch can determine, a written copy of the charging document for each defendant was not provided to private defense counsel and the defendants until one week after the charging documents were read in court.

### d. Refusal to require information concerning chain of custody of documentation and refusal to permit defense to nominate own expert for document examination

The most significant evidence in the Dujail trial came from documents compiled in the trial dossier by the investigative judge and presented by the prosecution at trial. The dossier contains no indication that the investigative judge took any steps to verify any of the documents, or sought out information that would be relevant to determining the authenticity of the documents. The investigative judge also did not indicate how the documents were obtained, from which files or series of files they were extracted, and whether the documents constituted partial or complete extracts from a larger file.

Information concerning the source and chain of custody of a document is essential to assess how much weight should be placed on the document.[198] Similarly, it is important to know whether the document constitutes an extract from a larger file (which may well contain documents that cast doubt on the information in the document tendered), in order to assess its weight and in order to enable the other party to demand to inspect the complete file.[199] In the Nuremberg trials, the prosecution provided detailed information concerning how the tendered documents were captured, analyzed, registered, translated, and safeguarded.[200] In the *Hostages Case*, the Nuremberg tribunal went so far as to state that failure to produce the remainder of a document on the part of the prosecution would cause the court to infer that the evidence contained therein was unfavorable to the prosecution.[201]

No information concerning the source and chain of custody of any document in the dossier was ever introduced during the Dujail trial, and the court was indifferent to defense requests that the prosecution produce information concerning the provenance of the documents. Indeed, when on April 5, 2006, private defense counsel demanded information about how the prosecution had obtained the documents in the dossier, the prosecution refused to answer.[202] The court did not react to the prosecution's refusal. When, on April 4, private defense lawyers alleged that the documents were obtained through the Association of Free Prisoners,[203] the presiding judge denied the claim but offered no further information on the source of the documents.[204] In fact, numerous photocopied documents in the dossier bear the stamp of the Association of Free Prisoners. As discussed above, requests by the

---

[198] *Prosecutor v. Halilovic*, ICTY, Case No. IT-01-48, Judgment (Trial Chamber), November 16, 2005, para. 21; *Prosecutor v. Delalic*, ICTY, Case No. IT-96-21, Decision on the Motion of the Prosecution for the Admissibility of Evidence, January 19, 1998, para. 20.

[199] May and Wierda, *International Criminal Evidence*, p. 244.

[200] *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10 (1946-1949)* (Washington, DC: U.S. Govt Printing Office, 1949-53), vol. 15, pp. 632–72 ("Contemporaneous and Captured Documents").

[201] Ibid., vol. 15, pp. 94–96.

[202] Human Rights Watch–ICTJ trial observation notes, April 5, 2006.

[203] The Association of Free Prisoners comprises a group of former political detainees, Shi'as in the main, who announced their establishment as a nongovernmental organization on April 11, 2003, the day after Baghdad fell to coalition forces. According to its founders, the decision for establishing the Association of Free Prisoners and laying down their plan of action, including for the seizure of Iraqi state documents, was taken soon after the war against Iraq became imminent. Human Rights Watch interview with Ibrahim Ra'uf al-Idrisi, head of the Association of Free Prisoners, Baghdad, July 2003.

[204] Human Rights Watch–ICTJ trial observation notes, April 4, 2006.

defense to produce the full Revolutionary Court file, from which four pages were extracted, were also denied. Overall, the court failed to avail itself of the opportunity to obtain evidence that would be vital to assessing the weight to be given to the documents. It also seemed unaware of the relevant international principles that might guide its approach to this issue.

The only step taken to attempt to verify any of the documents submitted in the court was the retention of "handwriting experts" from the Ministry of Interior to inspect approximately 11 of the several hundred documents in the dossier. The mandate of the handwriting experts—whose identities and qualifications were never disclosed, and who were never made available for questioning—was to evaluate whether signatures on certain documents corresponded with signature samples taken from the defendants Saddam Hussein,[205] Barzan al-Tikriti,[206] 'Abdullah Kadhim Ruwayid,[207] Mizher 'Abdullah Kadhim Ruwayid,[208] and 'Ali Dayeh 'Ali.[209] In addition, a report said to have been authored by Saddam's late son-in-law Hussein Kamel, and dated July 1987, was sent for verification. Two panels (one composed of three experts and the other composed of five experts) examined these documents in March–April 2006. According to the summary of the reports read in court on April 19 and April 24, the panels were able to verify the signatures and handwriting on seven out of the 11 documents, but could not authenticate the documents because they were unable to assess the documents' age.[210] In the summary report read in court, it was stated that

[205] The documents submitted for signature verification in relation to Saddam Hussein were: Presidential Decree No. 778 of June 16, 1984 (authorizing the carrying out of the death sentences imposed by the Revolutionary Court); Revolutionary Command Council Resolution 1283 of October 14, 1982 (authorizing the expropriation of lands in Dujail for an "agricultural development" project); and Revolutionary Command Council Resolution 982 of July 31, 1982 (awarding promotions to several General Intelligence Directorate Officers for their role in responding to the incident at Dujail).

[206] The documents submitted for signature verification in relation to Barzan al-Tikriti were: General Intelligence Directorate letter addressed to the Revolutionary Command Council regarding honors/awards of General Intelligence Directorate Officers, No. 220 of 21 July 1982; General Intelligence Directorate document No. 5782 of 23 September 1982 regarding Dujail farms; General Intelligence Directorate document No. 6282 of 25 October 1982 regarding Dujail farms, with a list of farm owners attached; and Memo addressed to the Revolutionary Command Council from the head of the General Intelligence Directorate, 13 July 1982, No. 9, concerning progress in the investigation into events at Dujail.

[207] The document submitted for signature verification in relation to 'Abdullah Kadhim Ruwayid was the Ba'th Party report allegedly written by him to then-Minister of Interior Sa'doun Shaker, naming Da'wa Party supporters in Dujail, undated.

[208] The document submitted for signature verification in relation to Mizher 'Abdullah Kadhim Ruwayid was the Ba'th Party report allegedly written by him to then-Minister of Interior Sa'doun Shaker, naming Da'wa Party supporters in Dujail, undated.

[209] The document submitted for signature verification in relation to 'Ali Dayeh 'Ali was the Ba'th Party report allegedly written by him to then-Minister of Interior Sa'doun Shaker, naming Da'wa Party supporters in Dujail, dated July 8, 1982.

[210] Human Rights Watch–ICTJ trial observation notes, April 19 and 24, 2006.

both panels reached their conclusions by consensus. The defendants were denied the opportunity to retain their own expert to inspect the documents and submit a view concerning their authenticity. The defense objected to the use of experts from the Ministry of Interior, arguing that the institution was implicated in the activities of Shi'a "death squads" and was dominated by groups hostile to some of the senior defendants. Their objections were rejected out of hand, as was their request for an international document expert to be appointed by the court.

Because the credentials and identities of the experts were never disclosed, and none of them was made available for questioning by the defense, the defense was unable to effectively confront this evidence. Moreover, by denying the defendants the opportunity to call their own expert to offer an opinion, the court does not appear to have considered the requirements of equality of arms, insofar as one party should not be placed at a disadvantage in terms of its opportunity to present evidence.[211] Human Rights Watch has also learned that the second panel of experts did not, in fact, reach their conclusions by consensus, but the differences in opinion between the experts do not appear to have been disclosed to the defendants. This exculpatory evidence should have been disclosed to the defense under rule 42 of the IHT Rules, as noted above, but the court appears to have ignored the rule.

### e. Ex parte scheduling of trial sessions and closing of the defense case

The devising of a trial schedule, known in advance to both sides and created on the basis of an objective evaluation of the preparation needs of both sides, is a basic logistical prerequisite for ensuring that adequate time and facilities have been accorded in long trials.[212] The IHT trial chamber engaged in no process of pre-trial hearings, had no clear timetable for its sessions, and no procedural mechanisms (such as "status conferences") by which it might create one: it simply issued the

---

[211] See, for example, European Court of Human Rights, *Mantovanelli v. France* (App. 21497/93), Judgment of 18 March 1997; (1997) 24 EHRR 370, in which the ECtHR held that, where an expert report is commissioned by the court, the litigants must have an opportunity to be "associated with the process of producing the report, as it consisted in interviewing witnesses and examining documents." Making submissions on the content of the report after it was produced, and in the absence of contributing to it, was not a real opportunity to comment effectively on it (paras. 35–36).

[212] For example, rule 73*bis* and rule 73*ter* of the ICTY's Rules of Evidence and Procedure require the trial chamber to hold status conferences before the beginning of the trial, and after the end of the prosecution case, and issue written decisions determining how many witnesses may be called by the prosecution and defense, and how many trial days are to be allocated for each part. The scheduling order may be amended on the application of either party, in the interests of justice.

dossier and assumed that the defense would be ready within 45 days. Even once the trial had commenced, the court rarely consulted the defense in advance when scheduling sessions and would schedule on a session-by-session basis, creating great uncertainty as to when and for how long it would adjourn. The practice of the IHT trial chamber was to schedule sessions in informal consultation with the prosecution only. This poor trial management helps explain the "stop-start" nature of the proceedings.

The absence of a deliberative and reasoned process in which the court assesses the readiness of each side, and also sets deadlines for various intermediate procedural steps, diminishes the transparency of the trial, while increasing the risk that the court will appear indifferent to the right of the defendants to adequately prepare their defense. While the court did often adjourn for long periods of time, these adjournments were unscheduled and not necessarily related to any requests by the defense, or any reasoned evaluation by the court of the defense's requests for more time to prepare.

The presiding judge moved to close the defense case on June 13, 2006. He did so without issuing a reasoned written decision and with no explanation except that he had decided that he had heard enough witnesses. Courts have an inherent power to control proceedings and to impose limits on the length of time that a party has to present its case. However, the IHT trial chamber imposed its time limit in an essentially arbitrary manner, without previously setting a schedule for the defense and without giving the defense any prior ruling about how many days and court hours they would be permitted to take up. When the defense sought permission to bring additional witnesses, the presiding judge did not inquire into the relevance and materiality of each witness before refusing the request.

The court's power to control the proceedings and the need for expedition must be balanced with the defendant's right to a fair trial. As the ICTY Appeals Chamber noted in *Oric*,[213]

---

[213] *Prosecutor v. Oric*, ICTY, Case No. IT-03-68, Interlocutory Decision on Length of Defence Case, July 20, 2005.

> [T]he authority to limit the length of time and number of witnesses
> allocated to the defense case ... [is] always subject to the general
> requirement that the rights of the accused pursuant to Article 21 of the
> Statute of the International Tribunal[214] be respected. Thus, in addition
> to the question whether, relative to the time allocated to the
> Prosecution, the time given to the Accused is reasonably proportional,
> a Trial Chamber must also consider whether the amount of time is
> objectively adequate to permit the Accused to set forth his case in a
> manner consistent with his rights.

The IHT never engaged in the exercise of trying to determine what amount of time
would be objectively adequate to permit the defendants to set forth their case in a
manner consistent with their rights. It imposed the time limit in an ad hoc manner,
and failed to issue any kind of written decision that explained how the time limit was
consistent with the defendants' fair trial rights. The court acted in a way that
suggested it was indifferent to or ignorant of the relevant procedural principles.

## 4. The Defendants' Right to Confront and Examine Witnesses

The defendant's right to confront and examine witnesses against him or her is a
fundamental fair trial guarantee applicable to both common law and civil law
systems. It is essential to test the credibility of witnesses and their evidence. The
right requires that an accused should be given "adequate and proper opportunity to
challenge and question a witness against him, either at the time the witness makes
his statement or at some later stage in the proceedings."[215] This does not mean that
every witness must be heard and cross-examined, but a conviction cannot be based
substantially on the statements of witnesses whom the defense is unable to cross-
examine.[216]

---

[214] Article 21 of the ICTY Statute replicates the fair trial guarantees found in article 14 of the ICCPR.

[215] European Court of Human Rights, *Delta v. France* (App. 11444/85), Judgment of 19 December 1990; (1993) 16 EHRR 574, para. 36.

[216] European Court of Human Rights, *Kostovski v. The Netherlands* (App. 11454/85), Judgment of 20 November 1989; (1990) 12 EHRR 434; D.J. Harris, M. O'Boyle and C. Warbrick, *Law of the European Convention on Human Rights* (London: Butterworths, 1995), p. 212.

Two features of the Dujail trial violated the defendants' right to confront and examine witnesses against them: the reading of 29 prosecution witness statements into the court record without making any of them available for questioning by defense counsel, and the blanket use of protective measures that amounted to "constructive anonymity" for the overwhelming majority of prosecution witnesses who did testify.

### a. Reading of 29 witness statements into the court record

On February 13, 2006, the trial chamber read 23 prosecution witness statements into the court record without any reasoned decision as to why the witnesses would not be required to attend in person to give their testimony. On March 1, a further six prosecution witness statements were read into the record without explanation. As noted above, of the 23 statements read on February 13, 13 had not been previously and were not subsequently disclosed to the defendants and their lawyers.

Many of the witness statements read into the record referred by name to individual defendants and purported to describe specific conduct by certain defendants. The right to question witnesses is often exercised at the investigative phase in civil law systems.[217] However, defense lawyers in the Dujail trial had not been invited to attend the investigative sessions at which witnesses were deposed, and thus had had no opportunity to question those witnesses. Hence, the witnesses whose statements were read into the record were never, at any stage of the proceedings, questioned on behalf of the defendants.

The Defense Office lawyers who were representing all the defendants at that time (due to a boycott by private defense counsel, described above in Section III.5) did not object to the court's conduct. When private defense counsel returned to court, they requested the recall of these witnesses to permit cross-examination.[218] The trial chamber essentially ignored the request, issuing no written decision as to why the witnesses would or would not be recalled and never explaining its decision to read the statements into the record.

---

[217] Caroline Buisman, Ben Gumpert and Martine Hallers, "Trial and Error – How Effective is Legal Representation in International Criminal Proceedings?" *International Criminal Law Review*, vol. 5, no. 1 (2005), pp. 1–82.

[218] Human Rights Watch–ICTJ trial observation notes, March 15, 2006.

The total number of prosecution witnesses and complainants who appeared before the IHT and gave *viva voce* evidence was 29. Thus, the 29 statements read represent half of all witnesses against the defendants. While some of the witness statements might have been of a kind which did not require cross-examination (because they were of a cumulative nature, or concerned background issues), a defendant *must* have the opportunity to question a witness whose statement concerns the defendant's acts and conduct.[219] By reading the statements into the record without differentiating between statements that concern individual defendants' acts and conduct, and those that do not, and by not providing any reasoned response to the private defense lawyers' request to have witnesses recalled, the trial chamber did not adequately safeguard the defendants' right to confront these witnesses.

### b. *Constructive anonymity and blanket use of protective measures*

In-court "protective measures"—in which a witness is permitted to conceal her or his identity from the public, and in some cases to be shielded from the sight of the defendants in court—are indispensable tools for war crimes prosecutions. They can be instrumental in convincing witnesses that they can be protected from intimidation and retaliation, inside and outside the courtroom. However, protective measures must also be balanced with the defendant's right to confront the witness and test the witness's evidence, and thus must be applied on a witness-by-witness basis.[220] Complete anonymity of witnesses, in which the defendant's lawyer can neither know the name of the witness beforehand nor has the practical possibility of observing the witness under questioning, is not consistent with the right to confront the witness.[221]

---

[219] See, for example, rule 92 *bis* (A) of the ICTY Rules of Procedure and Evidence, which permits proof of facts by a written witness statement, where the statement goes to proof of a matter other than the acts and conduct of the defendant. See also *Prosecutor v. Milosevic*, ICTY, Case No. IT-02-54, Decision on Prosecution's Request to have Written Statements Admitted under Rule 92 *bis*, March 21, 2002; *Prosecutor v. Galic*, ICTY, Case No. IT-98-29, Decision on Interlocutory Appeal Concerning Rule 92 *bis* (C), June 7, 2002.

[220] *Prosecutor v. Thomas Lubanga Dyilo*, Case No. ICC-01/04-01/06, Decision Establishing General Principles Governing Applications to Restrict Disclosure pursuant to Rule 81(2) and (4) of the Rules of Procedure and Evidence, May 19, 2006, paras. 31–32; *Prosecutor v. Brdjanin and Talic*, ICTY, Case No. IT-99-36, Decision on Motion by Prosecution for Protective Measures, July 3, 2000, para. 13.

[221] European Court of Human Rights, *Van Mechelen v. Netherlands* (App. 21363/93, 21364/93, 21427/93, 22056/93), Judgment of 23 April 1997; (1998) 25 EHRR 647; ECtHR, *P.S. v. Germany* (App. 33900/96), Judgment of 20 December 2001. International tribunals have permitted complete anonymity in only one instance, the notorious "Witness L" case in *Prosecutor v. Tadic* (ICTY). "Witness L" lost his protective measures after it was discovered that he was not the person he claimed to be. *Prosecutor v. Tadic*, Case No. IT-94-1, Decision on Prosecution Motion to Withdraw Protective Measures for Witness L, December 5, 1996. Since that episode, international tribunals have refrained from granting anonymity. See May and Wierda, *International Criminal Evidence*, p. 283.

Of the 29 prosecution witnesses and complainants testifying against the defendants at trial, at least 23 were "constructively anonymous." That is, their names were deleted from the dossier before it was handed to the defense (indeed, all witness names were deleted) and they testified out of sight of the prosecution, the defense lawyers and the defendants, in a curtained witness box. Defense lawyers would be provided with the names of the witnesses to testify on the morning of the trial session at which the witness would speak. But the design of the courtroom and witness box was such that not all defense lawyers could observe the demeanor of the witness under questioning if the witness testified with the curtains of the witness box drawn.

The purpose of disclosing witness names in advance of the trial is to provide the defense with the opportunity to investigate witnesses in order to properly test their truthfulness and credibility.[222] Disclosing witness names one hour before testimony does not satisfy this purpose as it renders such investigation impossible. The IHT Rules require that the names of prosecution witnesses be disclosed to the defense 45 days before trial.[223] Rule 48 provides that the court may order protective measures, which include non-disclosure of witness names to the public and the media, but the rule does not refer to withholding of witness names from the defense.

The Dujail trial chamber never issued a single ruling or order setting out the parameters of protective measures for a witness and explaining why the measures were justified. Instead, protective measures amounting to anonymity were applied in a blanket manner. The measures were also sometimes applied in a way that was nonsensical and self-defeating, indicating a lack of understanding of how to use protective measures effectively. For example, on February 13 and 14, 2006, five witnesses were permitted to testify while concealed by the drawn curtains of the witness box, even though their names had been read out in open court.

## 5.  No Reasoned Written Decisions on Key Procedural Issues

The transparency of the Dujail trial was greatly diminished by the consistent failure of the court to publicly issue written decisions on key procedural issues, such as on

---

[222] *Lubanga*, para. 30; *Brdjanin and Talic*, para. 36.

[223] IHT Rules of Procedure and Evidence, rule 41(1)(a).

its decision to close the defense case, its decision to read 29 witness statements into the record, or in response to defense motions accusing the presiding judge of bias. During sessions observed by Human Rights Watch, at least six written motions—addressing issues such as the time needed for the defense to prepare, security for defense counsel, recall of witnesses, scheduling of trial sessions, and the legality of the court—were submitted by private defense lawyers. No public written response on these issues was provided by the court. While some of the motions, such as the motion concerning the legality of the IHT, could be addressed in a final judgment, most of the motions concerned procedural concerns with bearing on the defendants' fair trial rights. Ignoring them over the course of the trial runs the serious risk that the defendants' rights will be irreversibly prejudiced because of the lack of a timely response by the court. Indeed, the failure of the court to respond with reasoned written opinions reinforces the impression that it was essentially indifferent to or unaware of the fair trial principles discussed above.

## 6. Judicial Turnover and Judicial Demeanor

### a. Turnover of sitting judges

The IHT's first trial chamber, which is responsible for adjudicating all questions of fact and law in the trial, consists of five judges.[224] During the course of the Dujail trial, three members of the trial chamber as originally constituted permanently left the bench: Judge Rizgar Amin and Judge Saeed al-Hammashi (both mentioned above, see Section IV,1), and a third judge who recused himself after November 28, 2005. During the course of the trial, a fourth judge was frequently absent due to illness, and was replaced by an alternate. The IHT assigns alternate judges to each trial chamber, who follow proceedings via video from another room in the court building. It is unclear how many alternates are assigned to each trial chamber.

Substitution of judges is not an unknown occurrence when there is a long-running trial.[225] The Rules of Evidence and Procedure of the ICTY and ICTR explicitly allow the

---

[224] IHT Statute, article 3(4)(B).

[225] See, for example, *Prosecutor v. Krajisnik*, ICTY, Case No. IT-00-39 & 40, Decision Pursuant to Rule 15 *bis*(D), December 16, 2004; *Prosecutor v. Milosevic*, ICTY, Case No. IT-02-54, Order Pursuant to Rule 15*bis*(D), March 29, 2004; Order Replacing a Judge in a Case Before a Trial Chamber (President of the ICTY), June 10, 2004; *Prosecutor v. Nyiramasuhuko et al.*, ICTR, Case No. ICTR-97-21-T, Decision in the Matter of Proceedings Under Rule 15*bis*(D) (Trial Chamber II), July 15, 2003; *affirmed by* Decision in the Matter of Proceedings Under Rule 15*bis*(D) (Appeals Chamber), September 24, 2003.

substitution of one judge, even if the defendant objects, in order to avoid unnecessary interruption or repetition of proceedings.[226] In deciding whether to continue with the proceedings where one judge leaves the bench, the international tribunals have applied an "interests of justice" test, taking into account a variety of factors including the ability to assess the demeanor and credibility of witnesses from the trial record; the interests of victims and witnesses; the progress of the case; and the financial costs of restarting the trial.[227]

On the other hand, the rules of the international tribunals envisage a one-off substitution, and certainly not a situation in which 80 percent of the trial chamber effectively turns over in the course of the trial. Where the trial chamber is the primary trier of fact, first-hand evaluation by judges of the demeanor of witnesses is of vital importance.[228] While the video-recording of proceedings can be regarded as an acceptable "second-best" in conjunction with transcripts,[229] in the Dujail case the overwhelming majority of prosecution witnesses testified behind a drawn curtain and thus their demeanor may not be observable by means of the video record of the trial. It is questionable whether a review of video-recorded trial proceedings can, in any event, be considered adequate where not one but four judges were permanently or temporarily replaced over the course of the trial. The turnover of judges in the Dujail trial undermined the integrity of fact-finding by the trial chamber.

### b. Lapses in judicial demeanor by the presiding judge

The presiding judge was the public face of the Dujail trial. He was the only judge whose face was regularly broadcast on television, and had primary responsibility for the conduct of proceedings in court. Presiding judge Ra'uf Abdel Rahman, who replaced Judge Rizgar Amin in January 2006, faced aggressive and unruly defendants, and defense lawyers who engaged in tactics that would sorely try the patience of any

---

[226] ICTY Rules of Procedure and Evidence, rule 15 *bis*; ICTR Rules of Procedure and Evidence, rule 15 *bis*.

[227] See, for example, *Prosecutor v. Krajisnik*, Decision Pursuant to Rule 15 *bis*(D), para. 10.

[228] *Prosecutor v. Karemera*, ICTR, Case No. ICTR-98-44, "Reasons for Decision on Interlocutory Appeals Regarding the Continuation of Proceedings with a Substitute Judge and on Nzirorera's Motion for Leave to Consider New Material," October 22, 2004, paras. 55–61; *Nyiramasuhuko*, Decision in the Matter of Proceedings Under Rule 15*bis*(D) (Trial Chamber II), July 15, 2003, para. 33(e) (allowing substitution of one judge but noting that "the need for every judge to assess demeanor is certainly a very important one...").

[229] See, for example, *Prosecutor v. Krajisnik*, Decision Pursuant to Rule 15 *bis*(D), para. 14.

court.[230] These strained circumstances led to deterioration in relations between the presiding judge and the privately retained defense lawyers over the course of the trial, for which the defendants and their lawyers bear heavy responsibility. At the same time, a judge remains bound by the obligation to maintain his impartiality, and the appearance of impartiality, throughout the proceedings.[231]

Human Rights Watch is concerned that, during the course of the trial, the presiding judge committed a number of lapses of judicial demeanor that undermined his appearance of impartiality. He appears to have lost his temper numerous times, leading to exchanges of insults with the defendants, or erratic and often unexplained decisions limiting the rights of defense counsel to question witnesses.

During his questioning of defendant 'Awwad al-Bandar on March 13, 2006, when al-Bandar was making his statement as a defendant, the presiding judge adopted a hostile tone, frequently interrupting the defendant and ultimately refusing to allow him to finish his statement, although it was clearly related to the case against him.[232] On June 5, the presiding judge made a statement to al-Bandar that suggested that the judge had closed his mind to a key fact in issue, namely, the duration of proceedings before the Revolutionary Court. The prosecution had alleged that al-Bandar had conducted the trial of the 148 accused men and boys from Dujail in less than an hour, while al-Bandar maintained that he had conducted the trial over 16 days:

> Judge: Asking for dossiers [of the Revolutionary Court's file] is the work of the defense but don't ask us to do it.
>
> Al-Bandar: The Americans have seized all the documents of the Iraqi government, and the court can ask them to bring it, but if you want to litigate me without knowing the truth …

---

[230] The conduct of private defense counsel is discussed further below.

[231] See, for example, IHT Rules of Procedure and Evidence, rule 7(4), which requires a judge to withdraw from a case if his independence or impartiality "might reasonably be in doubt." It is an established principle of most legal systems that impartiality implies not only actual freedom from bias, but also the appearance of freedom from bias. See, for example, *Prosecutor v. Furundzija*, ICTY, Case No. IT-95-17/1, Judgment (Appeals Chamber), July 21, 2000, paras. 189-190; European Court of Human Rights, *Piersack v. Belgium* (App. 8692/79), Judgment of 1 October 1982; (1983) 5 EHRR 169, para. 30.

[232] Human Rights Watch–ICTJ trial observation notes, March 13, 2006.

> Judge: I don't do that, this is not a special court, I am not prosecuting you without fulfilling my conscience, I won't issue a sentence on 148 within one hour, I am not this type.[233]

(As noted in the Introduction to this report, whether the 148 men and boys charged over Dujail actually all stood trial is uncertain. The official record says 148 were tried and convicted, but a document dated July 5, 1987, and addressed by Saddam Hussein's son-in-law, Hussein Kamel, to Saddam Hussein states that 46 of the 148 accused had already died in detention by the time they were referred to trial. Another document produced in court in the Dujail trial was an extract of a court verdict from 1986 against an interrogator who had worked on the Dujail case and who had been convicted of misconduct. This document also stated that 46 persons died during interrogation, and that the interrogators sought to conceal the deaths for fear of reprimand.)

On May 15, 2006, the judge refused to allow defendants all to be present when defense witnesses gave evidence. For example, when a witness for defendant Ali Dayeh Ali gave evidence, the judge did not allow the other defendants to be present. This did not appear to be based on any misconduct by the other defendants, and no reasons were given. This continued for another trial day before the judge changed his mind, without explanation. Similarly, also on May 15, in a seemingly erratic manner, the judge refused to allow a defense lawyer to question his own witness, but later in the day permitted it without explanation. On May 24 the judge refused to allow defense lawyers to direct any questions to defense witness Tariq Aziz, exclaiming that "the defense team's aim is to insult the court,"[234] although defense lawyers had not yet had a chance to pose any questions to Aziz before the judge reached this view. After the lunch recess, the judge reversed himself and permitted Aziz to be recalled for questioning, but with no explanation as to why he had disallowed questioning in the first place.

---

[233] Human Rights Watch–ICTJ trial observation notes, June 5, 2006.

[234] Human Rights Watch-ICTJ trial observation notes, May 24, 2006.

On June 12, 2006, the judge entered into an exchange of insults with defendant Barzan al-Tikriti before ordering the latter's removal from the chamber. Al-Tikriti had complained that witnesses for him were scared to come forward to testify:

> Judge: Afraid of Whom? Ghosts?
>
> Al-Tikriti: Afraid of the terrifying court.
>
> Judge: You're terrifying!
>
> Al-Tikriti: No, you're terrifying!
>
> Judge: Why do you always have to be the hero? Get him out of here.[235]

On June 13, 2006, the judge derided a member of Saddam Hussein's defense team from the United States, Curtis Doebbler. When Doebbler rose to object to the closing of the defense case, the judge was observed to sneer at him and said (in Arabic), "We know his purpose. He comes here to hear his own voice and claim that he is an international lawyer."[236] On July 24, during the closing statement for Barzan al-Tikriti, the judge exclaimed to al-Tikriti, "Since you were a child, you were drowned in blood."[237] On July 26 the judge stated to defendant Saddam Hussein (whose lawyers were boycotting the closing sessions of the trial after the June assassination of their colleague Khamis al-Obeidi—see Section III.3, above), "Where are your lawyers? They incite violence, they took millions [of dinars] from Iraq and now they are outside Iraq. They are not lawyers, they incite violence."[238] On July 27 the judge called 'Awwad al-Bandar "stupid" as he ordered him to resume his seat, after al-Bandar tried to interject in the reading of a defense statement on his behalf by a court-appointed Defense Office lawyer.

---

[235] Human Rights Watch-ICTJ trial observation notes, June 12, 2006.

[236] Cited in "Judge Declares End to Hearing of Defense Witnesses in Saddam Trial," Associated Press, June 14, 2006.

[237] Human Rights Watch-ICTJ trial observation notes, July 24, 2006.

[238] Human Rights Watch–ICTJ trial observation notes, July 26, 2006.

While none of these statements compels the conclusion that the judge was in fact biased against the defendants, they do not reflect well on the court's appearance of impartiality. At the very least, these outbursts suggest that relations between the presiding judge and the defendants and their retained lawyers had become so poisoned that the judge had considerable difficulty detaching his own feelings towards some of them from the conduct of the case.[239]

## 7. Conduct of Defense Counsel

The observed performance of Iraqi defense counsel—whether privately retained or appointed by the Defense Office—was generally poor. The absence of any training or instruction in international criminal law was evident in the failure of defense counsel to raise or discuss any relevant international criminal law principles during the course of the trial.[240] As already noted, defense lawyers were not provided with international criminal law texts in Arabic until several months into the trial. Given that a trial of this kind was entirely outside the experience of Iraqi criminal lawyers, and in the absence of any attempt to build capacity through training, it is unsurprising that Iraqi defense counsel floundered. The observed level of preparation by private defense counsel and Defense Office counsel for questioning of witnesses was also poor, although this could in part be attributed to same-day disclosure of witness names and same-day notification of which witnesses would testify.

Some private defense counsel seemed more concerned to make political statements through their questioning of witnesses than to serve the interests of their clients by addressing the substance of the case against them. Combined with the tactic of boycotting proceedings (discussed below), the result was that it was difficult to discern any coherent defense case developed by private defense lawyers for each defendant, either factually or legally: no consistent and identifiable argument as to why the prosecution case was wrong or flawed was developed.

---

[239] See, for example, the discussion in *Kyprianou v. Cyprus* (App. 73797/01), Judgment of 15 December 2005, paras. 129-131, in which the European Court of Human Rights found that the "emphatic language" used by judges in response to a contemptuous remark by defense counsel in a criminal case contributed to the conclusion that the judges had become "personally embroiled" in the case.

[240] As noted above, the Defense Office lawyers did make substantive international criminal law arguments during the closing statements for the defendants, but these arguments were written on behalf of the Defense Office lawyers by the Defense Office's international advisor, and thus do not reflect the underlying capacity of the Defense Office counsel.

The use of boycotts became a common practice among some privately retained counsel.[241] Iraqi law requires that lawyers practicing in Iraqi courts must be respectful towards the court and not obstruct the course of justice or cause unreasonable delays.[242] The Iraqi code of legal professional ethics states that lawyers must appear in court on the set dates, should not try to delay the resolution of a case, and must facilitate the task of the judge.[243] In the Dujail case, the defendants' lawyers' statement that they would boycott the case unless certain demands were met (such as the resignation of the new presiding judge) would appear to contravene their professional obligations under Iraqi law. It is also difficult to envisage a situation in which it would advance the interests of the lawyers' clients. The repeated threat and use of the tactic created the strong impression that some counsel deliberately sought to delay or obstruct the course of the trial. This tactic in fact greatly diminished the ability of privately retained counsel to raise legitimate and serious procedural concerns that did persist in relation to the trial.

During the course of the defense case, private defense lawyers for Saddam Hussein were accused of procuring the perjury of four defense witnesses.[244] The witnesses had testified on May 30 and 31, 2006. Two had claimed that the chief prosecutor in the Dujail case had tried to bribe them into giving false testimony against Saddam Hussein. Another claimed that some of the individuals alleged by the prosecution to have been executed were in fact alive and living in Dujail, while the fourth witness claimed that a person whom he believed to be the chief prosecutor had attended a celebration in Dujail marking the anniversary of the assassination attempt against Saddam Hussein and that some attendees at that anniversary celebration had taken responsibility for the assassination attempt. The witnesses were detained after the end of the court hearing on May 31 on suspicion of perjury, and were interrogated by an investigative judge in the presence of court-appointed counsel. They are alleged to have confessed to having knowingly fabricated their testimony due to threats and inducements by one of Saddam Hussein's defense counsel, who allegedly had

---

[241] Privately retained counsel for Ali Dayeh Ali and for 'Abdullah Kadhim Ruwayid and Mizher 'Abdullah Kadhim Ruwayid did not participate in the boycotts to the same extent.

[242] Law of the Legal Profession, No. 173 of 1965, art. 50.

[243] Lawyer's Professional Code of Conduct, June 16, 1987 (annexed to the Law of the Legal Profession), art. 9.

[244] "Four witnesses in Saddam trial held," Associated Press, June 1, 2006.

coached them on what to say.[245] Defense lawyers for Saddam Hussein claimed that the witnesses had been assaulted and detained incommunicado and that their confessions to perjury were coerced.[246] The witnesses' confessions were read in court in the Dujail trial on June 5. Human Rights Watch has been unable to independently investigate the allegation that the detained witnesses were coerced into confessing perjury, but the confessions raise grave concerns about serious professional misconduct on the part of the implicated defense counsel.

The Defense Office lawyer appointed to represent Dujail defendant Muhammad 'Azzawi in September 2005 did not meet with his client before the opening of the trial, nor for a month after it opened.[247] The court-appointed Defense Office lawyer failed to appear, without prior notice, on at least two occasions,[248] and in all the sessions observed between October 2005 and January 29, 2006, the court-appointed Defense Office lawyer asked no questions. The role of Defense Office lawyers was dramatically enlarged upon the first boycott of the privately retained defense lawyers, which commenced on January 29, 2006, and lasted for three sessions (February 1, 13 and 14).[249] On the first day that Defense Office lawyers were brought in to replace boycotting private counsel, the lawyers asked no questions of any of the three witnesses who testified for the prosecution. In the next three sessions, the Defense Office lawyers became more active, and did ask relevant questions, but generally showed little evidence of preparation. For example, when the former head of the Office of the President, Ahmed Hussein Samarra'i, gave evidence concerning the workings of that office—a critical issue in terms of identifying reporting lines of information and establishing what defendant Saddam Hussein knew about the abuses committed against residents of Dujail—the Defense Office lawyers did not ask a single question of the witness.[250] On the same day, the

---

[245] Paul Schemm, "Key Saddam Witnesses Say They Were Bribed, Coerced," Agence France-Presse, June 12, 2006. The perjury cases against the four witnesses appear to have been referred to ordinary Iraqi criminal courts for prosecution, and Human Rights Watch is unaware of the status of these cases.

[246] Sinan Salaheddin, "Saddam Defense Protests Witnesses' Arrests," Associated Press, June 5, 2006.

[247] Human Rights Watch interview with Defense Office lawyers, November 2005.

[248] November 28, 2005, and March 13, 2006.

[249] For a discussion of the relevant legal principles governing circumstances in which the court can impose lawyers against the will of defendants, see Human Rights Watch, *The Iraqi High Tribunal and Representation of the Accused*, February 2006.

[250] Human Rights Watch–ICTJ trial observation notes, February 13, 2006.

court read the 23 witness statements into the court record without notice (mentioned above). No objection was raised by any Defense Office lawyer, although some of the witness statements pertained to the acts of individual defendants. When asked by Human Rights Watch why they did not object to the reading of the statements, a Defense Office lawyer responded that they did not wish to risk a reprimand from the judge.[251]

---

[251] Human Rights Watch-ICTJ trial observation notes, February 13, 2006. The fear of antagonizing the court was underlined by another Defense Office lawyer interviewed by Human Rights Watch in October 2006: The lawyer noted that the Defense Office lawyers were dependent on the court for their security, and were for that reason reluctant to do anything that might incur the hostility or ire of the court. Human Rights Watch interview with Defense Office lawyer, Baghdad, October 2006.

## V.    Substantive Concerns

The brutality of the former Ba'thist government in Iraq was notorious, but the internal functioning of the "bureaucracy of repression" has not been systematically examined and documented. One of the significant incidental outcomes of attempting to establish individual criminal responsibility for systematic human rights violations is that, in order to link an accused individual with the crime, it is usually necessary to carefully reconstruct the functioning of the "criminal system" in which the individual acted.

The scale of criminal conduct implied in crimes such as crimes against humanity usually means that the "underlying acts" of the crime—mass killing, forced displacement, mass arrests—will be difficult to deny. However, attributing individual criminal responsibility for these acts further up the chain of political and military responsibility can be complicated by the fact that "system crimes ... are generally characterized by a division of labour between planners and executants, as well as arrangements in structure and execution that tend to make connections between these two levels difficult to establish."[252]

The challenge of successfully prosecuting individuals who are alleged to be "planners" is that describing the events of the crime ("crime-base") will generally not be enough: it will be necessary to "elucidate the elements of the operation of the machinery"[253] by showing how political and security institutions regularly functioned, to whom information flowed as a matter of course, and what was known or reasonably knowable to those higher up in the system. Unless the orders or instructions given were patently criminal on their face,[254] this kind of evidence is essential to showing that an accused person knew and intended that the criminal acts would be committed by persons under his or her control or acting in conjunction with him or her. Proving knowledge and intent is necessary to prove that an accused person is individually liable for a criminal act.

---

[252] Office of the High Commissioner for Human Rights, *Rule-of-Law Tools for Post-Conflict States: Prosecution Initiatives* (United Nations, New York and Geneva, 2006), p. 12.

[253] Ibid.

[254] An example of such an order would be "torture all detainees," or "kill all men and boys."

Based on our review of the dossier of evidence in the Dujail case, and our observation of proceedings, Human Rights Watch is concerned that neither the investigative judge nor the prosecution in the Dujail case paid sufficient attention to gathering evidence that would prove the required kinds of knowledge and intention on the part of the defendants in the Dujail case to commit the crimes alleged. In particular, the case against the senior defendants was marred by a striking lack of "linkage evidence." That is, an almost total lack of evidence establishing:

- the legal and practical authority of the numerous security organizations and political institutions implicated in the events at Dujail;
- structures of command and internal organization of these security organizations and political institutions;[255]
- the internal reporting lines and flows of information within these organizations, and how information could be expected to flow to individual defendants;
- the general context of human rights practices (such as the systematic use of torture) and violence by security organizations; and
- the nature of the historical relationship between the political institutions (such as the Office of the President and the Revolutionary Command Council) and the legal institution (the Revolutionary Court) implicated in the crime.

The absence of these kinds of evidence diminishes the persuasiveness of the prosecution case, because it makes it harder to establish that the high-level defendants knew or had reason to know that crimes would be committed as a result of orders that might have been legal on their face, or in the absence of explicit orders at all. These kinds of evidence are generally essential to reconstruct the political context

---

[255] The doctrine of judicial notice has been applied by international criminal courts to permit judges to take notice of certain laws and public documents as "facts of common knowledge." It might have been permissible for the IHT trial chamber to take judicial notice of Iraqi laws establishing the legal authority and structure of some political institutions and security organizations implicated in the events at Dujail. However, the practical functioning and exercise of authority by these organizations and institutions would still have to be established by evidence. Moreover, the court would still have to inform the prosecution and defense teams in respect of what exactly it intends to take judicial notice, so that both sides have an opportunity to comment or object. Judicial notice cannot be taken of a fact that would amount to an essential element of a crime, such as the intent and knowledge (*mens rea*) of the accused. The prosecution did not invite the court to take judicial notice of any facts not in evidence. See *Prosecutor v. Semanza*, Case No. ICTR-97-20, Decision on the Prosecutor's Motion for Judicial Notice and Presumptions of Facts Pursuant to Rules 94 and 54, Nov. 3, 2000; *Prosecutor v. Karemera*, Case No. ICTR-97-24, Decision on Prosecutor's Interlocutory Appeal of Decision on Judicial Notice, June 16, 2006, para. 47; *Semanza v. Prosecutor*, Judgment (Appeals Chamber), para. 192; *Prosecutor v. Fofana*, SCSL, Decision on Appeal Against "Decision on Prosecution's Motion for Judicial Notice and Admission of Evidence", May 16, 2005, paras. 28-31 and separate concurring opinion of Justice Robertson, para. 16.

in which the crimes took place, thus allowing the credible inference that senior political figures authorized, or had an unspoken agreement approving, the crimes.

## 1. Relevant Legal Principles

The defendants were charged uniformly with committing murder, torture, forced displacement, and unlawful imprisonment as a crime against humanity under article 12 of the IHT Statute.[256] A crime against humanity is defined in the IHT Statute as "any of the following acts [in this case, murder, torture, forced displacement, and unlawful imprisonment] when committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack." A person has the necessary intention to commit a crime against humanity when he or she has the intention to commit the underlying act[257] (for example, murder), and when he or she knows that there is an attack on the civilian population and that his or her acts form part of that attack.[258]

---

[256] As noted in Section IV.2, above, these charges were expanded without notice to include enforced disappearance and other inhumane acts intentionally causing great suffering, after the close of the prosecution case. For the purposes of this discussion, the original charges will be considered.

[257] The elements of each underlying offense must also be proved. Thus, a person charged with murder as a crime against humanity must have had the necessary intention and engaged in the necessary acts constituting the offense of murder, namely: an act or omission by the accused (or person for whom the accused has criminal responsibility) causing the death of the victim, and done with the intention to kill or cause serious injury. *Prosecutor v. Blagojevic and Jokic*, ICTY, Case No. IT-02-60, Judgment (Trial Chamber), January 17, 2005, para. 556; *Prosecutor v. Brdjanin*, ICTY, Case No. IT-99-36, Judgment (Trial Chamber), September 1, 2004, paras. 381–382.

A person charged with torture as a crime against humanity must have had the intention to commit torture, and know that his or her act forms part of an attack on a civilian population. Torture occurs under international criminal law when there is the intentional infliction, by act or omission, of severe pain or suffering, whether physical or mental. The act or omission must aim at obtaining information or a confession, or at punishing, intimidating or coercing the victim or a third person, or at discriminating, on any ground, against the victim or a third person. *Prosecutor v. Kunarac et al.*, ICTY, Case No. IT-96-23&23/1, Judgment (Appeals Chamber), June 12, 2002, para. 142.

Forcible displacement of a population occurs under international criminal law when there is an intentional relocation or removal of persons from the territory in which they lawfully reside, involuntarily and without grounds permitted under international law. Relocation or removal is involuntary if it is the result of threat of force or coercion. *Prosecutor v. Simic et al.*, ICTY, Case No. IT-95-9, Judgment (Trial Chamber), October 17, 2003, para. 125.

Unlawful imprisonment occurs under international criminal law where an individual is deprived of his or her liberty without legal basis and with the intention by the accused (or persons for whom the accused bears criminal responsibility) of arbitrarily depriving the person of his or her liberty, or in the reasonable knowledge that his or her act or omission is likely to cause the arbitrary deprivation of physical liberty. *Simic*, para. 64.

[258] See *Kordic and Cerkez*, Judgment (Appeals Chamber), para. 99.

Because of the vagueness of the notice of charges (as discussed above, Section IV.2), it is unclear what "mode of responsibility" is alleged against each of the defendants.[259] However, based on the prosecution's in-court statements, it seems to be that the four senior defendants (Saddam Hussein, Barzan al-Tikriti, Taha Yassin Ramadan, and 'Awwad al-Bandar) were accused of having committed a crime against humanity by participation in a "joint criminal enterprise." The four lower-level defendants ('Abdullah Kadhim Ruwayid, Mizher 'Abdullah Kadhim Ruwayid, 'Ali Dayeh 'Ali, and Muhammad 'Azzawi[260]) appear to have been accused of "aiding and abetting" a crime against humanity by naming suspected Da'wa Party members to the then-minister of interior on July 8, 1982, and allegedly leading security forces to the homes of some individuals, who were then arrested, and some of them later executed.

A "joint criminal enterprise" is a means of committing[261] the crime alleged, namely, a crime against humanity. It is a "theory of liability" that, if its elements are proved, means that an accused is individually responsible for the underlying crime (the elements of which must also be proved). There are three kinds of joint criminal enterprise in international criminal law:[262] "basic," "systemic," and "extended." Only the "basic" and "extended" forms are relevant to the events concerning Dujail.[263]

A "basic" joint criminal enterprise exists where all co-perpetrators, acting pursuant to a common criminal purpose, possess the same criminal intention.[264] For example, participants in a joint criminal enterprise formulate a common plan to kill and each of them has the intent to kill, although each may carry out a different role. An "extended" joint criminal enterprise entails a situation where there is a common

---

[259] Article 15(2) of the IHT Statute sets six modes of responsibility: direct commission; ordering, soliciting or inducing; facilitation, assistance or aiding and abetting; joint criminal enterprise; incitement (for genocide only); and attempting.

[260] In its closing statement, the prosecution recommended the acquittal of 'Azzawi.

[261] *Prosecutor v. Kvocka et al.*, ICTY, Case No. IT-98-30/1, Judgment (Appeals Chamber), February 28, 2005, para. 91.

[262] *Prosecutor v. Vasiljevic*, ICTY, Case No. IT-98-32, Judgment (Appeals Chamber), February 25, 2004, para. 96; *Kvocka*, Judgment (Appeals Chamber), para. 82.

[263] "Systemic" joint criminal enterprise is applied to "an organized system of ill-treatment. An example is extermination or concentration camps, in which the prisoners are killed or mistreated pursuant to the joint criminal enterprise [of running the camp]." *Vasiljevic*, Judgment (Appeals Chamber), para. 98.

[264] *Vasiljevic*, Judgment (Appeals Chamber), para. 97

criminal purpose, but additional crimes outside the common criminal purpose are a natural and foreseeable consequence of carrying out the common purpose.[265]

The *criminal intent* that must be shown to prove guilt as a member of a "basic" joint criminal enterprise is the individual's intention to perpetrate a certain crime (for example, murder, torture, or displacement), with this intent being shared by all other co-perpetrators.[266] The criminal intent that must be shown to prove guilt as a member of an "extended" joint criminal enterprise is an intention to participate and further the common criminal purpose of a group. Responsibility for a crime other than one that was part of the common design arises if it was foreseeable that such a crime might be perpetrated by another member of the group, and the accused willingly took that risk.[267] The intention of the accused can be determined either by manifest evidence, or by inference, where the inference of the accused's intention is the *only reasonable inference* from the evidence.[268] The fact that an accused holds a command role does not give rise to the presumption that he or she knew about the criminal acts of subordinates.[269]

The *acts* that must be established to prove guilt as a member of a joint criminal enterprise are the same irrespective of whether it is a "basic" or "extended" joint criminal enterprise. It must be proved that: a plurality of persons were involved; there was a common design or purpose involving the commission of a prosecutable crime; and the accused actually participated in this common design or purpose.[270] The "common design or purpose" to commit the crime (in this case, a crime against humanity) need not be express, but can be an unspoken understanding inferred from the fact that a plurality of persons *acted in unison* to effect the criminal purpose.[271] However, an unspoken understanding among the members of the joint criminal enterprise should only be inferred if it is the *only reasonable inference* from the

---

[265] *Kvocka*, Judgment (Appeals Chamber), para. 83.

[266] *Vasiljevic*, Judgment (Appeals Chamber), para. 101.

[267] Ibid.

[268] Ibid., paras. 129–132.

[269] *Blaskic*, Judgment (Appeals Chamber), para. 62.

[270] *Kvocka*, Judgment (Appeals Chamber), para. 96.

[271] *Vasiljevic*, Judgment (Appeals Chamber), paras. 108–9.

evidence.[272] "Participation" in the common plan or purpose does not require physical perpetration of any of the underlying acts of the crime (such as murder or torture), but may take the form of assistance or contribution.[273]

## 2. Lack of 'Linkage' Evidence Relating to Knowledge and Intention

The documentary evidence collected by the investigative judge clearly establishes the parameters of the "underlying acts" constituting a crime against humanity: large-scale and prolonged arbitrary detention of a civilian population; torture and harsh conditions in detention leading to numerous deaths; and a summary trial followed by execution of over 100 individuals. Where the documentary evidence is largely silent is in respect of proving either an explicit or unspoken common purpose among senior defendants to commit these crimes, and that each defendant knowingly committed acts in furtherance of the common criminal purpose of committing a crime against humanity. It is here that expert and other evidence concerning the structure, internal organization, and past practice of the Ba'thist government security and political apparatuses was necessary to fill in the gaps and show the links between the "crime-base" and the leadership. "Linkage" evidence can be provided by experts in the politics, history, or military affairs of the country concerned, who can provide detailed contextual information to show how the individual accused fits into a chain of command, how his or her authority was exercised, and what level of knowledge he or she may be expected to have in the circumstances. In the Dujail case, no such expert evidence was presented.

The importance of compiling evidence that addresses the state of knowledge and intent of the defendants can be illustrated by considering the key documents relied upon by the prosecution to make its case against Saddam Hussein. The evidence collected by the investigative judge established that, in the immediate aftermath of the assassination attempt, Saddam Hussein ordered an investigation. The precise parameters of the order were never established by the evidence. On October 14, 1982, the Revolutionary Command Council issued an order, signed by Saddam Hussein, authorizing the expropriation of lands in Dujail for the purposes of an "agricultural

---

[272] *Brdjanin*, Judgment (Trial Chamber), para. 353.

[273] *Prosecutor v. Krnojelac*, ICTY, Case No. IT-97-25, Judgment (Appeals Chamber), September 17, 2003, para. 31; *Kvocka*, Judgment (Appeals Chamber), para. 263.

redevelopment" project and requiring compensation to be paid to the expropriated (except for certain persons detained in relation to the assassination attempt).[274] On May 27, 1984, Saddam Hussein signed a document referring the cases of 148 individuals accused of involvement in the assassination attempt[275] to trial before the Revolutionary Court;[276] the referral was based upon the recommendation of legal advisors who reviewed a 361-page dossier of evidence compiled against the 148 individuals. The decision of the Revolutionary Court, convicting all 148 individuals and sentencing them to death by hanging, was issued on June 14, 1984, and on June 16, 1984, Saddam Hussein signed an order ratifying the death sentences.[277] The death sentences appear to have been implemented in March 1985. The haste with which the accused persons were tried and convicted, and with which the death sentences were ratified, clearly raises real suspicions that the process was no more than part of a de facto plan to carry out extrajudicial executions.

However, no evidence was presented from which the intent and state of knowledge of Saddam Hussein could be discerned or inferred in relation to these actions. The critical issue to be resolved in deciding whether this amounted to committing a crime against humanity is whether Saddam Hussein knew and intended that referring 148 persons to the Revolutionary Court would result in their conviction and execution. In the absence of direct incriminating evidence that Saddam Hussein and Revolutionary Court judge 'Awwad al-Bandar expressly colluded with each other, evidence establishing that Saddam Hussein had knowledge about the way in which the Revolutionary Court functioned or that he directly controlled its proceedings would be needed. One would expect this evidence to set out the structure and actual functioning of the Revolutionary Court, its legal and practical relationship with the Office of the President, its legal and practical non-independence from the policies and will of the president, and its historical treatment of persons alleged to be a

---

[274] The order refers to a list of names of these individuals appended to the order, but the list was not attached to the order produced in court.

[275] The accused persons referred to the Revolutionary Court were charged under articles 156 and 175(2) of the Iraqi Penal Code of 1969, which criminalize intentional attempts to violate the independence, unity or security of Iraq.

[276] The power of the then-president of Iraq to refer to the Revolutionary Court cases concerning threats to the internal or external security of the state was provided for in Revolutionary Command Council Decision No. 1016 of August 1, 1978, promulgated in Al-Waqa'i al-Iraqiya No. 1096 of August 14, 1978.

[277] For the evident contradiction between the official record of 148 accused having been tried and sentenced, and reports that up to 46 had already died in custody prior to the trial, see Section IV,6.b, above.

"security threat" against the state. As a corollary, to prove that former Revolutionary Court judge 'Awwad al-Bandar was guilty of participating in a joint criminal enterprise to murder persons from Dujail, evidence establishing that he knowingly acted in furtherance of the then-president's criminal plan or policy must be shown. One way of showing this would be to demonstrate that the Revolutionary Court (along with other exceptional courts in Iraq under the former Ba'thist government) regularly acted as an extension of state policy and its judges were not independent of the then-president. Thus, in the famous *Altstotter Case* before the Nuremberg Tribunal, certain judges who worked in Nazi Germany's legal system were held criminally responsible for certain judicial decisions implementing National Socialist laws because the judges were proved to have knowingly and deliberately contributed towards the effectuation of a criminal plan of racial persecution directed by the Nazi Party and the state. As part of proving its case, the prosecution in *Altstotter* traced the degeneration of the German legal system under Nazism and the corrosion of judicial independence, and showed how the defendant judges had a history of taking instructions from the Nazi leadership in regard to specific cases.[278]

Neither the investigative judge nor the prosecution gathered any evidence concerning these issues. The laws creating the jurisdiction of the Revolutionary Court, its procedures, the methods of appointing its judges, and other relevant information were never put before the IHT trial chamber. The history of the use of special and exceptional courts by the former Ba'thist government to effect state policy, which was extensive, was also not the subject of evidence. These absences suggest that neither the investigative judge nor the prosecution had an adequate grasp of what international criminal law requires to be proved in order to convict a person accused of a crime against humanity, in the context of these actions.

In a similar vein, no evidence was presented concerning the structure and internal organization of the several governmental institutions and security apparatuses that

---

[278] *The Trial of Josef Altstotter and Others*, United States Military Tribunal at Nuremberg, 17 February to 4 December 1947, reported in *Law Reports of Trials of War Criminals* (Buffalo, NY: W.S. Hein & Co., 1997), Vol. VI, pp. 1-110. The investigative judge and the prosecution in the Dujail case focused on the unfairness of the trial before the Revolutionary Court, and the evidence indeed suggests that the trial was summary and highly unfair. However, subjecting a person to an unfair trial is not listed as one of the underlying acts that can amount to a crime against humanity under article 12 of the IHT Statute. As the court in *Altstotter* pointed out, showing arbitrary behavior by the judge in the courtroom is not sufficient; rather it must be proved that the arbitrary behavior amounted to participation in a criminal policy or plan. Ibid., p. 81.

played a role in the events concerning Dujail, and what the leaders of these various institutions knew or could have been expected to know concerning the actions of their subordinates. For example, the Ba'th Party's "Popular Army" militia was alleged to have played a role in the response to the assassination attempt against Saddam Hussein, by arresting suspects and delivering them to the custody of the General Intelligence Directorate and the General Security Directorate (*Mudiriyyat al-Amn al-'Amm*) and in subsequently razing orchards in Dujail.[279] Taha Yassin Ramadan was the national commander of the Popular Army, and appears to have been accused of having command responsibility[280] for the acts of the Popular Army in Dujail. Yet no evidence was ever presented concerning the command structure of the Popular Army, the actual and legal authority of Ramadan as commander, who were his subordinates or who had actual command of the Popular Army in Dujail, and what the reporting lines were between Ramadan and his subordinates. Ramadan was also alleged to have been a member of an ad hoc committee comprising representatives of security agencies that was responsible for coordinating the response to the assassination attempt at Dujail, but the powers, membership, and structure of this committee were never the subject of any evidence.

Important political organs such as the Revolutionary Command Council, the National Security Council, and the Office of the President all appear to have played a role in the response to the assassination attempt at Dujail. However, the membership, powers, and internal organization of these political organs was not the subject of any evidence, making it impossible to determine whether, for example, a report submitted to the National Security Council concerning the fact that nearly 800 persons from Dujail had been detained[281] would have come to the attention of Saddam Hussein, Taha Yassin Ramadan, or Barzan al-Tikriti. The paths through which information flowed from the security apparatus to the political leadership, and

---

[279] The wanton destruction of property is not one of the underlying crimes that can form part of a crime against humanity under article 12 of the IHT Statute. Hence, it is puzzling that the prosecution focused mostly on Ramadan's alleged role in supervising the razing of the orchards in Dujail, as even if this was proved, it would not amount to a crime against humanity unless it was proved to be part of the crime of persecution—something with which Ramadan was never charged.

[280] Due to the vagueness of the charges, it is unclear whether Ramadan was in fact alleged to have had command responsibility for the acts of the Popular Army, or whether he was primarily accused of being a participant in the joint criminal enterprise of the leadership group.

[281] Report from then-Minister of Interior Sa'doun Shaker to the National Security Council, dated December 28, 1982, stating that 393 men over age 19 and 394 women and children from Balad and Dujail were in detention.

the kinds of information that could be expected to reach the political leadership about the security apparatuses' response to Dujail, were not part of the evidence compiled by the investigative judge.

The systematic use of torture in interrogation in Iraq, and the history of disproportionate violence on the part of the former Ba'thist government's security forces, was also never the subject of any evidence. If the use of torture and excessive force can be shown to be a common practice by security forces, and has been previously brought to the attention of the political leadership (for example, by reports submitted by human rights nongovernmental organizations or through the human rights organs of the United Nations), it becomes harder for senior government officials to claim that they did not know that torture would occur under interrogation by personnel of the intelligence and security agencies.

In respect of the four lower-level defendants, charged with "aiding and abetting" crimes against humanity in Dujail, no evidence was presented concerning their state of knowledge and their intent when allegedly participating in the arrest operations. In order to be found guilty of "aiding and abetting," an accused must be proved to: know that the acts he or she is committing will assist in the commission of the specific crime by the principal;[282] be aware of the essential elements of the crime including the principal's intention to commit the crime;[283] and be aware that one of a number of crimes will probably be committed, and one of those crimes is in fact committed.[284] Thus, the lower-level defendants in the Dujail case (who were charged with aiding and abetting murder, torture, forced displacement, and unlawful imprisonment as a crime against humanity) must be shown to have known that their acts would assist in the commission of murder, torture, forced displacement, and unlawful imprisonment; have been aware of the principals' intention to commit these crimes; and have been aware that one of the crimes will probably be committed. Neither the investigative judge nor the prosecution produced evidence relevant to proving these issues: for example, no evidence addressing the question of whether the lower-level defendants knew or reasonably would have known that

---

[282] *Blaskic*, Judgment (Appeals Chamber), para. 45.

[283] *Prosecutor v. Aleksovski*, ICTY, Case No. IT-95-14/1, Judgment (Appeals Chamber), March 24, 2000, para. 162.

[284] *Blaskic*, Judgment (Appeals Chamber), para. 50.

their acts would assist in the commission of murder or torture or other crimes was ever introduced. Indeed, during their interrogation by the investigative judge, the defendants were not even questioned about what they knew or believed would happen to those individuals who were arrested during the aftermath of the assassination attempt in Dujail.[285]

Overall, the case prepared by the investigative judge in relation to the events in Dujail in 1982 suffered from important gaps in terms of the kinds of evidence necessary to prove intent, knowledge, and criminal responsibility on the part of the defendants. When preparing the case, it appears that neither the prosecution nor the investigative judge paid sufficient attention to the requirements of what must be proved under international criminal law in order to establish specific, individual criminal responsibility of each defendant for the abuses that were committed against the people of Dujail.

Some of the evidentiary gaps may also be explained by the intense pressure placed on the IHT by the Iraqi government to move forward with a trial of Saddam Hussein as early as possible.[286] According to a judge with knowledge of internal deliberations of the IHT trial chamber, when the Dujail case was first referred to trial in July 2005, the trial chamber judges found the dossier of evidence to be insufficient to move forward with a trial and remitted it to the investigative judge for further investigation.[287] The investigative judge appealed, and the Appeals Chamber, under what the judge described as "intense political pressure,"[288] ruled that the trial should proceed.

---

[285] Statement of 'Abdullah Kadhim Ruwayid Fandi al-Mashaikh, February 21 and 28, 2005; Statement of Ali Dayeh Ali al-Zubeidi, May 5, 2005; Statement of Mohammad 'Azzawi 'Ali al-Marsumi, April 27 and June 1, 2005; Statement of Mizhir 'Abdullah Kadhim Ruwayid Fandi al-Mashaikh, February 21 and 28, 2005.

[286] Over the course of 2004 and 2005, senior figures in the Iraqi government made numerous statements demanding that the trial of Saddam Hussein start quickly, or promising that the trial was imminent. See "Talabani: Saddam to Stand Trial within Two Months", *Al-Sabah al-Jadeed*, June 1, 2005, as reported in Institute for War and Peace Reporting, *Iraqi Press Monitor*, No. 253, October 1, 2005; "Barzani Calls for Speedy Trial for Saddam," *Al-Mutamar*, June 8, 2005, as reported in Institute for War and Peace Reporting, *Iraqi Press Monitor*, No. 258, October 1, 2005; "Speed Up Saddam's Trial, Allawi Tells Court," Reuters, August 16, 2004; "Former Saddam Henchmen to Face Trial from Next Week: PM," Agence France-Presse, December 15, 2004; "Iraqi FM Hopes for Saddam Trial by Year's End," Agence France-Presse, June 21, 2005; "Iraqi leader says judges wasting time on Saddam case," *AFX News Ltd*, June 24, 2005; and "Talabani: Saddam likely to face trial soon," Associated Press, May 31, 2005.

[287] Human Rights Watch Interview with IHT judge, Baghdad, March 2006.

[288] Ibid.

## VI.  The Role of International Advisors

The institutional design of the IHT makes the non-binding advice of international advisors the principal mechanism to address the underlying lack of capacity of the Iraqi legal system in respect of trying international crimes. The IHT Statute envisages advisors in each of the branches of the court—judicial, prosecutorial, and defense[289] (but not the administration)—as an alternative to direct participation of international personnel. In reality, the RCLO has been the only source of international advisors to the investigative judges and the prosecution, and the RCLO has frequently been forced to step in and resolve gaps left by the poor administration of the court (such as witness protection and defense counsel security). As a result, the already significant role of the RCLO[290] expanded to the oversight of key logistical and administrative requirements for the conduct of the Dujail trial. As one IHT judge put it, the RCLO functioned at times as the "executive authority" of the IHT.[291]

Apart from RCLO personnel, only two other individuals have been appointed as advisors to the court: one to the IHT trial chamber during the Dujail trial, and the other to the IHT Defense Office from April 2006. Both of these individuals have very significant experience and expertise in international criminal law and procedure, and do appear to have had some impact in preventing even more serious defects in the trial than those documented in this report. Ultimately, however, advisors have not been able to correct or prevent the significant fair trial concerns that arose over the course of the trial.[292]

A further concern with relying on advisors as the only mechanism for international expertise is the lack of transparency concerning the extent of the advisors' role. As previously noted, the closing statements for the Defense Office lawyers in the Dujail trial (the privately retained defense lawyers then staging a boycott) were substantially

---

[289] See above, Section II, "Background."

[290] See Human Rights Watch, *The Former Iraqi Government on Trial,* p. 17.

[291] Human Rights Watch interview with IHT judge, Baghdad, November 2005.

[292] The advisor to the trial chamber has left the court and no replacement for him has yet been found, leaving the trial chamber in the Anfal trial currently without a non-RCLO international advisor.

written by the Defense Office international advisor. When some defendants made this claim in court, the presiding judge flatly denied it. The court's false denial creates the unfortunate impression that the court is trying to hide or conceal the advisor's role, and encourages the perception that the advisors "stage manage" the proceedings.

A direct and significant role by international personnel is to be welcomed and encouraged, but must be transparent. Advisors have proven a poor substitute for direct international involvement as co-counsel, judges, and administrators, such as occurs in the War Crimes Chamber for Bosnia-Herzegovina.[293]

The lack of other non-RCLO advisors can be attributed to several factors. The cost of maintaining an advisor (who stays at either the UK or US Embassy) runs between US$20,000 and $70,000 per month, and European governments other than the UK have not provided significant financial assistance to the IHT because of the likelihood that the court will apply the death penalty in its sentencing (all EU donor countries are abolitionist). Another factor appears to be the reluctance to be involved in what is perceived as a US-dominated process. Any international personnel directly assisting the IHT will be heavily dependent on the RCLO and the US military to facilitate their entry and exit from Iraq, and to provide logistical support (and potentially accommodation) while in Iraq. No entity with an arms-length relationship from both the US and Iraqi government currently serves as the practical vehicle for channeling, managing, and supporting potential international assistance to the IHT.[294] Given the serious problems in the administration of the court, the IHT administration has no capacity to directly manage and support international advisors.[295] Indeed, the then-president of the IHT generally declined to make written requests for further international advisors, even though as president he had primary

---

[293] International involvement in the War Crimes Chamber is subject to a planned phase-out over several years, to ensure both that sufficient expertise is available to conduct trials that meet international standards, *and* that local ownership is achieved over time. See Human Rights Watch, *Looking for Justice*, p. 7.

[294] The International Bar Association was the nongovernmental organization that provided some training support to the IHT judges and facilitated the recruitment of the non-RCLO trial chamber advisor. However, the advisor, once recruited, depends on the US and UK Embassies for day-to-day support in Iraq.

[295] This can be contrasted with the Registry of the War Crimes Chamber of Bosnia-Herzegovina, which is "internationalized" through the appointment of experienced international staff persons as registrar and in other key posts such as witness protection and head of the defense office. The Registry oversees the recruitment and management of international staff, and is also the recipient of donor funds for the court as a whole. The international personnel of the Registry are then gradually phased out once the institution is able to function effectively and has gained the confidence of donors.

responsibility for authorizing advisors to assist the court.[296] Finally, the grave and deteriorating security conditions in Baghdad over the course of 2005 and 2006 have deterred potential international advisors.

---

[296] IHT Statute, arts. 7(2), 8(9), 9(7).

## VII.  Death Penalty

Human Rights Watch opposes the death penalty as an inherently cruel and inhumane punishment. As noted above, the death penalty will be widely applicable for crimes tried before the IHT.[297] Human Rights Watch expresses its grave concern that article 27(2) of the IHT Statute makes the carrying out of death sentences handed down by the tribunal mandatory, by prohibiting the commutation of death sentences by any government official. The mandatory application of the death penalty, without any opportunity for clemency, directly violates Iraq's human rights obligations under the ICCPR. Article 6(4) of the ICCPR states that "anyone sentenced to death shall have the right to seek pardon or commutation of the sentence. Amnesty, pardon or commutation of the sentence of death may be granted in all cases." The Iraqi constitution provides that the President of the Republic is required to ratify death sentences before they are implemented,[298] and thus the IHT Statute's prohibition on amnesty or commutation appears to infringe upon the constitutional authority of the president.

Article 27(2) also requires that a sentence be executed no later than 30 days after a final decision is handed down. This creates the possibility that a person charged in several cases can be tried, convicted, and executed for one of those cases before any other cases are subject to public trial, and as such is likely to deprive victims, witnesses, and the Iraqi people as a whole of the opportunity to conclusively establish which individuals were legally responsible for some of the worst human rights violations in Iraq's history. The execution of convicted individuals while other charges are pending against them means that there may never be a public accounting of the evidence for and against them in relation to these events.

---

[297] See note 39, above, concerning the history of the application of the death penalty in Iraq after 2003.

[298] Constitution of Iraq, art. 72(h).

# VIII.  Conclusion

This report has documented serious procedural flaws in the IHT's conduct of the Dujail trial. These included:

- government actions that undermined the independence and perceived impartiality of the court;
- a failure to ensure adequately detailed notice of the charges against the defendants;
- numerous shortcomings in the timely disclosure of incriminating evidence, exculpatory evidence and important court documents;
- violations of the defendants' basic fair trial right to confront witnesses against them; and
- lapses of judicial demeanor that undermined the apparent impartiality of the presiding judge.

The court's conduct, as documented in this report, reflects a basic lack of understanding of fundamental fair trial principles, and how to uphold them in the conduct of a relatively complex trial. The result is a trial that did not meet key fair trial standards. Under such circumstances, the soundness of the verdict is questionable. In addition, the imposition of the death penalty—an inherently cruel and inhumane punishment—in the wake of an unfair trial is indefensible.

Apart from the conduct of the trial itself, this report has shown that the IHT as an institution has struggled to competently perform administrative functions that are essential to a fair and effective trial. The tribunal lacks a functioning outreach program, a competent witness protection program, and a Defense Office that could effectively ensure a vigorous defense for the accused. Some of these administrative failings have been exacerbated by the sharp deterioration in the security environment from 2004, but poor security conditions do not adequately explain the deficiencies in the functioning of the court. Rather, the facts gathered by Human Rights Watch point to a fundamental lack of capacity on the part of administrators, judges, prosecutors, and defense lawyers. Some of the failings of the court highlighted in this report, such as

the complete absence of an outreach and communications strategy, are now much harder to correct due to the security situation, but the court failed to take the opportunity to develop a program when security conditions were more permissive.

The concerns documented in this report point to the need for significant reforms in the structure and functioning of the IHT if it is to have a real chance of conducting subsequent trials that are fair and credible. The current design of the IHT is not conducive to effective international assistance in the conduct of the trial. The court's structure needs to be revised to ensure international participation at all levels, and the creation of an effective and independent court administration to oversee the integrity of the institution as a whole. In the absence of these reforms, the credibility of the IHT as an independent, fair, and effective judicial institution is fundamentally doubtful.

# IX.  Recommendations

## To the Iraqi Government

- Desist from using article 4(4) of the IHT Statute to remove or relocate sitting trial judges. All questions of bias must be left to the Appeals Chamber of the IHT pursuant to its rules.
- Discourage statements by government officials and political figures concerning the guilt or innocence of defendants before the IHT, concerning the courtroom conduct of judges, or concerning the substance of any ongoing trial.
- Discourage statements by government officials that could in any way be seen as attempts to bring public pressure on the IHT and its judicial decision making.
- Uphold security arrangements agreed upon by government officials with the IHT and private defense lawyers, regarding the provision of salaries for armed guards for defense lawyers.

## To the Iraqi Parliament and the IHT

- Revise the IHT Statute to permit individuals with experience in international criminal trials to participate directly in the trial process as judges, co-prosecutors and co-defense counsel, alongside Iraqi personnel.
- Revise the IHT Statute to create the Administrative Department as an independent entity, led by an individual experienced in managing complex criminal trials and judicial institutions, and tasked with servicing the requirements of the defense as well as the prosecution and judiciary.
- Revise the IHT Statute to reduce the administrative role of the president of the court.
- Revise the IHT Statute to delete article 4(4) of the IHT Statute and to amend article 33 concerning former membership of the Ba'th Party. Dismissal of judges on the grounds of former membership of the Ba'th Party should only occur after an individualized assessment of the past conduct of the judge, that assessment to be undertaken by the disciplinary procedures established under the IHT Statute.

- Revise the IHT Statute to remove the requirement that a judge or prosecutor be a spokesperson for the court.
- Abolish the death penalty.

## To the IHT

- Immediately institute an outreach program administered by a person with expertise in communications.
- Establish a protocol for communications with private defense counsel, and devise methods of verifying delivery of documents and motions, while taking into account difficulties faced by counsel in reaching the court offices out of court sessions.
- Develop training programs for administrative staff.
- Recruit an experienced professional in witness protection to develop and manage a comprehensive witness protection program.
- Institute a protocol for due diligence in the review of evidence and documents held by the court, to ensure thorough and complete disclosure of exculpatory evidence under the IHT Rules.
- Supervise disclosure of evidence by the prosecution to minimize or avoid late or same-day disclosure of incriminating evidence.
- Ensure timely disclosure of witness identities to the defense.
- Develop a reasoned approach to the application of in-court protective measures.
- Appoint an official, with necessary support staff, responsible for ensuring security arrangements for defense counsel. Develop and implement a comprehensive and well supervised security plan for defense counsel.
- Respond to motions concerning fundamental procedural issues in a timely manner and with reasons.
- Institute a practice of maintaining a verbatim written transcript of court proceedings, to be disclosed on a regular basis to all parties to the case.
- Develop a practice of regularly scheduling status conferences well before the beginning of the trial to objectively assess the readiness of both sides for trial, and issue scheduling orders setting out a timetable for hearing.
- Ensure the proper legibility and adequate organization of the dossier of evidence when provided to the defense, and ensure disclosure of defendants' interrogation statements to the defense.

- Institute intensive and ongoing training for Defense Office lawyers in international criminal law and procedure. Appoint an experienced international criminal lawyer as an advisor to the head of the Defense Office.
- Ensure the provision of logistical and other administrative support to private defense lawyers, through the Defense Office.

## X.  Acknowledgments

This report was written by Nehal Bhuta, Arthur Helton fellow with the International Justice Program at Human Rights Watch. The report was researched by staff of the Middle East and North Africa Division of Human Rights Watch, and Nehal Bhuta. Legal research was provided by Daniel Ulmer, a consultant to the International Justice Program. Hugh Sandler, an intern with the International Justice Program, provided additional legal research. The report was edited by Richard Dicker, director of the International Justice Program, and Ian Gorvin, consultant in the Program Office. Legal review was conducted by Aisling Reidy, senior legal advisor. Daniel Ulmer, Hannah Gaertner, associate in the International Justice Program and Andrea Holley, director of publications, prepared the report for publication.

Human Rights Watch sincerely appreciates the cooperation afforded to its researchers by judges and officials of the IHT, prosecutors, Defense Office lawyers and private defense lawyers. Human Rights Watch also thanks advisors to the IHT and staff of the Regime Crimes Liaison Office for their cooperation.

A deep debt is owed to Miranda Sissons and Marieke Wierda, senior associates with the International Center for Transitional Justice, New York, and a consultant for ICTJ, for extensive sharing of information and research.

HUMAN RIGHTS WATCH
350 Fifth Avenue, 34ᵗʰ Floor
New York, NY 10118-3299

**www.hrw.org**

# H U M A N
# R I G H T S
# W A T C H

# Judging Dujail

## The First Trial before the Iraqi High Tribunal

The Iraqi High Tribunal (IHT) has the daunting task of bringing to justice those responsible for grave human rights violations committed in Iraq under the Ba'thist Government. But at the same time, the court is a newly-created institution in a recently-reconstituted legal system, in which lawyers and judges were isolated from developments in international criminal law and had no experience in investigating and trying complex international crimes. The capacity of the IHT to fairly and effectively prosecute international crimes has been questioned since its creation under the U.S.-led occupation.

Based on 12 months research and observation, and dozens of interviews with judges, prosecutors, defence lawyers and other key actors, Human Rights Watch's report provides the most comprehensive analysis of the first trial conducted by the IHT, for crimes against humanity committed against the Iraqi town of Dujail in 1982. The report documents serious administrative, procedural and substantive legal defects in the conduct of the case.

The picture that emerges from this report is of an institution struggling with all aspects of conducting these legally and factually complicated trials, and also beset by external problems: misunderstanding and hostility in public opinion, and from political leaders; grave and increasing security threats to all participants; a bitterly divided legal profession; and, a deepening reluctance by other international actors to assist the process. These limitations have meant that, in the Dujail trial, the court has not met essential fair trial standards and the credibility of the trial process is doubtful. The report proposes root-and-branch reforms to the IHT to enable it to meet the challenge of delivering justice for massive human rights violations.



*Abdullah Kadhim al-Ruwayid, a defendant in the Dujail trial, addresses the first trial chamber of the Iraqi High Tribunal as Chief Judge Ra'uf Abdel Rahman gestures in the foreground, while former Iraqi president Saddam Hussein looks on. February 13, 2006 in Baghdad, Iraq.*
*© 2006 Getty Images*

**Briefing Paper**

# DUJAIL: TRIAL AND ERROR?

## November 2006



International center for
**TRANSITIONAL**
**JUSTICE**

5 Hanover Square, 24th Floor
New York, NY 10004
Tel 917-637-3800
Fax 917-637-3900
www.ictj.org

# DUJAIL: TRIAL AND ERROR?

**Contents**

| | | |
|---|---|---|
| I. | **SUMMARY** | 1 |
| II. | **BASIC FACTS** | 2 |
| | **The Dujail Trial** | 2 |
| | **The Iraqi High Tribunal** | 3 |
| | **The Role of the ICTJ in Relation to the Trial** | 4 |
| III. | **CONTEXT** | 5 |
| | **What Did Iraqis Want?** | 5 |
| | **What Can These Kinds of Trials Achieve?** | 5 |
| IV. | **EVALUATING THE DUJAIL TRIAL** | 5 |
| | A. Has the Trial Improved Respect for the Rule of Law and Independence of the Judiciary? | 6 |
| | B. Has the Trial Succeeded in Exposing the Full Extent of the System Crimes? | 9 |
| | C. Was the Trial Fair? | 11 |
| | D. Did the Trial Restore the Dignity of Victims? | 13 |
| | E. Did the Trial Consolidate the IHT's Institutional Capacity? | 14 |
| V. | **CONCLUSIONS AND RECOMMENDATIONS** | 15 |

## I.    SUMMARY[1]

On November 5, 2006, the Iraqi High Tribunal (IHT) passed an historic judgment against Saddam Hussein and seven others. What became known as the "the Dujail trial" was the first before the Tribunal; the second would be that of al-Anfal, which began in August 2006.

The Dujail verdict was delivered in a 40-minute session that gave little indication of the judgment's detail and reasoning. Former president Saddam Hussein and his former chief of intelligence, Barzan al-Tikriti, were found guilty of willful killing, forcible deportation and torture. They were both sentenced to death and to two terms of 10 years' imprisonment each.[2] The former president of the Revolutionary Court, Awwad Hamd al-Bandar, was found guilty of willful killing and sentenced to death. The former vice president and head of the popular army, Taha Yasin Ramadan, was found guilty of willful killing, deportation, torture, and other inhumane acts. He was sentenced to life imprisonment and to three other terms of imprisonment, ranging from seven to 10 years. Former Ba'ath party officials, Abd Allah al-Ruwaid and Ali Dayih Ali, were found guilty of willful killing and sentenced to 15 years' imprisonment each. Former Ba'ath party leader, Mizher al-Ruwaid, was sentenced to 15 years' imprisonment for willful killing and seven years' imprisonment for torture. All these defendants were found guilty of these crimes as crimes against humanity.[3] Charges against Muhammad Azzawi Ali, a former Ba'ath party member from Dujail, were dismissed for lack of evidence. Individuals sentenced to more than one penalty will serve only the most severe.[4] No defendants were found guilty of the crime of enforced disappearances.

The November 5 judgment is not the final step in judicial proceedings, however. The case will also go to cassation, a process similar to an appeal. The cassation chamber will have to issue its final judgment before any sentences can be carried out. Among its options will be to affirm, reverse, or revise a decision.[5] It can also refer a case back to the lower court for retrial, although there is a discrepancy between the statute and the Iraqi Code of Criminal Procedure in terms of the grounds on which it can do so.[6]

This briefing paper was written prior to the release of the written judgment. It cannot analyze the evidence or judgment in depth until the court makes public its own reasoning behind the judgment. Instead, this paper summarizes the basic facts about the Dujail trial and the IHT, and of the ICTJ's trial-related work, including its in-depth monitoring. The paper outlines the context and considers both what the Iraqis

---

[1] This briefing was written by Marieke Wierda and Miranda Sissons, both Senior Associates at the International Center for Transitional Justice. Bill van Esveld also contributed. Our thanks go to the ICTJ Iraq consultant, Anne Massagee, Ari Bassin, and Bill van Esveld, as well as to Nehal Bhuta and the Iraq Researcher of Human Rights Watch. We gratefully acknowledge the assistance of all officials involved in facilitating ICTJ's monitoring efforts at the Iraqi High Tribunal.
[2] Saddam Hussein was sentenced to a further term of seven years' imprisonment upon being found guilty of other inhumane acts. This was omitted in early reporting.
[3] Crimes against humanity are among the most serious crimes of concern to the international community. They are designed to reflect the fact that certain crimes are either committed on a massive scale or are systemic and committed pursuant to an official policy of either a state or organization. The Tribunal's definitions of crimes against humanity are contained in Article 12 of the Law of the Supreme Iraqi Criminal Tribunal (Law Number 10 of 2005) *Official Gazette of the Republic of Iraq* (October 18, 2005). This law is referred to hereafter as "the statute". An English translation of the statute is available online at:
http://www.ictj.org/static/MENA/Iraq/iraq.statute.engtrans.pdf
[4] Article 142, Iraqi Penal Code (Law No 111) of 1969)
[5] Article 25, IHT statute, supra note 3.
[6] Article 26 of the IHT statute requires an application from either party to show that new findings or facts have been discovered which could have been decisive in reaching the verdict but were unknown at the time of the proceedings. However, the Iraqi Code of Criminal Procedure (Law 23 of 1971) seems to allow a broader discretion in this respect, and simply states that it must explain the grounds for its decision, paragraph 259(a)(1)(8)(B). On the face of it, there is some confusion between relevant provisions of the statute, rules of evidence, and the criminal procedural code.

wanted out of the trial, and what such prosecutions can achieve. The substance of the briefing, however, is an assessment of the trial itself, evaluating whether it:

- assisted in affirming judicial independence;
- exposed the full extent of system crimes;
- adhered to minimum fair trial guarantees;
- contributed to restoring the victims' dignity, and
- consolidated the IHT's institutional capacity.

Finally, the ICTJ offers conclusions and recommendations relating to both the Dujail trial and the IHT generally.

If done effectively, trying the perpetrators of massive human rights crimes can result in some measure of accountability and dignity to the victims. It can also help build much-needed respect for human rights and rule of law. Such trials must be evaluated against the broader political context – but also according to internationally-recognized standards of fairness. These issues are detailed on page 5.

While recognizing the many difficulties faced by the Tribunal, it is the ICTJ's assessment that the trial phase of the Dujail case did not meet these standards. It also fell short in a number of other crucial areas. These include exposing the full extent of the crimes committed by Saddam Hussein's regime; providing adequate outreach to the Iraqi public, and developing badly-needed administrative structures for the IHT. These concerns are discussed in detail on pages 11-14.

The Dujail trial was a significant but flawed step in the search for Iraqi justice. Tribunal judges courageously attempted to deliver justice at a new and ambitious standard for Iraq. But the trial was troubled by challenges such as political interference, gaps in evidence, and breaches of fair trial standards. Based on its in-depth monitoring of the Dujail proceedings, the ICTJ believes a robust appeals process is essential. Substantive and procedural flaws in the trial phase should be addressed. The Tribunal's Cassation (appeals) Chamber should consider referring the Dujail case for retrial to ensure justice is realized. These and other recommendations can be found on pages 15-17.

Three defendants in the Dujail case face the death penalty. The ICTJ opposes the application of the death penalty, and even more so in the light of the flaws of this trial. The terrible crimes of the Ba'ath regime deserve justice and punishment; the ICTJ is articulating its concerns because it believes Iraqi victims and the Iraqi people deserve a fair, strong verdict that will stand the test of time.

## II.    BASIC FACTS

### The Dujail Trial

The alleged facts of this trial deal with a retributive attack against the population of Dujail, a small village about 60 kilometers north of Baghdad. It was here that local residents allegedly mounted an assassination attempt on then president Saddam Hussein on July 8, 1982. The attack took place when his presidential motorcade visited the town. On the day, several residents of Dujail were killed in the town. In the days that followed, hundreds of others were detained and tortured. The Revolutionary Court passed the death sentence on nearly 100 male detainees, who were then executed. Up to 46 others included in the Revolutionary Court judgment had already died under torture. Hundreds of their relatives, including elderly men, as well as women and children, were banished to a camp in the desert.[7] While in internal

---

[7] The Liya camp, in the al-Samawah desert, is located close to the Saudi border.

exile, their houses were confiscated, their orchards in the area of Dujail razed and their property destroyed.

The IHT tried eight accused in the Dujail trial, ranging in seniority from the highest to low-ranking Ba'ath officials. The high-ranking defendants included Saddam Hussein; his half-brother and former chief of the intelligence service (the *mukhabarat*), Barzan Ibrahim al-Hassan al-Tikriti; the former deputy prime minister and later vice-president and head of the army, Taha Yasin Ramadan; and the president of the Revolutionary Court, Awwad Hamd al-Bandar. At the other end of the spectrum were medium- to low-ranking local Ba'ath party members. These included Abd Allah Kathim al-Ruwaid and Mazhar Abd Allah Kathim al-Ruwaid, senior Ba'ath party officials in Dujail, and Ali Dayih Ali and Mohammed Azawi Ali, both party officials in Dujail. The defendants were charged with crimes against humanity, including willful killing, deportation, imprisonment, torture, disappearances and "other inhumane acts."[8]   Under Article 406 of Iraq's penal code, the crime of murder is punishable by death.

Crimes against humanity are amongst the most serious crimes of concern to the international community. While the underlying offences of murder, torture and so on are important measures of individual criminal acts, they do not on their own convey the full nature and extent of the crimes. Crimes against humanity are derived from international criminal law and designed to reflect the fact that certain crimes are committed on a massive scale or systemically, often following an official policy of a state or organization. The crimes must have been committed as part of a widespread or systematic attack against a civilian population. Furthermore, it must be shown that the accused knew that the crime in question formed part of such an attack.

**The Iraqi High Tribunal**

In essence, the IHT is a domestic court that has been inserted into the Iraqi legal system. Its jurisdiction, however, applies international law provisions that were first developed after World War II, but had never been formally included in Iraqi law.

A more complete history of the Tribunal's establishment is documented in detail elsewhere.[9] Briefly, US officials stated their intention to establish an Iraqi-led tribunal prior to the fall of the Ba'athist regime. The IHT, originally titled the "Iraqi Special Tribunal," was established by order of the Coalition Provisional Authority in December 2003. In the following year, it was re-established in Iraqi national law and renamed. IHT proceedings are regulated by a statute promulgated on October 18, 2005.[10]

Under the statute, the IHT has jurisdiction over certain international crimes, including genocide, crimes against humanity and war crimes, if committed between July 17, 1968 and May 1, 2003.[11]   It also has jurisdiction over certain crimes under Iraqi national law.[12]   While separate rules of procedure and

---

[8] Awwad Hamd al-Bandar was charged initially with murder as a crime against humanity. The crimes of disappearances and other inhumane acts were added on May 15 2006, at the close of the prosecution case.
[9] See ICTJ, *Creation and First Trials of the Supreme Iraqi Criminal Tribunal*, October 2005 at
http://www.ictj.org/images/content/1/2/123.pdf.
[10] See Law of Supreme Iraqi Criminal Tribunal, supra note 3.
[11] Iraq ratified the 1949 Geneva Conventions on February 14, 1956, and acceded to the Convention on the Prevention and Punishment of the Crime of Genocide on January 20, 1959 (as mentioned in the statute, Article 11(1)). Genocide, war crimes and crimes against humanity had not been incorporated into domestic law before the Tribunal's statute was promulgated.
[12] Article 14 (1-3) of the IHT statute includes undefined crimes from a law of 1958: interference in the affairs of the judiciary; the wastage and squandering of natural resources, and the abuse of position and pursuit of policies that may lead to the threat of war or the use of Iraqi armed forces against an Arab country. Article 14 (4) of the statute, inserted in October 2005, allows the tribunal to hear cases of crimes which may lack the elements required for crimes against humanity, war crimes, or genocide if they constitute crimes under the Iraqi Penal Code.

3

evidence were promulgated for the IHT,[13] the basic procedural framework of the Dujail trial was taken from Iraqi law, specifically the Iraqi Code of Criminal Procedure of 1971 and the Iraqi Penal Code of 1969.

The Iraqi legal system follows the civil law tradition, not the Anglo-Saxon system of common law. The trial, therefore, followed a standard civil law format, where the presiding judge plays a leading role. He is required to guide proceedings through various phases of evidence, including the complainants' phase and witness testimony, documentary evidence and the statements of defendants themselves. This is followed by a charging process, witnesses for the defense and concluding statements. As in any civil law system, the defendants were given the opportunity to represent their own views and to be represented by legal counsel of their choice.[14]

The IHT received international advice primarily via the Regime Crimes Liaison Office (RCLO), a unit operating out of the US Embassy. The RCLO is staffed largely by individuals seconded from the US Department of Justice, and also provides investigative and logistical support. An experienced British lawyer who is not an RCLO employee advised the judges of the first trial chamber. Another expert was appointed to assist the defense office some six months after the Dujail trial began.

### The Role of the ICTJ in Relation to the Trial

The ICTJ is one of only two organizations (with Human Rights Watch)[15] to formally observe the trial throughout. Prior to the trial, ICTJ commented on the statute and the rules of procedure and evidence. The organization's Arabic-speaking observers were present from the trial's opening, and attended 85 percent of the hearings. The ICTJ has engaged in many conversations and interviews with key participants in a series of four visits,[16] one including international expert Robin Vincent, formerly Registrar of the Special Court for Sierra Leone.

In addition to maintaining a consistent presence on the ground, the ICTJ organized a pre-trial dialogue on international standards in London – aimed at prosecutors and judges. It also evaluated the trial dossiers, kept an informal transcript, and corresponded with the Tribunal. The organization has also provided extensive media commentary throughout the trial. The ICTJ also worked in Iraq prior to the trial and, together with the University of California, Berkeley, conducted a country-wide survey on Iraqis' expectations of transitional justice in 2003.[17]

---

[13] Rules of Procedure and Gathering of Evidence with Regard to the Supreme Iraqi Criminal Tribunal, *Official Gazette of the Republic of Iraq* (October 18, 2005), available at
http://www.ictj.org/static/MENA/Iraq/IraqTribRules.eng.pdf

[14] On the frequent occasions that counsel of their choice were absent, the IHT made an effort to ensure that the accused were represented by members of the court's own defense office.

[15] In this regard, our thanks in particular go to Nehal Bhuta and the Iraq researcher from Human Rights Watch for an extensive collaboration on covering the IHT and the trials. Most of our missions were joint missions and we are very grateful for the opportunity for consulted and shared impressions.

[16] October 2005; November – December, 2005; February - March 2006; and July 2006.

[17] In extensive interviews and focus group discussions, 395 people, representing a broad cross-section of the Iraqi population, were polled through 38 interviews and 49 focus groups, conducted in July and August, 2003. ICTJ / Human Rights Center, University of California (Berkeley), *Iraqi Voices: Attitudes Toward Transitional Justice and Social Reconstruction*, (2004), p.60. Generally, interviewees expressed widespread support both for material and symbolic compensation and rehabilitation as ways of rebuilding lives, restoring dignity and moving beyond the legacy of the old regime. Many responses further indicated a desire for national reconciliation through education, media, and community programs. The three most pressing issues in social reconstruction were securing basic needs, maintaining security and stability, and improving economic conditions. *Iraqi Voices*, pp. i-iii.

### III.    CONTEXT

**What Did Iraqis Want?**

When surveyed shortly after the fall of the Ba'ath regime by the ICTJ and University of California, Berkeley, Iraqis strongly supported fair and public trials for the regime's massive human rights violations[18] – namely, the trials of Saddam Hussein, his family, and his closest supporters.[19]  Those surveyed said they viewed public trials as a way to ensure the public airing of the regime's crimes.[20]  Because victims and their families desired retribution, respondents felt that the punishment should fit the crime.[21]

The survey also made clear that Iraqis' belief in the legitimacy of a trial process would be built gradually. Attitudes revealed conflicting feelings: a desire for fair trials, but also for swift and vengeful justice; a strong demand for an Iraqi-controlled accountability process, and a lack of confidence in the fairness of the Iraqi legal system and mixed feelings about judges and lawyers from the old regime; recognition of the need for international assistance, but mistrust of the US for its earlier support of Saddam Hussein and its role as an occupying power. They also expressed anger against the international community for years of sanctions and decades of inaction against Saddam Hussein.[22] The trial should be evaluated against this background of expectations.

**What Can These Kinds of Trials Achieve?**

If handled effectively, trials dealing with massive human rights violations can strongly reaffirm the rule of law. They can bring a measure of accountability for terrible crimes, and restore dignity to victims. They can demonstrate a new commitment to an independent and effective judiciary, strengthen the capacity of criminal justice institutions, and demonstrate the meaning and importance of fairness. However, holding such trials in post-conflict (and conflict) environments poses great challenges. These may include continued insecurity, political upheaval and potential politicization; as well as lack of capacity, and/or lack of independence or impartiality by the judges. All these factors should be taken into account when evaluating any trial process. However, one should never lose sight of the fundamental questions. Was the trial fair? Did it meet recognized international standards? And will it merit respect in years to come?  This document seeks to answer these questions in regard to the Dujail trial.

### IV.    EVALUATING THE DUJAIL TRIAL

The Dujail trial is the first step of a very ambitious exercise. It is rare for countries to attempt to try their own leaders for massive human rights violations in the immediate aftermath of their overthrow. Hence, the very fact that Iraq decided to hold trials must be seen as significant. Unlike during the post World War II trials at Nuremberg, the violence in Iraq continues, and the Tribunal is working in an extremely challenging environment.

---

[18] Respondents tended to define a fair legal process as the antithesis of what they had experienced in the past. Other criteria included, inter alia, open and public trials, judgments in accordance with the law, and non-corrupt judges. *Iraqi Voices*, p. 48.
[19] Ali Hassan al-Majid (Chemical Ali), Izzat Ibrahim al-Douri (vice-chair of the Revolutionary Command Council), and Uday and Qusay Hussein were among those specifically named. *Iraqi Voices*, p. 49. Respondents stressed the need to differentiate between Ba'ath party leadership and mere members. Id., pp. 27-28.
[20] Some of those interviewed criticized the killings of Uday and Qusay Hussein because they would not be confronted with their crimes in court. Id, p. 48.
[21] Id., p. 26.
[22] Id., pp. i-ii.

It would not be fair to say that the Dujail trial has been a sham; the judges have clearly intended to set a new standard for Iraqi judicial processes – one that is procedurally and substantially fairer than any previously held by the special courts that dominated the criminal justice regime during the era of Saddam Hussein in Iraq. Some of those involved in the Dujail trial – judges, prosecutors, complainants, witnesses, and lawyers - are individuals of enormous courage, and their participation has required considerable personal sacrifice. Judges at investigative and trial levels, as well as other Tribunal participants, are attempting to deliver justice to a certain standard.

Their efforts are complicated by the fact they are working from an extremely low base. Under Ba'athist rule, the Iraqi criminal justice system was a travesty. It would be unrealistic to expect the trials to conform fully to international standards without additional international assistance. Even trials conducted under the auspices of the UN have not always met international standards of fairness.[23]

The ICTJ considers that the Dujail trial should be evaluated according to the following criteria – i.e., did it contribute towards:

- Improving respect for the independence and impartiality of the judiciary (as a way of building the rule of law);

- Uncovering the full extent of the system crimes, and thereby contributing to accountability for these crimes;

- Demonstrating and preserving standards of fairness, even for defendants who may be despised;

- Restoring the dignity of victims, including thorough acknowledgement of the crimes committed against them and the extent of their suffering;

- Building the effectiveness and institutional capacity of the IHT.

Ultimately, it is for Iraqis to decide the form of justice that they wish to pursue, provided it adheres fully to human rights standards. While recognizing the difficult circumstances in which it took place, the ICTJ considers that the Dujail trial fell short of international standards – and also of the Tribunal's own statute and rules. By drawing attention to these shortcomings, the ICTJ hopes that mistakes will be recognized and corrected, and that, ultimately, the quality of justice delivered in the Dujail case – and in future cases – will stand the test of time.

## A. Has the Trial Improved Respect for the Rule of Law and Independence of the Judiciary?

Several issues impacted directly on the Tribunal's ability to demonstrate the centrality of the rule of law and the independence of the judiciary in post-2003 Iraq. Some of these factors were within the Tribunal's control; others were not.

Much has been made in the media and elsewhere of the dramatics in the courtroom, particularly the exchanges between the judges and the accused. But these are, to some extent, common to such trials. High-ranking politicians are almost always capable of better showmanship than judges. Rather, other factors have seriously undermined the trial's ability to re-affirm the rule of law.

The first and most serious issue is that of political attacks on the independence of the judiciary. Iraqi political leaders have continually made remarks and exerted pressure, creating an atmosphere that is not

---

[23] See Caitlin Reiger and Marieke Wierda, *The Serious Crimes Process in Timor-Leste: In Retrospect* (ICTJ, 2006), pp. 2-3, 40-41. See also David Cohen, *Indifference and Accountability: The United Nations and the Politics of International Justice in East Timor* (East-West Center, June 2006).

conducive to the exercise of the presumption of innocence or to fair trials. Judge Rizgar Amin, who initially presided over the Dujail trial, resigned in January 2006, following criticism of his courtroom demeanor by senior political figures and the public.[24] In the same month, the ICTJ was told that members of the executive reportedly threatened to cut judicial allowances, following unfavorable media coverage of the IHT. Judge Abdullah al-Amiri, who was presiding over the second trial chamber, was removed on September 19, 2006, following an outcry from the prime minister's office, parliamentarians, and the public at his comment that Saddam Hussein was "not a dictator."[25]

Such direct and indirect forms of interference are intended to have a chilling effect on the behavior of the remaining judges.[26] The political message is clear: if judges are seen as too lenient in their courtroom demeanor or judgments, they will be removed. Internal judicial processes for evaluating the conduct and possible bias of judges, and resulting in their disqualification, have been completely ignored. Other remarks by political leaders have eroded the presumption of innocence and given the impression that the trials are a foregone conclusion. It is difficult to think of a more blatant attack on the independence of the judiciary.[27]

A second vital issue concerns the repeated interventions in judicial selection by the Higher National De-Ba'athification Commission.[28] The IHT has undergone several rounds of de-Ba'athification, a politicized process which has ignored the high threshold required by international standards before judges can be removed from ongoing cases.[29]

De-Ba'athification has not been confined to the Tribunal. However, the standard imposed is unusually stringent, and it has remained a looming threat throughout the proceedings.[30] The first round of removals was in the summer of 2005, when a number of the IHT's staff was dismissed. But when Judge Sa'id al-Hammashi was due to replace former presiding judge Rizgar Amin as the next most senior judge, the De-Ba'athification Commission prompted his removal from the trial chamber (although he was not ultimately removed from the IHT). In October 2006, a further four judges received letters to indicate that they were under investigation and were suspended from their duties. It is unknown what future damage de-Ba'athification may cause to the process.

---

[24] The Minister of Justice, Abd al-Hussein Shandal, directly attacked Judge Rizgar in December 2005; his attacks were subsequently directed at the newly-appointed presiding judge, Rauf Abd al-Rahman. *Al-Hayat*, February 5, 2006.

[25] See Peter Beaumont, "Judge in Saddam Trial Axed in Neutrality Row," *The Guardian*, September 20, 2006.

[26] Article 4(4) of the IHT statute allows the Council of Ministers (made up of the Prime Minister and the cabinet) to transfer a judge from the IHT to the Higher Judicial Council "for any reason."

[27] See the UN Basic Principles on the Independence of the Judiciary, available online at http://www.unhchr.ch/html/menu3/b/h_comp50.htm

[28] According to Article 33 of the Tribunal's Statute, "No person belonging to the Ba'ath Party may be appointed as a Judge, Investigative Judge, Prosecutor, employee or any of the Tribunal's staff." Coalition Provisional Authority (CPA) Order No. 7 gave ex post ratification to the first and second decisions of the Higher National De-Ba'athification Commission and authorized the Iraqi Governing Council to further delegate powers to the Commission. CPA Order No. 6: Delegation of Authority Under De-Baathification Order No. 1 (CPA/MEM/4 November 2003/7), Sections 1(1), and 2(1). Further, CPA Order 15, "*Noting* that the Iraqi justice system has been subjected to political interference and corruption over the years of Iraqi Ba'ath Party rule," created a Committee to "investigate and gather information on the suitability of Judges and Prosecutors to hold office," with the power to remove them or confirm them in office, appoint replacements, and resolve claims of improper removal. CPA Order 15, Establishment of the Judicial Review Committee (CPA/ORD/-- Jun 2003/--), June 23, 2003, Section 4(1).

[29] In this regard, the ICTJ notified then Iraqi Prime Minister Ibrahim al-Jafaari of the UN Basic Principles on the Independence of the Judiciary in a letter of February 14, 2006.

[30] In other fields, it is high-ranking Ba'ath party members who are subjected to de-Ba'athification, but Article 33 of the Tribunal statute states that any person who was a member of the Ba'ath party cannot be employed by the court.

The Dujail case had a substantial turnover. During the course of the trial, there were at least four changes of personnel in the five-judge panel (due to resignation, recusal, de-Ba'athification, and illness). It is reasonable to conclude that the judges' ability to assess the facts was affected and fairness was damaged.

Comparative experience shows that respect for the independence of the judiciary is vital to the success of domestic prosecutions for grave human rights abuses.[31] Unless Iraqi government officials, the De-Ba'athification Commission and others halt their interference with these trials, their legacy will be tainted and they will be perceived as having been politicized for years to come.

A number of other factors have contributed to the politicization of the Dujail trial and its inability fully to affirm the centrality of the rule of law in the Iraqi context:

- *Perceptions regarding legitimacy.* The promulgation of the Tribunal's statute may have ensured its legitimacy as a matter of formal law. However, there is still a difficulty in terms of *perception* of the legitimacy of the Tribunal, because of the US role in its creation and its provision of ongoing support, mainly through the RCLO. This has been readily seized upon by defendants and defense counsel. It has also impaired the trial's impact in the Middle East and North Africa regions.

- *Security.* The security environment in which the IHT operates has deteriorated sharply since 2003, affecting almost every aspect of its work. At least five IHT employees have been murdered since 2004, and three defense lawyers were murdered during the Dujail trial. These deaths have led to ongoing controversy over the propriety of the trial's timing and location. The killing of the defense lawyers, in particular, gave rise to the perception that the IHT and RCLO had not taken sufficient steps to protect them from the outset of the Dujail trial. While certain arrangements may have been offered to defense counsel, too little appears to have been offered too late.[32] Members of the Tribunal's defense office have also had difficulty in making adequate security arrangements. As a result, defendants faced difficulties in retaining not only private counsel, but even court-appointed attorneys.[33] The deaths of the defense counsel are also likely to have had an enormous impact on the defense's ability to conduct independent investigations.

- *Failure to apply legal rules during the proceedings.* The Dujail trial also suffered from an absence of regularized procedures, which contributed to a sometimes chaotic appearance. Judges' lack of prior experience in conducting complex criminal cases was apparent at times, in spite of the efforts made to run an orderly court.

- *Judicial demeanor and impact on impartiality.* The exchanges between the judges and the posturing of defendants in the courtroom led to several lapses in judicial demeanor. Some of these may have been harmless, unlike statements such as that by judge Rauf to Awwad al-Bandar directly alluding to facts under dispute: "This is not a special court, I am not prosecuting you without fulfilling my conscience, I won't issue a sentence on 148 defendants within one hour, I am not this type."[34]

---

[31] Steven R. Ratner and Jason S. Abrams, *Accounting for Human Rights Atrocities in International Law: Beyond the Nuremberg Legacy* (Oxford University Press, 2001), pp. 182-183.

[32] After the killing of Sadun al-Janabi in October 2006, defense counsel demanded that they be given a choice of protective personnel (rather than have guards provided by the Ministry of Interior); that they be issued weapons and appropriate licenses, and that an impartial investigation be conducted into the killing of al-Janabi. In March 2006, there were delays in paying the guards assigned to them by the Ministry of the Interior, and there was reportedly still no offer to relocate outside of Iraq.

[33] Ali Dayih Ali claimed that, after two privately hired lawyers withdrew from his case, his two court-appointed attorneys either withdrew or simply failed to appear. IHT session, February 1, 2006.

[34] IHT session, June 5, 2006.

- *Role of defendants.* Defendants were more concerned with the trial as a political platform than with their own legal defense. There can be no doubt that the fact that the proceedings were televised provided the accused with additional opportunities in this regard.

- *Role of defense counsel.* Many defense counsel contributed directly to the trial's politicization through tactics both in and out of the courtroom. These included staging walk-outs and other political gestures such as boycotts.[35]  This kind of behavior was not in the interests of their clients, who were left to fend for themselves.  The IHT had insufficient disciplinary tools to tackle this problem.

## B. Has the Trial Succeeded in Exposing the Full Extent of the System Crimes?

Investigative techniques for "system" crimes, such as those committed by Saddam Hussein's regime, differ from those relating to ordinary crimes. The work of the investigative judge or prosecutor in investigating and presenting most ordinary crimes is sometimes likened to that of a film director in terms of "depicting" or reenacting an event, such as a murder. On the other hand, the investigation of system crimes requires an approach closer to that of an engineer. If an investigation were to demonstrate the responsibility of members of a criminal regime, the task would to expose clearly how the various parts of the 'machinery' functioned to culminate in crimes such as murder on a massive scale.[36]

System crime investigation – whether in relation to one or a series of criminal acts – requires a detailed exploration of the system itself, and not merely its results. The results are manifested in the underlying offenses that constitute what is called the "crime base" (e.g., murder, torture, rape, deportation, etc.). In the Dujail case, the testimony of the complainants and the documentary evidence succeeded in establishing the crime base.

However, the more difficult task is to show that high-level accused such as Saddam Hussein himself were responsible for the crimes committed by his subordinates. This requires evidence that links them to the crimes. Such evidence may establish their direct participation (for instance, though oral or written orders). It may also establish their superior or command responsibility (in terms of showing that they had effective control over their subordinates and failed to act or punish them, even though they knew or should have known about the crimes.) In short, the prosecution case, as compiled by the investigative judge, was *much weaker* in terms of linkage evidence.

This analysis was written prior to the release of the trial chamber's written judgment. The ICTJ will analyze the judgment in depth at a later stage. Based on extensive monitoring and observer notes, however, the ICTJ has identified the following weaknesses in the case presented against the defendants:

- *Lack of clarity on the forms of participation alleged.* The prosecutor never clearly laid out *how* each of the accused participated in the crimes.  While he seemed to allege that there was something akin to a joint criminal enterprise to carry them out, no evidence was brought to that

---

[35] After Barzan al-Tikriti had been ordered removed from the court, a Jordanian defense lawyer stood up and began shouting at the presiding judge until he was removed as well.  The judge observed that this counselor was inciting his clients. IHT session, January 29, 2006. Hussein's private defense attorneys were still boycotting the trial when Hussein re-appeared in court on July 26 to critique it, and to listen to two other lawyers as they delivered his closing defense arguments. IHT session, July 26, 2006; BBC Monitoring Middle East (transcription of al-Jazeera television broadcast), July 23, 2006.

[36] See Office of the UN High Commissioner for Human Rights, *Rule of Law Tools for Post-Conflict States: Prosecution Initiatives* (UN, New York and Geneva: 2006)

effect, nor were other types of co-perpetration specified.[37] This leaves open the possibility that the violations committed in the course of investigating the assassination attempt were the result of acts by overzealous individuals. Moreover, none of the charging documents specified the particular roles played by the individuals accused of the crimes.

- *No clarity on the respective responsibilities of the different organs of Saddam Hussein's regime.* In the trials at Nuremberg, or at the Yugoslav Tribunal, it has been common to call expert witnesses to give an overview of how a particular system operated. This helps produce clear descriptions of chains of command and the respective responsibilities of various parts of the "machine." In the Dujail trial, *no such witness was called*, and the respective competences of the institutions with which individual accused were affiliated were never clearly defined (for example, the *mukhabarat*, the Revolutionary Court, the Popular Army, the Ba'ath party, or the President's Office). The result is that the evidence related more clearly to the facts of the crimes themselves, than to who orchestrated them.

- *Absence of patterns.* The presentation of evidence seemed constrained by the sequence stipulated in Iraqi law, where it is common to start with complainants, followed by witnesses, and then present the documentary evidence. This process did not easily allow for the presentation of patterns of evidence, which would have allowed the prosecution to argue that the judges should draw inferences. For instance, if it had been shown that torture was widespread in the *mukhabarat*, it would have been easier to argue that Saddam Hussein knew, or should have known, that such torture was occurring in the aftermath of the Dujail attack. Nor did the judges exercise their right to call additional evidence on such issues.

- *Lack of evidence on knowledge or intent.* There was insufficient evidence to show that some of the accused were aware of, or should have known about, the crimes. For instance, documentation from the Revolutionary Court in relation to the cases before it – including a verdict from June 14, 1984 and ratified on June 16 – shows that Saddam Hussein was aware that 148 individuals were ordered executed for events in Dujail. However, this in itself is not enough to constitute the requisite intent for crimes against humanity. What was required was evidence showing that the Revolutionary Court sentenced people to death without any trial, and that Saddam Hussein was aware of that. This is merely one of several such examples.

The difficulties in defining the case against the accused allowed issues to emerge which were not central to the case, but which occupied much time and attention in the courtroom. Examples include whether the Revolutionary Court had followed Iraqi law in its proceedings, or whether any juveniles had been executed. The result was that *no clear narrative* emerged from the proceedings.

Although there was much media attention on the documentary phase of the trial, the ICTJ's assessment is that the documents in this case did not succeed in providing a "roadmap" to the system crimes. ICTJ had an opportunity to examine the dossier and found that it did not seem to be compiled in a logical or strategic manner, and that it contained many pieces of evidence of doubtful probative value. In many cases, the chain of custody of documents could not be discerned.[38]

---

[37] A joint criminal enterprise would ordinarily require evidence that several persons having a *common purpose* embark on criminal activity that is then carried out either jointly or by some members of this plurality of persons (although joint criminal enterprise is not usually used in civil law systems, which tend to rely on various levels of co-perpetration).

[38] Rule 26 of the Rules of Procedure and Evidence provide that the investigative judge, public prosecutor or investigator must send a copy of any information or material evidence gathered before the trial – to the Tribunal's Information unit, which must "preserve this material" ( rule 26(1-2)). An ICTJ observer mission to the Tribunal, from February 27 to March 3, 2006, raised concerns that such a unit had, in fact, transparently ensured the origin and handling of the evidence in the Dujail trial.

Documentary evidence provided snippets of insight into the functioning of Saddam Hussein's regime over the years. However, with the exception of the role of the department of *mukhabarat*, the documents did not contain evidence on many facets of the prosecutor's case.

Some commentators have overemphasized the value of "admissions" made by the accused in the courtroom or to the investigative judge. These unsworn statements, an ordinary feature of the civil law trial, are not necessarily evidence and in this case are of doubtful evidentiary value. For instance, at one point during the trial Saddam said that "Everything I signed I am responsible for,"[39] but this will not constitute conclusive evidence if the documents do not decisively establish his guilt.

Finally, the evidence on the role of the lower-level Ba'ath party officials was scant. It did not seek to demonstrate how their individual actions may have been carried out in the knowledge that they were part of a widespread or systematic attack.

### C. Was the Trial Fair?

In terms of procedural fairness, the standards by which the Dujail trial should be evaluated were acknowledged by the Tribunal itself. The language of Article 19 of the statute incorporates almost exactly that of Article 14 of the International Covenant on Civil and Political Rights.[40] This article was read out at the outset of the trial.

In addition to concerns about the independence of the IHT and the presumption of innocence discussed in section A, the ICTJ has a number of other serious fairness concerns. Many of these were brought to the attention of the IHT in a letter to its president, dated May 13, 2006.

- *Specificity in charging.* The IHT's charging process followed that of Iraqi domestic criminal law; however, in the ICTJ's opinion, it was insufficiently specific in terms of what should be required for a case of crimes against humanity. The first charges contained in a "referral decision" by the investigative judge simply stated that the accused were charged with crimes against humanity. These charges were not detailed in the dossier, nor did the prosecutor provide much additional information in his opening statement. The charges were similarly weak in that they constituted only a brief factual account, with no differentiation between the accused individuals. This was attached to the charging document presented in May 2006 at the end of the case for the prosecution (an occasion on which charges of disappearances and other inhumane acts were added). This violates an accused's right to be informed promptly and in detail of the charges against him, making the case very difficult to defend. Crimes against humanity, being of a widespread nature, often rule out defenses that exist in domestic law (for example, that of alibi.) Most defenses by those accused in such trials deal with the fact that, although the crimes may have occurred, they themselves did not participate. By failing to specify the mode of participation, the prosecutor deprived the defendants of such possible avenues of defense and/or meant that they had to prepare for every possible alleged scenario.

- *Right to confront witnesses.* The ICTJ believes that the investigative stage -- and potentially the trial stage -- may have violated the right of the accused to examine, or to have examined, the witnesses against him. It is the ICTJ's understanding that neither the accused nor their

---

[39] BBC Monitoring Middle East, July 26, 2006.

[40] This article includes the accused's presumed innocence (19(2)), entitlement to a public hearing (19(3)), and such minimum guarantees of a fair impartial trial (19(4)) as: being promptly informed of the content, nature and cause of the charge against him (4a); having adequate time and facilities to prepare his defense and to communicate freely with counsel of his own choosing (4b); being tried in his own presence (4d).

defense counsel were present during the questioning of complainants in the investigative stage,[41] so that there was no confrontation of witnesses at that time. While about half of complainants (28) subsequently appeared in court, another 28 were deemed "unavailable" and their statements were read in court, but without offering them the opportunity of confronting the witnesses. Moreover, the identity of up to 23 of the complainants was disclosed only an hour in advance of their being called (the complainants were also not subsequently recalled), making it impossible for the defense to prepare adequately for cross-examination.

- *Lack of opportunity for lower-level defendants.* The inclusion in the case of both relatively minor and high-level defendants seriously hampered the quality of their defense, as the former were generally accorded less time and fewer resources than the latter. The unfairness is compounded by the severity of the sentencing.

- *Equality of arms.* The ICTJ also considers that the Dujail trial fundamentally breached the principle of equality of arms, whereby both the prosecution and defense are given the opportunity to present evidence under equal conditions. (A related right is the right to adequate time and facilities to prepare the defense case.) While inadequate institutional support has been a common problem in international and hybrid tribunals, IHT problems relating to equality of arms were more pronounced than elsewhere, and were also exacerbated by the security situation. Preserving this right in the face of public opinion to the contrary could have been one of the most significant contributions of the IHT process.

There is no indication that the investigative judge fulfilled his duties to find and disclose exculpatory evidence. On one occasion, a request by the court for assistance in locating the Revolutionary Court dossier on Dujail – claimed to be exculpatory – was explicitly turned down. The security situation made it difficult if not impossible for the defense to conduct its own investigations; nor were they able to go to Dujail.

Indeed, the court was consistently unresponsive to defense motions. Only rarely did it issue short oral rulings, and seldom gave reasons for decisions (thereby depriving the defendants of remedies). An absence of reasoning can also affect the defendant's ability to appeal.

Defendants were frequently represented by the defense office; however, this office lacked capacity for much of the trial. Until the trial's final stages, defense office lawyers were usually silent and passive in court.[42] It seems that the court did not always treat the defense as essential to the integrity of the proceedings: as an integral part of the trial, not a luxury. Instead, it appears that, on many occasions, the court simply substituted giving the accused an opportunity to speak with giving them a full opportunity to present a legally-based defense.

There were also other indications of a lack of even-handedness in procedural matters. For instance:

- the prosecutor was allowed to introduce into evidence a number of documents and other exhibits in court, without prior disclosure to the defense (amounting effectively to "trial by ambush")
- the chain of custody of documents was not always clear, and some sources with custody of the documents may not have been impartial, including certain victim organizations

---

[41] Other than in defendants' interviews with the investigative judge.
[42] The relationship between the defense office and private attorneys was fraught, and the latter did not always share documents with the defense office or inform them when filing motions.

        -   as far as the ICTJ can determine, the defense did not have access to their own statements
            to the investigative judge as part of the dossier.

The ICTJ raises these concerns in the full knowledge of the extreme security conditions in which the
tribunal operates, but considers that these are not necessarily to blame for many of the shortcomings,
including the fact that (1) the investigative judge did not seek or disclose exculpatory evidence; (2) the
charging process was not sufficiently specific; (3) witness statements were read into the trial record
without reservation; (4) the prosecutor did not properly disclose documents ahead of time.  The ICTJ
urges the IHT to urgently review its approach to the rights of the accused in current and future trials.
ICTJ's recommendations for the Dujail case and other recommendations for future action that follow
from this are detailed below

### D. Did the Trial Restore the Dignity of Victims?

The ICTJ believes that the trial has played a role in restoring the dignity of those victims who participated
as complainants, and who were represented by lawyers in the courtroom.  People from Dujail often sat in
the public gallery and seemed to take a measure of pride in the role of residents of Dujail in confronting,
and testifying against, Saddam Hussein and the other defendants.

Some of the testimony given in the trial was both compelling and historic. For example, several witnesses
testified to the torture they underwent while they were detained in the months and years following the
assassination attempt.  Female witnesses showed tremendous courage in testifying about their detention
and torture.[43] One recalled how she was stripped naked, hung by her arms, and shocked by electrical
wires attached to her fingers and toes.[44] Many victims withstood strong and often abusive questioning by
defense counsel – and verbal outbreaks by the defendants themselves – as they told of the arrest,
disappearance, or deaths of friends, brothers, fathers, uncles, sons, and nephews.  While the testimonies
were often horrific in content, the importance to the victims of recounting their experience in a courtroom
in front of the former Iraqi leadership cannot be overstated.

The broader impact of the narrative created by this testimony was, however, hampered by the IHT's lack
of outreach.  Ideally, the Tribunal should have educated the public about the importance of this testimony
and its process.  To date, however, its failure to disseminate general information about court procedures,
the laws being applied, and the role of the defense have seriously diminished its potential to show that
justice was being done.

The IHT's location inside Baghdad's International Zone severely hampered access to the trial.  For the
average Iraqi, the tribunal's security arrangements and location might as well have been located outside
Iraq.  While the television coverage was presumed to be a substitute, sessions were edited and aired
without any explanation, while for security reasons cameras could not depict the entire courtroom. Much
of the focus was on the exchanges between the presiding judge and the accused.

Press conferences were held by the spokesperson, but ICTJ observers have raised with the IHT the
appropriateness of using an investigative judge in this representative role.

---

[43] BBC Monitoring Middle East (transcription of Al-Sharqiya television broadcast), December 6, 2005 (Witness A
recalling how she was tortured with electricity, beaten with hoses and prodded to confess); IHT session, February 1,
2006 (testifying that she was detained, tortured, subjected to mock hanging and the mock execution of her parents).
The testimonies of women prompted indignant responses from Saddam Hussein, who repeatedly stated that no
woman could have been subject to abuse under his regime.
[44] IHT session, February 1, 2006.

**E. Did the Trial Consolidate the IHT's Institutional Capacity?**

The recent experience of criminal tribunals shows that fair, efficient trials require effective administration. Like the "registries" of the International Criminal Tribunal for the former Yugoslavia (ICTY), the International Criminal Tribunal for Rwanda (ICTR) and the Special Court for Sierra Leone, the administrative department of the IHT is formally charged with crucial responsibilities both inside and outside the courthouse. These include handling the court's documentation (both in maintaining the trial record and in handling motions); assisting the chambers, prosecutors, and defense office, forming a victims and witnesses unit, overseeing the detention of defendants, as well as communicating with the media.[45]

In practice, however, the administrative structure outlined in the Tribunal's framing laws has failed to function. A critical issue has been a lack of leadership. Administrative directors have been purged and replaced, and the director's duties have been divided among other IHT officials on an ad hoc basis.[46] IHT judges – particularly the late president of the IHT – saw little need to remedy the absence of an experienced senior administrator and well-trained staff. Serious problems have resulted. These have included:

- *Delays, interruptions, and confusion in court sessions.* The presiding judge did not always know how many privately retained defense counsel were entitled to be in court, who they were, whom they represented, and whether they had power of attorney. Counsel occasionally arrived in court to find there were not enough seats. Scheduling appeared erratic and subject to judicial whim. There was no master schedule available that both parties could consult – a major issue given the logistical complexities of attendance. These problems contributed to a perception of chaotic courtroom proceedings.

- *Damage to fairness of proceedings.* The late disclosure of documents, and the unclear origin and chain of custody of evidence, raised concerns that went beyond inefficiency. Defense counsel complained repeatedly the very limited disclosure of witness identities (an hour before proceedings) damaged their ability to confront witnesses, and that they had received copies of prosecution documents or sound recordings. Procedures relating to the submission and receipt of motions were poorly managed, and several defense motions were reportedly lost altogether. No written transcript was available during the trial phase, which affected final statements and also limited public understanding of events. Unless an unedited transcript is subsequently produced, defendants will not have a court transcript on which to base appeals.[47]

- *Inadequate communication with and protection of victims and witnesses.* The IHT was not proactive in providing information to victims, and in managing their expectations. Crucially, and despite the robust victim and witness protection program set out in Tribunal documents,[48] the victim and witness unit was initiated only well into the trial process, and was placed in the hands of the Dujail trial's chief investigative judge. From the ICTJ's research, it appears that the program merely offered transport assistance and some limited services at the IHT itself.

---

[45] See article 15 of the Rules of Procedure. The goal of the unit is to protect anyone at risk, "on account of the testimony they give" at the Tribunal, and includes safety measures, short and long term plans for protection, and medical treatment, counseling and rehabilitative support.

[46] Salem Chalabi, the original Director, was replaced in August 2004; his replacement was removed in August 2005; the post has been vacant since. The tasks of media outreach and establishing a victims and witness protection unit were assigned to the chief investigative judge.

[47] Compare article 53 of the Rules of Procedure, mandating the preservation of trial records.

[48] Rule 15, Rules of Procedure.

No witness relocation program had been institutionalized by March 2006, although ad hoc arrangements had developed.

• *Lack of budgetary clarity*. The Iraqi portion of the IHT's budget is managed directly by the IHT. Responses by IHT staff indicated that information on budgetary allocations was closely guarded. If no coherent, transparent process for allocating the Iraqi portion of Tribunal funds, exists, then the Tribunal's management and administration will be significantly compromised and its accountability processes undermined.

Finally, as far as long-term capacity building is concerned, the Tribunal's legacy to Iraq's legal profession will be non-existent unless the security and credibility of the IHT improve. If judges, lawyers and victims are not respected, or cannot stay safely in Iraq after participating in the IHT, its lasting contribution to Iraq's legal system will be minimal. Moreover, if the Tribunal's administrative problems are not addressed, they may well be exacerbated in the al-Anfal case, which involves far higher numbers of witnesses and a greater volume of evidence than Dujail.

## V.    CONCLUSIONS AND RECOMMENDATIONS

In the light of the observations above, it is the ICTJ's conclusion that, despite the tribunal's significant efforts the Dujail trial has fallen short of its desired goals – not just in terms of guaranteeing fair trial standards, but in a number of other areas as well. The concern of the ICTJ is that, if the mistakes made in the Dujail trial are not rectified, they will fundamentally undermine the contribution of the trial of Saddam Hussein and his associates to the transition in Iraq. Instead of arriving at a conclusive historical record, the proceedings are in danger of being questioned on their factual determination and fairness for years to come.

The fact that this trial did not perform better is particularly surprising in the light of the role played by the RCLO. The United States has significant experience in conducting trials for international crimes, and much of the "how to" in terms of investigating and prosecuting system crimes was developed by Americans at Nuremberg and subsequently used at the ICTY, ICTR, and the Special Court for Sierra Leone. Seen from this perspective, it may be puzzling that the case left so much to be desired. Individuals employed by the RCLO have seemed committed to the process and have often worked under difficult conditions. The reason for failings often given by RCLO officials is that their advice went unheeded. At the same time, the RCLO continued to play a significant, though often hidden, role in terms of supporting the trials (including legal, financial and logistical support).

In the ICTJ's view, many of these problems could have been avoided by inserting more varied external expertise into the process. The role of the RCLO had a chilling effect both on the Iraqi desire to seek other external advice, and on the willingness of other international experts to participate (as did the application of the death penalty).

As a matter of principle, the ICTJ would greatly prefer a process that includes greater external expertise, although it recognizes there may be some practical limitations. Nonetheless, the ICTJ urges the Tribunal to explore additional options for retaining external experts through means other than the RCLO: for instance, through an elaboration of the current arrangements for the independent judicial advisor. External experts have made largely positive contributions to issues of legal substance and fairness. External experts should be made available by governments beyond that of the United States, subject to constraints of the European Convention of Human Rights and other international human rights instruments in respect of cooperation with courts that apply the death penalty,

The IHT should not necessarily be judged on a single trial. But it should not allow even a single verdict to remain in place which is based on an unsatisfactory or sub-standard process. For these reasons, the ICTJ

15

urgently recommends that the Tribunal take steps to rectify the errors of the Dujail trial, and to make structural adjustments that will benefit future trials. This is in recognition of the fact that there is still a willingness and desire on behalf of the IHT to deliver justice to a standard that will be internationally recognized as sufficient.

## Recommendations – the Dujail Case

The ICTJ believes a robust appeals process is essential. The substantive and procedural shortcomings in the investigative and trial phase should be addressed. The Tribunal's cassation chamber should consider referring the Dujail case back to the trial chamber for retrial to ensure justice is realized. A retrial may be the most desirable remedy in this situation as it would allow the Chamber to seek to correct the procedural flaws as well as the evidentiary gaps-the trial's two major deficiencies.

Three defendants in the Dujail case face the death penalty. The ICTJ opposes the application of the death penalty, and its opposition is strengthened in the light of the flaws in this trial. The death penalty would render irreversible all mistakes made during this trial, and would negate the access to justice for victims of other crimes.

## Recommendations - Going Forward

### To Iraqi political leaders and parliamentarians:

- The political leadership of Iraq should immediately put an end to all forms of political interference with the IHT, be this in the form of statements intended to influence the proceedings, administrative pressure, or the removal of judges. The political leadership of Iraq has a strict duty to promote an environment that is conducive to the holding of fair trials by an independent judiciary.

- Amend the language of Article 4(4) of the IHT statute to conform to UN Basic Principles on the Independence of the Judiciary and remove the inappropriate power of the executive to order the transfer of judges "for any reason."

- Delete Article 33 of the IHT statute. Any allegations of bias, disciplinary or other complaints against sitting judges should be dealt with by existing internal tribunal procedures or disciplinary mechanisms.

### To the Higher National De-Ba'athification Commission:

- The Higher National De-Ba'athification Commission should cease issuing De-Ba'athification orders against existing Tribunal staff. Any allegations of bias, disciplinary or other complaints against sitting judges should be dealt with by existing internal tribunal procedures or disciplinary mechanisms.

### To the Iraqi High Tribunal:

The IHT should seek to address the flaws in the prosecution case in Dujail, and thereby avoid similar problems in the Anfal case. This includes concentrating on adequate charging, on the elements of the crimes, and linking high-level accused with the crimes described by the complainants. Consider increased use of expert evidence for essential background.

- Urgently retain more external experts, with skills similar to the international judicial and defense office advisers. International assistance could include former judges, lawyers, or administrators

16

from international or hybrid tribunals, and others with substantial experience in trials of crimes against humanity or war crimes.

- Provide as a matter of priority additional training on international law for the prosecution, judges, and defense (including both private lawyers and the defense office). This should include training on elements of the crimes and modes of participation.

- Review security arrangements for the defense and all other trial participants. Effective witness and victim protection programs should be institutionalized. Greater efforts should be made to address the specific concerns of defense counsel and defense office employees.

- Respect and enforce the rights of the accused more rigorously. If in doubt, judges should err on the side of caution in allowing defense requests. In particular, judges should:

    o Ensure that the charges in pending cases are more specific;
    o Refrain from admitting any evidence that is not properly confronted by the accused at the investigative or trial stages, or only admitted with an express recognition that it will not result in a conviction.
    o Make certain that adequate time and facilities are accorded to the defense, including:
        ▪ Dealing promptly with defense motions, giving a reasoned decision in each case;
        ▪ Assisting the accused and defense counsel with locating exculpatory evidence;
        ▪ Providing security and logistical support for defense investigations;
        ▪ Strengthening the defense office, and improving its relationship with private counsel;
        ▪ Ensuring the equality of arms more broadly, including in simple matters such as access to Tribunal offices and scheduling of session times;
        ▪ Improving disclosure practices that comply with the IHT's own rules, including that concerning the identity of protected witnesses;
        ▪ Improving facilities for the defense office.

- Consolidate judges' control of the courtroom by conducting consistent criminal proceedings regulated by the rules, and establishing appropriate disciplinary mechanisms.

- Appoint a senior administrator (national or international), and strengthen IHT administration.

- Develop a comprehensive outreach strategy as a matter of urgency.

**To other governments:**

- Make external experts available to the Iraqi High Tribunal, subject to the constraints of the European Convention of Human Rights and other international human rights instruments in respect of cooperation with courts that apply the death penalty.

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

Awad Hamed Al-Bandar

99999

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Ramsey Clark [#73833]
Counsel of Record
Lawrence W. Schilling
37 West 12th Street 2B
New York, New York 10011
(212) 989-6613
(212) 979-1583 (FAX)
see Attachment A for complete listing of attorneys for petitioner

## DEFENDANTS

George W. Bush, in his official capacity as President of the United States

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

CASE NUMBER   1:06CV02209

JUDGE: Rosemary M. Collyer

DECK TYPE: TRO/Preliminary Injunctio

DATE STAMP: 12/26/2006

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

◉ 2 U.S. Government Defendant

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZEN...
FOR PLAINTIF...

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

◉ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**     OR     ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ⊙ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ⊗ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

28 U.S.C. 2241

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐ | DEMAND $ [_____] | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** | YES ☐  NO ⊠ |

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ⊠   If yes, please complete related case form.

DATE  _12.26.06_   SIGNATURE OF ATTORNEY OF RECORD  _not signed_

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.     RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.